However, development of typical Resource Plays may involve greater extraction and retrieval costs than are involved in development of typical Conventional Plays. In the typical Resource Play, the existence of gas is known but the quantity of such gas, and commercial viability, is unknown. The process of developing a Resource Play requires significant costs before the commercial viability can be ascertained. Therefore, there is a greater risk of cost overrun and the risk of inadequate gas recoveries is not avoided.

It is important to recognize that Resource Plays offer attractive potential for large reserve additions. This is because the large conventional traps have largely been found and developed, and because Resource Plays inherently have much greater size and therefore greater reserve potential. All of the top five onshore "gas giant" fields discovered and developed in the 1990s (including Powder River Basin CBNG, Jonah, Pinedale, Madden Deep and Ferron CBNG) were in the Rocky Mountain Region. Four out of the five with estimated reserves of over 30 TCF were unconventional tight sands or CBNG Resource Plays.

*Strong Acquisition Market*

The recent sales of major Rocky Mountain independent oil and gas companies such as Westport Resources Corporation, Tom Brown, Inc., Evergreen Resources, Inc., Patina Oil & Gas Corporation and Prima Energy Corporation for total consideration of over ten billion dollars, in the opinion of Management, bear testimony to the strength of the acquisition market for companies that have established proven reserve growth from Unconventional Resource Plays. While only Evergreen was a pure resource-play oriented company, each of the others has had a major component of such plays as part of their portfolio which helped to increase their exit valuations due to the large amount of proven undeveloped category reserves associated with them. Although there are no assurances, Fellows anticipates that the success of any of its major Unconventional Resource Plays will quickly make it a favored acquisition target for large, public companies seeking to grow through strategic acquisitions, thus providing an attractive exit strategy for its stockholders.

*Large Strategic Land Position*

Fellows, through its direct ownership of mineral rights in the Powder River Basin, Overthrust Belt and Uinta Basin, has a strategic land position in the oil and gas producing basins of the Rocky Mountains. Known hydrocarbon resources in reservoirs in Resource Plays such as coal seams, thick oil-bearing shales, and extensive bodies of tight gas-bearing sands throughout the properties create the potential for a large inventory of drilling locations should initial exploration efforts prove successful. Although there are no assurances, this inventory could support future net reserve additions and production growth over the next several years.

*Strong Underlying Industry Fundamentals*

According to the National Petroleum Council Gas Report, the domestic natural gas fundamentals will continue to be attractive, for the foreseeable future. The U.S. faces a significant natural gas supply problem due to the maturing of its traditional producing basins, the increase in exploration and development costs, and demand increases coupled with production decline rates. The U.S. has several ways to combat this supply problem through measures including increased development and importation of Canadian and Alaskan gas and delivery of liquefied natural gas. However, the impact of these efforts is expected to only mitigate the supply decline or at best increase supply marginally.

*Proven Management Expertise*

CEO and President George S. Young and Vice President Steve Prince have experience in operating and growing an oil and gas public company. Mr. Young brings strong leadership and

4

business qualifications, an understanding from having been trained as both an attorney and engineer and 25 years of natural resource industry experience. Mr. Prince brings 13 years of oil and gas industry experience as a geologist and as a significant contributor to the development of major producing fields in areas of interest to the Company.

## Financing Strategy

Fellows intends to access debt and equity markets for private and public financings from time to time based on the needs of the Company on terms in the market then available to the Company. Initially, Management expects that the bulk of capital formation will be in the form of equity capital to support the initial phases of exploration and exploitation work required on its resource projects. See "Dilution." To the extent the plays mature into "Proven" status as determined by independent third-party engineers, the Company plans to utilize debt sources for a large percentage of its capital requirements so as to maximize the return on equity that these projects generate. This debt may be in the form of senior bank debt, junior or subordinated bank debt, and/or mezzanine debt. The Company cannot provide any assurance that it will be able to raise additional debt or equity to fund future operational and exploration needs or terms acceptable to the company.

Additionally, the Company may generate funds through (i) a joint venture, sale or farm out on an interest in one or more of its properties and/or (ii) divesting one or more of its properties that are determined not to fit with its strategic core holdings. On November 8, 2004, Fellows entered into a joint venture agreement with JMG Exploration, Inc. ("JMG"), an affiliate of JED Oil, Inc., and Enterra Energy Trust ("Enterra") in which the parties will receive a 50% interest in certain Fellows' properties in exchange for a $2,000,000 commitment for exploration and drilling on such properties. In addition, JMG loaned Fellows $1,500,000, 50% of which has been paid off and 50% of which is payable on April 30, 2005, with interest at 18%.

## Property Summary

In its short operating history in the oil and gas industry, Fellows has positioned itself to control and exploit potential reserves from a number of large oil and gas resource type projects covering approximately 350,000 gross and 190,000 net acres. See "Property Overview." These projects focus on CBNG, tight sands gas and oil from fractured shales. Such projects are characterized by their widespread occurrence, large reserve potential, low finding and development costs, high drilling success rates, and low geologic and operating risks. Such projects are also subject to certain risks and development of such projects requires substantial capital. See "Risk Factors."

## Summary Historical Financial Data

The following tables present selected financial and operating data for Fellows as of and for the periods indicated. The selected actual financial data as of and for the years ended December 31, 2003 and 2004 has been derived from our financial statements, which were audited by Hall and Company, independent auditors, and were prepared in accordance with the standards of the Public Company Accounting Oversight Board in the U.S. You should read the following tables together with the Management's Discussion and Analysis of Financial Condition and Results of Operations, financial statements and the related notes, and other information included in our Annual Report on Form 10-KSB for the Fiscal Year ended December 31, 2004.

|  | Year Ended December 31, | |
|---|---|---|
|  | 2003 | 2004 |
| **Consolidated Income Statement Data** | *(Audited)* | *(Audited)* |
| Revenue | $      — | $      — |
| Expense |  |  |
|   Exploration | — | 2,253,295 |
|   General and administrative | 111,632 | 1,371,280 |
| Total operating expense | 111,632 | 3,624,575 |
| Operating (loss) | (111,632) | (3,624,575) |
| Interest income (expense), net | (10,243) | (135,733) |
| Loss before income taxes | (121,875) | (3,760,308) |
| Income tax expense | 1,600 | — |
| Net loss | (123,475) | (3,760,308) |
| **Balance Sheet Data** |  |  |
| Cash and cash equivalents | 291,445 | 149,027 |
| Net property, plant and equipment | — | 3,705,211 |
| Total assets | 291,445 | 3,989,238 |
| Total liabilities | 400,781 | 3,340,790 |
| Shareholders' equity | (109,336) | 648,448 |

## Terms of the Offering

The following summarizes the basic terms and conditions on which Fellows is offering to sell the Units exclusively to accredited investors in a private placement. The rights, preferences and privileges of the Common Stock is more particularly defined in the Articles of Incorporation filed in the State of Nevada.

| | |
|---|---|
| **Securities Offered:** | A minimum of 948,718 Units and a maximum of 5,384,615 Units (the "Units") each consisting of three (3) shares of common stock, $0.001 par value per share, of the Company (the "Common Stock") and one-and one-half (1 1/2) Series A warrant to purchase the Company's Common Stock (each a "Warrant," collectively, the "Warrants" and together with the Units, and the Common Stock, the "Securities"). One (1) Warrant will be exercisable into one (1) share of Common Stock at $1.00 per share for a period of three (3) years from the date of purchase of such Unit. |
| **Offering Price:** | $1.95 per Unit |
| **Minimum Offering:** | $1,850,000 |
| **Maximum Offering:** | $10,500,000 |
| **Minimum Individual Subscription:** | $100,000 per purchaser (which may be waived at the discretion of the Company) |
| **Use of Proceeds:** | The net proceeds from the sale of the Units will be used to fund its ongoing exploration, drilling and for general corporate and working capital purposes. See "Use of Proceeds." |
| **Registration Rights:** | The Company will prepare and file with the Commission, a registration statement (on Form S-1 or SB-2, or other appropriate |

6

registration statement form) under the Securities Act (the "Registration Statement"), at the sole expense of the Company, so as to permit a resale of the shares purchased in this Offering, including those underlying the Warrants contained in the Units and shares of Common Stock issued, if any, in lieu of liquidated damages (as provided for below), under the Securities Act by the investors as selling stockholders (and not as underwriters).

The Company shall cause such Registration Statement to be filed within 30 calendar days from the first closing date with penalties for non-performance on filing of: 2%, if the filing is not completed and filed within 30 days of the first closing, and 2% each month thereafter in which the registration statement is unfiled. Any penalty due by the Company to the investors will be payable in cash or Common Stock at a per share price equivalent to 95% of the VWAP of Common Stock for any applicable consecutive 10 day period, at the Company's option. The Company will notify the investors and its transfer agent of the effectiveness of the Registration Statement within two trading days of the Commission declaring the Registration Statement effective.

The Company will maintain the Registration Statement effective under the Securities Act until the earlier of (i) the date that none of the Securities covered by such Registration Statement may be issued pursuant to the terms of such security, (ii) the date that all of the Securities have been sold pursuant to such Registration Statement, (iii) the date the investors receive an opinion of counsel to the Company, which counsel shall be reasonably acceptable to the investors, that the Securities may be sold under the provisions of Rule 144 without limitation as to volume, (iv) all Securities have been otherwise transferred to persons who may trade such shares without restriction under the Securities Act, and the Company has delivered a new certificate or other evidence of ownership for such securities not bearing a restrictive legend, or (v) three years from the effective date of the Registration Statement.

In the event that (i) the Registration Statement is not declared effective within 90 calendar days from the first closing date, or (ii) 120 days in the case of a review of the Registration Statement by the Commission, or (iii) such Registration Statement is not maintained as effective by the Company for the period set forth above (each a "Registration Default"), then the Company will pay in Company stock, for each Registration Default then in effect, as liquidated damages and not as a penalty, during any periods in which each Registration Default is occurring, 2% of the Offering completed as of the date of such Registration Default of the shares per month for each month thereafter of the Registration Default. Any penalty due by the Company to the investors will be payable in cash or Common Stock at a per share

|  |  |
|---|---|
|  | price equivalent to 95% of the VWAP of Common Stock for any applicable consecutive 10 day period, at the Company's option. Such payment of the liquidated damages shall not relieve the Company from its obligations to register the Securities and the additional shares payable as liquidated damages. |
| **Antidilution Provisions:** | Until two (2) years from the date the Registration Statement filed pursuant to the Registration Rights Agreement is declared effective, and except for the issuance of shares of Common Stock pursuant to any rights, warrants, convertible securities or options for Fellows' capital stock (i) as set forth in Section 9.1(a) of the Warrants issued to the investors by the Company, (ii) as in effect on the date hereof, including, without limitation, the Company's employee stock option plan, or (iii) pursuant to the Offering, if and when the Company issues or sells any Common Stock (including, rights, warrants, convertible securities or options for its capital stock) for a consideration per share less than the per share purchase price of such Common Stock in the Offering (with the entire amount of such purchase price being allocated entirely to the shares of Common Stock in such Unit and not to any warrants), then the Company shall issue, for each such occasion, additional shares of Common Stock to the investors so that the average per share purchase price of the shares of Common Stock issued to the investors (of only the Common Stock still owned by such investors) is equal to such other lower price per share. The delivery to the investors of the additional shares of Common Stock shall be not later than thirty (30) days following the closing date of the transaction giving rise to the requirement to issue additional shares of Common Stock. The investors shall be granted the same piggyback registration rights in relation to such additional shares of Common Stock that have been granted to the investors with respect to the Common Stock underlying the Warrants issued by the Company.

The Warrants will also contain limited anti-dilution rights. The Warrants are subject to adjustment only in the event of (i) any subdivision or combination of the Company's outstanding Common Stock or (ii) any distribution by the Company to holders of Common Stock of (x) a stock dividend, or (y) assets (other than cash dividends payable out of retained earnings) to holders of Common Stock.

For example, the Warrants will not be adjusted for issuances of Common Stock upon or in connection with the (i) exercise or conversion of any other Warrants or any other presently outstanding securities, (ii) the future issuance of stock, options, warrants to employees, directors, consultants directly or pursuant to a stock option plan or restricted stock plan approved by the Company's Board of Directors, (iii) the future issuance of stock, options, warrants or other securities or (iv) the future issuance of stock, options or warrants in connection with a merger, |

8

| | |
|---|---|
| | acquisition or strategic alliance. |
| **Transfer Agent and Registrar:** | Pacific Stock Transfer Company will serve as the Registrar and Transfer Agent for the holders of the Common Stock. |
| **Information Rights:** | Upon written request of a holder of Common Stock, the Company shall provide it with a copy of its annual report on Form 10-KSB and its quarterly report on Form 10-QSB. |
| **Investor Suitability:** | The Units shall only be sold to "accredited investors" as defined by Rule 501 of Regulation D under the Securities Act. |
| **Placement Fees and Expenses:** | The Company shall pay placement fees to Legend Merchant Group, Inc., equal to 10% of accepted subscriptions, payable upon closing of a minimum offering of $1,850,000, and Warrants, identical to the Warrants contained in the Units, equal to 15% of the Units sold in the Offering. We have also agreed to pay legend a non-accountable expense allowance equal to 3% of any subscriptions the Company accepts. |
| **Restriction on Transfer:** | The Securities are deemed to be "restricted securities" as defined in Rule 144 under the Securities Act and may not be sold, transferred or otherwise disposed of in the absence of an effective registration statement or an exemption from registration. See "Transfer Restrictions" and "Risk Factors." |
| **Certain Risk Factors:** | Investment in the Securities involves significant risks. See "Risk Factors" and "Subscription Process – Suitability Standards." |

## RISK FACTORS

*You should carefully consider the risks and uncertainties described below before deciding whether to invest in this Offering, which may not be the only ones we face. If any of these risks and uncertainties actually occur, our business, financial condition or results of operations could be materially and adversely affected, the value of your securities could decline, and you may lose all or part of your investment.*

### Certain Risks Related to the Business

*We have a limited operating history and have recorded losses to date.*

We have grown rapidly, and we have a limited operating history for our operations to which investors may look to evaluate our performance given we have been in the oil and gas exploration and development business only since November 2003. See "Summary Historical Financial Data." As a result, the historical information shows only losses. Our capital has been invested primarily in acquiring oil and gas properties and we have not yet generated revenues.

*Our ability to grow depends on our ability to satisfy our short-term obligations as well as obtain financing for our capital-intensive endeavors.*

The acquisition, exploration and production of natural gas from CBNG and tight sands plays as well as conventional oil and gas properties are capital-intensive businesses. We currently do not have the funds available to meet existing and expected expenditures related to

9

our existing projects or to repay outstanding indebtedness over the next 12 months. If we sell the minimum amount of Units in this Offering, we expect to realize gross proceeds of $1,850,000. Our current liabilities as of December 31, 2004 were approximately $2,000,000. Moreover, we have an obligation to pay Quaneco, L.L.C. $500,000 upon the initial closing of this Offering and $2,400,000 by May 15, 2005 in connection with an option agreement to acquire a 12.5% interest in the Kirby CBNG Project and the Castle Rock CBNG Project (See "Property Overview"). If we fail to make such payments, we will lose our interest in such projects. If we sell only the minimum amount of Units, we would not be able to make the required payment to Quaneco, we would not have enough funds to meet our current liabilities and we would need to seek additional short-term financing to meet our obligations.

Additionally, even if we realize the maximum gross proceeds from this offering of $10,500,000, we will be unable to satisfy all our expected expenditures related to our current projects, including acquisition of properties and development costs. As such, we will require significant additional capital in order to pursue our growth strategy. If we are unable to obtain additional equity capital from investors or cannot secure debt financing on terms acceptable to us or at all, we may be unable to pursue our development strategy for expanding reserves, our acquisition strategy, or to drill development wells, and would have to curtail our current and future projects.

*Our success depends on key members of our management, the loss of whom could disrupt our business operations.*

We depend on the continued employment and performance of our officers and key operational personnel among others George S. Young, Steven L. Prince and other members of Management. See "Management." If any of these officers or other key personnel resign or become unable to continue in their present roles and are not adequately replaced, our business operations could be materially adversely affected. We do not maintain any "key man" life insurance for any officers. See "Company Overview."

*We may not discover commercially productive reserves.*

Our future success depends on our ability to economically locate oil and gas production and reserves in commercial quantities. Our anticipated exploration and development activities are subject to reservoir and operational risks. Even when oil and gas is found in what is believed to be commercial quantities, reservoir risks, which may be heightened in new discoveries, may lead to increased costs and decreased production. These risks include the inability to sustain deliverability at commercially productive levels as a result of decreased reservoir pressures, large amounts of water, or other factors that might be encountered. See "Property Summary."

*Unconventional Resource Plays rely on technological advances that in the future may not be effective.*

The success of Unconventional Resource Plays is important to the success of our business. Development of typical Unconventional Resource Plays may involve greater extraction and retrieval costs than are involved in development of typical Conventional Plays. Often the quality of gas and commercial viability is unknown in a typical Unconventional Resource Play and thus the process of developing a Unconventional Resource Play requires significant costs before commercial viability can be ascertained and has a greater risk of cost overruns and inadequate gas recovery.

Further, technological innovation has become a key driver in unlocking the economic value of the Unconventional Resource Play. The company continues to explore advances in technologies such as drilling, well completion and geophysical technologies that have helped the viability of the Unconventional Resource Play. Future advances in technologies should continue

10

to make the Unconventional Resource Play a superior method to the Conventional Play. Such technological advances, however, are not predictable with certainty and there exists the risk that such technologies may not be effective. See "Company and Industry Highlights."

***Our wells may be unsuccessful.***

Our success depends on our ability to achieve production and revenue. Identifying the probability of successful wells is a very inexact science. For every well we invest in, there is a risk that the well may be unable to produce commercially salable amounts of gas. There is also a risk that the well will be dry. If a well is not commercially successful, we will incur a part of the drilling expense associated with investing in the well, with no offsetting production revenue. This may adversely affect your return on investment.

***If we are not successful in making acquisitions of producing properties, we may be unable to expand our business and be competitive in our industry.***

We anticipate that a significant portion of our growth will be the result of acquisition and exploitation of gas producing properties. We expect to continue to evaluate and pursue acquisition opportunities available on terms Management considers favorable. The successful acquisition of producing properties requires an assessment of recoverable reserves, future gas prices, operating costs, potential environmental and other liabilities and other factors beyond our control. This assessment is necessarily inexact and its accuracy is inherently uncertain. It will not reveal all existing or potential problems, nor will it permit us to become sufficiently familiar with the properties to assess fully their deficiencies and capabilities. Inspections may not be performed on every well, and structural and environmental problems are not always observable even when inspection is undertaken. There can be no assurance that our acquisitions will be successful, and any unsuccessful acquisition could be costly, damaging to our operations, and could have a material adverse effect on our business.

***Price fluctuations will affect our profitability.***

In the oil and gas industry, a producer's financial performance is heavily tied to the price at which it is able to sell oil and gas. Significant price fluctuations are common. Prices are heavily influenced by supply and demand levels, weather, and foreign policy. In some of our properties, we plan to acquire working interests in drilling projects that do not currently have any contracts that lock in the prices at which the gas produced will be sold. We cannot predict the price at which we will be able to sell our gas production. It is possible that prices will drop so low that production will become uneconomical. Ongoing production costs that will continue include equipment maintenance, compression, and pumping costs. If production becomes uneconomical, we may decide to discontinue production until gas prices improve.

***Production levels cannot be predicted.***

We cannot predict with certainty the level of production that will be available from any well, or the number of years, if any, that a well will continue in production.

***We do not yet have contracts to sell gas for our properties.***

There is no assurance that we will be able to secure contracts for the sale of gas on any or all of our properties, nor is there any assurance that if we are able to obtain contracts that any of them will be long-term contracts. We do not currently have gas being produced nor a gas buyer identified. If we are able to obtain contracts of the desired duration, there is still no assurance as to what gas prices the contracts will provide.

*We may lose money if we are unable to produce gas sufficient to meet our contractual obligations.*

In a typical gas delivery contract, we will be required to deliver specified volumes of gas, on specified dates, and at specified prices. If we are unable to provide the gas we have contracted to provide from our own production, we will be required to purchase gas in the futures market to meet our contractual obligation. The price at which we are forced to purchase this gas may be greater than the price we are paid for the gas under contract. There is no assurance that our commitments under our gas contracts will always match our production capabilities.

*Pipeline capacity may be inadequate.*

Because of the nature of natural gas development, there may be periods of time when pipeline capacity is inadequate to meet our transportation needs. It is often the case that as new development comes on-line, pipelines are close to or at capacity before new pipelines are built. During periods when pipeline capacity is inadequate, we may be forced to reduce production or incur additional expense as existing production is compressed to fit into existing pipelines.

*We may incur compression difficulties and expense.*

As production increases, more compression is generally required to compress the production into the pipeline. As more compression is required, production costs increase, primarily because more fuel is required in the compression process. Furthermore, because compression is a mechanical process, a breakdown may occur that will cause us to be unable to deliver gas until repairs are made.

*The actual values of our reserves (when proven), and reserves of properties in which we may acquire a working interest, as compared to estimated values may vary materially as a result of the uncertainties involved in estimating gas reserves, which can impact production.*

Estimates of potential gas reserves, by necessity, are projections based on engineering data, and there are uncertainties inherent in the interpretation of such data as well as the projection of fixture rates of production and the timing of development expenditures. Reserve engineering is a subjective process of estimating underground accumulations of oil and gas that are difficult to measure. The accuracy of any reserve estimate of potential reserves is a function of the quality of available data, engineering and geological interpretation and judgment. Estimates of economically recoverable gas reserves and of future net cash flows therefrom necessarily depend upon a number of variable factors and assumptions, such as historical production from the area compared with production from other producing areas, effects of regulations by governmental agencies, future gas prices, future operating costs, severance and excise taxes, development costs, workover and remedial costs, all of which may in fact vary considerably from actual results. For these reasons, estimates of the economically recoverable quantities of gas attributable to any particular group of properties, classifications of such reserves based on risk of recovery and estimates of the future net cash flows expected therefrom may vary substantially. Moreover, there can be no assurance that our reserves (when proven), or the reserves of properties in which we may seek to acquire a working interest, will ultimately be produced or that our, or such other properties', proved and probable undeveloped reserves will be developed within the periods anticipated. Any significant variance in the assumptions could materially affect the estimated quantity and value of our, or such properties', reserves. Actual production, revenues and expenditures with respect to such reserves will likely vary from estimates, and such variances may be material.

*We are subject to complex federal, state, local and other laws and regulations that could adversely affect the cost, manner or feasibility of doing business.*

Our exploration, development, production and marketing operations are regulated extensively at the federal, state and local levels. Environmental and other governmental laws and regulations have increased the costs to plan, design, drill, install, operate and abandon oil and natural gas wells. Under these laws and regulations, we could also be liable for personal injuries, property damage and other damages. Failure to comply with these laws and regulations may result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties. Moreover, public interest in environmental protection has increased in recent years, and environmental organizations have opposed, with some success, certain drilling projects.

Our coalbed methane exploration and production activities result in the discharge of large volumes of produced groundwater into adjacent lands and waterways. The ratio of methane gas to produced water varies over the life of the well. The environmental soundness of discharging produced groundwater pursuant to water discharge permits has come under increased scrutiny. Moratoriums on the issuance of additional water discharge permits, or more costly methods of handling these produced waters, may affect future well development. Compliance with more stringent laws or regulations, or more vigorous enforcement policies of the regulatory agencies, or difficulties in negotiating required surface use agreements with land owners, or receiving other governmental approvals, could delay our exploration and production activities and/or require us to make material expenditures for the installation and operation of systems and equipment for pollution control and/or remediation, all of which could have a material adverse effect on our financial condition or results of operations.

Part of the regulatory environment in which we operate includes, in some cases, federal requirements for obtaining environmental assessments, environmental impact studies and/or plans of development before commencing exploration and production activities. In addition, our activities are subject to the regulation by oil and natural gas-producing states and Native American tribes of conservation practices and protection of correlative rights. These regulations affect our operations and limit the quantity of oil and natural gas we may produce and sell. A major risk inherent in our drilling plans is the need to obtain drilling permits from state, local and Native American tribal authorities. Delays in obtaining regulatory approvals, drilling permits, the failure to obtain a drilling permit for a well or the receipt of a permit with unreasonable conditions or costs could have a material adverse effect on our ability to explore on or develop our properties. Additionally, the oil and natural gas regulatory environment could change in ways that might substantially increase the financial and managerial costs to comply with the requirements of these laws and regulations and, consequently, adversely affect our profitability. Furthermore, we may be put at a competitive disadvantage to larger companies in our industry that can spread these additional costs over a greater number of wells and larger operating staff.

*Compliance with environmental regulations may be costly and difficult and violations thereof may subject us to significant penalties and liabilities.*

Our operations are subject to complex and constantly changing federal, state and local environmental laws and regulations. The implementation of new, or the modification of existing, laws or regulations could have a material adverse affect on us. The discharge of gas or other pollutants into the air, soil or water may give rise to significant liabilities on our part and may require us to incur substantial costs of remediation. In addition, CBNG production in its initial stages involves the disposal of water, which is highly regulated and can result in delays in production or additional regulatory compliance costs. The emissions and noise levels of compression for low pressure gas gathering is highly regulated, which could result in delays,

13