## COMPANY OVERVIEW

Fellows is a development stage oil and gas company led by an experienced management team and focused on exploration and production of natural gas, especially from "Unconventional Resource" Plays such as tight sands and coal beds, and oil in the Rocky Mountain Region.

## Management

Fellows' executive officers, directors and other management with their ages and positions are set forth below:

| Name | Age | Position |
|---|---|---|
| George S. Young | 52 | Chairman, Chief Executive Officer and President |
| Steven L. Prince | 46 | Vice President and Director |

The following table sets forth information concerning the compensation paid by us to our officers in 2004.

### Summary Compensation Table

| Name and Principal Position | Annual Compensation<br>Salary | Long Term Compensation Awards<br>Securities Underlying Options |
|---|---|---|
| George S. Young<br>*President and Chief Executive Officer* | $96,000 | 200,000 |
| Steven L. Prince<br>*Vice President* | $96,000 | 150,000 |

The management group is responsible for project selection, project finance and administration and corporate operations. Field operations and activities are subcontracted to parties with whom Fellows has developed a working relationship based upon favorable service experience. The Fellows management team has a longstanding, diversified and experienced background in land, development, operations and administrative management of Exploration and Production properties. Summary backgrounds for key Fellows personnel are as follows:

*George S. Young*

Mr. Young is an experienced business executive in the mining and petroleum industries. He is an attorney and engineer by profession, and began his legal career in the law department of Exxon Company USA. Mr. Young also worked at Kennecott Copper Corporation as a metallurgical engineer involved in the construction and start-up of a new copper smelter. From 1998 to 2002, Mr. Young practiced natural resource law in Salt Lake City, Utah. Prior to that Mr. Young was the President of Oro Belle Resources Corporation in Golden, Colorado from 1996 to 1998. Previous positions also include General Counsel and Acting General Manager for the Intermountain Power Project, a $4.4 billion coal-fired power project; Domestic Minerals Division Counsel for Getty Oil Company; and General Counsel for Bond International Gold, Inc. Mr. Young currently serves as a director and president of Palladon Ventures Ltd., a British Columbia corporation which trades on the TSX Venture Exchange under the trading symbol PLL.V, and is

an exploration company with properties in Southern Argentina. Mr. Young is the sole owner, officer and director of Diamond Oil & Gas Corporation, a privately held Nevada corporation. He holds a B.Sc. in Metallurgical Engineering, which he earned in 1975 from the University of Utah and a J.D. degree, which he earned in 1979 from the University of Utah. Mr. Young is a member of the Society of Mining Engineers, and the state bars of Utah, Colorado and Texas. Mr. Young is not an officer or director of any other reporting company.

*Steven L. Prince*

Mr. Prince is a petroleum engineer with over 13 years of operating experience in conventional oil and gas drilling and in coal bed natural gas drilling and field development. From 2003 to the present, Mr. Price has been a Senior Petroleum Engineer for the Navajo Indian Nation. From 2001 to 2003, Mr. Price was an Operations Manager with CBNG Production Consultants. From 1997 to 2002, he served as Executive Director of the Castle Valley Gas Producers Council, a gas industry trade association. Previous positions also include Drilling Engineer with Shell Western Exploration & Production; Operations Manager and Engineering Manager with River Gas Corporation where he played a significant role in developing the Drunkard's Wash Field located in Central Utah, one of the most successful coal bed methane fields in the United States. Mr. Prince is a member of the Society of Petroleum Engineers and the Rocky Mountain Association of Geologists. Mr. Prince received his B.S. in Petroleum Engineering from Montana College of Mining, Science and Technology in 1987. Mr. Prince is not an officer or director of any other reporting company.

## Consultants

*Harry Terbest*

Mr. Terbest is a Certified Professional Geologist with 35 years of experience as a geologist. Mr. Terbest received his B.S. in Geology from Oregon State University. He was employed by Texaco from 1969 to 1978 where he supported exploration and exploitation activities in Alaska and California. From 1978 to 1997 he was a geologist at Amoco Production Company where he conducted exploration and exploitation activities in New Mexico, Utah, Wyoming, Colorado and Arizona. A principal focus during this time was providing geologic support for the development of the CBNG resources of the San Juan Basin, the largest and most economically successful CBNG play in the world. Subsequent to leaving Amoco, Mr. Terbest founded Black Gold Resources, a geologic consulting firm based in Parker, Colorado. From 1997 to the present he has provided services for acreage evaluation, stratigraphic and structural analysis, prospect generation, and field development of oil and gas and coalbed methane projects in various Rocky Mountain, West Coast, and Mid-Continent basins. The principal client during this time period has been J.M. Huber Corporation for whom Mr. Terbest directed exploration efforts in the Powder River Basin CBNG, where Huber has successfully developed over 300 successful producers. Mr. Terbest is a member of the American Association of Petroleum Geologists (AAPG), Rocky Mountain Association of Geologists (RMAG), New Mexico Geological Society, and Society of Economic Paleontologists and Mineralogists (SEPM). The terms of Mr. Terbest's consulting agreement consist of industry standard per diem rates plus expenses. The term of the consulting agreement is three years ending September 30, 2007.

*Art F. Jacob*

Mr. Jacob has more than twenty-five years of broad geological experience generating and evaluating oil, gas, uranium and coalbed methane exploration projects. Trained at Rutgers University, the University of Colorado and the Universite de Lausanne, Switzerland, his U.S. experience includes work in various Rocky Mountain basins, the Overthrust Belt, Range Province and Texas. Recently he has completed intensive coalbed methane exploration in the Powder River

Basin and is currently evaluating and marketing various exploration projects in the U. S. mid-continent, Rocky Mountain Region and elsewhere. The terms of Mr. Jacobs' consulting agreement consist of industry standard per diem rates plus expenses. The term of the consulting agreement is three years ending September 30, 2007.

*Dave T. Terry*

Mr. Terry is an experienced manager and land acquisition executive in the petroleum and coal industries. He served as Regional Landman for Getty Oil Company and as Land Manager for Barrick Gold Corporation before being appointed by the Governor of Utah as the Director of the Utah State School and Institutional Lands Administration. During his tenure there, Mr. Terry instituted several progressive changes in the systems of leasing and managing of vast acreages of state-owned coal, petroleum and mineral lands. Since 2003, he has been instrumental in locating and evaluating coalbed methane and conventional oil and gas projects for potential acquisition. The terms of Mr. Terry's consulting agreement consist of industry standard per diem rates plus expenses. The term of the consulting agreement is three years ending September 30, 2007.

*Thomasson Partner Associates, Inc.*

Fellows has entered into an agreement with Thomasson Partner Associates, Inc. ("TPA"). This agreement permits Fellows to get a "first look" at new projects that TPA is generating. TPA is a prospect-generating group that has a successful track record assembled successful exploration projects and sold them to industry players. The terms of TPA's consulting agreement consist of a payment to TPA by the company of $800,000 for overhead. In return, TPA is obligated to bring eight projects per year to the company that have the potential to produce at a minimum of 20 million barrels of oil or 200 Bcf of natural gas.

TPA was formed in January, 1991 by Dr. M. Ray Thomasson, formerly the Head of Strategic Studies for the Royal Dutch Shell Group, Chief Geologist of Shell Oil Company and past President of the globally recognized American Association of Petroleum Geologists (AAPG) and the American Geological Institute (AGI). Since its inception, TPA has sold 65 projects to industry partners. From those sales it is estimated that 4,598,580 acres have been leased, over 21,900 miles of 2-D seismic has been licensed, 360 square miles of 3-D seismic have been shot and 224 wells have been drilled, of which 152 were successful. TPA's record in finding new reserves results from the specialized business processes utilized by TPA. TPA is a collaborative partnership of over 30 professionals, each of whom has substantial experience in various arenas of geology, geophysics, petrophysics, engineering and land. TPA is a unique private exploration entity. Through focused project teams, TPA develops ground floor exploration and exploitation concepts that are then rigorously tested by its complement of professionals prior to bringing the project to industry partners.

## Employees

As of March 1, 2005, the Company had 4 full-time employees. The majority of development services have been provided to the Company by the officers and outside, third-party vendors.

## Facilities

The Company's offices are located at 370 Interlocken Boulevard, Suite 400, Broomfield, Colorado 80021. The telephone number is (303) 327-1525; facsimile number (303) 327-1526; website: www.fellowsenergy.com.

The current lease agreement for the Company's office facilities has an 18 month term, which expires in February 2006. Under the agreement, rents are to be paid at the rate of $1,300 per month.

## Capitalization

The following table sets forth our capitalization as of December 31, 2004, on an (i) actual basis and (ii) as adjusted basis giving effect to the purchase of the maximum number of shares being offered in this Offering.

|  | Actual | As Adjusted (1) |
|---|---|---|
| Cash and cash equivalents | $149,027 | $9,184,027 |
| Restricted cash | 135,000 | 135,000 |
| Note payable to associated entity (2) | 56,379 | 56,379 |
| Convertible note payable (matured Mar '05, being converted into 2,449,265 shares of Common Stock, has anti-dilution rights) | 350,000 | — |
| Convertible debenture (matures 06/04/2006, convertible @ $1.25, as additional consideration 400,000 warrants were issued exercisable @ $1.50, both the convertible debenture and the warrants have anti-dilution rights) | 1,000,000 | 1,000,000 |
| Stockholders' equity: | | |
| Warrants offered hereby exercisable for 8,250,000 shares of Common Stock @ $1.00 per share | — | — |
| Common Stock Issuance Obligation (400,000 shares of Common Stock) | 362,500 | 362,500 |
| Preferred stock, $0.001 par value; 25 million authorized; none issued and outstanding | — | — |
| Common stock, $0.001 par value; 100 million authorized shares; 41,743,150 issued and outstanding; pro forma as adjusted: 60,346,260 (3) | 41,743 | 60,346 |
| Additional paid in capital | 4,201,702 | 13,568,099 |
| Accumulated deficit | (3,957,497) | (3,957,497) |
| Total stockholders' equity | 648,448 | 10,033,448 |
| **Total capital** | $ 2,338,854 | $ 20,408,854 |

(1) As adjusted to reflect the sale of the $10,500,000 in Common Stock, net of estimated placement fees and expenses of approximately $1,465,000.

(2) The $56,379 note is a demand note and may be paid off at any time upon demand. The amount due under the note is not intended to be paid out of the Use of Proceeds.

(3) Includes approximately 5,737,727 restricted securities outstanding prior to this Offering that the Company expects to register on the Registration Statement.

## Dilution

If you invest in the Units, your interest will be diluted to the extent of the difference between the Offering Price of the Units and the pro forma as adjusted net tangible book value per share of Common Stock immediately after this offering. Pro forma net tangible book value per share represents the amount of our total tangible assets less total liabilities, divided by the number of shares of Common Stock outstanding at December 31, 2004.

Investors participating in this offering will incur immediate, substantial dilution. Our net tangible book value was $648,448, computed as total stockholders' equity less goodwill and other intangible assets, or $0.01553 per share of Common Stock outstanding at December 31, 2004. Assuming the sale by the Company of all the Units offered in this Offering at an initial offering price of $1.95 per Unit, and after deducting estimated placement fees and estimated offering expense, our pro forma as adjusted net tangible book value at December 31, 2004, would have been $9,683,448, or $0.16725 per share of Common Stock. This represents an immediate increase in pro forma net tangible book value of $0.15172 per share of Common Stock to our existing stockholders and an immediate dilution of $0.48275 per share to the new investors purchasing Units in this Offering. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Offering Price Per Unit | | $1.95000 |
| Shares per unit | | 3 |
| Offering price per share, with no allocation to the Warrants | | $0.65000 |
| Net tangible book value per share at December 31, 2004 | $0.01553 | |
| Increase in pro forma net tangible book value per share attributable to this Offering | $0.15172 ] | |
| Pro forma as adjusted net tangible book value per share after the Offering (1) | | $0.16725 |
| Dilution per share to new investors | | $0.48275 |

The discussion and table above are based on the number of shares of Common Stock outstanding at March 21, 2005.

## Principal Stockholders

The following table sets forth our principal stockholders as of December 31, 2004, on an actual basis.

| Common Stock | Shares Outstanding(1) | Percentage of Total |
|---|---:|---:|
| George S. Young (2) | 3,600,000 | 8.15% |
| Steven L. Prince (2) | 75,000 | 0.17% |
| Clifford Murray (2) | 62,500 | 0.14% |
| Other stockholders | 38,243,150 | 86.59% |
| Total common stock | 41,980,650 | 95.05% |
| Common Stock Issuance Obligation (3) | 400,000 | 0.91% |
| Convertible Note (4) | 350,000 | 0.79% |
| Convertible Debenture (5) | 800,000 | 1.81% |
| Warrants (6) | 400,000 | 0.91% |
| Employee Options (7) | 237,500 | 0.54% |
| Total fully diluted shares | 44,168,150 | 100.00% |

(1) *Assumes conversion or exercise of all convertible securities, options and warrants, but excludes securities (Common Stock and Warrants) to be issued in this Offering and any adjustment to the amount of outstanding convertible securities as a result of anti-dilution rights that may be triggered by this Offering.*
(2) *Assumes exercise of vested options (100,000 shares for Mr. Young, 75,000 shares for Mr. Prince and 62,500 for Mr. Murray) and includes shares beneficially held, if applicable.*
(3) *The Company is obligated to issue this stock in connection with agreements with consultants/advisors and related to property acquisition agreements.*
(4) *Conversion price is $1.00. Note holder has anti-dilution rights. As mentioned above, the holder has notified the Company in March 2005 that it intends to covert the note into 2,449,265 shares of our Common Stock.*
(5) *Conversion price is $1.25. Debenture holder has anti-dilution rights.*
(6) *Exercise price of $1.50 per share. Warrant holder has anti-dilution rights.*
(7) *Assumes exercise of unvested options.*

## Competition

Oil and gas exploration and acquisition of undeveloped properties is a highly competitive and speculative business. We compete with a number of other companies, including major oil companies and other independent operators which are more experienced and which have greater financial resources. Such companies may be able to pay more for prospective oil and gas properties. Additionally, such companies may be able to evaluate, bid for and purchase a greater number of properties and prospects than the Company's financial and human resources permit. We do not hold a significant competitive position in the oil and gas industry.

## Regulation

Our operations are or will be subject to various types of regulation at the federal, state and local levels. Such regulation includes requiring permits for the drilling of wells; maintaining bonding requirements in order to drill or operate wells; implementing spill prevention plans; submitting notification and receiving permits relating to the presence, use and release of certain materials incidental to oil and gas operations; and regulating the location of wells, the method of drilling and casing wells, the use, transportation, storage and disposal of fluids and materials used in connection with drilling and production activities, surface usage and the restoration of properties upon which wells have been drilled, the plugging and abandoning of wells and the transporting of production. Our operations are or will be also subject to various conservation matters, including the regulation of the size of drilling and spacing units or proration units, the number of wells which may be drilled in a unit, and the unitization or pooling of oil and gas properties. In this regard, some states allow the forced pooling or integration of tracts to facilitate exploration while other states rely on voluntary pooling of lands and leases, which may make it more difficult to develop oil and gas properties. In addition, state conservation laws establish maximum rates of production from oil and gas wells, generally limit the venting or flaring of gas, and impose certain requirements regarding the ratable purchase of production. The effect of these regulations is to limit the amounts of oil and gas we may be able to produce from our wells and to limit the number of wells or the locations at which we may be able to drill.

The Company's business is affected by numerous laws and regulations, including energy, environmental, conservation, tax and other laws and regulations relating to the oil and gas industry. The Company plans to develop internal procedures and policies to ensure that its operations are conducted in full and substantial environmental regulatory compliance.

Failure to comply with any laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of injunctive relief or both. Moreover, changes in any of these laws and regulations could have a material adverse effect on the Company's business. In view of the many uncertainties with respect to current and future laws and regulations, including their applicability to us, we cannot predict the overall effect of such laws and regulations on our future operations.

We believe that our operations comply in all material respects with applicable laws and regulations and that the existence and enforcement of such laws and regulations have no more restrictive an effect on our operations than on other similar companies in the energy industry. Fellows anticipates no material estimated capital expenditures to comply with federal and state environmental requirements.

## Environmental Matters

Operations on properties in which we have an interest are subject to extensive federal, state and local environmental laws that regulate the discharge or disposal of materials or substances into the environment and otherwise are intended to protect the environment. Numerous governmental agencies issue rules and regulations to implement and enforce such laws, which are often difficult and costly to comply with and which carry substantial administrative, civil and criminal penalties and in some cases injunctive relief for failure to comply.

Some laws, rules and regulations relating to the protection of the environment may, in certain circumstances, impose "strict liability" for environmental contamination. These laws render a person or company liable for environmental and natural resource damages, cleanup costs and, in the case of oil spills in certain states, consequential damages without regard to negligence or fault. Other laws, rules and regulations may require the rate of oil and gas production to be

31

below the economically optimal rate or may even prohibit exploration or production activities in environmentally sensitive areas. In addition, state laws often require some form of remedial action, such as closure of inactive pits and plugging of abandoned wells, to prevent pollution from former or suspended operations.

Legislation has been proposed in the past and continues to be evaluated in Congress from time to time that would reclassify certain oil and gas exploration and production wastes as "hazardous wastes." This reclassification would make these wastes subject to much more stringent storage, treatment, disposal and clean-up requirements, which could have a significant adverse impact on operating costs. Initiatives to further regulate the disposal of oil and gas wastes are also proposed in certain states from time to time and may include initiatives at the county, municipal and local government levels. These various initiatives could have a similar adverse impact on operating costs.

The regulatory burden of environmental laws and regulations increases our cost and risk of doing business and consequently affects our profitability. The federal Comprehensive Environmental Response, Compensation and Liability Act, or CERCLA, also known as the "Superfund" law, imposes liability, without regard to fault, on certain classes of persons with respect to the release of a "hazardous substance" into the environment. These persons include the current or prior owner or operator of the disposal site or sites where the release occurred and companies that transported, disposed or arranged for the transport or disposal of the hazardous substances found at the site. Persons who are or were responsible for releases of hazardous substances under CERCLA may be subject to joint and several liability for the costs of cleaning up the hazardous substances that have been released into the environment and for damages to natural resources, and it is not uncommon for the federal or state government to pursue such claims.

It is also not uncommon for neighboring landowners and other third parties to file claims for personal injury or property or natural resource damages allegedly caused by the hazardous substances released into the environment. Under CERCLA, certain oil and gas materials and products are, by definition, excluded from the term "hazardous substances." At least two federal courts have held that certain wastes associated with the production of crude oil may be classified as hazardous substances under CERCLA. Similarly, under the federal Resource, Conservation and Recovery Act, or RCRA, which governs the generation, treatment, storage and disposal of "solid wastes" and "hazardous wastes," certain oil and gas materials and wastes are exempt from the definition of "hazardous wastes." This exemption continues to be subject to judicial interpretation and increasingly stringent state interpretation. During the normal course of operations on properties in which we have an interest, exempt and non-exempt wastes, including hazardous wastes, that are subject to RCRA and comparable state statutes and implementing regulations are generated or have been generated in the past. The federal Environmental Protection Agency and various state agencies continue to promulgate regulations that limit the disposal and permitting options for certain hazardous and non-hazardous wastes.

We believe that the operator of the properties in which we have an interest is in substantial compliance with applicable laws, rules and regulations relating to the control of air emissions at all facilities on those properties. Although we maintain insurance against some, but not all, of the risks described above, including insuring the costs of clean-up operations, public liability and physical damage, there is no assurance that our insurance will be adequate to cover all such costs, that the insurance will continue to be available in the future or that the insurance will be available at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could have a material adverse effect on our financial condition and operations. Compliance with environmental requirements, including financial assurance requirements and the costs associated with the cleanup of any spill, could

have a material adverse effect on our capital expenditures, earnings or competitive position. We do believe, however, that our operators are in substantial compliance with current applicable environmental laws and regulations. Nevertheless, changes in environmental laws have the potential to adversely affect operations. At this time, we have no plans to make any material capital expenditures for environmental control facilities.

## Legal Proceedings

We were sued in the Sixth Judicial District Court, Garfield County, Utah on November 10, 2004, by Midway Perforating and Drilling in a complaint alleging nonpayment of charges connected with drilling the Johns Valley 10-33C2 well in Garfield, UT. The complaint seeks damages of $100,000 and costs of $10,000. We filed our Answer and Counterclaim on January 19, 2005. We believe we have a strong defense and counterclaim in that the plaintiff failed to follow our instructions to use appropriate equipment for controlling deviation of the wellbore, and that such failure caused significant deviation of the wellbore, causing the well to be unusable. The suit is in its early stages. Although we believe we have a strong defense and counterclaim, we cannot predict the final outcome of the suit.

# Property Overview

## Overthrust CBNG Project, Utah and Wyoming

The Overthrust CBNG Project is an unconventional resource play with 183,000 gross and 118,950 net acres targeting coal bed natural gas in southwestern Wyoming and northeastern Utah. This project also has the potential for conventional oil and gas.

In March 2004, Fellows entered into an option agreement with Quaneco, L.L.C., an Oklahoma limited liability company ("Quaneco"), to acquire a 65% working interest for $250,000 in the Overthrust CBNG Project. The Overthrust CBNG Project is located in Rich and Summit Counties of northeastern Utah, and Uinta County, Wyoming. Quaneco has approximately 183,000 acres under lease in the project area. Just east of the project area is over 6 TCF of gas production from the conventional "Overthrust" oil and gas play, so pipeline infrastructure and gas markets are well established in the area.

Under the terms of the option agreement with Quaneco, Fellows has paid to Quaneco an option payment of $100,000 and intends to issue 200,000 shares of Common Stock in early 2005. Fellows is then obliged to spend $1,500,000 on geologic work and drilling by July 31, 2005. Based upon the results of that work, Fellows can select any or all of the optioned acreage (183,000 gross and 118,950 net acres) and pay an option payment of $20 per net acre plus 200,000 shares of Common Stock by August 1, 2005. Thereafter, Fellows is required to spend an additional $1,500,000 on geologic work and drilling by April 30, 2006. Based upon the results of that work, Fellows can then exercise its option to purchase any or all of the optioned acreage by paying an additional $35 per acre by May 1, 2006.

Based upon regional geologic studies of historical oil and gas and coal mining activity, plus the results from seven exploratory wells previously drilled by Quaneco, the Overthrust CBNG play has multiple coal seams of Tertiary and Cretaceous age that may contain coal bed methane. Some of this coal is of similar age and depositional condition to other productive coal bed methane fields such as the Drunkard's Wash field in eastern Utah which has estimated reserves of 2 TCF.

In May 2004, Fellows completed the first round of its exploratory activity with the drilling of the Crane #6-7 Well on the northern portion of the Overthrust CBNG Project lease

33

block in northern Utah. The Well reached a depth of 4,280 feet. Fellows cored coals and carbonaceous shales over a combined interval of 556 feet. The core tests confirm the presence of coals with potentially commercial gas contents in the Frontier and Bear River formations.

In early 2005, Fellows plans the second round of exploration activities on the southern portion of the Overthrust CBNG Project. This activity will include detailed geologic studies of the Coalville and Henrys Fork areas, core drilling, and production testing. The Coalville and Henrys Fork area contains known thick coals in the Tertiary Adaville and Cretaceous Frontier formations. These coals crop out and are mined in and around the small town of Coalville, Utah. Wells in the Coalville area were reported to have penetrated net coal thickness of 100 feet from the Adaville Formation and 50 feet from the Frontier Formation. The State of Utah estimates the gas-in-place (CBNG Gas Resource) could range from 0.1 to 1.0 TCF from the Tertiary Adaville and Cretaceous Frontier formations.

## Kirby CBNG Project, Big Horn & Custer Counties, Montana

In March 2005, we entered into an option agreement with Quaneco to acquire a 12.5% working interest for $2,225,000 in the Kirby CBNG Project. This option agreement provides that $458,763 of the purchase price will be in the form of our Common Stock valued at $1.00 per share. The balance of the purchase price of $1,766,237 is in cash. Under the terms of this option agreement, 75% of the cash and 100% of the Common Stock was due as payment by April 10, 2005. Fellows has negotiated with Quaneco to provide $250,000 upon initial closing of this Offering and the remainder of the cash due April 10, 2005 by May 15, 2005. The remainder of the 25% of cash is due by July 1, 2005. Pursuant to this option agreement, the Company will participate in a 48 well drilling program during 2005 that will extend out from an existing 18 well pilot program of previously drilled wells. Fellows' share of the 48 well drilling program is projected at $562,500. Fellows will have ownership in the previously drilled wells, which are currently being dewatered. The other working interest owners in the Kirby CBNG Project include Quaneco (25%), Pinnacle Gas Resources (50%), and Galaxy Energy Corporation (OTCBB: GAXI) (12.5%).

The Powder River Basin coalfield of northeastern Wyoming and southeastern Montana is an unconventional gas play that offers an unusual combination of reasonable risk and large economic potential. The vast coal deposits of the Powder River Basin are one of the greatest accumulations of coal in the world. These coal deposits contain a large resource of biogenic coal bed natural gas associated with numerous thick, laterally continuous, relatively shallow (less than 3,000 feet deep) Tertiary coal beds.

The Kirby CBNG Project is an extension of the Powder River Basin CBNG play, which produces from the Tongue River Member of the Tertiary Fort Union Formation, on the western margin of the Basin north of Sheridan, Wyoming. This portion of the Basin has already seen considerable production from properties owned and managed by Huber Oil & Gas at Prairie Dog Field which is on the Wyoming side, and Fidelity Oil & Gas at CX Field which straddles the Montana/Wyoming border. The Kirby CBNG Project is located in T6S-T8S and R38E-R42E Big Horn and Custer Counties, Montana, and comprises 95,000 acres of fee, state and federal leasehold. The Kirby Block prospect area is about 10 miles north of Decker, Montana and 12 miles north of the Wyoming / Montana border. Fidelity's CX Field is about 6 miles south of the southern boundary of the Block.

Production at CX Field is from the Anderson, Dietz, Monarch, and Carney coals. Potentially productive coals on the Kirby block include the Wall, Brewster-Arnold, Sawyer and Flowers-Goodale coals, which are stratigraphically lower than the CX Field coals. The Wall coal is the thickest coal in the Kirby CBNG Project area with 50-60 feet of development throughout