the area. South and east of the prospect area the Wall coal splits and thins. Drilling depth to the Wall coal is about 500 feet over most of the prospect. The Wall coal is at outcrop along the Tongue River on the east margin of the prospect and along Rosebud Creek on the northwest portion of the prospect. The coal beds below the Wall coal range in thickness from about 2 feet to 20 feet. The Sawyer and Flowers-Goodale coals can each be 10-20 feet thick over portions of the Project area. Both of these coal zones have produced some gas from shallow water wells located east of the prospect area. Total combined coal thickness over the area is around 100 feet.

An 18 well pilot well program has been drilled on the Kirby acreage and is scheduled to go into production on March 1, 2005. This pilot program will test the productivity of the Wall and Flowers-Goodale coals. Gas content data from mud logs and cores taken over these zones indicates the prospective coals are fully saturated with gas, which should translate into a short period of dewatering before commercial gas production volumes are achieved. The engineering firm Sproule Associates, Inc. has been retained to do a resource evaluation of the Kirby CBNG Project. Ultimately, hundreds of wells could be drilled on the Kirby CBNG Project.

## Castle Rock CBNG Project, Powder River County, Montana

In March 2005, Fellows entered into an option agreement with Quaneco to acquire a 12.5% working interest in the Castle Rock CBNG Project for $2,625,000. This option agreement provides that $541,237 of the purchase price will be in the form of Fellows stock valued at $1.00 per share. The balance of the purchase price of $2,083,763 is in cash. Under the terms of this option agreement, 75% of the cash and 100% of the Common Stock was due as payment by April 10, 2005. Fellows has negotiated with Quaneco to provide $250,000 upon initial closing of this Offering and the remainder of the cash by due April 10, 2005 by May 15, 2005. The remainder of 25% of cash is due by July 1, 2005. Pursuant to this option agreement, Fellows will participate in a 48 well drilling program during 2005 that will extend out from 4 previously drilled core holes. Fellows' share of the 48 well drilling program is projected at $562,500. The other working interest owners in the Castle Rock CBNG Project include Quaneco (25%), Rocky Mountain Gas, Inc. (43.75%), Carrizo (6.25%) and Galaxy Energy Corporation (12.5%).

On February 25, 2005, Enterra Energy Trust ("Enterra") (Nasdaq: EENC), announced that it had entered into a letter of intent for the acquisition of Rocky Mountain Gas, Inc. ("RMG"). RMG holds natural gas assets in Montana and Wyoming. RMG has approximately 130,000 net acres of production rights to coalbed methane of which approximately half are located in the Castle Rock CBNG Project. RMG also owns approximately 17% of Pinnacle Gas Resources, Inc, a private coalbed methane exploration and production company involved in the Kirby CBNG Project.

The Castle Rock CBNG Project is an extension of the Powder River Basin CBNG play on the eastern margin of the Basin north of Gillette, Wyoming. This portion of the Basin is where most of the production has occurred in the Powder River Basin CBNG play, which extends up to, but not across, the Montana/Wyoming border. The Castle Rock CBNG Project is located in R45W and R47WR49W Powder River County, Montana, and comprises 140,000 acres of fee, state and federal leasehold. The Castle Rock Block is located along the Pumpkin Creek drainage, and about 20 miles west of Broadus, Montana. The eastern and northern boundaries of the Block are the outcrops of the Sawyer and Flowers Goodale Coals. The western boundary is the Custer National Forest. Primary coals of interest thin along the southern boundary of the Castle Rock Block.

Coals of primary interest at the Castle Rock Block are the Pawnee, Sawyer. and Flowers-Goodale coals. Other coals of interest in the area are the Cook, Lower Cook, Brewster-Arnold, Knobloch, Terret, and Stag coals. Total coal thickness over most of the acreage block is 80 feet or

greater. Average thickness in the Pawnee is about 22 feet, the Sawyer about 16 feet. and the Flowers Goodale about 26 feet. Gas shows from the Sawyer, Knobloch, and Flowers Goodale coals have been noted in several shallow water wells drilled in the area. Wells drilled by Quaneco had good mud log gas shows.

### Weston County Project, Wyoming

The Weston County play will focus initially on the development of a conventional oil field followed by exploration for conventional oil reservoirs in the Dakota and Minnelusa on 19,290 gross and net acres. The South Coyote Creek Field thus far has no identifiable reserves but Management hopes that it will provide short-term cash flow to cover Company overhead.

Fellows acquired an option to purchase a 100% working interest for 19,290 acres of oil and gas rights in Weston County, Wyoming for a total purchase price of $750,000. Fellows closed that purchase on June 15, 2004 and concluded a reevaluation of drilling production data and seismic surveys. This resulted in the delineation of 18 conventional oil and gas well locations on the property which are ready to drill that are potential extensions of an existing producing field called South Coyote Creek Field. South Coyote Creek Field was discovered and developed back in the 1960s and has produced approximately 3 million barrels of oil to date. It is estimated that the Field may ultimately have reserve potential of up to 5-10 million barrels according to TPA. Fellows has signed a joint venture agreement with JMG to drill its Weston County and Gordon Creek projects. Under the agreement, JMG will receive a 50% interest in exchange for incurring $2,000,000 in exploration and drilling expenditures on the two projects by November 7, 2005. Subsequent to this initial joint venture drilling commitment being fulfilled, Fellows plans to participate in eight 4,500 foot field extension wells at an estimated cost of $1,000,000.

The Weston County Play has two deeper horizons at drilling depths of 5,000 to 7,500 feet that add enormous oil and gas reserve potential to the acreage position that Fellows owns. The Cretaceous Dakota and Permo-Penn Minnelusa are both highly productive sandstone reservoirs when found in trapping positions and have accounted for hundreds of millions of barrels of production in the Powder River Basin. Some of the largest Dakota and Minnelusa fields are located within 10 miles of the Fellows acreage including the 75 million barrel Raven Creek and 25 million barrel Donkey Creek.

The Dakota and Minnelusa are also both amenable to seismic exploration and can be resolved clearly with 3-D seismic. Fellows has access to 200 miles of a regional 2-D seismic data base that covers the Weston County play area. On the basis of this seismic, a series of prospects in the Dakota and Minnelusa have been identified with the potential for up to 50 million barrels of oil reserves. One of these prospects is a Minnelusa field with only one producer drilled to date that appears to be on the edge of a much larger accumulation. Fellows will be working to develop a plan for the further delineation of these prospects with a plan to drill one or more exploratory tests in 2005.

### Carter Creek Project, Wyoming

The Carter Creek Project targets an unconventional resource play for oil on 14,196 gross and 9,959 net acres from fractured shales in the Niobrara and Mowry.

In January 2004, Fellows acquired a 100% working interest of 10,678 acres known as the Carter Creek Project in the southern Powder River Basin of Wyoming for $223,000. This project was generated by TPA.

36

The Carter Creek Project offers large-scale reserve potential from a section of over-pressured Lower Cretaceous zones including the Niobrara, Turner (Frontier), Mowry, Muddy, and the normally pressured Dakota formations. All these zones are currently productive in the region of the Carter Creek Project. Drilling depths to the Dakota range from 10,000 feet to 11,500 feet. The primary objectives in the Carter Creek Project are the Niobrara and Mowry formations which are both thick hydrocarbon-rich shale units. These shale units are referred to as "source beds" because under sufficient heat and pressure they are the source of petroleum that feeds the conventional oil and gas traps in a given basin. In this case, the source beds also act as oil reservoirs due to fracturing that has been induced along shear zones created by regional tectonic forces. Within these shear zones are fractures which provide both storage of oil and gas, as well as the permeability necessary for them to flow to a well bore. The shear zones also provide a pathway for thermal energy from deeper in the basin to flow into a local area and promote oil generation and maturation, thus improving the hydrocarbon recovery potential within the shear zone. Over pressuring is caused by hydrocarbon generation within the source beds which also contributes to the fracture system.

Within the general vicinity of the Carter Creek Project there are 21 Niobrara producers that have had a combined cumulative production of 629,777 BO and 1.2 Bcf. These wells were drilled as vertical producers without the benefit of modern exploration concepts, and drilling and completion technology. The best of these wells was the Dunlop well in Section 26, T44N-R71W, which produced 205,965 BO and 519,935 Mcf of gas through May of 2004 from a vertical well that was lightly acidized. This is a promising result that, if it can be repeated consistently, likely would provide a basis for a highly economic oil play.

A study by TPA of the Carter Creek Project area indicates that results similar to or better than the Dunlop well may be achieved through the use of high-resolution seismic to identify shear and fracture trends combined with horizontal drilling technology to maximize exposure to productive fracture zones within the Niobrara and Mowry. Management believes that the use of these exploration and drilling techniques could result in wells with average recoveries of 400,000 barrels of oil equivalent or "BOE" (i.e. including gas at a 6 MCF to 1 BO ratio). The size of the play could range from 10 to 100 wells with reserve potential of 4 to 40 million barrels.

Secondary objectives in the play below the Niobrara include the Turner and Muddy zones within the over-pressured Cretaceous envelope, as well as the normally pressured zones including the deeper Dakota formation. In addition, there are shallower secondary objectives including the Shannon, Teapot, Parkman and Teckla zones above the Niobrara. These reservoirs could provide significant reserve additions to the Niobrara and Mowry and will be evaluated in each initial well drilled.

The current plan for this project is to acquire additional seismic and leasehold, then drill one horizontal well into the Niobrara section at a location where the available seismic data suggests good fractured reservoir conditions exist. If successful, additional wells can be drilled in 2005-2006. To minimize formation damage, the well will be drilled under-balanced. Cost of the well is projected at $1,250,000. Reserve potential could be as much as 400,000 BOE. The risk of finding producible reserves in this project is considered low due to the widespread occurrence of hydrocarbons within the objective formations, the remaining question is whether the production levels achieved will provide economic returns on a consistent basis.

## Gordon Creek Project, Utah

The Gordon Creek Project targets an unconventional resource play on 5,242 gross and 3,184 net acres for gas from tight sands in the Ferron formation, plus coal bed natural gas from coals in the Emery formation.

In January 2004, Fellows acquired an option to purchase 5,242 acres known as the Gordon Creek Project. Fellows closed the purchase for $288,000 in July 2004. The Gordon Creek Project is located in Carbon County, eastern Utah.

The Gordon Creek Project targets natural gas reserves in two large resource plays: (i) the Cretaceous Ferron sandstone play and (ii) the Cretaceous Emery coal bed natural gas play. The Cretaceous Ferron sandstone play is established by the Clear Creek Field which has had cumulative production of 137 Bcf from 16 wells or an average of 8.6 Bcf per well to date. The Clear Creek Field is located 7 miles to the west of the Fellows acreage.

During 2001, 2002 and 2003, Klabzuba Oil & Gas drilled a series of six wells previously drilled into the 100 foot thick Ferron sandstone at Gordon Creek Field and completed them for production. Gordon Creek Field is located 3 miles south of Fellows' acreage. The six wells have produced 1.5 Bcf in their first year of production according to state records. These early indications of production confirm a potentially large play which may someday have reserves in excess of 2 TCF of gas.

As previously mentioned, Fellows has signed a joint venture agreement with JMG to drill its Weston County and Gordon Creek projects. Subsequent to initial drilling by JMG on Gordon Creek, Fellows plans to spend $450,000 to drill additional wells and acquire acreage in the Ferron sandstone trend.

In addition to the Ferron sandstone, the Gordon Creek project has potential in the Emery coal. While the Emery coal play is in an early stage it may have similar potential to the Drunkard's Wash field which produces from the Ferron coal. The Drunkard's Wash Field is located 6 miles to the southeast of Fellows' Gordon Creek land holdings. Fellows' project personnel were previously involved in drilling for River Gas Corporation in the Drunkard's Wash field. The Ferron coal bed play trend has estimated reserves of 2 TCF, and the play may eventually have twice that level of reserves as coals along trend are developed. The Emery coal trend is essentially parallel and to the west of the Ferron trend and represents a later episode of deposition when the Cretaceous sea level was higher.

## Bacaroo Project, Baca County, Colorado

The Bacaroo Project targets conventional oil and gas reserves from prolific reservoirs in the Pennsylvanian Topeka, Lansing-Kansas City and Morrow formations as well as the Mississippian Keyes formations. The Bacaroo Project has been developed by TPA and is located in Baca County, Colorado on the northwest flank of the greater Anadarko Basin. Nearby analog fields include the Morrow Stateline and Interstate fields with production of 25 to 50 MMBO; and the Keyes Dome, which has produced 1 TCF of gas from the Mississippian Keyes section. Currently, Fellows has six prospects undergoing lease acquisition. Three of these prospects have multiple objectives with seismically and subsurface defined structural or stratigraphic traps, and are adjacent to or on-trend with proven production. All of the selected drill sites are near to or offsetting excellent shows of oil and gas with drilling depths of objectives ranging from 1,200 to 5,000 feet. The estimated initial cost to acquire 34,720 acres and drill eight evaluation wells is $2.3 million.

## Summary of Fellows Projects, Acreage Holdings, and Wells

| Project | Objective | Play Type | Gross Acres | Net Acres |
|---|---|---|---|---|
| **Overthrust CBNG, Rich, Morgan & Summit Counties, Utah (1)** | | | | |
| | Adaville Coal | Coal Bed Natural Gas | 183,000 | 118,950 |
| | Frontier Coal | Coal Bed Natural Gas | | |
| | Bear River Coal | Coal Bed Natural Gas | | |
| **Kirby CBNG, Big Horn & Custer Counties, Montana (2)** | | | | |
| | Ft. Union Coals | Coal Bed Natural Gas | 95,000 | 11,875 |
| **Castle Rock CBNG, Powder River County, Montana (2)** | | | | |
| | Ft. Union Coals | Coal Bed Natural Gas | 140,000 | 17,500 |
| **Weston County Project, Wyoming** | | | | |
| | Turner | Conventional Oil | 19,290 | 19,290 |
| | Dakota | Conventional Oil | | |
| | Minnelusa | Conventional Oil | | |
| **Carter Creek, Converse County, Wyoming** | | | | |
| | Niobrara | Oil from Fractured Shale | 14,196 | 9,959 |
| | Mowry | Oil from Fractured Shale | | |
| | Turner, Muddy, Dakota | Conventional Oil | | |
| **Gordon Creek, Carbon County, Utah** | | | | |
| | Ferron Sandstone | Tight Sands Gas | 5,242 | 3,184 |
| | Emery Coal | Coal Bed Natural Gas | | |
| | | **Totals** | **456,728** | **180,758** |

(1) Subject to an earn-in contract with Quaneco, L.L.C. for a 65% working interest.
(2) Purchase contract to acquire 12.5% working interest yet to close.

# Description of Capital Stock

## Capital Stock

*Prices of Common Stock*

We participate in the OTC Bulletin Board, an electronic quotation medium for securities traded outside of the Nasdaq Stock Market, and prices for our Common Stock are published on the OTC Bulletin Board under the trading symbol "FLWE." This market is extremely limited and the prices quoted are not a reliable indication of the value of our Common Stock. Quotes reflect inter-dealer prices, without retail mark-up, mark-down or commission, and may not represent actual transactions.

| Period | High* | Low* |
|---|---|---|
| April 1, 2005 to April 14, 2005 | 0.94 | 0.82 |
| January 1, 2005 to March 31, 2005 | 1.18 | 0.76 |
| October 1, 2004 to December 31, 2004 | 1.00 | 0.72 |
| July 1, 2004 to September 30, 2004 | 1.07 | 0.75 |
| April 1, 2004 to June 30, 2004 | 1.26 | 0.89 |
| January 1, 2004 to March 31, 2004 | 2.16 | 1.16 |
| October 1, 2003 to December 31, 2003 | 1.78 | .043 |
| July 1, 2003 to September 30, 2003 | 0.15 | .043 |
| April 1, 2003 to June 30, 2003 | 0.15 | 0.15 |

\* High and low closing prices for Common Stock per share, as reported by NASDAQ and adjusted for stock splits.

Our authorized capital stock consists of 100,000,000 shares of Common Stock, $0.001 par value per share, and 25,000,000 shares of preferred stock, $0.001 par value.

The following descriptions provide a summary of our capital stock.

*Common Stock*

We are authorized to issue 100,000,000 shares of Common Stock. As of March 21, 2005, approximately 41,743,150 shares of Common Stock were issued and outstanding, and we had reserved an additional 3,950,000 shares of Common Stock for issuance under our various stock and compensation incentive plans, exercise of outstanding warrants and conversion of outstanding convertible notes and outstanding convertible debentures. The holders of the Common Stock have ordinary voting rights for the election of directors and for other corporate matters. Each share is entitled to one vote. Holders of Common Stock do not have cumulative voting rights. As a result, the holders of a majority of the shares voting for the election of directors can elect all the directors if they choose to do so. The holders of the Common Stock have no preemptive, conversion or redemptive rights, and are not entitled to the benefits of any sinking fund. The Common Stock is not assessable.

The holders of Common Stock are entitled to dividends thereon that may be declared from time to time by our board of directors out of funds legally available for dividends. We do not anticipate paying any dividends in the foreseeable future on the Common Stock.

On November 3, 2003, our Board of Directors approved a 7 for 1 stock split of the issued and outstanding Common Stock, effectuated through a dividend of six shares for each share of Common Stock outstanding as of the record date and payable on November 17, 2003 for stockholders of record on November 14, 2003. Prior to that, on June 17, 2002, we authorized a 2.09 to 1 split of our Common Stock by means of a dividend of 1.09 shares of Common Stock for each share of Common Stock for holders of record on June 21, 2002. In January 2004 we redeemed 52,610,000 shares of Common Stock.

*Preferred Stock*

We are authorized to issue 25,000,000 shares of preferred stock. No shares of preferred stock were outstanding at the date of this Memorandum. Our Board of Directors has the authority, without stockholder approval, to issue shares of preferred stock in one or more series, and to determine the number of shares, powers, designations, preferences, voting powers, dividend rights, liquidation preferences or conversion or exchange rights, redemption provisions, sinking fund provisions and other terms of any such series. The issuance of shares of preferred stock, or the issuance of rights to purchase such shares, could be used by an incumbent Board of Directors to discourage an unsolicited acquisition proposal. For instance, the issuance of a series of preferred stock might impede a business combination by including class voting rights that would enable the holders to block such a transaction. Alternatively, such an issuance might facilitate a business combination by including voting rights that would provide a required percentage vote of the stockholders. The issuance of preferred stock could adversely affect the voting power of the common stockholders. Although the Board of Directors is required to make any determination to issue preferred stock based on its judgment as to the best interests of the stockholders, the Board of Directors could act in a manner that would discourage an acquisition attempt or other transaction that some or a majority of the stockholders might believe to be in their best interests or in which stockholders might receive a premium for their stock over the then market price of such stock. The Board of Directors does not at present intend to seek stockholder approval prior to any issuance of currently authorized stock, unless otherwise required by law or the rules of any market on which our securities are traded.

*Warrants*

Each Warrant offered in this Memorandum is exercisable into one (1) share of Common Stock at $1.00 per share for a period of three (3) years from the date of the purchase of the corresponding Unit.

## Anti-Dilution Provisions

Until two (2) years from the date the Registration Statement filed pursuant to the Registration Rights Agreement is declared effective, and except for the issuance of shares of Common Stock pursuant to any rights, warrants, convertible securities or options for Fellows' capital stock (i) as set forth in the Warrants issued to the investors by the Company, (ii) as in effect on the date hereof, including, without limitation, the Company's employee stock option plan, or (iii) pursuant to the Offering, if and when the Company issues or sells any Common Stock (including, rights, warrants, convertible securities or options for its capital stock) for a consideration per share less than the per share purchase price of such Common Stock in the Offering (with the entire amount of such purchase price being allocated entirely to the shares of Common Stock in such Unit and not to any warrants), then the Company shall issue, for each such occasion, additional shares of Common Stock to the investors so that the average per share

purchase price of the shares of Common Stock issued to the investors (of only the Common Stock still owned by such investors) is equal to such other lower price per share. The delivery to the investors of the additional shares of Common Stock shall be not later than thirty (30) days following the closing date of the transaction giving rise to the requirement to issue additional shares of Common Stock. The investors shall be granted the same piggyback registration rights in relation to such additional shares of Common Stock that have been granted to the investors with respect to the Common Stock underlying the Warrants.

The Warrants will also contain limited anti-dilution rights. The Warrants are subject to adjustment only in the event of (i) any subdivision or combination of the Company's outstanding Common Stock or (ii) any distribution by the Company to holders of Common Stock of (x) a stock dividend, or (y) assets (other than cash dividends payable out of retained earnings) to holders of Common Stock.

For example, the Warrants will not be adjusted for issuances of Common Stock upon or in connection with the (i) exercise or conversion of any other Warrants or any other presently outstanding securities, (ii) the future issuance of stock, options, warrants to employees, directors, consultants directly or pursuant to a stock option plan or restricted stock plan approved by the Company's Board of Directors, (iii) the future issuance of stock, options, warrants or other securities or (iv) the future issuance of stock, options or warrants in connection with a merger, acquisition or strategic alliance.

## Registration Rights

In connection with this Offering, we will enter into a Registration Rights Agreement with purchasers of Units. Under the Registration Rights Agreement, the Common Stock and the Common Stock issuable upon exercise of the Warrants issued in the Offering and any other securities outstanding prior to this Offering having registration rights will constitute "Registrable Shares" entitled to the registration rights described below. The Company expects to register approximately 5,737,727 restricted securities outstanding prior to this Offering on the Registration Statement (as defined below). We will pay certain expenses incurred by the holders of Registrable Shares in exercising their registration rights. See "Terms of the Offering" for more detail.

Pursuant to the Registration Rights Agreement, the Company will prepare and file with the Commission, a registration statement (on Form S-1 or SB-2, or other appropriate registration statement form) under the Securities Act (the "Registration Statement"), at the sole expense of the Company, so as to permit a resale of the shares purchased in this Offering, including those underlying the Warrants contained in the Units and shares of Common Stock issued, if any, in lieu of liquidated damages (as provided for below), under the Securities Act by the investors as selling stockholders (and not as underwriters).

The Company shall cause such Registration Statement to be filed within 30 calendar days from the first closing date with penalties for non-performance on filing of: 2%, if the filing is not completed and filed within 30 days of the first closing, and 2% each month thereafter in which the registration statement is unfiled. Any penalty due by the Company to the investors will be payable in cash or Common Stock at a per share price equivalent to 95% of the VWAP of Common Stock for any applicable consecutive 10 day period, at the Company's option. The Company will notify the investors and its transfer agent of the effectiveness of the Registration Statement within two trading days of the Commission declaring the Registration Statement effective.

The Company will maintain the Registration Statement effective under the Securities Act until the earlier of (i) the date that none of the Securities covered by such Registration Statement may be issued pursuant to the terms of such security, (ii) the date that all of the Securities have been sold pursuant to such Registration Statement, (iii) the date the investors receive an opinion of counsel to the Company, which counsel shall be reasonably acceptable to the investors, that the Securities may be sold under the provisions of Rule 144 without limitation as to volume, (iv) all Securities have been otherwise transferred to persons who may trade such shares without restriction under the Securities Act, and the Company has delivered a new certificate or other evidence of ownership for such securities not bearing a restrictive legend, or (v) three years from the effective date of the Registration Statement. Piggyback registration rights apply if the Registration Statement is not effective during this period.

In the event that (i) the Registration Statement is not declared effective within 90 calendar days from the first closing date, or (ii) 120 days in the case of a review of the Registration Statement by the Commission, or (iii) such Registration Statement is not maintained as effective by the Company for the period set forth above (each a "Registration Default"), then the Company will pay in Company stock, for each Registration Default then in effect, as liquidated damages and not as a penalty, during any periods in which each Registration Default is occurring, 2% of the Offering completed as of the date of such Registration Default of the shares per month for each month thereafter of the Registration Default. Any penalty due by the Company to the investors will be payable in cash or Common Stock at a per share price equivalent to 95% of the VWAP of Common Stock for any applicable consecutive 10 day period, at the Company's option. Such payment of the liquidated damages shall not relieve the Company from its obligations to register the Securities and the additional shares payable as liquidated damages.

## Limitation of Liability and Indemnification

Provisions of Nevada law authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breach of directors' fiduciary duty of care. Our articles of incorporation, as amended, limits the liability of our directors to us or our stockholders to the fullest extent permitted by Nevada law. Our bylaws provide certain indemnification to our officers and directors, and we have entered into agreements with each of our directors providing for indemnification.

The Company has provided indemnification to Legend, the Placement Agent, its agents, employees, attorneys, officers, and directors, and any agents, employees, attorneys, officers, and directors of any broker/dealers solicited by Legend to participate in the Offering against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation and counsel fees) caused by: (i) any breach by the Company of the representations, warranties, agreements or covenants by the Company contained in or made pursuant to any Subscription Agreement; (ii) any untrue statement of a material fact contained in this Memorandum or in any amendment or supplement thereto; or (iii) any omission to state in this Memorandum any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading; provided, however, that the Company shall not be responsible for, nor will the Company indemnify or hold harmless Legend or its controlling persons against any losses, claims, damages, liabilities or expenses arising out of or resulting from the offer or sale of the Units to any person who was not given, delivered or sent a copy of this Memorandum as appropriate, the failure by Legend to offer and sell the Units in accordance with the provisions of and applicable rules, regulations and published administrative interpretations of the Securities Act, including Section 4(2) and Regulation D promulgated thereunder, and the securities or blue sky laws of any jurisdiction in which the Units are offered

or sold by or through Legend, or a misstatement or omission of material fact contained within information provided by Legend for inclusion in this Memorandum.

### Board of Directors

Our articles of incorporation and bylaws provide that our Board of Directors shall consist of no less than one and no more than 15 person(s) as determined by our Board of Directors of and shall be divided into three classes of directors serving for staggered three-year terms. Although our Board currently has only two directors, this classified board provision could, in the future, provide some protection for the Company from unwanted change of control contests.

### Stock Option Plan

On October 9, 2003, we adopted an incentive stock option plan, pursuant to which shares of our Common Stock are reserved for issuance to satisfy the exercise of options. The purpose of the incentive stock option plan is to retain qualified and competent officers, employees and Directors. As noted in the table below, the incentive stock option plan for our executive officers authorizes up to 2,000,000 shares of authorized Common Stock, $0.001 par value per share, to be purchased pursuant to the exercise of options. The effective date of the stock option plan was October 9, 2003, and the stock option plan was approved by stockholders on November 10, 2003. As of December 31, 2004, 475,000 options have been granted pursuant to the incentive stock option plan. These options vested 50% on the grant date and vest 50% on September 15, 2005.

| Recipient | Exercise Price Per Share | Shares Underlying Options Granted |
|---|---|---|
| George S. Young | $ 0.80 | 200,000 |
| Steve Prince | $ 0.80 | 150,000 |
| Cliff Murray | $ 0.80 | 125,000 |

Our Board of Directors, or a committee thereof, administers the stock option plan and is authorized, in its discretion, to grant options thereunder to all of our eligible employees, including officers, and to our Directors, whether or not those Directors are also our employees. Options will be granted pursuant to the provisions of the incentive stock option plan on such terms, subject to such conditions and at such exercise prices as shall be determined by our Board of Directors. Options granted pursuant to the stock option plan will not be exercisable after the expiration of ten years from the date of grant.

## TAX CONSIDERATIONS

Fellows is not providing any tax advice as to the acquisition, holding or disposition of the Securities offered herein. In making an investment decision, investors must consult their own tax advisor to determine the federal, state, local and any applicable foreign tax consequences for their investment in the Securities.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

On January 5, 2004, the Company acquired certain interests in certain oil and gas leases owned by Diamond Oil & Gas Corporation, a Nevada corporation ("Diamond"). Diamond is wholly owned by George S. Young, CEO, President and a Director of the Company. At the time