of the acquisition, neither Diamond nor George Young was affiliated with the Company. The acquisition was negotiated on an arms-length basis.

In connection with the transaction with Diamond, the Company (i) issued 3,500,000 shares of the Company's Common Stock to Diamond; (ii) completed a private placement of $2,750,000, pursuant to which the Company issued 2,750,000 shares of its Common Stock at $1.00 per share; (iii) appointed George S. Young as the President, Chief Executive Officer and a Director of the Company and Steven L. Prince as the Vice President and a Director of the Company; and (iv) accepted the resignation of its management and redeemed 52,610,000 shares of Common Stock owned by the outgoing and former management in exchange for an aggregate sum of $27,000.

## EXPERTS

The consolidated financial statements incorporated by reference in this Memorandum from our Annual Report on Form 10-KSB for the year ended December 31, 2004 have been audited by Hall and Company, independent auditors, as stated in their report, which is incorporated in this Memorandum by reference, and have been so incorporated in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

# GLOSSARY OF TERMS

The following are abbreviations and definitions of certain terms commonly used in the oil and gas industry and this Memorandum:

**Bbl.** One stock tank barrel, or 42 U.S. gallons liquid volume, used in reference to oil or other liquid hydrocarbons.

**Def.** One billion cubic feet of natural gas at standard atmospheric conditions.

**Bcfe.** One billion cubic feet equivalent of natural gas, calculated by converting oil to equivalent Mcf at a ratio of 6 Mcf to 1 Bbl of oil.

**BO.** Barrels of Oil

**BWPD.** Barrels of water per day.

**Completion.** The installation of permanent equipment for the production of oil or natural gas.

**Developed Acreage.** The number of acres which are allocated or assignable to producing wells or wells capable of production.

**Exploitation.** The continuing development of a known producing formation in a previously discovered field. To make complete or maximize the ultimate recovery of oil or natural gas from the field by work including development wells, secondary recovery equipment or other suitable processes and technology.

**Exploration.** The search for natural accumulations of oil and natural gas by any geological, geophysical or other suitable means.

**Farmout or Farmin.** An agreement where the owner of a working interest in an oil and gas lease assigns the working interest or a portion thereof to another party who desires to drill on the leased acreage. Generally, the assignee is required to drill one or more wells in order to earn its interest in the acreage. The assignor usually retains a royalty or reversionary interest in the lease. The interest received by an assignee is a farmin while the interest transferred by the assignor is a farmout.

**Fracturing.** The technique of improving a well's production or injection rates by pumping a mixture of fluids into the formation and rupturing the rock, creating an artificial channel. As part of this technique, sand or other material may also be injected into the formation to keep the channel open, so that fluids or gases may more easily flow through the formation.

**Gross Acres.** The total acres in which we have a working interest.

**Gross Wells.** The total number of producing wells in which we own any amount of working interest.

**Horizontal Drilling.** A drilling operation in which a portion of the well is drilled horizontally within a productive or potentially productive formation. This operation usually yields a well which has the ability to produce higher volumes than a vertical well drilled in the same formation.

46

**Injection Well or Injector.** A well which is used to place liquids or gases into the producing zone during secondary/tertiary recovery operations to assist in maintaining reservoir pressure and enhancing recoveries from the field.

**Intangible Drilling Costs.** Expenditures made for wages, fuel, repairs, hauling and supplies necessary for the drilling or recompletion of an oil or gas well and the preparation of such well for the production of oil or gas, but without any salvage value, which expenditures are generally accepted in the oil and gas industry as being currently deductible for federal income tax purposes. Examples of such costs include:

- ground clearing, drainage construction, location work, road making, temporary roads and ponds, surveying and geological works;

- drilling, completion, logging, cementing, acidizing, perforating and fracturing of wells;

- hauling mud and water, perforating, swabbing, supervision and overhead;

- renting horizontal tools, milling tools and bits; and

- construction of derricks, pipelines and other physical structures necessary for the drilling or preparation of the wells.

**Lease.** An instrument which grants to another (the lessee) the exclusive right to enter to explore for, drill for, produce, store and remove oil and natural gas on the mineral interest, in consideration for which the lessor is entitled to certain rents and royalties payable under the terms of the lease. Typically, the duration of the lessee's authorization is for a stated term of years and "for so long thereafter" as minerals are producing.

**Mbbl.** One thousand barrels of oil or other liquid hydrocarbons.

**Mcf.** One thousand cubic feet of natural gas at standard atmospheric conditions.

**Mcfe.** One thousand cubic feet equivalent of natural gas, calculated by converting oil to equivalent Mcf at a ratio of 6 Mcf to 1 Bbl of oil.

**Mmbbl.** One million barrels of oil or other liquid hydrocarbons.

**Mmcf.** One million cubic feet of natural gas at standard atmospheric conditions.

**Mmcfe.** One million cubic feet equivalent of natural gas, calculated by converting oil to equivalent Mcf at a ratio of 6 Mcf to 1 Bbl of oil.

**Net Acres.** Gross acres multiplied by the percentage working interest owned by Fellows.

**PV-10 Value.** The present value of estimated future revenues to be generated from the production of proved reserves calculated in accordance with guidelines of the Securities and Exchange Commission, net of estimated lease operating expense, production taxes and future development costs, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service and depreciation, depletion and amortization or Federal income taxes and discounted using an annual discount rate of 10%.

47

**Net Wells.** The sum of all the complete and partial well ownership interests (i.e., if we own 25% percent of the working interest in eight producing wells, the subtotal of this interest to the total net producing well count would be two net producing wells).

**Net Production.** Production that is owned by Fellows less royalties and production due others.

**NYMEX.** New York Mercantile Exchange.

**Operator.** The individual or company responsible for the exploration, exploitation and production of an oil or natural gas well or lease.

**Permeability.** The capacity of a geologic formation to allow water, natural gas or oil to pass through it.

**Porosity.** The ratio of the volume of all the pore spaces in a geologic formation to the volume of the whole formation.

**Potential Reserves.** The best future reserve potential of a property in the Company's estimate based on information currently available to the Company. Before any reserves are established for a property, substantial additional work will have to be performed, including drilling and production data and analysis, none of which has been completed. Any estimate of reserve potential is inherently uncertain and unreliable, and is intended only to provide an estimate of the upside available from a particular property.

**Royalty.** An interest in an oil and natural gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage, or of the proceeds of the sale thereof, but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

**Secondary Recovery.** An artificial method or process used to restore or increase production from a reservoir after the primary production by the natural producing mechanism and reservoir pressure has experienced partial depletion. Gas injection and waterflooding are examples of this technique.

**Standardized Measure of Discounted Future Net Cash Flows.** The present value of future discounted net cash flows attributed to proved oil and gas properties made by applying year-end prices of oil and gas (with consideration of price changes only to the extent provided by contractual arrangements) to the estimated future production of proved oil and gas reserves, less estimated future expenditures (based on year-end costs) to be incurred in developing and producing the proved reserves, less estimated future income tax expenses (based on year-end statutory tax rates, with consideration of future tax rates already legislated) to be incurred on pretax net cash flows less tax basis of the properties and available credits, and assuming continuation of existing economic conditions. The estimated future net cash flows are then discounted using a rate of 10% per year to reflect the estimated timing of the future cash flows.

48

**Tangible Drilling Costs.**   Expenditures necessary to develop oil or gas wells, including acquisition, transportation and storage costs, which typically are capitalized and depreciated for federal income tax purposes. Examples of such expenditures include:

- well casings;
- wellhead equipment;
- water disposal facilities;
- metering equipment;
- pumps;
- gathering lines; and
- storage tanks.

**3-D Seismic.**   The method by which a three dimensional image of the earth's subsurface is created through the interpretation of reflection seismic data collected over a surface grid. 3-D seismic surveys allow for a more detailed understanding of the subsurface than do conventional surveys and contribute significantly to field appraisal, exploitation and production.

**Waterflood.**   A secondary recovery operation in which water is injected into the producing formation in order to maintain reservoir pressure and force oil toward and into the producing wells.

**Working Interest.**   An interest in an oil and natural gas lease that gives the owner of the interest the right to drill for and produce oil and natural gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations.

# APPENDIX

Exhibit A – Subscription Documents – Attached hereto.

**Exhibit A**

**SUBSCRIPTION AGREEMENT**
**FOR**
**FELLOWS ENERGY LTD.**

Fellows    Energy    Ltd.,    a    Nevada    corporation    (the    "Company"),    and
_____ ("Investor"), in consideration of the mutual promises contained in
this Subscription Agreement (this "Agreement") and the performance and payment described in
this Agreement, the sufficiency of which is hereby acknowledged, mutually agree as follows:

     1.    <u>Subscription</u>. Investor hereby subscribes for and offers to purchase _____ units
of the Company at $1.95 per unit (each a "Unit" and collectively "Units"), in exchange for the
consideration set forth on the signature page below. Each Unit consists of three (3) shares of
common stock, $0.001 par value per share, of the Company (the "Common Stock") and one and
one-half (1 1/2) Series A warrants to purchase the Company's common stock (each a "Warrant,"
collectively the "Warrants" and together with the Units and the Common Stock, the
"Securities"). One (1) whole Warrant will be exercisable into one (1) share of Common Stock at
$1.00 per share for a period of three (3) years from the date of this Agreement.

     2.    <u>Representations and Warranties</u>. Investor hereby represents and warrants as
follows:

     (a)    Investor is experienced in evaluating and investing in oil and gas companies such
as the Company. Investor has substantial knowledge regarding, and experience
in, financial and business matters, including knowledge and experience in
investing in and evaluating private placement transactions of securities in
companies similar to the Company. Investor is capable of evaluating the risks and
merits of its investment in the Company and has the capacity to protect his, her or
its own interests. Investor has been furnished all information necessary to enable
it to evaluate the merits and risks of an investment in the Company.

     (b)    Investor is acquiring the Securities for investment for his, her or its own account
and not with a view to, or for resale in connection with, any distribution thereof,
except in compliance with applicable securities laws, and Investor has no present
intention of selling or distributing the Securities, and will not sell or distribute
such Securities, except in compliance with applicable securities laws. Investor
understands that as of the date of this Agreement the Securities have not been
registered under the Securities Act of 1933, as amended (the "Act"). Investor
understands that Investor has neither the right to require the Company or any
underwriter to register the Securities under the Act or state securities laws at any
time nor the right to join in any future registration of shares of capital stock by the
Company except as provided for in the Confidential Private Placement
Memorandum dated April 15, 2005 (the "PPM") provided to Investor by the
Company in connection with this Agreement.

     (c)    Investor acknowledges that, because the Securities have not been registered under
the Act, the Securities that Investor receives at the closing of its investment must

be held indefinitely unless subsequently registered under the Act or an exemption from such registration is available. Investor is aware of the provisions of Rule 144 promulgated under the Act that permits limited resale of securities purchased in a private placement subject to the satisfaction of certain conditions, including, among other things, the resale occurring not less than one year after a party has purchased and paid for the security to be sold. Investor understands that at the present time Rule 144 is not applicable with respect to the Securities and may not be applicable in the future.

(d)     Investor has read, understood, and is familiar with the PPM provided to Investor by the Company in connection with this Agreement and has had an opportunity to discuss in detail the Company's business, management and financial affairs with, and to ask questions of, the Company's managers and employees with regard to the Company, its businesses and other information relevant to Investor, and has reviewed all documents and records of the Company which the Company has provided in response to Investor's request and has had an opportunity to request and review all documents necessary to fully evaluate the investment decision.

(e)     Investor is financially able to bear the economic risk of investment in the Securities, including a total loss of investment. Investor has adequate means of providing for its current needs and has no need for liquidity in its investment in the Securities and has no reason to anticipate any material change in its financial condition in the foreseeable future. Investor understands that the acquisition of the Securities is an investment involving a risk of loss and there is no guarantee that Investor will realize any gain from such investment, and that he, she or it could lose the total amount of such investment. Investor understands that neither the Securities and Exchange Commission nor any other U.S. federal or state agency has reviewed the proposed offering of Securities or made any finding or determination of fairness of the offering of Securities or any recommendation or endorsement of such investment.

(f)     No representations or warranties have been made to Investor by the Company or any of its agents, managers, employees or affiliates, and in entering into the present transaction Investor is not relying on any information, other than from the results of independent investigation by Investor and the PPM.    Investor understands that the Securities are being offered to him, her or it in reliance on specific exemptions from the registration requirements of U.S. federal and state securities laws and that the Company is relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgements and understandings of Investor set forth herein in order to determine the applicability of such exemptions and the suitability of Investor to acquire the Securities.

(g)     Investor has not been organized for the specific purpose of acquiring Securities.

(h)     Investor has its principal residence in the state or jurisdiction set forth on the signature page to this Agreement, and the address and social security number or

federal tax identification number, if any, set forth below is the true and correct address and social security number or federal tax identification number of Investor. Investor has no present intention of becoming a resident of another state or jurisdiction.

(i)    The information set forth in this Subscription Agreement is true, complete and correct, and Investor is aware that the Company and its counsel will rely on the information, representations and warranties set forth in this Agreement in accepting or rejecting Investor's offer to purchase the Securities. Investor has accurately and fully completed the Accredited Investor Certification attached as Exhibit A to this Agreement, which is incorporated in this Agreement by this reference. Investor represents that the information contained in Exhibit A to this Agreement is complete and accurate and may be relied upon by the Company and its officers, directors, and control persons. Investor hereby covenants to notify the Company immediately of any material change in any of the information contained in Exhibit A prior to the acceptance by the Company of his, her or its subscription.

(j)    Investor acknowledges that no general solicitation or general advertising (including communications published in any newspaper, magazine or other broadcast) has been received by him, her or it and that no public solicitation or advertisement with respect to the offering of the Securities has been made to him, her or it.

(k)    Investor understands that his, her or its subscription for the Securities is subject to acceptance by the Company, in whole or in part, and understands that his, her or its subscription offer may not be withdrawn.

(l)    Investor has not made an overall commitment to investments that are not readily marketable that is disproportionate to his, her or its net worth, and his, her or its investment in the Securities will not cause such overall commitment to become excessive.

(m)    Investor is an "accredited investor," as such term is defined under Rule 501 of Regulation D promulgated under the Act.

3.    Stock Certificate Restrictions. All certificates representing Securities subject to this Agreement shall bear a legend in substantially the following form:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR STATE SECURITIES LAWS AND CANNOT BE OFFERED, SOLD, ASSIGNED, OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF EVIDENCE SATISFACTORY TO THE

COMPANY AND ITS COUNSEL (INCLUDING, AT THE COMPANY'S OPTION, AN OPINION OF COUNSEL) THAT REGISTRATION IS NOT REQUIRED FOR SUCH OFFER OR TRANSFER AND THAT SUCH OFFER OR TRANSFER IS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS AND REGULATIONS PROMULGATED THEREUNDER. THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED BY THE REGISTERED OWNER HEREOF FOR INVESTMENT AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION THEREOF IN VIOLATION OF THE SECURITIES ACT. THE SHARES MAY NOT BE SOLD, PLEDGED, TRANSFERRED OR ASSIGNED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE PROVISIONS OF THE SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR IN A TRANSACTION OTHERWISE IN COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS."

4.    Indemnification.  Investor acknowledges that he, she or it understands the meaning and legal consequences of the representations and warranties of this Agreement and that the Company has relied upon such representations and warranties, and he, she or it hereby agrees to indemnify and hold harmless the Company and its officers, directors, affiliates, shareholders, controlling persons, agents and employees from and against any and all loss, damage or liability due to or arising out of a breach or the inaccuracy of any such representation, warranty or covenant.  The Company acknowledges and agrees that any indemnification rights granted by Investor to the Company pursuant to this Agreement shall not be jointly and severally made with other investors in the offering and Investor shall not be held jointly liable for any liability arising under this Agreement.  Any indemnification granted by Investor shall be limited to the amount of net proceeds received by Investor from the sale of Registrable Securities (as defined in the Registration Rights Agreement between Investor and the Company, dated as of April [___], 2005 (the Registration Rights Agreement")) in connection with any applicable Registration Statement (as defined in the Registration Rights Agreement).  All representations, warranties and covenants contained in this Subscription Agreement, and the indemnification contained in this Section 4, shall survive the acceptance of this subscription and will continue in full force without limitation and effect.

5.    Further Agreement of Investor.  Investor recognizes and agrees that the Company shall have the right to accept or reject Investor's subscription, in whole or in part, for any reason whatsoever.

6.    Escrow Account.  The Company has entered into an Escrow Agreement with a Wachovia Bank, National Association ("Escrow Agent").  The terms of the Escrow Agreement, which the Company hereby agrees to make its best efforts to enforce, are as follows: