# APPENDIX TO
# AFFIDAVIT OF GEORGE YOUNG,
# DATED JUNE 21, 2007

# EXHIBIT A

8-K 1 form8k.htm FELLOWS ENERGY LTD. FORM 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): February 15, 2007**

**Fellows Energy Ltd.**
(Exact name of registrant as specified in its charter)

| Nevada | 000-33321 | 33-0967648 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

370 Interlocken Boulevard, Suite 400, Broomfield, Colorado 80021
(Address of principal executive offices and Zip Code)

Registrant's telephone number, including area code (303) 327-1525

Copies to:
Marc Ross, Esq.
Sichenzia Ross Friedman Ference LLP
1065 Avenue of the Americas
New York, New York 10018
Phone: (212) 930-9700
Fax: (212) 930-9725

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 1.01 Entry into a Material Definitive Agreement.

On February 15, 2007, we entered into a series of transactions to restructure securities issued pursuant to securities purchase agreements dated June 17, 2005 and September 21, 2005.

*Background*

June 2005 Financing

On June 17, 2005, we closed a financing pursuant to a securities purchase agreement with three accredited investors, Palisades Master Fund, L.P. ("Palisades"), Crescent International Ltd. ("Crescent") and JGB Capital L.P. ("JGB") for the issuance of $5,501,199.95 in face amount of debentures maturing September 16, 2008 (the "June Debentures"). The June Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting October 1, 2005, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.60 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring June 17, 2008, to purchase 4,584,334 shares of restricted common stock, exercisable at a per share of $0.649 (the "June Warrants"). In addition, the exercise price of the June Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the June Warrants' exercise price, all of the June Warrants shall expire on the 30th trading day after we send a call notice to the June Warrant holders. If at any time after one year from the date of issuance of the June Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the June Warrants, then the holder may exercise the June Warrant at such time by means of a cashless exercise.

September 2005 Financing

On September 21, 2005, we closed a financing pursuant to a securities purchase agreement with two accredited investors, Palisades and Crescent for the issuance of $3,108,000 in face amount of debentures maturing December 20, 2008 (the "September Debentures" and together with the June Debentures, the "Old Debentures"). The September Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting January 1, 2006, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.75 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring September 21, 2008, to purchase 2,172,000 shares of restricted common stock, exercisable at a per share of $0.80 (the "September Warrants" and together with the June Warrants, the "Old Warrants"). In addition, the exercise price of the September Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

2

If in any period of 20 consecutive trading days our stock price exceeds 250% of the September Warrants' exercise price, all of the September Warrants shall expire on the 30th trading day after we send a call notice to the September Warrant holders. If at any time after one year from the date of issuance of the September Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the September Warrants, then the holder may exercise the September Warrant at such time by means of a cashless exercise.

*Restructuring*

On February 15, 2007, the following transactions took place with regards to the Old Debentures and Old Warrants:

1) JGB entered into an assignment agreement with Crescent, pursuant to which Crescent purchased from JGB the June Debentures issued to JGB. The face value of the June Debentures issued to JGB at the time of the transaction was $333,333.33 and Crescent paid $250,000 to JGB for the assignment;

2) We entered into a settlement agreement with JGB for the sum of $83,333.33. We amended the terms of the Old Warrants held by JGB to remove the ratchet and call provisions and JGB agreed to release any shares reserved for issuance of the Old Warrants and to not exercise such Old Warrants until we obtain an increase in the authorized shares of common stock. Upon obtaining the increase in authorized shares, we agreed to issue JGB 500,000 shares of restricted common stock;

3) We entered into a first amendment and waiver agreement with Palisades for the amendment of the Old Debentures issued to Palisades (the "Palisades Amendment Agreement"); and

4) We entered into a first amendment and waiver agreement with Crescent for the amendment of the Old Debentures issued to JGB (and purchased by Crescent) and Crescent (the "Crescent Amendment Agreement" and together with the Palisades Amendment Agreement, the "Restructuring Amendments").

Palisades and Crescent agreed to amend the Old Debentures to remove the mandatory monthly liquidation provision and to amend the fixed conversion price of the Old Debentures to $0.1375 (the "Fixed Conversion Price"). As a result, the principal amount remaining on the Old Debentures is now due and payable at maturity, unless sooner converted into shares of common stock by the investors, at the Fixed Conversion Price. Palisades and Crescent further agreed to waive any and all existing defaults under the Old Debentures.

Pursuant to the Palisades Amendment Agreement, we agreed to issue 7,025,789 shares of common stock (the "Monthly Redemption Shares") to Palisades upon conversion of $608,433.15 in principal amount of the Old Debentures. Such Monthly Redemption Shares were issued as payment for monthly redemptions owed to Palisades on December 1, 2006 and January 1, 2007 and February 1, 2007 pursuant to the Old Debentures. These Monthly Redemption Shares were not issued while we negotiated the terms of a potential buy-out or restructuring of the Old Debentures. The Monthly Redemption Shares were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission and represent the remaining shares of common stock registered thereunder for Palisades pursuant to the Old Debentures. As a result of the Monthly Redemption Shares, the exercise price of the Old Warrants was reduced to $0.0866, which Palisades exercised on a cashless basis and received 2,970,758 shares of common stock which were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission.

3

We agreed to pay Palisades a forbearance fee of $150,000 a month, for six months, which fee was paid in shares of common stock at an issuance price of $0.1375, for a total issuance of 5,454,546 shares of restricted common stock. In addition, we agreed to issue Palisades 1,449,825 shares of common stock as a commitment fee for the restructuring of the Old Debentures.

In connection with the restructuring and new financing discussed below, we executed a security agreement (the "Security Agreement") in favor of Palisades and Crescent granting them a first priority security interest in all of our goods, inventory, contractual rights and general intangibles, receivables, documents, instruments, chattel paper, and intellectual property, except for our Carbon County prospect, which Palisades and Crescent took a second priority interest and for our Carter Creek and Weston County prospects, which the investors were not granted any security interest. The Security Agreement states that if an event of default occurs under the Old Debentures, Security Agreement or New Debenture, the Investors have the right to take possession of the collateral, to operate our business using the collateral, and have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the collateral, at public or private sale or otherwise to satisfy our obligations under these agreements.

*New Financing*

On February 15, 2007, we closed a financing pursuant to a securities purchase agreement with Palisades for the issuance of a $714,500 face amount debenture maturing September 15, 2007 (the "New Debenture"). The New Debenture does not accrue interest and the investors paid $500,000 for the New Debenture. We paid a commission of $100,000 to HPC Capital Management (a registered broker-dealer) in connection with the transaction, resulting in net proceeds to us of $400,000 before our legal fees. We used the net proceeds to pay our settlement agreement payment to JGB, repayment of a bridge loan to Petro Capital Securities, LLC and the remainder for general working capital purposes. We also issued HPC Capital Management 6,458,063 shares of restricted common stock and agreed to issue an additional 1,041,937 shares of restricted common stock upon obtaining an increase in our authorized shares of common stock, which shares are additional compensation for its services in connection with the transaction with the investors.

The convertible debentures are secured and are convertible into our common stock, at Palisades option, at a fixed conversion price of $0.1375. Based on this conversion price, the $714,500 secured convertible debenture is convertible into 5,196,364 shares of our common stock.

In the event of default, the investors may require payment, which shall be the greater of: (A) 130% of the principal amount of the face amount of the debenture to be prepaid, or (B) the principal amount of the debenture to be prepaid, divided by the conversion price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is less, multiplied by the closing price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is greater

The conversion price of the debenture may be adjusted in certain circumstances such as if we pay a stock dividend, subdivide or combine outstanding shares of common stock into a greater or lesser number of shares, or take such other actions as would otherwise result in dilution of the investor's position.

4

The Company has agreed to file a registration statement with the Securities and Exchange Commission to cover the future sale by the investors of the shares issuable upon conversion of the Old and New Debentures. If the registration statement is not filed by the filing deadline or if the registration statement is not declared effective by the effective deadline, we are required to pay liquidated damages to the investors.

**Item 2.03 Creation of a Direct Financial Obligation.**

See Item 1.01 above.

**Item 3.02 Unregistered Sales of Equity Securities.**

See Item 1.01 above.

**Item 9.01 Financial Statements and Exhibits.**

    **(a) Financial statements of business acquired.**

        Not applicable.

    **(b) Pro forma financial information.**

        Not applicable.

    **(c) Exhibits.**

| Exhibit Number | Description |
|---|---|
| 4.1 | First Amendment and Waiver Agreement, dated as of February 15, 2007, by and between Fellows Energy Ltd. and Palisades Master Fund, L.P. |
| 4.2 | First Amendment and Waiver Agreement, dated as of February 15, 2007, by and between Fellows Energy Ltd. and Crescent International Ltd. |
| 4.3 | Securities Purchase Agreement by and between Fellows Energy Ltd. and Palisades Master Fund, L.P. |
| 4.4 | Debenture issued to Palisades Master Fund, L.P. |
| 4.5 | Registration Rights Agreement by and between Fellows Energy Ltd. and Palisades Master Fund, L.P. |
| 4.6 | Security Agreement by and among Fellows Energy Ltd., Palisades Master Fund, L.P. and Crescent International Ltd. |
| 10.1 | Settlement Agreement, dated as of February 15, 2007, by and between Fellows Energy Ltd. and JGB Capital, L.P. |

5

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Fellows Energy Ltd.**

Date: February 21, 2007                    By:  /s/ GEORGE S. YOUNG

George S. Young
Chief Executive Officer

6

EX-4.1 2 ex41.htm EXHIBIT 4.1
Exhibit 4.1

# FIRST AMENDMENT AND WAIVER AGREEMENT

This First Amendment and Waiver Agreement (this "Agreement"), is made and entered into as of February 15, 2007, by and among Fellows Energy Ltd., a Nevada corporation (along with its subsidiaries signatory hereto, the "Company") and Palisades Master Fund (the "Holder").

WHEREAS, the Company and the Holder are parties to that certain Securities Purchase Agreement, dated June 17, 2005, by and among the Company and the signatories thereto (collectively, the "June Purchase Agreements"), pursuant to which the Company issued to the Holder a Convertible Debenture, due September 7, 2007, with an aggregate principal amount of $4,01,200, of which $1,046,438.23 currently remains outstanding (the "June Debenture"); and

WHEREAS, the Company and the Holder are parties to that certain Securities Purchase Agreement, September 21, 2005, by and among the Company and the signatories thereto (collectively, the "September Purchase Agreement" and together with the June Purchase Agreement, the "Purchase Agreements"), pursuant to which the Company issued to the Holder a Convertible Debenture, due September 7, 2007, with an aggregate principal amount of $2,858,000, of which $1,536,238.51 currently remains outstanding (the "September Debenture" and together with the June Debenture, the "Debentures"); and

WHEREAS, on account of dilutive issuances of equity by the Company, the conversion price of the Debentures and the exercise prices of the common stock purchase warrants (collectively, the "Warrants") issued pursuant to the Purchase Agreements have been reduced to equal $0.1357, subject to adjustment therein, with proportional increases in the number of shares of common stock issuable upon exercise of such Warrants, as set forth therein; and

WHEREAS, certain events of default have occurred pursuant to the Debentures and are continuing to occur related to the Debentures and as a result of such defaults ("Existing Defaults"), Palisades is entitled, among other things, to enforce its rights and remedies against the Company, including without limitation, acceleration and immediately demand payment in full of all obligations under the Debentures; and

WHEREAS, the parties have reached an agreement with respect to the modification and amendment of certain terms of the Debentures relating to the conversion and terms of the Debentures and the waiver of the Existing Defaults; and

WHEREAS, capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to such terms as set forth in the September Purchase Agreement; and

NOW THEREFORE, in consideration of the terms and conditions contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

1

1.  Incorporation of Preliminary Statements and Acknowledgement. The preliminary statements set forth above by this reference hereto are hereby incorporated into this Agreement. Without limiting the foregoing, the Company hereby acknowledges that the Existing Events have occurred and are continuing under the terms of the Purchase Agreement and Debentures and, notwithstanding anything to the contrary in this Agreement, the Purchase Agreements, Debentures or any of the other Transaction Documents, the Company acknowledges and agrees that upon a breach of this Agreement by the Company, such breach shall be an Event of Default under the Debentures.

2.  Consent to JGB/Crescent Transaction. Simultaneously with the execution of this Agreement, the following transactions are also taking place: a) the Company and JGB Capital L.P. ("JGB") are entering into a settlement agreement; b) JGB is entering into an assignment agreement with Crescent International Ltd. ("Crescent") for the assignment of the Debenture (the "JGB Assignment Agreement"); c) the Company is entering into an amendment agreement (the "Debenture Amendments" and together with this Agreement and the JGB Assignment Agreement, the "Assignment Documents") with Crescent for the amendment of the convertible debentures issued pursuant to the Purchase Agreements; and d) the Company and Holder are entering into a securities purchase agreement for the purchase of $714,500 in secured convertible debentures. The Holder hereby consents to the above-described transactions.

3.  Waiver of Existing Defaults. The Holder agrees to forever waive its rights and remedies against the Company, including without limitation, acceleration of the Debentures, solely in connection with, and as they relate to, the prior occurrence of the Existing Defaults. Notwithstanding anything herein to the contrary, this waiver is limited only to the Existing Defaults and any future Events of Default, including a breach of this Agreement, shall not be deemed waived hereunder.

4.  Release of all Claims. THE COMPANY (FOR ITSELF AND ITS AFFILIATES) HEREBY UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES THE HOLDER AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, ACCOUNTANTS, CONSULTANTS, CONTRACTORS, ADVISORS AND ATTORNEYS (COLLECTIVELY, THE "BENEFITED PARTIES") FROM ALL CLAIMS (AS DEFINED BELOW) AND AGREES TO INDEMNIFY THE BENEFITED PARTIES, AND HOLD THEM HARMLESS FROM ANY AND ALL CLAIMS, LOSSES, CAUSES OF ACTION, COSTS AND EXPENSES OF EVERY KIND OR CHARACTER IN CONNECTION WITH THE CLAIMS. AS USED IN THIS AMENDMENT, THE TERM "CLAIMS" MEANS ANY AND ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTIONS, COSTS, EXPENSES AND LIABILITIES WHATSOEVER, KNOWN OR UNKNOWN, AT LAW OR IN EQUITY, ORIGINATING IN WHOLE OR IN PART, WHICH THE COMPANY, OR ANY OF ITS AGENTS, EMPLOYEES OR AFFILIATES MAY NOW OR HEREAFTER HAVE OR CLAIM AGAINST ANY OF THE BENEFITED PARTIES AND IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR OTHERWISE IN CONNECTION WITH ANY OF THE TRANSACTION DOCUMENTS, INCLUDING ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE MAXIMUM RATE ON INTEREST CHARGEABLE UNDER APPLICABLE LAW AND ANY LOSS, COST OR DAMAGE, OF ANY KIND OR CHARACTER, ARISING OUT OF OR IN ANY WAY CONNECTED WITH OR IN ANY WAY RESULTING FROM THE ACTIONS OR OMISSIONS OF THE BENEFITED PARTIES, INCLUDING ANY BREACH OF FIDUCIARY DUTY, BREACH OF ANY DUTY OF GOOD FAITH OR FAIR DEALING, UNDUE INFLUENCE, DURESS, ECONOMIC COERCION, CONFLICT OF INTEREST, NEGLIGENCE, BAD FAITH, MALPRACTICE, VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, INTENTIONAL OR NEGLIGENT INFLICTION OF MENTAL DISTRESS, TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, TORTIOUS INTERFERENCE WITH CORPORATE GOVERNANCE OR PROSPECTIVE BUSINESS ADVANTAGE, BREACH OF CONTRACT, DECEPTIVE TRADE PRACTICES, LIBEL, SLANDER, CONSPIRACY OR ANY CLAIM FOR WRONGFULLY ACCELERATING ANY OBLIGATIONS OR WRONGFULLY ATTEMPTING TO FORECLOSE ON ANY COLLATERAL. THE COMPANY (FOR ITSELF AND ITS AFFILIATES) AGREES THAT NONE OF THE BENEFITED PARTIES HAS FIDUCIARY OR SIMILAR OBLIGATIONS TO THE COMPANY OR ANY AGENTS, EMPLOYEES OR AFFILIATES OF THE COMPANY AND THAT THEIR RELATIONSHIPS ARE STRICTLY THAT OF CREDITOR AND DEBTOR. THIS RELEASE IS ACCEPTED BY HOLDER PURSUANT TO THIS AMENDMENT AND SHALL NOT BE CONSTRUED AS AN ADMISSION OF LIABILITY BY HOLDER OR ANY OTHER BENEFITED PARTY.

5.  <u>Cashless Exchange of Warrant</u>. In consideration for the Holder immediately exercising the Warrants pursuant to the cashless exercise provisions thereof, the Company agrees to reduce the exercise price of the warrants ("<u>Exercise Price Adjustment</u>") to \$0.0866 in connection with such exercise such that the Holder shall receive 2,970,758 shares of Common Stock (the "<u>Exercised Shares</u>"). Within 3 Trading Days of the date hereof, the Company shall have delivered the Exercised Shares to the Depository Trust Account of the Holder pursuant to the instructions set forth on the Holder's signature page hereto. The Exercised Shares shall be registered for resale pursuant to the Registration Statements, File No. 333-127413 and 333-129627 (the "<u>Registration Statements</u>") free of any legends or restrictions on resale by the Holder. The Holder waives any anti-dilution adjustments that would otherwise occur to securities held by Holder solely as a result of the Exercise Price Adjustment; <u>provided</u>, <u>however</u>, that such waiver does not extend to any adjustment to a third party holder of the Company's securities that received an adjustment to their securities to less than \$0.0866, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement, as a result of the Exercise Price Adjustment.

6.  <u>Conversion of Debentures</u>. The Company shall issue shares of common stock (the "<u>Converted Shares</u>") to the Holder pursuant to overdue monthly redemptions owed as of December 1, 2006, January 1, 2007 and February 1, 2007, to the extent such Converted Shares are registered for resale pursuant to the Registration Statements. The Company shall issue 7,025,789 Converted Shares upon the monthly liquidation of, in the aggregate, \$608,433.15 in principal amount of the Debentures, as set forth on <u>Exhibit A</u> hereto. Within 3 Trading Days of the date hereof, the Company shall have delivered the Converted Shares to the Depository Trust Account of the Holder pursuant to the instructions set forth on the Holder's signature page hereto. The Converted Shares shall be registered for resale pursuant to the Registration Statements and free of any legends or restrictions on resale by the Holder. The Holder waives any anti-dilution adjustments that would otherwise occur to securities held by Holder as a result of the issuance of the Converted Shares; <u>provided</u>, <u>however</u>, that such waiver does not extend to any adjustment to a third party holder of the Company's securities that received an adjustment to their securities to less than \$0.0866, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement, as a result of the issuance of the Converted Shares. The Company shall keep the Registration Statements effective until the earlier of the date that the Holder no longer holds any Exercised Shares or Converted Shares or such shares may be sold pursuant to Rule 144(k). Upon the conversion of debentures, the remaining principal amount due of the Debentures is as set forth on <u>Exhibit A</u> hereto.

3

7.  <u>Forbearance Fee and Issuance of Common Stock</u>. The Company shall pay the Holder a Forbearance Fee of $150,000 a month, for six months, to be paid in shares of Common Stock of the Company at a price of $0.1375 per share, for a total of 5,454,546 shares which shares shall bear the restrictive legend set for in the Purchase Agreements (the "<u>Forbearance Shares</u>"). In addition, on the date hereof, the Company shall issue to the Holder 1,449,825 shares of Common Stock to the Holder which shares shall bear the restrictive legend set for in the Purchase Agreements ("<u>Commitment Shares</u>"). The rights and obligations of the Company with respect to the Forbearance Shares and Commitment Shares shall be identical in all respects to the rights and obligations of the Company with respect to the Underlying Shares issued and issuable pursuant to the Agreements. The September Agreement is hereby amended so that the term the term "Underlying Shares" includes the Forbearance Shares and Commitment Shares. The Forbearance Shares and Commitment Shares shall be delivered to the Holder within 5 Trading Days of the date hereof. The Forbearance Shares and Commitment Shares shall be registered pursuant to the terms of that certain Registration Rights Agreement, dated February 15, 2007, by and among the Company, the Holder and the other holders thereto.

8.  <u>Amendment to Debentures</u>. The Debentures are amended as follows:

(a)  All definitions and references in the Debentures to "Forced Conversion", "Forced Conversion Notice", "Forced Conversion Notice Date", "Monthly Conversion Period", "Monthly Conversion Price", Monthly Redemption", "Monthly Redemption Amount", "Monthly Redemption Date", "Monthly Redemption Notice", "Monthly Redemption Notice Date", "Monthly Redemption Notice Period", "Monthly Redemption Share Amount", "Optional Redemption", Optional Redemption Amount", Optional Redemption Notice", "Optional Redemption Notice Date", "Pre-Redemption Conversion Shares" and "Threshold Period" are hereby deleted and of no further force or effect in the Debentures.

(b)  Section 6(a) of the Debentures is hereby deleted in its entirely and replaced as follows: "*Section 6.RESERVED.*"

(c)  Section 4(b) of the Debentures is hereby amended and restated as follows:

"<u>Conversion Price</u>. The conversion price in effect on any Conversion Date shall be equal to **$0.1375** (subject to adjustment herein)(the "<u>Conversion Price</u>")."

4

9.  Security Interest. As security for the payment in full of principal, interest and performance under this Agreement and the Debentures and of all other liabilities and obligations of the Company to the Holder, the Company and its subsidiaries, grant the Holder a general security interest in all assets of the Company and its subsidiaries and all proceeds arising therefrom and any and all products of such assets and in certain real estate holdings as described below. In furtherance thereof, the Company shall:

a.  On the date hereof enter into a Security Agreement simultaneously herewith evidencing the above-referenced security interest in all of the assets of the Company and its subsidiaries; and

b.  Within 30 days of the date hereof, have granted the Holder a first lien on real property (except for the real property in Carbon county, which Holder shall take a second lien), in the form of a mortgage or deed of trust, in real property owned by the Company and its subsidiaries and located in Baca and Broomfield counties, Colorado, and Rich, Carbon and Emery counties, Utah. The Company shall use best efforts to secure such liens in favor of the Holder, including but not limited to, paying reasonable attorneys' fees in connection therewith and securing title insurance reports.

10.  Representations and Warranties of the Company. The Company hereby makes to the Holder the following representations and warranties:

i.  Authorization; Enforcement. The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement by the Company and the consummation by it of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, its board of directors or its stockholders in connection therewith other than in connection with the Required Approvals. This Agreement has been duly executed by the Company and, when delivered in accordance with the terms hereof will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

ii.  No Conflicts. The execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby do not and will not: (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien (except as contemplated by the Security Documents) upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any material agreement, credit facility, debt or other material instrument (evidencing a Company or Subsidiary debt or otherwise) or other material understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected; except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

5

iii.  Issuance of the Commitment Shares. The Commitment Shares are duly authorized and, upon the execution of this Agreement by a Holder, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents.

11.  Representations and Warranties of the Holder. The Holder represents and warrants as of the date hereof to the Company as follows:

i.  Authority. The execution, delivery and performance by such Holder of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate or similar action on the part of such Holder. This Agreement has been duly executed by such Holder, and when delivered by such Holder in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Holder, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

ii.  Own Account. Such Holder understands that the Commitment Shares are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and is acquiring the Commitment Share as principal for its own account and not with a view to or for distributing or reselling the Commitment Shares or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no arrangement or understanding with any other persons regarding the distribution of the Commitment Shares (this representation and warranty not limiting such Holder's right to sell the Commitment Shares pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws) in violation of the Securities Act or any applicable state securities law. Such Holder is acquiring the Commitment Shares hereunder in the ordinary course of its business. Such Holder does not have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Commitment Shares.

6

iii.  <u>Holder Status</u>. Such Holder is an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act. Such Holder is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

12.  <u>Effect on Transaction Documents</u>. Except as expressly set forth above, all of the terms and conditions of the Transaction Documents shall continue in full force and effect after the execution of this Agreement and shall not be in any way changed, modified or superseded by the terms set forth herein, including but not limited to, any other obligations the Company may have to the Holder under the Transaction Documents.

13.  <u>Amendments and Waivers</u>. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and the Holder.

14.  <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be delivered as set forth in the applicable Transaction Document.

15.  <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of the Holder. The Company may not assign (except by merger) its rights or obligations hereunder without the prior written consent of the Holder. The Holder may assign their respective rights hereunder in the manner and to the Persons as permitted under the applicable Transaction Document.

16.  <u>Execution and Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

17.  <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be determined in accordance with the provisions of the September Purchase Agreement.

7

18.  <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

19.  <u>Headings</u>. The headings in this Agreement are for convenience only, do not constitute a part of the Agreement and shall not be deemed to limit or affect any of the provisions hereof.

*[SIGNATURE PAGE FOLLOWS]*

8

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Agreement as of the date first set forth above.

**FELLOWS ENERGY LTD.**

By:  /s/ GEORGE S. YOUNG
_____

    Name: George S. Young
    Title: Chief Executive Officer

9

Exhibit 4.1

[SIGNATURE PAGE OF HOLDER TO FLWE AMENDMENT AND WAIVER]

Name of Holder: PALISADES MASTER FUND, L.P.

/s/ Arlene DeCastro                                    /s/ Peter Cooper
_____                    _____

Arlene DeCastro                                        Peter Cooper
Authorized Signatory                                 Authorized Signatory


DTC Instructions:

EX-4.2 3 ex42.htm EXHIBIT 4.2
**Exhibit 4.2**

# FIRST AMENDMENT AND WAIVER AGREEMENT

This First Amendment and Waiver Agreement (this "Agreement"), is made and entered into as of February 15, 2007, by and among Fellows Energy Ltd., a Nevada corporation (along with its subsidiaries signatory hereto, the "Company") and Crescent International Ltd. (the "Holder").

WHEREAS, the Company and the Holder are parties to that certain Securities Purchase Agreement, dated June 17, 2005, by and among the Company and the signatories thereto (collectively, the "June Purchase Agreements"), pursuant to which the Company issued to the Holder Convertible Debentures, due September 7, 2007, including those Convertible Debentures originally issued to JGB Capital L.P., which JGB is assigning to Holder simultaneously with this Agreement, with an aggregate principal amount of $1,500,000, of which $_____ currently remains outstanding (the "June Debenture"); and

WHEREAS, the Company and the Holder are parties to that certain Securities Purchase Agreement, September 21, 2005, by and among the Company and the signatories thereto (collectively, the "September Purchase Agreement" and together with the June Purchase Agreement, the "Purchase Agreements"), pursuant to which the Company issued to the Holder a Convertible Debenture, due September 7, 2007, with an aggregate principal amount of $250,000, of which $_____ currently remains outstanding (the "September Debenture" and together with the June Debenture, the "Debentures"); and

WHEREAS, on account of dilutive issuances of equity by the Company, the conversion price of the Debentures and the exercise prices of the common stock purchase warrants (collectively, the "Warrants") issued pursuant to the Purchase Agreements have been reduced to equal $0.1357, subject to adjustment therein, with proportional increases in the number of shares of common stock issuable upon exercise of such Warrants, as set forth therein; and

WHEREAS, certain events of default have occurred pursuant to the Debentures and are continuing to occur related to the Debentures and as a result of such defaults ("Existing Defaults"), Palisades is entitled, among other things, to enforce its rights and remedies against the Company, including without limitation, acceleration and immediately demand payment in full of all obligations under the Debentures; and

WHEREAS, the parties have reached an agreement with respect to the modification and amendment of certain terms of the Debentures relating to the conversion and terms of the Debentures and the waiver of the Existing Defaults; and

WHEREAS, capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to such terms as set forth in the September Purchase Agreement; and

1

NOW THEREFORE, in consideration of the terms and conditions contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

1.   Incorporation of Preliminary Statements and Acknowledgement. The preliminary statements set forth above by this reference hereto are hereby incorporated into this Agreement. Without limiting the foregoing, the Company hereby acknowledges that the Existing Events have occurred and are continuing under the terms of the Purchase Agreement and Debentures and, notwithstanding anything to the contrary in this Agreement, the Purchase Agreements, Debentures or any of the other Transaction Documents, the Company acknowledges and agrees that upon a breach of this Agreement by the Company, such breach shall be an Event of Default under the Debentures.

2.   Consent to Palisades Transaction. Simultaneously with the execution of this Agreement, the following transactions are also taking place: b) JGB is entering into an assignment agreement with Crescent International Ltd. ("Crescent") for the assignment of the Debentures (the "JGB Assignment Agreement"); b) the Company is entering into an amendment and waiver agreement (the "Debenture Amendments" and together with this Agreement and the JGB Assignment Agreement, the "Assignment Documents") with Palisades for the amendment of the convertible debentures issued pursuant to the Purchase Agreements; and c) the Company and Palisades are entering into a securities purchase agreement for the purchase of $714,500 in secured convertible debentures. The Holder hereby consents to the above-described transactions.

3.   Waiver of Existing Defaults. The Holder agrees to forever waive its rights and remedies against the Company, including without limitation, acceleration of the Debentures, solely in connection with, and as they relate to, the prior occurrence of the Existing Defaults. Notwithstanding anything herein to the contrary, this waiver is limited only to the Existing Defaults and any future Events of Default, including a breach of this Agreement, shall not be deemed waived hereunder.

4.   Release of all Claims. THE COMPANY (FOR ITSELF AND ITS AFFILIATES) HEREBY UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES THE HOLDER AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, ACCOUNTANTS, CONSULTANTS, CONTRACTORS, ADVISORS AND ATTORNEYS (COLLECTIVELY, THE "BENEFITED PARTIES") FROM ALL CLAIMS (AS DEFINED BELOW) AND AGREES TO INDEMNIFY THE BENEFITED PARTIES, AND HOLD THEM HARMLESS FROM ANY AND ALL CLAIMS, LOSSES, CAUSES OF ACTION, COSTS AND EXPENSES OF EVERY KIND OR CHARACTER IN CONNECTION WITH THE CLAIMS. AS USED IN THIS AMENDMENT, THE TERM "CLAIMS" MEANS ANY AND ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTIONS, COSTS, EXPENSES AND LIABILITIES WHATSOEVER, KNOWN OR UNKNOWN, AT LAW OR IN EQUITY, ORIGINATING IN WHOLE OR IN PART, WHICH THE COMPANY, OR ANY OF ITS AGENTS, EMPLOYEES OR AFFILIATES MAY NOW OR HEREAFTER HAVE OR CLAIM AGAINST ANY OF THE BENEFITED PARTIES AND IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR OTHERWISE IN CONNECTION WITH ANY OF THE TRANSACTION DOCUMENTS, INCLUDING ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE MAXIMUM RATE ON INTEREST CHARGEABLE UNDER APPLICABLE LAW AND ANY LOSS, COST OR DAMAGE, OF ANY KIND OR CHARACTER, ARISING OUT OF OR IN ANY WAY CONNECTED WITH OR IN ANY WAY RESULTING FROM THE ACTIONS OR OMISSIONS OF THE BENEFITED PARTIES, INCLUDING ANY BREACH OF FIDUCIARY DUTY, BREACH OF ANY DUTY OF GOOD FAITH OR FAIR DEALING, UNDUE INFLUENCE, DURESS, ECONOMIC COERCION, CONFLICT OF INTEREST, NEGLIGENCE, BAD FAITH, MALPRACTICE, VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, INTENTIONAL OR NEGLIGENT INFLICTION OF MENTAL DISTRESS, TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, TORTIOUS INTERFERENCE WITH CORPORATE GOVERNANCE OR PROSPECTIVE BUSINESS ADVANTAGE, BREACH OF CONTRACT, DECEPTIVE TRADE PRACTICES, LIBEL, SLANDER, CONSPIRACY OR ANY CLAIM FOR WRONGFULLY ACCELERATING ANY OBLIGATIONS OR WRONGFULLY ATTEMPTING TO FORECLOSE ON ANY COLLATERAL. THE COMPANY (FOR ITSELF AND ITS AFFILIATES) AGREES THAT NONE OF THE BENEFITED PARTIES HAS FIDUCIARY OR SIMILAR OBLIGATIONS TO THE COMPANY OR ANY AGENTS, EMPLOYEES OR AFFILIATES OF THE COMPANY AND THAT THEIR RELATIONSHIPS ARE STRICTLY THAT OF CREDITOR AND DEBTOR. THIS RELEASE IS ACCEPTED BY HOLDER PURSUANT TO THIS AMENDMENT AND SHALL NOT BE CONSTRUED AS AN ADMISSION OF LIABILITY BY HOLDER OR ANY OTHER BENEFITED PARTY.

5.   <u>Amendment to Debentures</u>. The Debentures are amended as follows:

(a)   All definitions and references in the Debentures to "Forced Conversion", "Forced Conversion Notice", "Forced Conversion Notice Date", "Monthly Conversion Period", "Monthly Conversion Price", Monthly Redemption", "Monthly Redemption Amount", "Monthly Redemption Date", "Monthly Redemption Notice", "Monthly Redemption Notice Date", "Monthly Redemption Notice Period", "Monthly Redemption Share Amount", "Optional Redemption", Optional Redemption Amount", Optional Redemption Notice", "Optional Redemption Notice Date", "Pre-Redemption Conversion Shares" and "Threshold Period" are hereby deleted and of no further force or effect in the Debentures.

(b)   Section 6(a) of the Debentures is hereby deleted in its entirely and replaced as follows: "*Section 6.RESERVED*."

(c)   Section 4(b) of the Debentures is hereby amended and restated as follows:

"<u>Conversion Price</u>. The conversion price in effect on any Conversion Date shall be equal to **$0.1375** (subject to adjustment herein)(the "<u>Conversion Price</u>")."

6.   <u>Security Interest</u>. As security for the payment in full of principal, interest and performance under this Agreement and the Debentures and of all other liabilities and obligations of the Company to the Holder, the Company and its subsidiaries, grant the Holder a general security interest in all assets of the Company and its subsidiaries and all proceeds arising therefrom and any and all products of such assets and in certain real estate holdings as described below. In furtherance thereof, the Company shall:

3

a.  On the date hereof enter into a Security Agreement simultaneously herewith evidencing the above-referenced security interest in all of the assets of the Company and its subsidiaries; and

b.  Within 30 days of the date hereof, have granted the Holder a first lien on real property (except for the real property in Carbon county, which Holder shall take a second lien), in the form of a mortgage or deed of trust, in real property owned by the Company and its subsidiaries and located in Baca and Broomfield counties, Colorado, and Rich, Carbon and Emery counties, Utah. The Company shall use best efforts to secure such liens in favor of the Holder, including but not limited to, paying reasonable attorneys' fees in connection therewith and securing title insurance reports.

7.  <u>Representations and Warranties of the Company</u>. The Company hereby makes to the Holder the following representations and warranties:

i.  <u>Authorization; Enforcement</u>. The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement by the Company and the consummation by it of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, its board of directors or its stockholders in connection therewith other than in connection with the Required Approvals. This Agreement has been duly executed by the Company and, when delivered in accordance with the terms hereof will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

ii.  <u>No Conflicts</u>. The execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby do not and will not: (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien (except as contemplated by the Security Documents) upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any material agreement, credit facility, debt or other material instrument (evidencing a Company or Subsidiary debt or otherwise) or other material understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected; except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

8.  <u>Representations and Warranties of the Holder</u>. The Holder represents and warrants as of the date hereof to the Company as follows:

4

i. <u>Authority</u>. The execution, delivery and performance by such Holder of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate or similar action on the part of such Holder. This Agreement has been duly executed by such Holder, and when delivered by such Holder in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Holder, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

ii. <u>Holder Status</u>. Such Holder is an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act. Such Holder is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

9. <u>Effect on Transaction Documents</u>. Except as expressly set forth above, all of the terms and conditions of the Transaction Documents shall continue in full force and effect after the execution of this Agreement and shall not be in any way changed, modified or superseded by the terms set forth herein, including but not limited to, any other obligations the Company may have to the Holder under the Transaction Documents.

10. <u>Amendments and Waivers</u>. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and the Holder.

11. <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be delivered as set forth in the applicable Transaction Document.

12. <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of the Holder. The Company may not assign (except by merger) its rights or obligations hereunder without the prior written consent of the Holder. The Holder may assign their respective rights hereunder in the manner and to the Persons as permitted under the applicable Transaction Document.

5

Unassociated Document

13. <u>Execution and Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

14. <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be determined in accordance with the provisions of the September Purchase Agreement.

15. <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

16. <u>Headings</u>. The headings in this Agreement are for convenience only, do not constitute a part of the Agreement and shall not be deemed to limit or affect any of the provisions hereof.

*[SIGNATURE PAGE FOLLOWS]*

6

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Agreement as of the date first set forth above.

**FELLOWS ENERGY LTD.**

By:  /s/ GEORGE S. YOUNG
_____

Name: George S. Young
Title: Chief Executive Officer

7

[SIGNATURE PAGE OF HOLDER TO FLWE AMENDMENT AND WAIVER]

Name of Holder: CRESCENT INTERNATIONAL LTD.
*Signature of Authorized Signatory of Holder*: /s/ MAXI BREZZI
Name of Authorized Signatory: Maxi Brezzi
Title of Authorized Signatory: Authorized Signatory


DTC Instructions:

8

EX-4.3 4 ex43.htm EXHIBIT 4.3
**Exhibit 4.3**

# SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") is dated as of February 15, 2007 among Fellows Energy Ltd., a Nevada corporation (the "Company"), and each purchaser identified on the signature pages hereto (each, including its successors and assigns, a "Purchaser" and collectively the "Purchasers").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act") and Rule 506 promulgated thereunder, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1  Definitions. In addition to the terms defined elsewhere in this Agreement: (a) capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Debentures (as defined herein), and (b) the following terms have the meanings indicated in this Section 1.1:

"Action" shall have the meaning ascribed to such term in Section 3.1(j).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 144 under the Securities Act. With respect to a Purchaser, any investment fund or managed account that is managed on a discretionary basis by the same investment manager as such Purchaser will be deemed to be an Affiliate of such Purchaser.

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"Closing Date" means the Trading Day when all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Securities have been satisfied or waived.

"Closing Price" means on any particular date (a) the last reported closing bid price per share of Common Stock on such date on the Trading Market (as reported by Bloomberg L.P. at 4:15 PM (New York time), or (b) if there is no such price on such date, then the closing bid price on the Trading Market on the date nearest preceding such date (as reported by Bloomberg L.P. at 4:15 PM (New York time) for the closing bid price for regular session trading on such day), or (c) if the Common Stock is not then listed or quoted on the Trading Market and if prices for the Common Stock are then reported in the "pink sheets" published by the Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported, or (d) if the shares of Common Stock are not then publicly traded the fair market value of a share of Common Stock as determined by a qualified independent appraiser selected in good faith by the Purchasers of a majority in interest of the outstanding principal amount of the Debentures.

1

"Commission" means the Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter have been reclassified or changed into.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Company Counsel" means Sichenzia Ross Friedman Ference LLP.

"Conversion Price" shall have the meaning ascribed to such term in the Debentures.

"Debentures" means, the Convertible Debentures due, subject to the terms therein, September 7, 2007, issued by the Company to the Purchasers hereunder, in the form of Exhibit A.

"Disclosure Schedules" shall have the meaning ascribed to such term in Section 3.1.

"Effective Date" means the date that the initial Registration Statement filed by the Company pursuant to the Registration Rights Agreement is first declared effective by the Commission.

"Evaluation Date" shall have the meaning ascribed to such term in Section 3.1(r).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exempt Issuance" means the issuance of (a) shares of Common Stock or options to employees, officers or directors of the Company pursuant to any stock or option plan duly adopted by the Board of Directors of the Company, (b) securities upon the exercise or exchange of or conversion of any Securities issued hereunder and/or securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date of this Agreement, provided that such securities have not been amended since the date of this Agreement to increase the number of such securities or to decrease the exercise, exchange or conversion price of any such securities, and (c) securities issued pursuant to acquisitions or strategic transactions, provided any such issuance shall only be to a Person which is, itself or through its subsidiaries, an operating company in a business synergistic with the business of the Company and in which the Company receives benefits in addition to the investment of funds, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.

2

"GAAP" shall have the meaning ascribed to such term in Section 3.1(h).

"Intellectual Property Rights" shall have the meaning ascribed to such term in Section 3.1(o).

"Legend Removal Date" shall have the meaning ascribed to such term in Section 4.1(c).

"Liens" means a lien, charge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(b).

"Material Permits" shall have the meaning ascribed to such term in Section 3.1(m).

"Maximum Rate" shall have the meaning ascribed to such term in Section 5.17.

"Participation Maximum" shall have the meaning ascribed to such term in Section 4.13.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Pre-Notice" shall have the meaning ascribed to such term in Section 4.13.

"Principal Amount" shall mean, as to each Purchaser, the amounts set forth below such Purchaser's signature block on the signature pages hereto and next to the heading "Principal Amount", in United States Dollars, which shall equal such Purchaser's Subscription Amount multiplied by 1.429.

3

"<u>Proceeding</u>" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"<u>Purchaser Party</u>" shall have the meaning ascribed to such term in Section 4.11.

"<u>Registration Rights Agreement</u>" means the Registration Rights Agreement, dated the date hereof, among the Company and the Purchasers, in the form of <u>Exhibit B</u> attached hereto.

"<u>Registration Statement</u>" means a registration statement meeting the requirements set forth in the Registration Rights Agreement and covering the resale of the Underlying Shares by each Purchaser as provided for in the Registration Rights Agreement.

"<u>Required Approvals</u>" shall have the meaning ascribed to such term in Section 3.1(e).

"<u>Required Minimum</u>" means, as of any date, the maximum aggregate number of shares of Common Stock then issued or potentially issuable in the future pursuant to the Transaction Documents, including any Underlying Shares issuable upon exercise or conversion in full of all Warrants and Debentures, ignoring any conversion or exercise limits set forth therein, and assuming that the Conversion Price is at all times on and after the date of determination 75% of the then Conversion Price on the Trading Day immediately prior to the date of determination.

"<u>Rule 144</u>" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>SEC Reports</u>" shall have the meaning ascribed to such term in Section 3.1(h).

"<u>Securities</u>" means the Debentures and the Underlying Shares.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Security Agreement</u>" shall mean the Security Agreement in substantially the form of <u>Exhibit D</u> hereto executed and delivered contemporaneously with this Agreement.

"<u>Security Documents</u>" shall mean the Security Agreement and any other documents and filing required thereunder in order to grant the Purchasers a first priority security interest in the assets of the Company and the Subsidiaries as provided in the Security Agreement, including all UCC-1 filing receipts.

"<u>Short Sales</u>" shall include all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act.

4

"<u>Subscription Amount</u>" means, as to each Purchaser, the aggregate amount to be paid for Debentures purchased hereunder as specified below such Purchaser's name on the signature page of this Agreement and next to the heading "Subscription Amount", in United States Dollars and in immediately available funds.

"<u>Subsequent Financing</u>" shall have the meaning ascribed to such term in Section 4.13.

"<u>Subsequent Financing Notice</u>" shall have the meaning ascribed to such term in Section 4.13.

"<u>Subsidiary</u>" means any subsidiary of the Company as set forth on <u>Schedule 3.1(a)</u>.

"<u>Trading Day</u>" means a day on which the Common Stock is traded on a Trading Market.

"<u>Trading Market</u>" means the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the Nasdaq SmallCap Market, the American Stock Exchange, the New York Stock Exchange, the Nasdaq National Market or the OTC Bulletin Board.

"<u>Transaction Documents</u>" means this Agreement, the Debentures, the Warrants, the Escrow Agreement, the Security Agreement, the Registration Rights Agreement and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"<u>Underlying Shares</u>" means the shares of Common Stock issued and issuable upon conversion of the Debentures.


## ARTICLE II.
## PURCHASE AND SALE


2.1  <u>Closing</u>. On the Closing Date, upon the terms and subject to the conditions set forth herein, concurrent with the execution and delivery of this Agreement by the parties hereto, the Company agrees to sell, and each Purchaser agrees to purchase in the aggregate, severally and not jointly, up to $714,500 principal amount of the Debentures. Each Purchaser shall deliver to the Company via wire transfer or a certified check immediately available funds equal to their Subscription Amount and the Company shall deliver to each Purchaser their respective Debenture and Warrants as determined pursuant to Section 2.2(a) and the other items set forth in Section 2.2 issuable at the Closing. Upon satisfaction of the conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of the Escrow Agent, or such other location as the parties shall mutually agree.

2.2  <u>Deliveries</u>

    a) On the Closing Date, the Company shall deliver or cause to be delivered to the Escrow Agent with respect to each Purchaser the following:

        (i) this Agreement duly executed by the Company;

        (ii) a legal opinion of Company Counsel, in the form of <u>Exhibit C</u> attached hereto;

        (iii) a Debenture with a principal amount equal to such Purchaser's Principal Amount, registered in the name of such Purchaser;

        (iv) the Security Agreement, duly executed by the Company; and

        (v) the Registration Rights Agreement duly executed by the Company.

    b) On the Closing Date, each Purchaser shall deliver or cause to be delivered to the Escrow Agent the following:

        (i) this Agreement duly executed by such Purchaser;

        (ii) such Purchaser's Subscription Amount by wire transfer to the account of the Escrow Agent;

        (iii) the Escrow Agreement duly executed by such Purchaser;

        (iv) the Security Agreement duly executed by such Purchaser; and

        (v) the Registration Rights Agreement duly executed by such Purchaser.

2.3  <u>Closing Conditions</u>.

    a) The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met:

        (i) the accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Purchasers contained herein;

        (ii) all obligations, covenants and agreements of the Purchasers required to be performed at or prior to the Closing Date shall have been performed; and

        (iii) the delivery by the Purchasers of the items set forth in Section 2.2(b) of this Agreement.

    b) The respective obligations of the Purchasers hereunder in connection with the Closing are subject to the following conditions being met:

6

(i)   the accuracy in all material respects on the Closing Date of the representations and warranties of the Company contained herein;

(ii)   all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed;

(iii)   the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)   there shall have been no Material Adverse Effect with respect to the Company since the date hereof;

(v)   the Company and each of the Purchasers shall have entered into amendment and waiver agreements with respect to outstanding convertible debentures of the Company held by the Purchasers;

(vi)   the Company shall have instructed, out of the closing proceeds raised hereunder, that $100,000 be paid to HPC Capital Management in connection with services provided by HPC Capital Management;

(vii)   the Company shall have issued 7,500,000 shares of Common Stock to HPC Capital Management, or their designees, for services provided by HPC Capital Management, of which 6,458,063 shares will be delivered at Closing and 1,041,937 shares will be issued upon obtaining the Stockholder Approval and February 15, 2007 shall be considered the date of acquisition of such shares for Rule 144 purposes; and

(viii)   from the date hereof to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission (except for any suspension of trading of limited duration agreed to by the Company, which suspension shall be terminated prior to the Closing), and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg Financial Markets shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity of such magnitude in its effect on, or any material adverse change in, any financial market which, in each case, in the reasonable judgment of each Purchaser, makes it impracticable or inadvisable to purchase the Debentures at the Closing.

7

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

3.1  <u>Representations and Warranties of the Company</u>. Except as set forth under the corresponding section of the disclosure schedules delivered to the Purchasers concurrently herewith (the "<u>Disclosure Schedules</u>") which Disclosure Schedules shall be deemed a part hereof, the Company hereby makes the representations and warranties set forth below to each Purchaser.

(a)  <u>Subsidiaries</u>. All of the direct and indirect subsidiaries of the Company are set forth on <u>Schedule 3.1(a)</u>. The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities. If the Company has no subsidiaries, then references in the Transaction Documents to the Subsidiaries will be disregarded.

(b)  <u>Organization and Qualification</u>. The Company and each of the Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization (as applicable), with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted. Neither the Company nor any Subsidiary is in violation or default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents. Each of the Company and the Subsidiaries is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business, prospects or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a "<u>Material Adverse Effect</u>") and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c)  <u>Authorization; Enforcement</u>. The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of each of the Transaction Documents by the Company and the consummation by it of the transactions contemplated thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, its board of directors or its stockholders in connection therewith other than in connection with the Required Approvals. Each Transaction Document has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

8

(d)  <u>No Conflicts</u>. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the other transactions contemplated hereby and thereby do not and will not: (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected; except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

(e)  <u>Filings, Consents and Approvals</u>. Subject to Stockholder Approval (as defined in Section 4.13), the Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than (i) filings required pursuant to Section 4.6, (ii) the filing with the Commission of the Registration Statement, (iii) the notice and/ or application(s) to each applicable Trading Market for the issuance and sale of the Debentures and Warrants and the listing of the Underlying Shares for trading thereon in the time and manner required thereby, and (iv) the filing of Form D with the Commission and such filings as are required to be made under applicable state securities laws (collectively, the "<u>Required Approvals</u>").

9

(f)  <u>Issuance of the Securities</u>. Subject to Stockholder Approval, the Securities are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents. The Underlying Shares, when issued in accordance with the terms of the Transaction Documents, will be validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company. The Company has reserved from its duly authorized capital stock a number of shares of Common Stock for issuance of the Underlying Shares at least equal to the Required Minimum on the date hereof.

(g)  <u>Capitalization</u>. The capitalization of the Company is as set forth on <u>Schedule 3.1(g)</u>. The Company has not issued any capital stock since its most recently filed periodic report under the Exchange Act, other than pursuant to the exercise of employee stock options under the Company's stock option plans, the issuance of shares of Common Stock to employees pursuant to the Company's employee stock purchase plan and pursuant to the conversion or exercise of outstanding Common Stock Equivalents. No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents. Except as a result of the purchase and sale of the Securities, there are no outstanding options, warrants, script rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents. The issuance and sale of the Securities will not obligate the Company to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under such securities. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities. No further approval or authorization of any stockholder, the Board of Directors of the Company or others is required for the issuance and sale of the Securities. There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.

10

(h)  SEC Reports; Financial Statements. The Company has filed all reports, schedules, forms, statements and other documents required to be filed by it under the Securities Act and the Exchange Act, including pursuant to Section 13 (a) or 15(d) thereof, for the two years preceding the date hereof (or such shorter period as the Company was required by law to file such material) (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

(i)  Material Changes. Since the date of the latest audited financial statements included within the SEC Reports, except as specifically disclosed in the SEC Reports, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or required to be disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans. The Company does not have pending before the Commission any request for confidential treatment of information.

(j)  Litigation. There is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

11

(k)  <u>Labor Relations</u>. No material labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company which could reasonably be expected to result in a Material Adverse Effect.

(l)  <u>Compliance</u>. Neither the Company nor any Subsidiary (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any order of any court, arbitrator or governmental body, or (iii) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business except in each case as could not have a Material Adverse Effect.

(m)  <u>Regulatory Permits</u>. The Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described in the SEC Reports, except where the failure to possess such permits could not have or reasonably be expected to result in a Material Adverse Effect ("<u>Material Permits</u>"), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

(n)  <u>Title to Assets</u>. The Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them that is material to the business of the Company and the Subsidiaries and good and marketable title in all personal property owned by them that is material to the business of the Company and the Subsidiaries, in each case free and clear of all Liens, except for Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases of which the Company and the Subsidiaries are in compliance.

(o) <u>Patents and Trademarks</u>. The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, licenses and other similar rights necessary or material for use in connection with their respective businesses as described in the SEC Reports and which the failure to so have could have a Material Adverse Effect (collectively, the "<u>Intellectual Property Rights</u>"). Neither the Company nor any Subsidiary has received a written notice that the Intellectual Property Rights used by the Company or any Subsidiary violates or infringes upon the rights of any Person. To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights of others.

(p) <u>Insurance</u>. The Company and the Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which the Company and the Subsidiaries are engaged, including, but not limited to, directors and officers insurance coverage at least equal to the aggregate Subscription Amount. To the best knowledge of the Company, such insurance contracts and policies are accurate and complete. Neither the Company nor any Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost.

(q) <u>Transactions With Affiliates and Employees</u>. Except as set forth in the SEC Reports, none of the officers or directors of the Company and, to the knowledge of the Company, none of the employees of the Company is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $60,000 other than (i) for payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company.

(r) <u>Sarbanes-Oxley; Internal Accounting Controls</u>. The Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002 which are applicable to it as of the Closing Date. The Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. The Company has established disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and designed such disclosure controls and procedures to ensure that material information relating to the Company, including its Subsidiaries, is made known to the certifying officers by others within those entities, particularly during the period in which the Company's most recently filed periodic report under the Exchange Act, as the case may be, is being prepared. The Company's certifying officers have evaluated the effectiveness of the Company's controls and procedures as of the date prior to the filing date of the most recently filed periodic report under the Exchange Act (such date, the "<u>Evaluation Date</u>"). The Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the effectiveness of the disclosure controls and procedures based on their evaluations as of the Evaluation Date. Since the Evaluation Date, there have been no significant changes in the Company's internal controls (as such term is defined in Item 307(b) of Regulation S-K under the Exchange Act) or, to the knowledge of the Company, in other factors that could significantly affect the Company's internal controls.

13

(s) <u>Certain Fees</u>. No brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents. The Purchasers shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by the Transaction Documents.

(t) <u>Private Placement</u>. Assuming the accuracy of the Purchasers representations and warranties set forth in Section 3.2, no registration under the Securities Act is required for the offer and sale of the Securities by the Company to the Purchasers as contemplated hereby. The issuance and sale of the Securities hereunder does not contravene the rules and regulations of the Trading Market.

(u) <u>Investment Company</u>. The Company is not, and is not an Affiliate of, and immediately after receipt of payment for the Securities, will not be or be an Affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended. The Company shall conduct its business in a manner so that it will not become subject to the Investment Company Act.

(v) <u>Registration Rights</u>. Other than each of the Purchasers, no Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company.

(w) <u>Listing and Maintenance Requirements</u>. The Company's Common Stock is registered pursuant to Section 12(g) of the Exchange Act, and the Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act nor has the Company received any notification that the Commission is contemplating terminating such registration. The Company has not, in the 12 months preceding the date hereof, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that the Company is not in compliance with the listing or maintenance requirements of such Trading Market. The Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements.

14

(x) <u>Application of Takeover Protections</u>. The Company and its Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's Certificate of Incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to the Purchasers as a result of the Purchasers and the Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation as a result of the Company's issuance of the Securities and the Purchasers' ownership of the Securities.

(y) <u>Disclosure</u>. The Company confirms that neither it nor any other Person acting on its behalf has provided any of the Purchasers or their agents or counsel with any information that constitutes or might constitute material, nonpublic information. The Company understands and confirms that the Purchasers will rely on the foregoing representations and covenants in effecting transactions in securities of the Company. All disclosure provided to the Purchasers regarding the Company, its business and the transactions contemplated hereby, including the Disclosure Schedules to this Agreement, furnished by or on behalf of the Company with respect to the representations and warranties made herein are true and correct with respect to such representations and warranties and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. The Company acknowledges and agrees that no Purchaser makes or has made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 3.2 hereof.

(z) <u>No Integrated Offering</u>. Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, neither the Company, nor any of its affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of the Securities Act or any applicable shareholder approval provisions, including, without limitation, under the rules and regulations of any Trading Market on which any of the securities of the Company are listed or designated.

(aa) <u>Solvency</u>. Based on the financial condition of the Company as of the Closing Date after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder, (i) the Company's fair saleable value of its assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature; (ii) the Company's assets do not constitute unreasonably small capital to carry on its business for the current fiscal year as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company, and projected capital requirements and capital availability thereof; and (iii) the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its debt when such amounts are required to be paid. The Company does not intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt). The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one year from the Closing Date. The SEC Reports set forth as of the dates thereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments. For the purposes of this Agreement, "<u>Indebtedness</u>" shall mean (a) any liabilities for borrowed money or amounts owed in excess of $50,000 (other than trade accounts payable incurred in the ordinary course of business), (b) all guaranties, endorsements and other contingent obligations in respect of Indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (c) the present value of any lease payments in excess of $50,000 due under leases required to be capitalized in accordance with GAAP. Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

15

Exhibit 4.3

(bb)  <u>Tax Status</u>. Except for matters that would not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and each Subsidiary has filed all necessary federal, state and foreign income and franchise tax returns and has paid or accrued all taxes shown as due thereon, and the Company has no knowledge of a tax deficiency which has been asserted or threatened against the Company or any Subsidiary.

(cc)  <u>No General Solicitation</u>. Neither the Company nor any person acting on behalf of the Company has offered or sold any of the Securities by any form of general solicitation or general advertising. The Company has offered the Securities for sale only to the Purchasers and certain other "accredited investors" within the meaning of Rule 501 under the Securities Act.

(dd)  <u>Foreign Corrupt Practices.</u> Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

16

(ee)  <u>Accountants</u>. The Company's accountants are set forth on <u>Schedule 3.1(ff)</u> of the Disclosure Schedule. To the knowledge of the Company, such accountants, who the Company expects will express their opinion with respect to the financial statements to be included in the Company's Annual Report on Form 10-KSB for the year ended December 31, 2005 are a registered public accounting firm as required by the Securities Act.

(ff)  <u>Seniority</u>. As of the Closing Date, no indebtedness or other equity of the Company is senior to the Debentures in right of payment, whether with respect to interest or upon liquidation or dissolution, or otherwise, other than indebtedness secured by purchase money security interests (which is senior only as to underlying assets covered thereby) and capital lease obligations (which is senior only as to the property covered thereby).

(gg)  <u>No Disagreements with Accountants and Lawyers.</u> There are no disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the accountants and lawyers formerly or presently employed by the Company and the Company is current with respect to any fees owed to its accountants and lawyers.

(hh)  <u>Acknowledgment Regarding Purchasers' Purchase of Securities</u>. The Company acknowledges and agrees that each of the Purchasers is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated hereby. The Company further acknowledges that no Purchaser is acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any advice given by any Purchaser or any of their respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is merely incidental to the Purchasers' purchase of the Securities. The Company further represents to each Purchaser that the Company's decision to enter into this Agreement has been based solely on the independent evaluation of the transactions contemplated hereby by the Company and its representatives.

(ii)  <u>Acknowledgement Regarding Purchasers' Trading Activity</u>. Anything in this Agreement or elsewhere herein to the contrary notwithstanding (except for Section 4.16 hereof), it is understood and agreed by the Company (i) that none of the Purchasers have been asked to agree, nor has any Purchaser agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term; (ii) that past or future open market or other transactions by any Purchaser, including Short Sales, and specifically including, without limitation, Short Sales or "derivative" transactions, before or after the closing of this or future private placement transactions, may negatively impact the market price of the Company's publicly-traded securities; (iii) that any Purchaser, and counter parties in "derivative" transactions to which any such Purchaser is a party, directly or indirectly, presently may have a "short" position in the Common Stock, and (iv) that each Purchaser shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction. The Company further understands and acknowledges that (a) one or more Purchasers may engage in hedging activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value of the Underlying Shares deliverable with respect to Securities are being determined and (b) such hedging activities (if any) could reduce the value of the existing stockholders' equity interests in the Company at and after the time that the hedging activities are being conducted.  The Company acknowledges that such aforementioned hedging activities do not constitute a breach of any of the Transaction Documents.

17

(jj)  Manipulation of Price.  The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Securities (other than for the placement agent's placement of the Securities), or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

3.2  Representations and Warranties of the Purchasers.  Each Purchaser hereby, for itself and for no other Purchaser, represents and warrants as of the date hereof and as of the Closing Date to the Company as follows:

(a)  Organization; Authority.  Such Purchaser is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate or partnership power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution, delivery and performance by such Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate or similar action on the part of such Purchaser. Each Transaction Document to which it is a party has been duly executed by such Purchaser, and when delivered by such Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Purchaser, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(b)  Own Account.  Such Purchaser understands that the Securities are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no arrangement or understanding with any other persons regarding the distribution of such Securities (this representation and warranty not limiting such Purchaser's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws) in violation of the Securities Act or any applicable state securities law. Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business. Such Purchaser does not have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

18

(c)  <u>Purchaser Status</u>. At the time such Purchaser was offered the Securities, it was, and at the date hereof it is, and on each date on which it exercises any Warrants or converts any Debentures it will be either: (i) an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act or (ii) a "qualified institutional buyer" as defined in Rule 144A(a) under the Securities Act. Such Purchaser is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

(d)  <u>Experience of Such Purchaser</u>. Such Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Such Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(e)  <u>General Solicitation</u>. Such Purchaser is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(f)  <u>Short Sales and Confidentiality Prior To The Date Hereof</u>. Other than the transaction contemplated hereunder, such Purchaser has not directly or indirectly, nor has any Person acting on behalf of or pursuant to any understanding with such Purchaser, executed any disposition, including Short Sales (but not including the location and/or reservation of borrowable shares of Common Stock), in the securities of the Company during the period commencing from the time that such Purchaser first received a term sheet from the Company or any other Person setting forth the material terms of the transactions contemplated hereunder until the date hereof ("<u>Discussion Time</u>"). Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement. Other than to other Persons party to this Agreement, such Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction).

19

The Company acknowledges and agrees that each Purchaser does not make or has not made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in this Section 3.2.

# ARTICLE IV.
## OTHER AGREEMENTS OF THE PARTIES

4.1   Transfer Restrictions.

(a)   The Securities may only be disposed of in compliance with state and federal securities laws. In connection with any transfer of Securities other than pursuant to an effective registration statement or Rule 144, to the Company or to an affiliate of a Purchaser or in connection with a pledge as contemplated in Section 4.1(b), the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act. As a condition of transfer, any such transferee shall agree in writing to be bound by the terms of this Agreement and shall have the rights of a Purchaser under this Agreement and the Registration Rights Agreement.

(b)   The Purchasers agree to the imprinting, so long as is required by this Section 4.1(b), of a legend on any of the Securities in the following form:

[NEITHER] THESE SECURITIES [NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [EXERCISABLE] [CONVERTIBLE]] HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THESE SECURITIES AND THE SECURITIES ISSUABLE UPON EXERCISE OF THESE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The Company acknowledges and agrees that a Purchaser may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or all of the Securities to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and who agrees to be bound by the provisions of this Agreement and the Registration Rights Agreement and, if required under the terms of such arrangement, such Purchaser may transfer pledged or secured Securities to the pledgees or secured parties. Such a pledge or transfer would not be subject to approval of the Company and no legal opinion of legal counsel of the pledgee, secured party or pledgor shall be required in connection therewith. Further, no notice shall be required of such pledge. At the appropriate Purchaser's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in connection with a pledge or transfer of the Securities, including, if the Securities are subject to registration pursuant to the Registration Rights Agreement, the preparation and filing of any required prospectus supplement under Rule 424(b)(3) under the Securities Act or other applicable provision of the Securities Act to appropriately amend the list of Selling Stockholders thereunder.

(c)  Certificates evidencing the Underlying Shares shall not contain any legend (including the legend set forth in Section 4.1(b) hereof): (i) while a registration statement (including the Registration Statement) covering the resale of such security is effective under the Securities Act, or (ii) following any sale of such Underlying Shares pursuant to Rule 144, or (iii) if such Underlying Shares are eligible for sale under Rule 144(k), or (iv) if such legend is not required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission). The Company shall cause its counsel to issue a legal opinion to the Company's transfer agent promptly after the Effective Date if required by the Company's transfer agent to effect the removal of the legend hereunder. If all or any portion of a Debenture or Warrant is converted or exercised (as applicable) at a time when there is an effective registration statement to cover the resale of the Underlying Shares, or if such Underlying Shares may be sold under Rule 144(k) or if such legend is not otherwise required under applicable requirements of the Securities Act (including judicial interpretations thereof) then such Underlying Shares shall be issued free of all legends. The Company agrees that following the Effective Date or at such time as such legend is no longer required under this Section 4.1(c), it will, no later than three Trading Days following the delivery by a Purchaser to the Company or the Company's transfer agent of a certificate representing Underlying Shares, as applicable, issued with a restrictive legend (such third Trading Day, the "Legend Removal Date"), deliver or cause to be delivered to such Purchaser a certificate representing such shares that is free from all restrictive and other legends. The Company may not make any notation on its records or give instructions to any transfer agent of the Company that enlarge the restrictions on transfer set forth in this Section. Certificates for Securities subject to legend removal hereunder shall be transmitted by the transfer agent of the Company to the Purchasers by crediting the account of the Purchaser's prime broker with the Depository Trust Company System.

21

(d)  In addition to such Purchaser's other available remedies, the Company shall pay to a Purchaser, in cash, as partial liquidated damages and not as a penalty, for each $1,000 of Underlying Shares (based on the Closing Price of the Common Stock on the date such Securities are submitted to the Company's transfer agent) delivered for removal of the restrictive legend and subject to Section 4.1(c), $10 per Trading Day (increasing to $20 per Trading Day 5 Trading Days after such damages have begun to accrue) for each Trading Day after the Legend Removal Date until such certificate is delivered without a legend. Nothing herein shall limit such Purchaser's right to pursue actual damages for the Company's failure to deliver certificates representing any Securities as required by the Transaction Documents, and such Purchaser shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief.

(e)  Each Purchaser, severally and not jointly with the other Purchasers, agrees that the removal of the restrictive legend from certificates representing Securities as set forth in this Section 4.1 is predicated upon the Company's reliance that the Purchaser will sell any Securities pursuant to either the registration requirements of the Securities Act, including any applicable prospectus delivery requirements, or an exemption therefrom.

(f)  Until the one year anniversary of the Effective Date, the Company shall not undertake a reverse or forward stock split or reclassification of the Common Stock without the prior written consent of the Purchasers holding a majority in Principal Amount outstanding of the Debentures.

4.2  <u>Acknowledgment of Dilution</u>. The Company acknowledges that the issuance of the Securities may result in dilution of the outstanding shares of Common Stock, which dilution may be substantial under certain market conditions. The Company further acknowledges that its obligations under the Transaction Documents, including without limitation its obligation to issue the Underlying Shares pursuant to the Transaction Documents, are unconditional and absolute and not subject to any right of set off, counterclaim, delay or reduction, regardless of the effect of any such dilution or any claim the Company may have against any Purchaser and regardless of the dilutive effect that such issuance may have on the ownership of the other stockholders of the Company.

4.3  <u>Furnishing of Information</u>. As long as any Purchaser owns Securities, the Company covenants to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to the Exchange Act. As long as any Purchaser owns Securities, if the Company is not required to file reports pursuant to the Exchange Act, it will prepare and furnish to the Purchasers and make publicly available in accordance with Rule 144(c) such information as is required for the Purchasers to sell the Securities under Rule 144. The Company further covenants that it will take such further action as any holder of Securities may reasonably request, all to the extent required from time to time to enable such Person to sell such Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144.

22

4.4  Integration. The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities in a manner that would require the registration under the Securities Act of the sale of the Securities to the Purchasers or that would be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Trading Market.

4.5  Conversion and Exercise Procedures. The form of Notice of Exercise included in the Warrants and the form of Notice of Conversion included in the Debentures set forth the totality of the procedures required of the Purchasers in order to exercise the Warrants or convert the Debentures. No additional legal opinion or other information or instructions shall be required of the Purchasers to exercise their Warrants or convert their Debentures. The Company shall honor exercises of the Warrants and conversions of the Debentures and shall deliver Underlying Shares in accordance with the terms, conditions and time periods set forth in the Transaction Documents.

4.6  Securities Laws Disclosure; Publicity. The Company shall, by 8:30 a.m. Eastern time on the Trading Day following the date hereof, issue a Current Report on Form 8-K, reasonably acceptable to each Purchaser disclosing the material terms of the transactions contemplated hereby, and shall attach the Transaction Documents thereto. The Company and each Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor any Purchaser shall issue any such press release or otherwise make any such public statement without the prior consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of each Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication. Notwithstanding the foregoing, the Company shall not publicly disclose the name of any Purchaser, or include the name of any Purchaser in any filing with the Commission or any regulatory agency or Trading Market, without the prior written consent of such Purchaser, except (i) as required by federal securities law in connection with the registration statement contemplated by the Registration Rights Agreement and (ii) to the extent such disclosure is required by law or Trading Market regulations, in which case the Company shall provide the Purchasers with prior notice of such disclosure permitted under subclause (i) or (ii).

4.7  Shareholder Rights Plan. No claim will be made or enforced by the Company or, to the knowledge of the Company, any other Person that any Purchaser is an "Acquiring Person" under any shareholder rights plan or similar plan or arrangement in effect or hereafter adopted by the Company, or that any Purchaser could be deemed to trigger the provisions of any such plan or arrangement, by virtue of receiving Securities under the Transaction Documents or under any other agreement between the Company and the Purchasers. The Company shall conduct its business in a manner so that it will not become subject to the Investment Company Act.

4.8  Non-Public Information. The Company covenants and agrees that neither it nor any other Person acting on its behalf will provide any Purchaser or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Purchaser shall have executed a written agreement regarding the confidentiality and use of such information. The Company understands and confirms that each Purchaser shall be relying on the foregoing representations in effecting transactions in securities of the Company.

23

4.9  <u>Use of Proceeds</u>. Except as set forth on <u>Schedule 4.9</u> attached hereto, the Company shall use the net proceeds from the sale of the Securities hereunder for working capital purposes and not for the satisfaction of any portion of the Company's debt (other than payment of trade payables in the ordinary course of the Company's business and prior practices), to redeem any Common Stock or Common Stock Equivalents or to settle any outstanding litigation.

4.10  <u>Reimbursement</u>. If any Purchaser becomes involved in any capacity in any Proceeding by or against any Person who is a stockholder of the Company (except as a result of sales, pledges, margin sales and similar transactions by such Purchaser to or with any current stockholder), solely as a result of such Purchaser's acquisition of the Securities under this Agreement, the Company will reimburse such Purchaser for its reasonable legal and other expenses (including the cost of any investigation preparation and travel in connection therewith) incurred in connection therewith, as such expenses are incurred. The reimbursement obligations of the Company under this paragraph shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Affiliates of the Purchasers who are actually named in such action, proceeding or investigation, and partners, directors, agents, employees and controlling persons (if any), as the case may be, of the Purchasers and any such Affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, the Purchasers and any such Affiliate and any such Person. The Company also agrees that neither the Purchasers nor any such Affiliates, partners, directors, agents, employees or controlling persons shall have any liability to the Company or any Person asserting claims on behalf of or in right of the Company solely as a result of acquiring the Securities under this Agreement.

4.11  <u>Indemnification of Purchasers</u>. Subject to the provisions of this Section 4.11, the Company will indemnify and hold the Purchasers and their directors, officers, shareholders, members, partners, employees and agents (each, a "<u>Purchaser Party</u>") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents or (b) any action instituted against a Purchaser, or any of them or their respective Affiliates, by any stockholder of the Company who is not an Affiliate of such Purchaser, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is based upon a breach of such Purchaser's representations, warranties or covenants under the Transaction Documents or any agreements or understandings such Purchaser may have with any such stockholder or any violations by the Purchaser of state or federal securities laws or any conduct by such Purchaser which constitutes fraud, gross negligence, willful misconduct or malfeasance). If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing. Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of such separate counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party. The Company will not be liable to any Purchaser Party under this Agreement (i) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed; or (ii) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by the Purchasers in this Agreement or in the other Transaction Documents.

24

4.12   Reservation and Listing of Securities.

(a)   Subject to Stockholder Approval, the Company shall maintain a reserve from its duly authorized shares of Common Stock for issuance pursuant to the Transaction Documents in such amount as may be required to fulfill its obligations in full under the Transaction Documents.

(b)   If, on any date, the number of authorized but unissued (and otherwise unreserved) shares of Common Stock is less than the Required Minimum on such date, then the Board of Directors of the Company shall use commercially reasonable efforts to amend the Company's certificate or articles of incorporation to increase the number of authorized but unissued shares of Common Stock to at least the Required Minimum at such time, as soon as possible and in any event not later than the 75th day after such date.

(c)   The Company shall, if applicable: (i) in the time and manner required by the Trading Market, prepare and file with such Trading Market an additional shares listing application covering a number of shares of Common Stock at least equal to the Required Minimum on the date of such application, (ii) take all steps necessary to cause such shares of Common Stock to be approved for listing on the Trading Market as soon as possible thereafter, (iii) provide to the Purchasers evidence of such listing, and (iv) maintain the listing of such Common Stock on any date at least equal to the Required Minimum on such date on such Trading Market or another Trading Market.

4.13   Stockholder Approval. The Company shall file a proxy or information statement with the SEC on or before April 16, 2007 and shall use its best efforts to obtain, on or before May 15, 2007, such approvals of the Company's stockholders as may be required to issue all of the shares of Common Stock issuable upon conversion or exercise of, or otherwise with respect to, the Debentures and the Warrants in accordance with Nevada law and any applicable rules or regulations of the OTCBB and Nasdaq, either through a reverse stock split of the Common Stock or an increase in authorized capital (the "Stockholder Approval"). The Company shall furnish to each Purchaser and its legal counsel promptly (but in no event less than two (2) business days) before the same is filed with the SEC, one copy of any amendment thereto, and shall deliver to each Buyer promptly each letter written by or on behalf of the Company to the SEC or the staff of the SEC, and each item of correspondence from the SEC or the staff of the SEC, in each case relating to such proxy or information statement (other than any portion thereof which contains information for which the Company has sought confidential treatment). The Company will promptly (but in no event more than three (3) business days) respond to any and all comments received from the SEC (which comments shall promptly be made available to each Buyer). The Company shall comply with the filing and disclosure requirements of Section 14 under the 1934 Act in connection with the Stockholder Approval. The Company represents and warrants that its Board of Directors has approved the proposal contemplated by this Section 4(l) and shall indicate such approval in the proxy or information statement used in connection with the Stockholder Approval. If the Company does not obtain Stockholder Approval at the first meeting, the Company shall call a meeting every 4 months thereafter to seek Stockholder Approval until the date that the Debentures are no longer outstanding. The Company shall notify the Purchasers promptly upon receipt of Stockholder Approval.

25

4.14  Participation in Future Financing.

(a)  From the date hereof until the date that is the 12 month anniversary of the Effective Date, upon any financing by the Company or any of its Subsidiaries of Common Stock or Common Stock Equivalents (a "Subsequent Financing"), such Purchaser shall have the right to participate in the Subsequent Financing in an amount equal to up to 100% of the Subsequent Financing (the "Participation Maximum").

(b)  At least 5 Trading Days prior to the closing of the Subsequent Financing, the Company shall deliver to each Purchaser a written notice of its intention to effect a Subsequent Financing ("Pre-Notice"), which Pre-Notice shall ask such Purchaser if it wants to review the details of such financing (such additional notice, a "Subsequent Financing Notice"). Upon the request of a Purchaser, and only upon a request by such Purchaser, for a Subsequent Financing Notice, the Company shall promptly, but no later than 1 Trading Day after such request, deliver a Subsequent Financing Notice to such Purchaser. The Subsequent Financing Notice shall describe in reasonable detail the proposed terms of such Subsequent Financing, the amount of proceeds intended to be raised thereunder, the Person with whom such Subsequent Financing is proposed to be effected, and attached to which shall be a term sheet or similar document relating thereto.

(c)  Any Purchaser desiring to participate in such Subsequent Financing must provide written notice to the Company by not later than 5:30 p.m. (New York City time) on the 5th Trading Day after all of the Purchasers have received the Pre-Notice that the Purchaser is willing to participate in the Subsequent Financing, the amount of the Purchaser's participation, and that the Purchaser has such funds ready, willing and available for investment on the terms set forth in the Subsequent Financing Notice. If the Company receives no notice from a Purchaser as of such 5th Trading Day, such Purchaser shall be deemed to have notified the Company that it does not elect to participate.

(d)  If by 5:30 p.m. (New York City time) on the 5th Trading Day after all of the Purchasers have received the Pre-Notice, notifications by the Purchasers of their willingness to participate in the Subsequent Financing (or to cause their designees to participate) is, in the aggregate, less than the total amount of the Subsequent Financing, then the Company may effect the remaining portion of such Subsequent Financing on the terms and to the Persons set forth in the Subsequent Financing Notice.

26

(e)  If by 5:30 p.m. (New York City time) on the 5th Trading Day after all of the Purchasers have received the Pre-Notice, the Company receives responses to a Subsequent Financing Notice from Purchasers seeking to purchase more than the aggregate amount of the Participation Maximum, each such Purchaser shall have the right to purchase the greater of (a) their Pro Rata Portion (as defined below) of the Participation Maximum and (b) the difference between the Participation Maximum and the aggregate amount of participation by all other Purchasers.  "Pro Rata Portion" is the ratio of (x) the Subscription Amount of Securities purchased on the Closing Date by a Purchaser participating under this Section 4.13 and (y) the sum of the aggregate Subscription Amounts of Securities purchased on the Closing Date by all Purchasers participating under this Section 4.13.

(f)  The Company must provide the Purchasers with a second Subsequent Financing Notice, and the Purchasers will again have the right of participation set forth above in this Section 4.13, if the Subsequent Financing subject to the initial Subsequent Financing Notice is not consummated for any reason on the terms set forth in such Subsequent Financing Notice within 60 Trading Days after the date of the initial Subsequent Financing Notice.

(g)  Notwithstanding the foregoing, this Section 4.13 shall not apply in respect of an Exempt Issuance.

4.15  Subsequent Equity Sales.

(a)  From the date hereof until 90 days after the Effective Date, neither the Company nor any Subsidiary shall issue shares of Common Stock or Common Stock Equivalents; provided, however, the 90 day period set forth in this Section 4.14 shall be extended for the number of Trading Days during such period in which (i) trading in the Common Stock is suspended by any Trading Market, or (ii) following the Effective Date, the Registration Statement is not effective or the prospectus included in the Registration Statement may not be used by the Purchasers for the resale of the Underlying Shares.

(b)  From the date hereof until such time as no Purchaser holds any of the Debentures, the Company shall be prohibited from effecting or entering into an agreement to effect any Subsequent Financing involving a "Variable Rate Transaction". The term "Variable Rate Transaction" shall mean a transaction in which the Company issues or sells (i) any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive additional shares of Common Stock either (A) at a conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such debt or equity securities, or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock or (ii) enters into any agreement, including, but not limited to, an equity line of credit, whereby the Company may sell securities at a future determined price.

27

(c)  Notwithstanding the foregoing, this Section 4.14 shall not apply in respect of an Exempt Issuance, except that no Variable Rate Transaction shall be an Exempt Issuance.

4.16  <u>Equal Treatment of Purchasers</u>. No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration is also offered to all of the parties to the Transaction Documents. Further, the Company shall not make any payment of principal on the Debentures in amounts which are disproportionate to the respective Principal Amounts outstanding on the Debentures at any applicable time. For clarification purposes, this provision constitutes a separate right granted to each Purchaser by the Company and negotiated separately by each Purchaser, and is intended for the Company to treat the Purchasers as a class and shall not in any way be construed as the Purchasers acting in concert or as a group with respect to the purchase, disposition or voting of Securities or otherwise.

4.17  <u>Short Sales and Confidentiality After The Date Hereof</u>. Each Purchaser severally and not jointly with the other Purchasers covenants that neither it nor any affiliates acting on its behalf or pursuant to any understanding with it will execute any Short Sales during the period after the Discussion Time and ending at the time that the transactions contemplated by this Agreement are first publicly announced as described in Section 4.6. Each Purchaser, severally and not jointly with the other Purchasers, covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company as described in Section 4.6, such Purchaser will maintain, the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction). Each Purchaser understands and acknowledges, severally and not jointly with any other Purchaser, that the Commission currently takes the position that coverage of short sales of shares of the Common Stock "against the box" prior to the Effective Date of the Registration Statement with the Securities is a violation of Section 5 of the Securities Act, as set forth in Item 65, Section 5 under Section A, of the Manual of Publicly Available Telephone Interpretations, dated July 1997, compiled by the Office of Chief Counsel, Division of Corporation Finance. Notwithstanding the foregoing, no Purchaser makes any representation, warranty or covenant hereby that it will not engage in Short Sales in the securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced as described in Section 4.6. Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the covenant set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.

28

## ARTICLE V.
## MISCELLANEOUS

5.1 <u>Termination</u>. This Agreement may be terminated by any Purchaser, as to such Purchaser's obligations hereunder only and without any effect whatsoever on the obligations between the Company and the other Purchasers, by written notice to the other parties, if the Closing has not been consummated on or before September 20, 2005; <u>provided</u>, <u>however</u>, that no such termination will affect the right of any party to sue for any breach by the other party (or parties).

5.2 <u>Fees and Expenses</u>. Except as expressly set forth in the Transaction Documents to the contrary, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. The Company shall pay all transfer agent fees, stamp taxes and other taxes and duties levied in connection with the delivery of any Securities.

5.3 <u>Entire Agreement</u>. The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

5.4 <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on a Trading Day, (b) the next Trading Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (c) the 2nd Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as set forth on the signature pages attached hereto.

5.5 <u>Amendments; Waivers</u>. No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by the Company and each Purchaser or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of either party to exercise any right hereunder in any manner impair the exercise of any such right.

5.6 <u>Headings</u>. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

29

5.7  <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of each Purchaser. Any Purchaser may assign any or all of its rights under this Agreement to any Person to whom such Purchaser assigns or transfers any Securities, provided such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions hereof that apply to the "Purchasers".

5.8  <u>No Third-Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.11.

5.9  <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. The parties hereby waive all rights to a trial by jury. If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

5.10  <u>Survival</u>. The representations and warranties contained herein shall survive the Closing and the delivery, exercise and/or conversion of the Securities, as applicable for the applicable statue of limitations.

5.11 <u>Execution</u>. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile signature page were an original thereof.

5.12 <u>Severability</u>. If any provision of this Agreement is held to be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision that is a reasonable substitute therefor, and upon so agreeing, shall incorporate such substitute provision in this Agreement.

5.13 <u>Rescission and Withdrawal Right</u>. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) the Transaction Documents, whenever any Purchaser exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Purchaser may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights; <u>provided</u>, <u>however</u>, in the case of a rescission of a conversion of a Debenture or exercise of a Warrant, the Purchaser shall be required to return any shares of Common Stock subject to any such rescinded conversion or exercise notice.

5.14 <u>Replacement of Securities</u>. If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof, or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and customary and reasonable indemnity, if requested. The applicants for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs associated with the issuance of such replacement Securities.

5.15 <u>Remedies</u>. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations described in the foregoing sentence and hereby agrees to waive in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

5.16 <u>Payment Set Aside</u>. To the extent that the Company makes a payment or payments to any Purchaser pursuant to any Transaction Document or a Purchaser enforces or exercises its rights thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

5.17 <u>Usury</u>. To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any claim, action or proceeding that may be brought by any Purchaser in order to enforce any right or remedy under any Transaction Document. Notwithstanding any provision to the contrary contained in any Transaction Document, it is expressly agreed and provided that the total liability of the Company under the Transaction Documents for payments in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "<u>Maximum Rate</u>"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums in the nature of interest that the Company may be obligated to pay under the Transaction Documents exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by law and applicable to the Transaction Documents is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to the Transaction Documents from the effective date forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to any Purchaser with respect to indebtedness evidenced by the Transaction Documents, such excess shall be applied by such Purchaser to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at such Purchaser's election.

5.18 <u>Independent Nature of Purchasers' Obligations and Rights</u>. The obligations of each Purchaser under any Transaction Document are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance of the obligations of any other Purchaser under any Transaction Document. Nothing contained herein or in any Transaction Document, and no action taken by any Purchaser pursuant thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Purchaser shall be entitled to independently protect and enforce its rights, including without limitation the rights arising out of this Agreement or out of the other Transaction Documents, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose. Each Purchaser has been represented by its own separate legal counsel in their review and negotiation of the Transaction Documents. For reasons of administrative convenience only, Purchasers and their respective counsel have chosen to communicate with the Company through Sichenzia Ross Friedman Ference LLP.

5.19  <u>Liquidated Damages</u>. The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

5.20  <u>Construction</u>. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments hereto.

*(Signature Pages Follow)*

33

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**FELLOWS ENERGY LTD.**                                          Address for Notice:

By: /s/ GEORGE S. YOUNG                                          370 Interlocken Boulevard, Suite 400,
_____                                       Broomfield, CO 80021

Name: George S. Young
Title: Chief Executive Officer
With a copy to (which shall not constitute notice):

Marc Ross
Sichenzia Ross Friedman Ference LLP
1065 Avenue of the Americas, 21st flr.
New York, NY 10018


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER FOLLOWS]

[PURCHASER SIGNATURE PAGES TO FLWE SECURITIES PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: <u>PALISADES MASTER FUND L.P.</u>

/s/ Arlene DeCastro                                    /s/ Peter Cooper
_____                        _____
Arlene DeCastro                                       Peter Cooper
Authorized Signatory                                  Authorized Signatory

Email Address of Purchaser:_____

Address for Notice of Purchaser:



Address for Delivery of Securities for Purchaser (if not same as above):



Subscription Amount: $500,000
Principal Amount: *(1.429 multiplied by the Subscription Amount) $714,500*
EIN Number: **[PROVIDE THIS UNDER SEPARATE COVER]**

35

Unassociated Document

EX-4.4 5 ex44.htm EXHIBIT 4.4

**EXHIBIT 4.4**

NEITHER THIS SECURITY NOR THE SECURITIES INTO WHICH THIS SECURITY IS CONVERTIBLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THIS SECURITY AND THE SECURITIES ISSUABLE UPON CONVERSION OF THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: February 15, 2007
Original Conversion Price (subject to adjustment herein): **$0.1375**

$714,500

**CONVERTIBLE DEBENTURE**

THIS CONVERTIBLE DEBENTURE is one of a series of duly authorized and issued Convertible Debentures of Fellows Energy Ltd., a Nevada corporation, having a principal place of business at 370 Interlocken Boulevard, Suite 400, Broomfield, CO 80021 (the "Company"), designated as its Convertible Debenture (this debenture, the "Debenture" and collectively with the other such series of debentures, the "Debentures").

FOR VALUE RECEIVED, the Company promises to pay to Palisades Master Fund L.P. or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $714,500 by September 7, 2007, or such earlier date as this Debenture is required or permitted to be repaid as provided hereunder (the "Maturity Date"). This Debenture is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Debenture: (a) capitalized terms not otherwise defined herein have the meanings given to such terms in the Purchase Agreement, and (b) the following terms shall have the following meanings:

"Alternate Consideration" shall have the meaning set forth in Section 5(d).

"<u>Base Conversion Price</u>" shall have the meaning set forth in Section 5(b).

"<u>Business Day</u>" means any day except Saturday, Sunday and any day which shall be a federal legal holiday in the United States or a day on which banking institutions in the State of New York are authorized or required by law or other government action to close.

"<u>Buy-In</u>" shall have the meaning set forth in Section 4(d)(v).

"<u>Change of Control Transaction</u>" means the occurrence after the date hereof of any of (i) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company, or (ii) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, or (iii) the Company sells or transfers its assets, as an entirety or substantially as an entirety, to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (iv) a replacement at one time or within a three year period of more than one-half of the members of the Company's board of directors which is not approved by a majority of those individuals who are members of the board of directors on the date hereof (or by those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the date hereof), or (v) the execution by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth above in (i) or (iv).

"<u>Closing Price</u>" means on any particular date (a) the last reported closing bid price per share of Common Stock on such date on the Trading Market (as reported by Bloomberg L.P. at 4:15 PM (New York time), or (b) if there is no such price on such date, then the closing bid price on the Trading Market on the date nearest preceding such date (as reported by Bloomberg L.P. at 4:15 PM (New York time) for the closing bid price for regular session trading on such day), or (c) if the Common Stock is not then listed or quoted on the Trading Market and if prices for the Common Stock are then reported in the "pink sheets" published by the Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported, or (d) if the shares of Common Stock are not then publicly traded the fair market value of a share of Common Stock as determined by a qualified independent appraiser selected in good faith by the Holders of a majority in interest of the outstanding principal amount of the Debentures.

2

"<u>Common Stock</u>" means the common stock, par value $0.001 per share, of the Company and stock of any other class of securities into which such securities may hereafter have been reclassified or changed into.

"<u>Conversion Date</u>" shall have the meaning set forth in Section 4(a).

"<u>Conversion Price</u>" shall have the meaning set forth in Section 4(b).

"<u>Conversion Shares</u>" means the shares of Common Stock issuable upon conversion of this Debenture.

"<u>Debenture Register</u>" shall have the meaning set forth in Section 2(c).

"<u>Dilutive Issuance</u>" shall have the meaning set forth in Section 5(b).

"<u>Dilutive Issuance Notice</u>" shall have the meaning set forth in Section 5(b).

"<u>Effectiveness Period</u>" shall have the meaning given to such term in the Registration Rights Agreement.

"<u>Event of Default</u>" shall have the meaning set forth in Section 8.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"<u>Fundamental Transaction</u>" shall have the meaning set forth in Section 5(d).

"<u>Mandatory Default Amount</u>" shall equal the sum of (i) the greater of: (A) 130% of the principal amount of this Debenture to be prepaid, or (B) the principal amount of this Debenture to be prepaid, divided by the Conversion Price on (x) the date the Mandatory Default Amount is demanded or otherwise due or (y) the date the Mandatory Default Amount is paid in full, whichever is less, multiplied by the Closing Price on (x) the date the Mandatory Default Amount is demanded or otherwise due or (y) the date the Mandatory Default Amount is paid in full, whichever is greater, and (ii) all other amounts, costs, expenses and liquidated damages due in respect of this Debenture.

"<u>New York Courts</u>" shall have the meaning set forth in Section 9(d).

"<u>Notice of Conversion</u>" shall have the meaning set forth in Section 4(a).

"<u>Original Issue Date</u>" shall mean the date of the first issuance of the Debentures regardless of the number of transfers of any Debenture and regardless of the number of instruments which may be issued to evidence such Debenture.

3

"<u>Person</u>" means a corporation, an association, a partnership, organization, a business, an individual, a government or political subdivision thereof or a governmental agency.

"<u>Purchase Agreement</u>" means the Securities Purchase Agreement, dated as of February 15, 2007, to which the Company and the original Holder are parties, as amended, modified or supplemented from time to time in accordance with its terms.

"<u>Registration Rights Agreement</u>" means the Registration Rights Agreement, dated as of the date of the Purchase Agreement, to which the Company and the original Holder are parties, as amended, modified or supplemented from time to time in accordance with its terms.

"<u>Registration Statement</u>" means a registration statement meeting the requirements set forth in the Registration Rights Agreement, covering among other things the resale of the Conversion Shares and naming the Holder as a "selling stockholder" thereunder.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Subsidiary</u>" shall have the meaning given to such term in the Purchase Agreement.

"<u>Trading Day</u>" means a day on which the Common Stock is traded on a Trading Market.

"<u>Trading Market</u>" means the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the Nasdaq SmallCap Market, the American Stock Exchange, the New York Stock Exchange, the Nasdaq National Market or the OTC Bulletin Board.

"<u>Transaction Documents</u>" shall have the meaning set forth in the Purchase Agreement.

<u>Section 2</u>. <u>Interest</u>.

a) <u>No Payment of Interest</u>. This Debenture was issued for an Original Issue Discount. No interest payments shall be due and payable to the Holder hereunder.

b) <u>Prepayment</u>. Except as otherwise set forth in this Debenture, the Company may not prepay any portion of the principal amount of this Debenture without the prior written consent of the Holder.

<u>Section 3.</u>  <u>Registration of Transfers and Exchanges</u>.

a) <u>Different Denominations</u>. This Debenture is exchangeable for an equal aggregate principal amount of Debentures of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be made for such registration of transfer or exchange.

b) <u>Investment Representations</u>. This Debenture has been issued subject to certain investment representations of the original Holder set forth in the Purchase Agreement and may be transferred or exchanged only in compliance with the Purchase Agreement and applicable federal and state securities laws and regulations.

c) <u>Reliance on Debenture Register</u>. Prior to due presentment to the Company for transfer of this Debenture, the Company and any agent of the Company may treat the Person in whose name this Debenture is duly registered on the Debenture Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Debenture is overdue, and neither the Company nor any such agent shall be affected by notice to the contrary.

<u>Section 4.</u>  <u>Conversion</u>.

a) <u>Voluntary Conversion</u>. At any time after the Original Issue Date until this Debenture is no longer outstanding, this Debenture shall be convertible into shares of Common Stock at the option of the Holder, in whole or in part at any time and from time to time (subject to the limitations on conversion set forth in Section 4(c) hereof). The Holder shall effect conversions by delivering to the Company the form of Notice of Conversion attached hereto as <u>Annex A</u> (a "<u>Notice of Conversion</u>"), specifying therein the principal amount of this Debenture to be converted and the date on which such conversion is to be effected (a "<u>Conversion Date</u>"). If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion is provided hereunder. To effect conversions hereunder, the Holder shall not be required to physically surrender this Debenture to the Company unless the entire principal amount of this Debenture has been so converted. Conversions hereunder shall have the effect of lowering the outstanding principal amount of this Debenture in an amount equal to the applicable conversion. The Holder and the Company shall maintain records showing the principal amount converted and the date of such conversions. The Company shall deliver any objection to any Notice of Conversion within 1 Business Day of receipt of such notice. In the event of any dispute or discrepancy, the records of the Holder shall be controlling and determinative in the absence of manifest error. The Holder and any assignee, by acceptance of this Debenture, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Debenture, the unpaid and unconverted principal amount of this Debenture may be less than the amount stated on the face hereof.

b) <u>Conversion Price</u>. The conversion price in effect on any Conversion Date shall be equal to **$0.1375** (subject to adjustment herein)(the "<u>Conversion Price</u>").

c) <u>Holder's Restriction on Conversion</u>. The Company shall not effect any conversion of this Debenture, and the Holder shall not have the right to convert any portion of this Debenture, pursuant to Section 4(a) or otherwise, to the extent that after giving effect to such conversion, the Holder (together with the Holder's affiliates), as set forth on the applicable Notice of Conversion, would beneficially own in excess of 4.99% of the number of shares of the Common Stock outstanding immediately after giving effect to such conversion. For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its affiliates shall include the number of shares of Common Stock issuable upon conversion of this Debenture with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted portion of this Debenture beneficially owned by the Holder or any of its affiliates and (B) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any other debentures or warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Holder or any of its affiliates. Except as set forth in the preceding sentence, for purposes of this Section 4(c), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. To the extent that the limitation contained in this section applies, the determination of whether this Debenture is convertible (in relation to other securities owned by the Holder) and of which a portion of this Debenture is convertible shall be in the sole discretion of such Holder. To ensure compliance with this restriction, the Holder will be deemed to represent to the Company each time it delivers a Notice of Conversion that such Notice of Conversion has not violated the restrictions set forth in this paragraph and the Company shall have no obligation to verify or confirm the accuracy of such determination. For purposes of this Section 4(c), in determining the number of outstanding shares of Common Stock, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Form 10-QSB or Form 10-KSB, as the case may be, (y) a more recent public announcement by the Company or (z) any other notice by the Company or the Company's Transfer Agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of the Holder, the Company shall within two Trading Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Debenture, by the Holder or its affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The provisions of this Section 4(c) may be waived by the Holder, at the election of the Holder, upon not less than 61 days' prior notice to the Company, and the provisions of this Section 4(c) shall continue to apply until such 61st day (or such later date, as determined by the Holder, as may be specified in such notice of waiver).

d) <u>Mechanics of Conversion</u>

6

i. <u>Conversion Shares Issuable Upon Conversion of Principal Amount</u>. The number of shares of Common Stock issuable upon a conversion hereunder shall be determined by the quotient obtained by dividing (x) the outstanding principal amount of this Debenture to be converted by (y) the Conversion Price.

ii. <u>Delivery of Certificate Upon Conversion</u>. Not later than three Trading Days after any Conversion Date, the Company will deliver or cause to be delivered to the Holder a certificate or certificates representing the Conversion Shares which shall be free of restrictive legends and trading restrictions (other than those required by the Purchase Agreement) representing the number of shares of Common Stock being acquired upon the conversion of this Debenture. The Company shall, if available and if allowed under applicable securities laws, use its best efforts to deliver any certificate or certificates required to be delivered by the Company under this Section electronically through the Depository Trust Corporation or another established clearing corporation performing similar functions.

iii. <u>Failure to Deliver Certificates</u>. If in the case of any Notice of Conversion such certificate or certificates are not delivered to or as directed by the applicable Holder by the third Trading Day after a Conversion Date, the Holder shall be entitled by written notice to the Company at any time on or before its receipt of such certificate or certificates thereafter, to rescind such conversion, in which event the Company shall immediately return the certificates representing the principal amount of this Debenture tendered for conversion.

iv. <u>Obligation Absolute; Partial Liquidated Damages</u>. If the Company fails for any reason to deliver to the Holder such certificate or certificates pursuant to Section 4(d)(ii) by the third Trading Day after the Conversion Date, the Company shall pay to such Holder, in cash, as liquidated damages and not as a penalty, for each $1000 of principal amount being converted, $10 per Trading Day (increasing to $20 per Trading Day after 5 Trading Days after such damages begin to accrue) for each Trading Day after such third Trading Day until such certificates are delivered. The Company's obligations to issue and deliver the Conversion Shares upon conversion of this Debenture in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any Person or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder or any other Person of any obligation to the Company or any violation or alleged violation of law by the Holder or any other person, and irrespective of any other circumstance which might otherwise limit such obligation of the Company to the Holder in connection with the issuance of such Conversion Shares; <u>provided</u>, <u>however</u>, such delivery shall not operate as a waiver by the Company of any such action the Company may have against the Holder. In the event the Holder of this Debenture shall elect to convert any or all of the outstanding principal

7

amount hereof, the Company may not refuse conversion based on any claim that the Holder or any one associated or affiliated with the Holder has been engaged in any violation of law, agreement or for any other reason, unless, an injunction from a court, on notice, restraining and or enjoining conversion of all or part of this Debenture shall have been sought and obtained and the Company posts a surety bond for the benefit of the Holder in the amount of 150% of the principal amount of this Debenture outstanding, which is subject to the injunction, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such Holder to the extent it obtains judgment. In the absence of an injunction precluding the same, the Company shall issue Conversion Shares or, if applicable, cash, upon a properly noticed conversion. Nothing herein shall limit a Holder's right to pursue actual damages or declare an Event of Default pursuant to Section 8 herein for the Company's failure to deliver Conversion Shares within the period specified herein and such Holder shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief. The exercise of any such rights shall not prohibit the Holder from seeking to enforce damages pursuant to any other Section hereof or under applicable law.

v. <u>Compensation for Buy-In on Failure to Timely Deliver Certificates Upon Conversion</u>. In addition to any other rights available to the Holder, if the Company fails for any reason to deliver to the Holder such certificate or certificates pursuant to Section 4(d)(ii) by the third Trading Day after the Conversion Date, and if after such third Trading Day the Holder is required by its brokerage firm to purchase (in an open market transaction or otherwise) Common Stock to deliver in satisfaction of a sale by such Holder of the Conversion Shares which the Holder anticipated receiving upon such conversion (a "<u>Buy-In</u>"), then the Company shall (A) pay in cash to the Holder (in addition to any remedies available to or elected by the Holder) the amount by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the Common Stock so purchased exceeds (y) the product of (1) the aggregate number of shares of Common Stock that such Holder anticipated receiving from the conversion at issue multiplied by (2) the actual sale price of the Common Stock at the time of the sale (including brokerage commissions, if any) giving rise to such purchase obligation and (B) at the option of the Holder, either reissue (if surrendered) this Debenture in a principal amount equal to the principal amount of the attempted conversion or deliver to the Holder the number of shares of Common Stock that would have been issued had the Company timely complied with its delivery requirements under Section 4(d)(ii). For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of this Debenture with respect to which the actual sale price of the Conversion Shares at the time of the sale (including brokerage commissions, if any) giving rise to such purchase obligation was a total of $10,000 under clause (A) of the immediately preceding sentence,

8

the Company shall be required to pay the Holder $1,000. The Holder shall provide the Company written notice indicating the amounts payable to the Holder in respect of the Buy-In. Notwithstanding anything contained herein to the contrary, if a Holder requires the Company to make payment in respect of a Buy-In for the failure to timely deliver certificates hereunder and the Company timely pays in full such payment, the Company shall not be required to pay such Holder liquidated damages under Section 4(d)(iv) in respect of the certificates resulting in such Buy-In.

vi. <u>Reservation of Shares Issuable Upon Conversion</u>. The Company covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock solely for the purpose of issuance upon conversion of this Debenture, free from preemptive rights or any other actual contingent purchase rights of persons other than the Holder (and the other holders of the Debentures), not less than such number of shares of the Common Stock as shall (subject to the terms and conditions set forth in the Purchase Agreement) be issuable (taking into account the adjustments and restrictions of Section 5) upon the conversion of the outstanding principal amount of this Debenture hereunder. The Company covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly and validly authorized, issued and fully paid, nonassessable and, if the Registration Statement is then effective under the Securities Act, registered for public sale in accordance with such Registration Statement.

vii. <u>Fractional Shares</u>. Upon a conversion hereunder the Company shall not be required to issue stock certificates representing fractions of shares of the Common Stock, but may if otherwise permitted, make a cash payment in respect of any final fraction of a share based on the Closing Price at such time. If the Company elects not, or is unable, to make such a cash payment, the Holder shall be entitled to receive, in lieu of the final fraction of a share, one whole share of Common Stock.

viii. <u>Transfer Taxes</u>. The issuance of certificates for shares of the Common Stock on conversion of this Debenture shall be made without charge to the Holder hereof for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery of such certificate, provided that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holder of this Debenture so converted and the Company shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

<u>Section 5</u>. <u>Certain Adjustments</u>.

9

a) <u>Stock Dividends and Stock Splits</u>. If the Company, at any time while this Debenture is outstanding: (A) pays a stock dividend or otherwise makes a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company pursuant to this Debenture), (B) subdivides outstanding shares of Common Stock into a larger number of shares, (C) combines (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (D) issues by reclassification of shares of the Common Stock any shares of capital stock of the Company, then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to this Section shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b) <u>Subsequent Equity Sales</u>. If the Company or any Subsidiary thereof, as applicable, at any time while this Debenture is outstanding, shall offer, sell, grant any option to purchase or offer, sell or grant any right to reprice its securities, or otherwise dispose of or issue (or announce any offer, sale, grant or any option to purchase or other disposition) any Common Stock or Common Stock Equivalents entitling any Person to acquire shares of Common Stock, at an effective price per share less than the then Conversion Price (such lower price, the "<u>Base Conversion Price</u>" and such issuances collectively, a "<u>Dilutive Issuance</u>"), as adjusted hereunder (if the holder of the Common Stock or Common Stock Equivalents so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which is issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share which is less than the Conversion Price, such issuance shall be deemed to have occurred for less than the Conversion Price on such date of the Dilutive Issuance), then the Conversion Price shall be reduced to equal the Base Conversion Price. Such adjustment shall be made whenever such Common Stock or Common Stock Equivalents are issued. Notwithstanding the foregoing, no adjustment will be made under this Section 5(b) in respect of an Exempt Issuance. The Company shall notify the Holder in writing, no later than the Business Day following the issuance of any Common Stock or Common Stock Equivalents subject to this section, indicating therein the applicable issuance price, or of applicable reset price, exchange price, conversion price and other pricing terms (such notice the "<u>Dilutive Issuance Notice</u>"). For purposes of clarification, whether or not the Company provides a Dilutive Issuance Notice pursuant to this Section 5(b), upon the occurrence of any Dilutive Issuance, after the date of such Dilutive Issuance the Holder is entitled to receive a number of Conversion Shares based upon the Base Conversion Price regardless of whether the Holder accurately refers to the Base Conversion Price in the Notice of Conversion.

10

c) <u>Pro Rata Distributions</u>. If the Company, at any time while this Debenture is outstanding, shall distribute to all holders of Common Stock (and not to the holders of the Debentures) evidences of its indebtedness or assets (including cash and cash dividends) or rights or warrants to subscribe for or purchase any security, then in each such case the Conversion Price shall be adjusted by multiplying such Conversion Price in effect immediately prior to the record date fixed for determination of stockholders entitled to receive such distribution by a fraction of which the denominator shall be the Closing Price determined as of the record date mentioned above, and of which the numerator shall be such Closing Price on such record date less the then fair market value at such record date of the portion of such assets or evidence of indebtedness so distributed applicable to one outstanding share of the Common Stock as determined by the Board of Directors in good faith. In either case the adjustments shall be described in a statement provided to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

d) <u>Fundamental Transaction</u>. If, at any time while this Debenture is outstanding, (A) the Company effects any merger or consolidation of the Company with or into another Person, (B) the Company effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, or (D) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "<u>Fundamental Transaction</u>"), then upon any subsequent conversion of this Debenture, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one share of Common Stock (the "<u>Alternate Consideration</u>"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to

11

the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new debenture consistent with the foregoing provisions and evidencing the Holder's right to convert such debenture into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this paragraph (d) and insuring that this Debenture (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

e) <u>Calculations</u>. All calculations under this Section 5 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. For purposes of this Section 5, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding treasury shares, if any) issued and outstanding.

f) <u>Notice to the Holder</u>.

     i. <u>Adjustment to Conversion Price</u>. Whenever the Conversion Price is adjusted pursuant to any of this Section 5, the Company shall promptly mail to each Holder a notice setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. If the Company issues a variable rate security, despite the prohibition thereon in the Purchase Agreement, the Company shall be deemed to have issued Common Stock or Common Stock Equivalents at the lowest possible conversion or exercise price at which such securities may be converted or exercised in the case of a Variable Rate Transaction (as defined in the Purchase Agreement).

     ii. <u>Notice to Allow Conversion by Holder</u>. If (A) the Company shall declare a dividend (or any other distribution) on the Common Stock; (B) the Company shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock; (C) the Company shall authorize the granting to all holders of the Common Stock rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights; (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Company is a party, any sale or transfer of all or substantially all of the assets of the Company, of any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property; (E) the Company shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company; then, in each case, the Company shall cause to be filed at each office or agency maintained for the purpose of conversion of this Debenture, and shall cause to be mailed to the Holder at its last address as it shall appear upon the stock books of the Company, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange; <u>provided</u>, that the failure to mail such notice or any defect therein or in the mailing thereof shall not affect the validity of the corporate action required to be specified in such notice. The Holder is entitled to convert this Debenture during the 20-day period commencing the date of such notice to the effective date of the event triggering such notice and such conversion shall not limit any other conversion right of the Holder.

Section 6. <u>RESERVED</u>.

Section 7. <u>Negative Covenants</u>. So long as any portion of this Debenture is outstanding, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

a) enter into, create, incur, assume or suffer to exist any liens of any kind, on or with respect to any of its property or assets now owned or any interest therein or any income or profits therefrom unless this Debenture is paid off in connection with such lien and pursuant to Section 6(b) herein;

b) amend its certificate of incorporation, bylaws or other charter documents so as to materially and adversely affect any rights of the Holder;

c) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a <u>de minimis</u> number of shares of its Common Stock or Common Stock Equivalents other than as to the Conversion Shares to the extent permitted or required under the Transaction Documents or as otherwise permitted by the Transaction Documents;

d) enter into any agreement with respect to any of the foregoing; or

e) pay cash dividends or distributions on any equity securities of the Company.

Section 8. <u>Events of Default</u>.

a) "<u>Event of Default</u>", wherever used herein, means any one of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

13

i. any default in the payment of (A) the principal amount of any Debenture, or (B) liquidated damages in respect of, any Debenture, as and when the same shall become due and payable (whether on a Conversion Date or the Maturity Date or by acceleration or otherwise) which default under clause (B) above, is not cured, within 3 Trading Days;

ii. the Company shall fail to observe or perform any other covenant or agreement contained in this Debenture or any other Debenture (other than a breach by the Company of its obligations to deliver shares of Common Stock to the Holder upon conversion which breach is addressed in clause (xi) below) which failure is not cured, if possible to cure, within the earlier to occur of (A) 5 Trading Days after notice of such default sent by the Holder or by any other Holder and (B)10 Trading Days after the Company shall become or should have become aware of such failure;

iii. a default or event of default (subject to any grace or cure period provided for in the applicable agreement, document or instrument) shall occur under (A) any of the Transaction Documents, or (B) any other material agreement, lease, document or instrument to which the Company or any Subsidiary is bound;

iv. any representation or warranty made herein, in any other Transaction Documents, in any written statement pursuant hereto or thereto, or in any other report, financial statement or certificate made or delivered to the Holder or any other holder of Debentures shall be untrue or incorrect in any material respect as of the date when made or deemed made;

v. (i) the Company or any of its Subsidiaries shall commence a case, as debtor, a case under any applicable bankruptcy or insolvency laws as now or hereafter in effect or any successor thereto, or the Company or any Subsidiary commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Company or any Subsidiary thereof or (ii) there is commenced a case against the Company or any Subsidiary thereof, under any applicable bankruptcy or insolvency laws, as now or hereafter in effect or any successor thereto which remains undismissed for a period of 60 days; or (iii) the Company or any Subsidiary thereof is adjudicated by a court of competent jurisdiction insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or (iv) the Company or any Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property which continues undischarged or unstayed for a period of 60 days; or (v) the Company or any Subsidiary thereof makes a general assignment for the benefit of creditors; or (vi) the Company shall fail to pay, or shall state that it is unable to pay, or shall be unable to pay, its debts generally as they become due; or (vii) the Company or any Subsidiary thereof shall call a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (viii) the Company or any Subsidiary thereof shall by any act or failure to act expressly indicate its consent to, approval of or acquiescence in any of the foregoing; or (ix) any corporate or other action is taken by the Company or any Subsidiary thereof for the purpose of effecting any of the foregoing;

14

vi. the Company or any Subsidiary shall default in any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement of the Company in an amount exceeding $150,000, whether such indebtedness now exists or shall hereafter be created and such default shall result in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

vii. the Common Stock shall not be eligible for quotation on or quoted for trading on a Trading Market and shall not again be eligible for and quoted or listed for trading thereon within five Trading Days;

viii. the Company shall be a party to any Change of Control Transaction or Fundamental Transaction, shall agree to sell or dispose of all or in excess of 33% of its assets in one or more transactions (whether or not such sale would constitute a Change of Control Transaction) or shall redeem or repurchase more than a de minimis number of its outstanding shares of Common Stock or other equity securities of the Company (other than redemptions of Conversion Shares and repurchases of shares of Common Stock or other equity securities of departing officers and directors of the Company; provided such repurchases shall not exceed $100,000, in the aggregate, for all officers and directors during the term of this Debenture);

ix. a Registration Statement shall not have been declared effective by the Commission on or prior to the 180th calendar day after the Closing Date;

x. if, during the Effectiveness Period (as defined in the Registration Rights Agreement), the effectiveness of the Registration Statement lapses for any reason or the Holder shall not be permitted to resell Registrable Securities (as defined in the Registration Rights Agreement) under the Registration Statement, in either case, for more than 10 consecutive Trading Days or 15 non-consecutive Trading Days during any 12 month period; provided, however, that in the event that the Company is negotiating a merger, consolidation, acquisition or sale of all or substantially all of its assets or a similar transaction and in the written opinion of counsel to the Company, the Registration Statement, would be required to be amended to include information concerning such transactions or the parties thereto that is not available or may not be publicly disclosed at the time, the Company shall be permitted an additional 10 consecutive Trading Days during any 12 month period relating to such an event; and

15

xi. the Company shall fail for any reason to deliver certificates to a Holder prior to the fifth Trading Day after a Conversion Date or any Forced Conversion Date pursuant to and in accordance with Section 4(d) or the Company shall provide notice to the Holder, including by way of public announcement, at any time, of its intention not to comply with requests for conversions of any Debentures in accordance with the terms hereof.

b) <u>Remedies Upon Event of Default</u>. If any Event of Default occurs, the full principal amount of this Debenture, together with other amounts owing in respect thereof, to the date of acceleration shall become, at the Holder's election, immediately due and payable in cash. The aggregate amount payable upon an Event of Default shall be equal to the Mandatory Default Amount. Commencing 5 days after the occurrence of any Event of Default that results in the eventual acceleration of this Debenture, the interest rate on this Debenture shall accrue at the rate of 18% per annum, or such lower maximum amount of interest permitted to be charged under applicable law. Upon the payment in full of the Mandatory Default Amount on this entire Debenture, the Holder shall promptly surrender this Debenture to or as directed by the Company. The Holder need not provide and the Company hereby waives any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such declaration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a Debenture holder until such time, if any, as the full payment under this Section shall have been received by it. No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

<u>Section 9</u>. <u>Miscellaneous</u>.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder, including, without limitation, any Notice of Conversion, shall be in writing and delivered personally, by facsimile, sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, facsimile number **303.327.1526, Attn: George Young** or such other address or facsimile number as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section. Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by facsimile, sent by a nationally recognized overnight courier service addressed to each Holder at the facsimile telephone number or address of such Holder appearing on the books of the Company, or if no such facsimile telephone number or address appears, at the principal place of business of the Holder. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Section prior to 5:30 p.m. (New York City time), (ii) the date after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Section later than 5:30 p.m. (New York City time) on any date and earlier than 11:59 p.m. (New York City time) on such date, (iii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service, or (iv) upon actual receipt by the party to whom such notice is required to be given.

16

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Debenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages (if any) on, this Debenture at the time, place, and rate, and in the coin or currency, herein prescribed. This Debenture is a direct debt obligation of the Company. This Debenture ranks <u>pari</u> <u>passu</u> with all other Debentures now or hereafter issued under the terms set forth herein.

c) <u>Lost or Mutilated Debenture</u>. If this Debenture shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Debenture, or in lieu of or in substitution for a lost, stolen or destroyed Debenture, a new Debenture for the principal amount of this Debenture so mutilated, lost, stolen or destroyed but only upon receipt of evidence of such loss, theft or destruction of such Debenture, and of the ownership hereof, and indemnity, if requested, all reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Debenture shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Debenture and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Debenture or the transactions contemplated hereby. If either party shall commence an action or proceeding to enforce any provisions of this Debenture, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorneys fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

17

e) <u>Waiver</u>. Any waiver by the Company or the Holder of a breach of any provision of this Debenture shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Debenture. The failure of the Company or the Holder to insist upon strict adherence to any term of this Debenture on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Debenture. Any waiver must be in writing.

f) <u>Severability</u>. If any provision of this Debenture is invalid, illegal or unenforceable, the balance of this Debenture shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates applicable laws governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum permitted rate of interest. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Debenture as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this indenture, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impeded the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) <u>Next Business Day</u>. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

h) <u>Headings</u>. The headings contained herein are for convenience only, do not constitute a part of this Debenture and shall not be deemed to limit or affect any of the provisions hereof.

18

Unassociated Document

i) <u>Assumption</u>.  Any successor to the Company or surviving entity in a Fundamental Transaction shall (i) assume in writing all of the obligations of the Company under this Debenture and the other Transaction Documents pursuant to written agreements in form and substance satisfactory to the Holder (such approval not to be unreasonably withheld or delayed) prior to such Fundamental Transaction and (ii) to issue to the Holder a new debenture of such successor entity evidenced by a written instrument substantially similar in form and substance to this Debenture, including, without limitation, having a principal amount and interest rate equal to the principal amounts and the interest rates of the Debentures held by the Holder and having similar ranking to this Debenture, and satisfactory to the Holder (any such approval not to be unreasonably withheld or delayed).  The provisions of this Section 9(i) shall apply similarly and equally to successive Fundamental Transactions and shall be applied without regard to any limitations of this Debenture.

*********************

IN WITNESS WHEREOF, the Company has caused this Debenture to be duly executed by a duly authorized officer as of the date first above indicated.

**FELLOWS ENERGY LTD.**

By: /s/ GEORGE S. YOUNG
———————————————————

George S. Young
Chief Executive Officer

EX-4.5 6 ex45.htm EXHIBIT 4.5

**EXHIBIT 4.5**

**REGISTRATION RIGHTS AGREEMENT**

This Registration Rights Agreement (this "<u>Agreement</u>") is made and entered into as of February 15, 2007, among Fellows Energy Ltd., a Nevada corporation (the "<u>Company</u>"), and the purchasers signatory hereto (each such purchaser is a "<u>Purchaser</u>" and collectively, the "<u>Purchasers</u>").

This Agreement is made pursuant to the Securities Purchase Agreement, dated as of the date hereof among the Company and the Purchasers (the "<u>Purchase Agreement</u>").

The Company and the Purchasers hereby agree as follows:

1. <u>Definitions</u>

 **Capitalized terms used and not otherwise defined herein that are defined in the Purchase Agreement shall have the meanings given such terms in the Purchase Agreement.** As used in this Agreement, the following terms shall have the following meanings:

"<u>Advice</u>" shall have the meaning set forth in Section 6(d).

"<u>Effectiveness Date</u>" means, with respect to the initial Registration Statement required to be filed hereunder, the 60th calendar day following the date hereof and, with respect to any additional Registration Statements which may be required pursuant to Section 3(c), the 120th calendar day following the date on which the Company first knows, or reasonably should have known, that such additional Registration Statement is required hereunder; <u>provided</u>, <u>however</u>, in the event the Company is notified by the Commission that one of the above Registration Statements will not be reviewed or is no longer subject to further review and comments, the Effectiveness Date as to such Registration Statement shall be the fifth Trading Day following the date on which the Company is so notified if such date precedes the dates required above.

"<u>Effectiveness Period</u>" shall have the meaning set forth in Section 2(a).

"<u>Event</u>" shall have the meaning set forth in Section 2(b).

"<u>Event Date</u>" shall have the meaning set forth in Section 2(b).

"<u>Filing Date</u>" means, with respect to the initial Registration Statement required hereunder, the 30th calendar day following the date hereof and, with respect to any additional Registration Statements which may be required pursuant to Section 3(c), the 30th day following the date on which the Company first knows, or reasonably should have known that such additional Registration Statement is required hereunder.

1

"Holder" or "Holders" means the holder or holders, as the case may be, from time to time of Registrable Securities.

"Indemnified Party" shall have the meaning set forth in Section 5(c).

"Indemnifying Party" shall have the meaning set forth in Section 5(c).

"Losses" shall have the meaning set forth in Section 5(a).

"Plan of Distribution" shall have the meaning set forth in Section 2(a).

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Prospectus" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"Registrable Securities" means (i) all of the shares of Common Stock issuable upon conversion in full of the Debentures, (ii) any shares of Common Stock issued or issuable to the Holders pursuant to and in connection with that certain First Amendment and Waiver Agreement, dated February 15, 2007, by and among the Company and Palisades, , (iii) any shares of Common Stock issued or issuable to Crescent International Ltd. ("Crescent") pursuant to and in connection with that certain First Amendment and Waiver Agreement, dated February 15, 2007, by and among the Company and Crescent (iv) any securities issued or issuable upon any stock split, dividend or other distribution, recapitalization or similar event with respect to the foregoing, (v) any additional shares issuable in connection with any anti-dilution provisions in the Debentures (without giving effect to any limitations on conversion set forth in the Debenture) and (vi) shares issuable in lieu of cash payments of liquidated damages pursuant to Section 2(b).

"Registration Statement" means the registration statements required to be filed hereunder and any additional registration statements contemplated by Section 3(c), including (in each case) the Prospectus, amendments and supplements to such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Rule 415" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"<u>Rule 424</u>" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"<u>Selling Shareholder Questionnaire</u>" shall have the meaning set forth in Section 3(a).

2.  <u>Shelf Registration</u>

   (a) On or prior to each Filing Date, the Company shall prepare and file with the Commission a "Shelf" Registration Statement covering the resale of 130% of the Registrable Securities on such Filing Date for an offering to be made on a continuous basis pursuant to Rule 415. The Registration Statement shall be on Form S-3 (except if the Company is not then eligible to register for resale the Registrable Securities on Form S-3, in which case such registration shall be on another appropriate form in accordance herewith) and shall contain (unless otherwise directed by the Holders) substantially the "<u>Plan of Distribution</u>" attached hereto as <u>Annex A</u>. Subject to the terms of this Agreement, the Company shall use its best efforts to cause a Registration Statement to be declared effective under the Securities Act as promptly as possible after the filing thereof, but in any event prior to the applicable Effectiveness Date, and shall use its best efforts to keep such Registration Statement continuously effective under the Securities Act until all Registrable Securities covered by such Registration Statement have been sold or may be sold without volume restrictions pursuant to Rule 144(k) as determined by the counsel to the Company pursuant to a written opinion letter to such effect, addressed and acceptable to the Company's transfer agent and the affected Holders (the "<u>Effectiveness Period</u>"). The Company shall telephonically request effectiveness of a Registration Statement as of 5:00 pm Eastern Time on a Trading Day. The Company shall immediately notify the Holders via facsimile of the effectiveness of a Registration Statement on the same Trading Day that the Company telephonically confirms effectiveness with the Commission, which shall be the date requested for effectiveness of a Registration Statement. The Company shall, by 9:30 am Eastern Time on the Trading Day after the Effective Date (as defined in the Purchase Agreement), file a Form 424(b)(5) with the Commission. Failure to so notify the Holder within 1 Trading Day of such notification shall be deemed an Event under Section 2(b).

3

(b) If: (i) a Registration Statement is not filed on or prior to its Filing Date (if the Company files a Registration Statement without affording the Holders the opportunity to review and comment on the same as required by Section 3(a), the Company shall not be deemed to have satisfied this clause (i)), or (ii) the Company fails to file with the Commission a request for acceleration in accordance with Rule 461 promulgated under the Securities Act, within five Trading Days of the date that the Company is notified (orally or in writing, whichever is earlier) by the Commission that a Registration Statement will not be "reviewed," or not subject to further review, or (iii) prior to its Effectiveness Date, the Company fails to file a pre-effective amendment and otherwise respond in writing to comments made by the Commission in respect of such Registration Statement within 10 calendar days after the receipt of comments by or notice from the Commission that such amendment is required in order for a Registration Statement to be declared effective, or (iv) a Registration Statement filed or required to be filed hereunder is not declared effective by the Commission by its Effectiveness Date, or (v) after the Effectiveness Date, a Registration Statement ceases for any reason to remain continuously effective as to all Registrable Securities for which it is required to be effective, or the Holders are not permitted to utilize the Prospectus therein to resell such Registrable Securities for 10 consecutive calendar days but no more than an aggregate of 15 calendar days during any 12-month period (which need not be consecutive Trading Days) (any such failure or breach being referred to as an "Event", and for purposes of clause (i) or (iv) the date on which such Event occurs, or for purposes of clause (ii) the date on which such five Trading Day period is exceeded, or for purposes of clause (iii) the date which such 10 calendar day period is exceeded, or for purposes of clause (v) the date on which such 10 or 15 calendar day period, as applicable, is exceeded being referred to as "Event Date"), then in addition to any other rights the Holders may have hereunder or under applicable law, on each such Event Date and on each monthly anniversary of each such Event Date (if the applicable Event shall not have been cured by such date) until the applicable Event is cured, the Company shall pay to each Holder an amount in cash, as partial liquidated damages and not as a penalty, equal to 1.5% of the aggregate purchase price paid by such Holder pursuant to the Purchase Agreement for any Registrable Securities then held by such Holder. If the Company fails to pay any partial liquidated damages pursuant to this Section in full within seven days after the date payable, the Company will pay interest thereon at a rate of 18% per annum (or such lesser maximum amount that is permitted to be paid by applicable law) to the Holder, accruing daily from the date such partial liquidated damages are due until such amounts, plus all such interest thereon, are paid in full. The partial liquidated damages pursuant to the terms hereof shall apply on a daily pro-rata basis for any portion of a month prior to the cure of an Event.

3. Registration Procedures.

In connection with the Company's registration obligations hereunder, the Company shall:

(a) Not less than five Trading Days prior to the filing of each Registration Statement or any related Prospectus or any amendment or supplement thereto (including any document that would be incorporated or deemed to be incorporated therein by reference), the Company shall, (i) furnish to each Holder copies of all such documents proposed to be filed, which documents (other than those incorporated or deemed to be incorporated by reference) will be subject to the review of such Holders, and (ii) cause its officers and directors, counsel and independent certified public accountants to respond to such inquiries as shall be necessary, in the reasonable opinion of respective counsel to conduct a reasonable investigation within the meaning of the Securities Act. The Company shall not file a Registration Statement or any such Prospectus or any amendments or supplements thereto to which the Holders of a majority of the Registrable Securities shall reasonably object in good faith, provided that, the Company is notified of such objection in writing no later than 5 Trading Days after the Holders have been so furnished copies of such documents. Each Holder agrees to furnish to the Company a completed Questionnaire in the form attached to this Agreement as Annex B (a "Selling Shareholder Questionnaire") not less than two Trading Days prior to the Filing Date or by the end of the fourth Trading Day following the date on which such Holder receives draft materials in accordance with this Section.

(b) (i) Prepare and file with the Commission such amendments, including post-effective amendments, to a Registration Statement and the Prospectus used in connection therewith as may be necessary to keep a Registration Statement continuously effective as to the applicable Registrable Securities for the Effectiveness Period and prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities; (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus supplement (subject to the terms of this Agreement), and as so supplemented or amended to be filed pursuant to Rule 424; (iii) respond as promptly as reasonably possible to any comments received from the Commission with respect to a Registration Statement or any amendment thereto and as promptly as reasonably possible provide the Holders true and complete copies of all correspondence from and to the Commission relating to a Registration Statement; and (iv) comply in all material respects with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by a Registration Statement during the applicable period in accordance (subject to the terms of this Agreement) with the intended methods of disposition by the Holders thereof set forth in such Registration Statement as so amended or in such Prospectus as so supplemented.

(c) If during the Effectiveness Period, the number of Registrable Securities at any time exceeds 90% of the number of shares of Common Stock then registered in a Registration Statement, then the Company shall file as soon as reasonably practicable but in any case prior to the applicable Filing Date, an additional Registration Statement covering the resale by the Holders of not less than 130% of the number of such Registrable Securities.

(d) Notify the Holders of Registrable Securities to be sold (which notice shall, pursuant to clauses (ii) through (vi) hereof, be accompanied by an instruction to suspend the use of the Prospectus until the requisite changes have been made) as promptly as reasonably possible (and, in the case of (i)(A) below, not less than five Trading Days prior to such filing) and (if requested by any such Person) confirm such notice in writing no later than one Trading Day following the day (i)(A) when a Prospectus or any Prospectus supplement or post-effective amendment to a Registration Statement is proposed to be filed; (B) when the Commission notifies the Company whether there will be a "review" of such Registration Statement and whenever the Commission comments in writing on such Registration Statement (the Company shall provide true and complete copies thereof and all written responses thereto to each of the Holders); and (C) with respect to a Registration Statement or any post-effective amendment, when the same has become effective; (ii) of any request by the Commission or any other Federal or state governmental authority for amendments or supplements to a Registration Statement or Prospectus or for additional information; (iii) of the issuance by the Commission or any other federal or state governmental authority of any stop order suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; (v) of the occurrence of any event or passage of time that makes the financial statements included in a Registration Statement ineligible for inclusion therein or any statement made in a Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to a Registration Statement, Prospectus or other documents so that, in the case of a Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and (vi) the occurrence or existence of any pending corporate development with respect to the Company that the Company believes may be material and that, in the determination of the Company, makes it not in the best interest of the Company to allow continued availability of a Registration Statement or Prospectus; provided that any and all of such information shall remain confidential to each Holder until such information otherwise becomes public, unless disclosure by a Holder is required by law; provided, further, notwithstanding each Holder's agreement to keep such information confidential, the Holders make no acknowledgement that any such information is material, non-public information.

(e)  Use its best efforts to avoid the issuance of, or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment.

(f)  Furnish to each Holder, without charge, at least one conformed copy of each such Registration Statement and each amendment thereto, including financial statements and schedules, all documents incorporated or deemed to be incorporated therein by reference to the extent requested by such Person, and all exhibits to the extent requested by such Person (including those previously furnished or incorporated by reference) promptly after the filing of such documents with the Commission.

(g)  Promptly deliver to each Holder, without charge, as many copies of the Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Persons may reasonably request in connection with resales by the Holder of Registrable Securities. Subject to the terms of this Agreement, the Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto, except after the giving on any notice pursuant to Section 3(d).

(h)  If NASDR Rule 2710 requires any broker-dealer to make a filing prior to executing a sale by a Holder, make an Issuer Filing with the NASDR, Inc. Corporate Financing Department pursuant to NASDR Rule 2710(b)(10)(A)(i) and respond within five Trading Days to any comments received from NASDR in connection therewith, and pay the filing fee required in connection therewith.

(i)  Prior to any resale of Registrable Securities by a Holder, use its commercially reasonable efforts to register or qualify or cooperate with the selling Holders in connection with the registration or qualification (or exemption from the Registration or qualification) of such Registrable Securities for the resale by the Holder under the securities or Blue Sky laws of such jurisdictions within the United States as any Holder reasonably requests in writing, to keep each registration or qualification (or exemption therefrom) effective during the Effectiveness Period and to do any and all other acts or things reasonably necessary to enable the disposition in such jurisdictions of the Registrable Securities covered by each Registration Statement; provided, that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified, subject the Company to any material tax in any such jurisdiction where it is not then so subject or file a general consent to service of process in any such jurisdiction.

(j)  If requested by the Holders, cooperate with the Holders to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates shall be free, to the extent permitted by the Purchase Agreement, of all restrictive legends, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holders may request.

(k)  Upon the occurrence of any event contemplated by this Section 3, as promptly as reasonably possible under the circumstances taking into account the Company's good faith assessment of any adverse consequences to the Company and its stockholders of the premature disclosure of such event, prepare a supplement or amendment, including a post-effective amendment, to a Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, neither a Registration Statement nor such Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. If the Company notifies the Holders in accordance with clauses (ii) through (vi) of Section 3(d) above to suspend the use of any Prospectus until the requisite changes to such Prospectus have been made, then the Holders shall suspend use of such Prospectus. The Company will use its best efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable. The Company shall be entitled to exercise its right under this Section 3(k) to suspend the availability of a Registration Statement and Prospectus, subject to the payment of partial liquidated damages pursuant to Section 2(b), for a period not to exceed 60 days (which need not be consecutive days) in any 12 month period.

(l)  Comply with all applicable rules and regulations of the Commission.

(m)  The Company may require each selling Holder to furnish to the Company a certified statement as to the number of shares of Common Stock beneficially owned by such Holder and, if required by the Commission, the person thereof that has voting and dispositive control over the Shares. During any periods that the Company is unable to meet its obligations hereunder with respect to the registration of the Registrable Securities solely because any Holder fails to furnish such information within three Trading Days of the Company's request, any liquidated damages that are accruing at such time as to such Holder only shall be tolled and any Event that may otherwise occur solely because of such delay shall be suspended as to such Holder only, until such information is delivered to the Company.

4. <u>Registration Expenses</u>. All fees and expenses incident to the performance of or compliance with this Agreement by the Company shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with the Trading Market on which the Common Stock is then listed for trading, (B) in compliance with applicable state securities or Blue Sky laws reasonably agreed to by the Company in writing (including, without limitation, fees and disbursements of counsel for the Company in connection with Blue Sky qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the Holders) and (C) if not previously paid by the Company in connection with an Issuer Filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with NASD Regulation, Inc. pursuant to the NASD Rule 2710, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the holders of a majority of the Registrable Securities included in a Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) Securities Act liability insurance, if the Company so desires such insurance, and (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company shall be responsible for all of its internal expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange as required hereunder. In no event shall the Company be responsible for any broker or similar commissions or, except to the extent provided for in the Transaction Documents, any legal fees or other costs of the Holders.

5. <u>Indemnification</u>

(a) <u>Indemnification by the Company</u>. The Company shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Holder, the officers, directors, agents, brokers (including brokers who offer and sell Registrable Securities as principal as a result of a pledge or any failure to perform under a margin call of Common Stock), investment advisors and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable attorneys' fees) and expenses (collectively, "<u>Losses</u>"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in a Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (i) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Holder expressly for use in a Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto (it being understood that the Holder has approved Annex A hereto for this purpose) or (ii) in the case of an occurrence of an event of the type specified in Section 3(d)(ii)-(vi), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated in Section 6(d). The Company shall notify the Holders promptly of the institution, threat or assertion of any Proceeding arising from or in connection with the transactions contemplated by this Agreement of which the Company is aware.

8

(b) <u>Indemnification by Holders</u>. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, to the extent arising out of or based solely upon: (x) such Holder's failure to comply with the prospectus delivery requirements of the Securities Act or (y) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading (i) to the extent, but only to the extent, that such untrue statement or omission is contained in any information so furnished in writing by such Holder to the Company specifically for inclusion in such Registration Statement or such Prospectus or (ii) to the extent that (1) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Holder expressly for use in a Registration Statement (it being understood that the Holder has approved Annex A hereto for this purpose), such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (2) in the case of an occurrence of an event of the type specified in Section 3(d)(ii)-(vi), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated in Section 6(d). In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

9

(c) <u>Conduct of Indemnification Proceedings</u>. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "<u>Indemnified Party</u>"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "<u>Indemnifying Party</u>") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall reasonably believe that a material conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and the reasonable fees and expenses of one separate counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten Trading Days of written notice thereof to the Indemnifying Party; provided, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is not entitled to indemnification hereunder, determined based upon the relative faults of the parties.

(d) <u>Contribution</u>. If the indemnification under Section 5(a) or 5(b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Party, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in this Agreement, any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section was available to such party in accordance with its terms.

10

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 5(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission, except in the case of fraud by such Holder.

The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

6. Miscellaneous

(a) Remedies. In the event of a breach by the Company or by a Holder, of any of their obligations under this Agreement, each Holder or the Company, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company and each Holder agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

(b) No Piggyback on Registrations. Except as set forth on Schedule 6(b) attached hereto (i) neither the Company nor any of its security holders (other than the Holders in such capacity pursuant hereto) may include securities of the Company in the initial Registration Statement other than the Registrable Securities and (ii) no Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company. The Company shall not file any other registration statements until the initial Registration Statement required hereunder is declared effective by the Commission, provided that this Section 6(b) shall not prohibit the Company from filing amendments to registration statements already filed.

11

Exhibit 4.5

(c)  Compliance. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Registrable Securities pursuant to a Registration Statement.

(d)  Discontinued Disposition. Each Holder agrees by its acquisition of such Registrable Securities that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in Section 3(d), such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until such Holder's receipt of the copies of the supplemented Prospectus and/or amended Registration Statement, or until it is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement. The Company will use its best efforts to ensure that the use of the Prospectus may be resumed as promptly as it practicable. The Company agrees and acknowledges that any periods during which the Holder is required to discontinue the disposition of the Registrable Securities hereunder shall be subject to the provisions of Section 2(b).

(e)  Piggy-Back Registrations. If at any time during the Effectiveness Period there is not an effective Registration Statement covering all of the Registrable Securities and the Company shall determine to prepare and file with the Commission a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-4 or Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with the stock option or other employee benefit plans, then the Company shall send to each Holder a written notice of such determination and, if within fifteen days after the date of such notice, any such Holder shall so request in writing, the Company shall include in such registration statement all or any part of such Registrable Securities such Holder requests to be registered; provided, however, that, the Company shall not be required to register any Registrable Securities pursuant to this Section 6(e) that are eligible for resale pursuant to Rule 144(k) promulgated under the Securities Act or that are the subject of a then effective Registration Statement.

(f)  Amendments and Waivers. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and each Holder of the then outstanding Registrable Securities. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of all of the Registrable Securities to which such waiver or consent relates; provided, however, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence.

12

(g)  Notices. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be delivered as set forth in the Purchase Agreement.

(h)  Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of each Holder. The Company may not assign its rights or obligations hereunder without the prior written consent of all of the Holders of the then-outstanding Registrable Securities. Each Holder may assign their respective rights hereunder in the manner and to the Persons as permitted under the Purchase Agreement.

(i)  No Inconsistent Agreements. Neither the Company nor any of its subsidiaries has entered, as of the date hereof, nor shall the Company or any of its subsidiaries, on or after the date of this Agreement, enter into any agreement with respect to its securities, that would have the effect of impairing the rights granted to the Holders in this Agreement or otherwise conflicts with the provisions hereof. Except as set forth on Schedule 6(i), neither the Company nor any of its subsidiaries has previously entered into any agreement granting any registration rights with respect to any of its securities to any Person that have not been satisfied in full.

(j)  Execution and Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and, all of which taken together shall constitute one and the same Agreement. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were the original thereof.

(k)  Governing Law. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be determined with the provisions of the Purchase Agreement.

(l)  Cumulative Remedies. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(m)  Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(n)  Headings. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(o)  <u>Independent Nature of Holders' Obligations and Rights</u>. The obligations of each Holder hereunder are several and not joint with the obligations of any other Holder hereunder, and no Holder shall be responsible in any way for the performance of the obligations of any other Holder hereunder. Nothing contained herein or in any other agreement or document delivered at any closing, and no action taken by any Holder pursuant hereto or thereto, shall be deemed to constitute the Holders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Holders are in any way acting in concert with respect to such obligations or the transactions contemplated by this Agreement. Each Holder shall be entitled to protect and enforce its rights, including without limitation the rights arising out of this Agreement, and it shall not be necessary for any other Holder to be joined as an additional party in any proceeding for such purpose.

*********************

14

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**FELLOWS ENERGY LTD.**

By:  /s/  GEORGE S. YOUNG
_____

Name: George S. Young
Title: Chief Executive Officer

[SIGNATURE PAGE OF HOLDERS FOLLOWS]

15

Exhibit 4.5

[SIGNATURE PAGE OF HOLDERS TO FLWE RRA]

Name of Holder: PALISADES MASTER FUND, L.P.

/s/ Arlene DeCastro                           /s/ Peter Cooper
_____                     _____

Arlene DeCastro                               Peter Cooper
Authorized Signatory                          Authorized Signatory

[SIGNATURE PAGES CONTINUE]

16

EX-4.6 7 ex46.htm EXHIBIT 4.6
**EXHIBIT 4.6**

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of February 15, 2007 (this "Agreement"), is made among Fellows Energy Ltd., a Nevada corporation (the "Debtor") and the holders of the Debtor's Convertible Debentures due September 7, 2007 signatory hereto, their endorsers, transferees and assigns (collectively, the "Secured Parties").

### W I T N E S S E T H :

WHEREAS, pursuant to the Securities Purchase Agreement, dated February 15, 2007, by and among the Debtor and the Secured Parties (the "Purchase Agreement"), the Secured Parties have severally agreed to extend loans with a principal amount of $714,500 to the Debtor evidenced by the Convertible Debentures due September 7, 2007 (the "SPA Debentures";

WHEREAS, pursuant to the First Amendment and Waiver Agreement, dated February 15, 2007, by and among the Debtor and Palisades Master Fund (the "Palisades Agreement"), the Company amended certain terms of the Convertible Debentures, due September 7, 2007, with an outstanding aggregate principal amount of $_____ (the "Palisades Debentures") in consideration for certain waiver of existing defaults under the Palisades Debentures;

WHEREAS, pursuant to the First Amendment and Waiver Agreement, dated February 15, 2007, by and among the Company and Crescent International Ltd. (the "Crescent Agreement" and together with the Purchase Agreement and the Palisades Agreement, the "Primary Agreements")), the Company amended certain terms of the Convertible Debentures, due September 7, 2007, with an outstanding aggregate principal amount of $_____ (the "Crescent Debentures" and collectively with the SPA Debentures and the Palisades Debentures, the "Debentures")) in consideration for certain waiver of existing defaults under the Crescent Debentures;

WHEREAS, the Debtor has agreed to guarantee and act as surety for payment of such Debentures; and

WHEREAS, in order to induce the Secured Parties to extend the loans evidenced by the SPA Debentures and agree to certain amendments and waiver in respect of the Crescent Debentures and Palisades Debentures, each Debtor has agreed to execute and deliver to the Secured Parties this Agreement and to grant the Secured Parties, pari passu with each other Secured Party and through the Agent, a security interest in certain property of such Debtor to secure the prompt payment, performance and discharge in full of all of the Debtor's obligations under the Debentures and the Guarantors' obligations under the Guarantee.

NOW, THEREFORE, in consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  **Certain Definitions**. As used in this Agreement, the following terms shall have the meanings set forth in this Section 1. Terms used but not otherwise defined in this Agreement that are defined in Article 9 of the UCC (such as "account", "chattel paper", "commercial tort claim", "deposit account", "document", "equipment", "fixtures", "general intangibles", "goods", "instruments", "inventory", "investment property", "letter-of-credit rights", "proceeds" and "supporting obligations") shall have the respective meanings given such terms in Article 9 of the UCC or defined in the Purchase Agreement.

(a)  "Collateral" means, except as set forth on Schedule I hereto, the collateral in which the Secured Parties are granted a security interest by this Agreement and which shall include the following personal property of the Debtors, whether presently owned or existing or hereafter acquired or coming into existence, wherever situated, and all additions and accessions thereto and all substitutions and replacements thereof, and all proceeds, products and accounts thereof, including, without limitation, all proceeds from the sale or transfer of the Collateral and of insurance covering the same and of any tort claims in connection therewith, and all dividends, interest, cash, notes, securities, equity interest or other property at any time and from time to time acquired, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Pledged Securities (as defined below):

(i)  All goods, including, without limitation, (A) all machinery, equipment, computers, motor vehicles, trucks, tanks, boats, ships, appliances, furniture, special and general tools, fixtures, test and quality control devices and other equipment of every kind and nature and wherever situated, together with all documents of title and documents representing the same, all additions and accessions thereto, replacements therefor, all parts therefor, and all substitutes for any of the foregoing and all other items used and useful in connection with any Debtor's businesses and all improvements thereto; and (B) all inventory;

(ii)  All contract rights and other general intangibles, including, without limitation, all partnership interests, membership interests, stock or other securities, rights under any of the Organizational Documents, agreements related to the Pledged Securities, licenses, distribution and other agreements, computer software (whether "off-the-shelf", licensed from any third party or developed by any Debtor), computer software development rights, leases, franchises, customer lists, quality control procedures, grants and rights, goodwill, trademarks, service marks, trade styles, trade names, patents, patent applications, copyrights, and income tax refunds;

(iii)  All accounts, together with all instruments, all documents of title representing any of the foregoing, all rights in any merchandising, goods, equipment, motor vehicles and trucks which any of the same may represent, and all right, title, security and guaranties with respect to each account, including any right of stoppage in transit;

(iv)  All documents, letter-of-credit rights, instruments and chattel paper;

2

(v) All commercial tort claims;

(vi) All deposit accounts and all cash (whether or not deposited in such deposit accounts);

(vii) All investment property;

 (viii) All supporting obligations; and

(ix) All files, records, books of account, business papers, and computer programs; and

(x) the products and proceeds of all of the foregoing Collateral set forth in clauses (i)-(ix) above.

Without limiting the generality of the foregoing, the "Collateral" shall include all investment property and general intangibles respecting ownership and/or other equity interests in each Guarantor, including, without limitation, the shares of capital stock and the other equity interests listed on Schedule H hereto (as the same may be modified from time to time pursuant to the terms hereof), and any other shares of capital stock and/or other equity interests of any other direct or indirect subsidiary of any Debtor obtained in the future, and, in each case, all certificates representing such shares and/or equity interests and, in each case, all rights, options, warrants, stock, other securities and/or equity interests that may hereafter be received, receivable or distributed in respect of, or exchanged for, any of the foregoing and all rights arising under or in connection with the Pledged Securities, including, but not limited to, all dividends, interest and cash.

Notwithstanding the foregoing, nothing herein shall be deemed to constitute an assignment of any asset which, in the event of an assignment, becomes void by operation of applicable law or the assignment of which is otherwise prohibited by applicable law (in each case to the extent that such applicable law is not overridden by Sections 9-406, 9-407 and/or 9-408 of the UCC or other similar applicable law); provided, however, that to the extent permitted by applicable law, this Agreement shall create a valid security interest in such asset and, to the extent permitted by applicable law, this Agreement shall create a valid security interest in the proceeds of such asset.

(b) "Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office, (ii) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof, and all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, (iii) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade dress, service marks, logos, domain names and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common law rights related thereto, (iv) all trade secrets arising under the laws of the United States, any other country or any political subdivision thereof, (v) all rights to obtain any reissues, renewals or extensions of the foregoing, (vi) all licenses for any of the foregoing, and (vii) all causes of action for infringement of the foregoing.

3

(c) "Majority in Interest" means, at any time of determination, the majority in interest (based on then-outstanding principal amounts of Debentures at the time of such determination) of the Secured Parties.

(d) "Necessary Endorsement" means undated stock powers endorsed in blank or other proper instruments of assignment duly executed and such other instruments or documents as the Agent (as that term is defined below) may reasonably request.

(e) "Obligations" means all of the liabilities and obligations (primary, secondary, direct, contingent, sole, joint or several) due or to become due, or that are now or may be hereafter contracted or acquired, or owing to, of any Debtor to the Secured Parties, including, without limitation, all obligations under this Agreement, the Primary Agreements, the Debentures, the Guarantee and any other instruments, agreements or other documents executed and/or delivered in connection herewith or therewith, in each case, whether now or hereafter existing, voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from any of the Secured Parties as a preference, fraudulent transfer or otherwise as such obligations may be amended, supplemented, converted, extended or modified from time to time. Without limiting the generality of the foregoing, the term "Obligations" shall include, without limitation: (i) principal of, and interest on the Debentures and the loans extended pursuant thereto; (ii) any and all other fees, indemnities, costs, obligations and liabilities of the Debtors from time to time under or in connection with this Agreement, the Debentures, the Guarantee and any other instruments, agreements or other documents executed and/or delivered in connection herewith or therewith; and (iii) all amounts (including but not limited to post-petition interest) in respect of the foregoing that would be payable but for the fact that the obligations to pay such amounts are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving any Debtor.

4

(f) "<u>Organizational Documents</u>" means with respect to any Debtor, the documents by which such Debtor was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Debtor (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

(g) "<u>Pledged Securities</u>" shall have the meaning ascribed to such term in Section 4(i).

(h) "<u>UCC</u>" means the Uniform Commercial Code of the State of New York and or any other applicable law of any state or states which has jurisdiction with respect to all, or any portion of, the Collateral or this Agreement, from time to time. It is the intent of the parties that defined terms in the UCC should be construed in their broadest sense so that the term "Collateral" will be construed in its broadest sense. Accordingly if there are, from time to time, changes to defined terms in the UCC that broaden the definitions, they are incorporated herein and if existing definitions in the UCC are broader than the amended definitions, the existing ones shall be controlling.

2. **Grant of Security Interest in Collateral**. As an inducement for the Secured Parties to extend the loans as evidenced by the Debentures and to secure the complete and timely payment, performance and discharge in full, as the case may be, of all of the Obligations, each Debtor hereby unconditionally and irrevocably pledges, grants and hypothecates to the Secured Parties a security interest in and to, a lien upon and a right of set-off against all of their respective right, title and interest of whatsoever kind and nature in and to, the Collateral (a "<u>Security Interest</u>" and collectively, the "<u>Security Interests</u>").

3. **Delivery of Certain Collateral**. Contemporaneously or prior to the execution of this Agreement, each Debtor shall deliver or cause to be delivered to the Agent (a) any and all certificates and other instruments representing or evidencing the Pledged Securities, and (b) any and all certificates and other instruments or documents representing any of the other Collateral, in each case, together with all Necessary Endorsements. The Debtors are, contemporaneously with the execution hereof, delivering to Agent, or have previously delivered to Agent, a true and correct copy of each Organizational Document governing any of the Pledged Securities.

4. **Representations, Warranties, Covenants and Agreements of the Debtors**. Except as set forth under the corresponding section of the disclosure schedules delivered to the Secured Parties concurrently herewith (the "<u>Disclosure Schedules</u>"), which Disclosure Schedules shall be deemed a part hereof, each Debtor represents and warrants to, and covenants and agrees with, the Secured Parties as follows:

(a) Each Debtor has the requisite corporate, partnership, limited liability company or other power and authority to enter into this Agreement and otherwise to carry out its obligations hereunder. The execution, delivery and performance by each Debtor of this Agreement and the filings contemplated therein have been duly authorized by all necessary action on the part of such Debtor and no further action is required by such Debtor. This Agreement has been duly executed by each Debtor. This Agreement constitutes the legal, valid and binding obligation of each Debtor, enforceable against each Debtor in accordance with its terms except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws of general application relating to or affecting the rights and remedies of creditors and by general principles of equity.

5

(b)  The Debtors have no place of business or offices where their respective books of account and records are kept (other than temporarily at the offices of its attorneys or accountants) or places where Collateral is stored or located, except as set forth on <u>Schedule A</u> attached hereto. Except as specifically set forth on <u>Schedule A</u>, each Debtor is the record owner of the real property where such Collateral is located, and there exist no mortgages or other liens on any such real property except for Permitted Liens (as defined in the Debentures). Except as disclosed on <u>Schedule A</u>, none of such Collateral is in the possession of any consignee, bailee, warehouseman, agent or processor.

(c)  Except for Permitted Liens (as defined in the Debentures) and except as set forth on <u>Schedule B</u> attached hereto, the Debtors are the sole owner of the Collateral (except for non-exclusive licenses granted by any Debtor in the ordinary course of business), free and clear of any liens, security interests, encumbrances, rights or claims, and are fully authorized to grant the Security Interests. Except as set forth on <u>Schedule B</u> attached hereto, there is not on file in any governmental or regulatory authority, agency or recording office an effective financing statement, security agreement, license or transfer or any notice of any of the foregoing (other than those that will be filed in favor of the Secured Parties pursuant to this Agreement) covering or affecting any of the Collateral. Except as set forth on Schedule B attached hereto and except pursuant to this Agreement, as long as this Agreement shall be in effect, the Debtors shall not execute and shall not knowingly permit to be on file in any such office or agency any other financing statement or other document or instrument (except to the extent filed or recorded in favor of the Secured Parties pursuant to the terms of this Agreement).

(d)  No written claim has been received that any Collateral or Debtor's use of any Collateral violates the rights of any third party. There has been no adverse decision to any Debtor's claim of ownership rights in or exclusive rights to use the Collateral in any jurisdiction or to any Debtor's right to keep and maintain such Collateral in full force and effect, and there is no proceeding involving said rights pending or, to the best knowledge of any Debtor, threatened before any court, judicial body, administrative or regulatory agency, arbitrator or other governmental authority.

(e)  Each Debtor shall at all times maintain its books of account and records relating to the Collateral at its principal place of business and its Collateral at the locations set forth on <u>Schedule A</u> attached hereto and may not relocate such books of account and records or tangible Collateral unless it delivers to the Secured Parties at least 30 days prior to such relocation (i) written notice of such relocation and the new location thereof (which must be within the United States) and (ii) evidence that appropriate financing statements under the UCC and other necessary documents have been filed and recorded and other steps have been taken to perfect the Security Interests to create in favor of the Secured Parties a valid, perfected and continuing perfected first priority lien in the Collateral.

6

(f)  This Agreement creates in favor of the Secured Parties a valid, security interest in the Collateral, subject only to Permitted Liens (as defined in the Debentures) securing the payment and performance of the Obligations. Upon making the filings described in the immediately following paragraph, all security interests created hereunder in any Collateral which may be perfected by filing Uniform Commercial Code financing statements shall have been duly perfected. Except for the filing of the Uniform Commercial Code financing statements referred to in the immediately following paragraph, the recordation of the Intellectual Property Security Agreement (as defined below) with respect to copyrights and copyright applications in the United States Copyright Office referred to in paragraph (m), the execution and delivery of deposit account control agreements satisfying the requirements of Section 9-104(a)(2) of the UCC with respect to each deposit account of the Debtors, and the delivery of the certificates and other instruments provided in Section 3, no action is necessary to create, perfect or protect the security interests created hereunder. Without limiting the generality of the foregoing, except for the filing of said financing statements, the recordation of said Intellectual Property Security Agreement, and the execution and delivery of said deposit account control agreements, no consent of any third parties and no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for (i) the execution, delivery and performance of this Agreement, (ii) the creation or perfection of the Security Interests created hereunder in the Collateral or (iii) the enforcement of the rights of the Agent and the Secured Parties hereunder.

(g)  Each Debtor hereby authorizes the Agent to file one or more financing statements under the UCC, with respect to the Security Interests with the proper filing and recording agencies in any jurisdiction deemed proper by it.

 (h)  The execution, delivery and performance of this Agreement by the Debtors does not (i) violate any of the provisions of any Organizational Documents of any Debtor or any judgment, decree, order or award of any court, governmental body or arbitrator or any applicable law, rule or regulation applicable to any Debtor or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing any Debtor's debt or otherwise) or other understanding to which any Debtor is a party or by which any property or asset of any Debtor is bound or affected. If any, all required consents (including, without limitation, from stockholders or creditors of any Debtor) necessary for any Debtor to enter into and perform its obligations hereunder have been obtained.

7

(i)  The capital stock and other equity interests listed on Schedule H hereto (the "Pledged Securities") represent all of the capital stock and other equity interests of the Debtor, and represent all capital stock and other equity interests owned, directly or indirectly, by the Debtor. All of the Pledged Securities are validly issued, fully paid and nonassessable, and the Debtor is the legal and beneficial owner of the Pledged Securities, free and clear of any lien, security interest or other encumbrance except for the security interests created by this Agreement and other Permitted Liens (as defined in the Debentures).

(j)  The ownership and other equity interests in partnerships and limited liability companies (if any) included in the Collateral (the "Pledged Interests") by their express terms do not provide that they are securities governed by Article 8 of the UCC and are not held in a securities account or by any financial intermediary.

(k)  Except for Permitted Liens (as defined in the Debentures), each Debtor shall at all times maintain the liens and Security Interests provided for hereunder as valid and perfected first priority liens and security interests in the Collateral in favor of the Secured Parties until this Agreement and the Security Interest hereunder shall be terminated pursuant to Section 11 hereof. Each Debtor hereby agrees to defend the same against the claims of any and all persons and entities. Each Debtor shall safeguard and protect all Collateral for the account of the Secured Parties. At the request of the Agent, each Debtor will sign and deliver to the Agent on behalf of the Secured Parties at any time or from time to time one or more financing statements pursuant to the UCC in form reasonably satisfactory to the Agent and will pay the cost of filing the same in all public offices wherever filing is, or is deemed by the Agent to be, necessary or desirable to effect the rights and obligations provided for herein. Without limiting the generality of the foregoing, each Debtor shall pay all fees, taxes and other amounts necessary to maintain the Collateral and the Security Interests hereunder, and each Debtor shall obtain and furnish to the Agent from time to time, upon demand, such releases and/or subordinations of claims and liens which may be required to maintain the priority of the Security Interests hereunder.

(l)  No Debtor will transfer, pledge, hypothecate, encumber, license, sell or otherwise dispose of any of the Collateral (except for non-exclusive licenses granted by a Debtor in its ordinary course of business and sales of inventory by a Debtor in its ordinary course of business) without the prior written consent of a Majority in Interest.

(m) Each Debtor shall keep and preserve its equipment, inventory and other tangible Collateral in good condition, repair and order and shall not operate or locate any such Collateral (or cause to be operated or located) in any area excluded from insurance coverage.

8

(n) Each Debtor shall maintain with financially sound and reputable insurers, insurance with respect to the Collateral, including Collateral hereafter acquired, against loss or damage of the kinds and in the amounts customarily insured against by entities of established reputation having similar properties similarly situated and in such amounts as are customarily carried under similar circumstances by other such entities and otherwise as is prudent for entities engaged in similar businesses but in any event sufficient to cover the full replacement cost thereof. Each Debtor shall cause each insurance policy issued in connection herewith to provide, and the insurer issuing such policy to certify to the Agent that (a) the Agent will be named as lender loss payee and additional insured under each such insurance policy; (b) if such insurance be proposed to be cancelled or materially changed for any reason whatsoever, such insurer will promptly notify the Agent and such cancellation or change shall not be effective as to the Agent for at least thirty (30) days after receipt by the Agent of such notice, unless the effect of such change is to extend or increase coverage under the policy; and (c) the Agent will have the right (but no obligation) at its election to remedy any default in the payment of premiums within thirty (30) days of notice from the insurer of such default. If no Event of Default (as defined in the Debentures) exists and if the proceeds arising out of any claim or series of related claims do not exceed $100,000, loss payments in each instance will be applied by the applicable Debtor to the repair and/or replacement of property with respect to which the loss was incurred to the extent reasonably feasible, and any loss payments or the balance thereof remaining, to the extent not so applied, shall be payable to the applicable Debtor, provided, however, that payments received by any Debtor after an Event of Default occurs and is continuing or in excess of $100,000 for any occurrence or series of related occurrences shall be paid to the Agent on behalf of the Secured Parties and, if received by such Debtor, shall be held in trust for the Secured Parties and immediately paid over to the Agent unless otherwise directed in writing by the Agent. Copies of such policies or the related certificates, in each case, naming the Agent as lender loss payee and additional insured shall be delivered to the Agent at least annually and at the time any new policy of insurance is issued.

(o) Each Debtor shall, within ten (10) days of obtaining knowledge thereof, advise the Secured Parties promptly, in sufficient detail, of any material adverse change in the Collateral, and of the occurrence of any event which would have a material adverse effect on the value of the Collateral or on the Secured Parties' security interest, through the Agent, therein.

(p) Each Debtor shall promptly execute and deliver to the Agent such further deeds, mortgages, assignments, security agreements, financing statements or other instruments, documents, certificates and assurances and take such further action as the Agent may from time to time request and may in its sole discretion deem necessary to perfect, protect or enforce the Secured Parties' security interest in the Collateral including, without limitation, if applicable, the execution and delivery of a separate security agreement with respect to each Debtor's Intellectual Property ("Intellectual Property Security Agreement") in which the Secured Parties have been granted a security interest hereunder, substantially in a form reasonably acceptable to the Agent, which Intellectual Property Security Agreement, other than as stated therein, shall be subject to all of the terms and conditions hereof.

(q) Each Debtor shall permit the Agent and its representatives and agents to inspect the Collateral during normal business hours and upon reasonable prior notice, and to make copies of records pertaining to the Collateral as may be reasonably requested by the Agent from time to time.

9

Exhibit 4.6

(r)  Each Debtor shall take all steps reasonably necessary to diligently pursue and seek to preserve, enforce and collect any rights, claims, causes of action and accounts receivable in respect of the Collateral.

(s)  Each Debtor shall promptly notify the Secured Parties in sufficient detail upon becoming aware of any attachment, garnishment, execution or other legal process levied against any Collateral and of any other information received by such Debtor that may materially affect the value of the Collateral, the Security Interest or the rights and remedies of the Secured Parties hereunder.

(t)  All information heretofore, herein or hereafter supplied to the Secured Parties by or on behalf of any Debtor with respect to the Collateral is accurate and complete in all material respects as of the date furnished.

(u)  The Debtors shall at all times preserve and keep in full force and effect their respective valid existence and good standing and any rights and franchises material to its business.

(v)  No Debtor will change its name, type of organization, jurisdiction of organization, organizational identification number (if it has one), legal or corporate structure, or identity, or add any new fictitious name unless it provides at least 30 days prior written notice to the Secured Parties of such change and, at the time of such written notification, such Debtor provides any financing statements or fixture filings necessary to perfect and continue the perfection of the Security Interests granted and evidenced by this Agreement.

(w)  Except in the ordinary course of business, no Debtor may consign any of its Inventory or sell any of its Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale without the consent of the Agent which shall not be unreasonably withheld.

(x)  No Debtor may relocate its chief executive office to a new location without providing 30 days prior written notification thereof to the Secured Parties and so long as, at the time of such written notification, such Debtor provides any financing statements or fixture filings necessary to perfect and continue the perfection of the Security Interests granted and evidenced by this Agreement.

(y)  Each Debtor was organized and remains organized solely under the laws of the state set forth next to such Debtor's name in <u>Schedule D</u> attached hereto, which <u>Schedule D</u> sets forth each Debtor's organizational identification number or, if any Debtor does not have one, states that one does not exist.

10

(z)  (i) The actual name of each Debtor is the name set forth in <u>Schedule D</u> attached hereto; (ii) no Debtor has any trade names except as set forth on <u>Schedule E</u> attached hereto; (iii) no Debtor has used any name other than that stated in the preamble hereto or as set forth on <u>Schedule E</u> for the preceding five years; and (iv) no entity has merged into any Debtor or been acquired by any Debtor within the past five years except as set forth on <u>Schedule E</u>.

(aa) At any time and from time to time that any Collateral consists of instruments, certificated securities or other items that require or permit possession by the secured party to perfect the security interest created hereby, the applicable Debtor shall deliver such Collateral to the Agent.

(bb)  Each Debtor, in its capacity as issuer, hereby agrees to comply with any and all orders and instructions of Agent regarding the Pledged Interests consistent with the terms of this Agreement without the further consent of any Debtor as contemplated by Section 8-106 (or any successor section) of the UCC. Further, each Debtor agrees that it shall not enter into a similar agreement (or one that would confer "control" within the meaning of Article 8 of the UCC) with any other person or entity.

(cc) Each Debtor shall cause all tangible chattel paper constituting Collateral to be delivered to the Agent, or, if such delivery is not possible, then to cause such tangible chattel paper to contain a legend noting that it is subject to the security interest created by this Agreement. To the extent that any Collateral consists of electronic chattel paper, the applicable Debtor shall cause the underlying chattel paper to be "marked" within the meaning of Section 9-105 of the UCC (or successor section thereto).

(dd) If there is any investment property or deposit account included as Collateral that can be perfected by "control" through an account control agreement, the applicable Debtor shall cause such an account control agreement, in form and substance in each case satisfactory to the Agent, to be entered into and delivered to the Agent for the benefit of the Secured Parties.

(ee)  To the extent that any Collateral consists of letter-of-credit rights, the applicable Debtor shall cause the issuer of each underlying letter of credit to consent to an assignment of the proceeds thereof to the Secured Parties.

(ff)  To the extent that any Collateral is in the possession of any third party, the applicable Debtor shall join with the Agent in notifying such third party of the Secured Parties' security interest in such Collateral and shall use its best efforts to obtain an acknowledgement and agreement from such third party with respect to the Collateral, in form and substance reasonably satisfactory to the Agent.

(gg) If any Debtor shall at any time hold or acquire a commercial tort claim, such Debtor shall promptly notify the Secured Parties in a writing signed by such Debtor of the particulars thereof and grant to the Secured Parties in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Agent.

(hh)  Each Debtor shall immediately provide written notice to the Secured Parties of any and all accounts which arise out of contracts with any governmental authority and, to the extent necessary to perfect or continue the perfected status of the Security Interests in such accounts and proceeds thereof, shall execute and deliver to the Agent an assignment of claims for such accounts and cooperate with the Agent in taking any other steps required, in its judgment, under the Federal Assignment of Claims Act or any similar federal, state or local statute or rule to perfect or continue the perfected status of the Security Interests in such accounts and proceeds thereof.

(ii) Each Debtor shall cause each subsidiary of such Debtor to immediately become a party hereto (an "<u>Additional Debtor</u>"), by executing and delivering an Additional Debtor Joinder in substantially the form of Annex A attached hereto and comply with the provisions hereof applicable to the Debtors. Concurrent therewith, the Additional Debtor shall deliver replacement schedules for, or supplements to all other Schedules to (or referred to in) this Agreement, as applicable, which replacement schedules shall supersede, or supplements shall modify, the Schedules then in effect. The Additional Debtor shall also deliver such opinions of counsel, authorizing resolutions, good standing certificates, incumbency certificates, organizational documents, financing statements and other information and documentation as the Agent may reasonably request. Upon delivery of the foregoing to the Agent, the Additional Debtor shall be and become a party to this Agreement with the same rights and obligations as the Debtors, for all purposes hereof as fully and to the same extent as if it were an original signatory hereto and shall be deemed to have made the representations, warranties and covenants set forth herein as of the date of execution and delivery of such Additional Debtor Joinder, and all references herein to the "Debtors" shall be deemed to include each Additional Debtor.

(jj)  Each Debtor shall vote the Pledged Securities to comply with the covenants and agreements set forth herein and in the Debentures.

(kk) Each Debtor shall register the pledge of the applicable Pledged Securities on the books of such Debtor. Each Debtor shall notify each issuer of Pledged Securities to register the pledge of the applicable Pledged Securities in the name of the Secured Parties on the books of such issuer. Further, except with respect to certificated securities delivered to the Agent, the applicable Debtor shall deliver to Agent an acknowledgement of pledge (which, where appropriate, shall comply with the requirements of the relevant UCC with respect to perfection by registration) signed by the issuer of the applicable Pledged Securities, which acknowledgement shall confirm that: (a) it has registered the pledge on its books and records; and (b) at any time directed by Agent during the continuation of an Event of Default, such issuer will transfer the record ownership of such Pledged Securities into the name of any designee of Agent, will take such steps as may be necessary to effect the transfer, and will comply with all other instructions of Agent regarding such Pledged Securities without the further consent of the applicable Debtor.

(ll) In the event that, upon an occurrence of an Event of Default, Agent shall sell all or any of the Pledged Securities to another party or parties (herein called the "<u>Transferee</u>") or shall purchase or retain all or any of the Pledged Securities, each Debtor shall, to the extent applicable: (i) deliver to Agent or the Transferee, as the case may be, the articles of incorporation, bylaws, minute books, stock certificate books, corporate seals, deeds, leases, indentures, agreements, evidences of indebtedness, books of account, financial records and all other Organizational Documents and records of the Debtors and their direct and indirect subsidiaries; (ii) use its best efforts to obtain resignations of the persons then serving as officers and directors of the Debtors and their direct and indirect subsidiaries, if so requested; and (iii) use its best efforts to obtain any approvals that are required by any governmental or regulatory body in order to permit the sale of the Pledged Securities to the Transferee or the purchase or retention of the Pledged Securities by Agent and allow the Transferee or Agent to continue the business of the Debtors and their direct and indirect subsidiaries.

(mm) Without limiting the generality of the other obligations of the Debtors hereunder, each Debtor shall promptly (i) cause to be registered at the United States Copyright Office all of its material copyrights, (ii) cause the security interest contemplated hereby with respect to all Intellectual Property registered at the United States Copyright Office or United States Patent and Trademark Office to be duly recorded at the applicable office, and (iii) give the Agent notice whenever it acquires (whether absolutely or by license) or creates any additional material Intellectual Property.

(nn) Each Debtor will from time to time, at the joint and several expense of the Debtors, promptly execute and deliver all such further instruments and documents, and take all such further action as may be necessary or desirable, or as the Agent may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Secured Parties to exercise and enforce their rights and remedies hereunder and with respect to any Collateral or to otherwise carry out the purposes of this Agreement.

(oo) <u>Schedule F</u> attached hereto lists all of the patents, patent applications, trademarks, trademark applications, registered copyrights, and domain names owned by any of the Debtors as of the date hereof. <u>Schedule F</u> lists all material licenses in favor of any Debtor for the use of any patents, trademarks, copyrights and domain names as of the date hereof. All material patents and trademarks of the Debtors have been duly recorded at the United States Patent and Trademark Office and all material copyrights of the Debtors have been duly recorded at the United States Copyright Office.

(pp) Except as set forth on <u>Schedule G</u> attached hereto, none of the account debtors or other persons or entities obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or any similar federal, state or local statute or rule in respect of such Collateral.

5. **Effect of Pledge on Certain Rights**. If any of the Collateral subject to this Agreement consists of nonvoting equity or ownership interests (regardless of class, designation, preference or rights) that may be converted into voting equity or ownership interests upon the occurrence of certain events (including, without limitation, upon the transfer of all or any of the other stock or assets of the issuer), it is agreed that the pledge of such equity or ownership interests pursuant to this Agreement or the enforcement of any of Agent's rights hereunder shall not be deemed to be the type of event which would trigger such conversion rights notwithstanding any provisions in the Organizational Documents or agreements to which any Debtor is subject or to which any Debtor is party.

13

6. **Defaults**. The following events shall be "<u>Events of Default</u>":

(a) The occurrence of an Event of Default (as defined in the Debentures) under the Debentures;

(b) Any representation or warranty of any Debtor in this Agreement shall prove to have been incorrect in any material respect when made;

(c) The failure by any Debtor to observe or perform any of its obligations hereunder for five (5) days after delivery to such Debtor of notice of such failure by or on behalf of a Secured Party unless such default is capable of cure but cannot be cured within such time frame and such Debtor is using best efforts to cure same in a timely fashion; or

(d) If any provision of this Agreement shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by any Debtor, or a proceeding shall be commenced by any Debtor, or by any governmental authority having jurisdiction over any Debtor, seeking to establish the invalidity or unenforceability thereof, or any Debtor shall deny that any Debtor has any liability or obligation purported to be created under this Agreement.

7. **Duty To Hold In Trust**.

(a) Upon the occurrence of any Event of Default and at any time thereafter, each Debtor shall, upon receipt of any revenue, income, dividend, interest or other sums subject to the Security Interests, whether payable pursuant to the Debentures or otherwise, or of any check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such sum, hold the same in trust for the Secured Parties and shall forthwith endorse and transfer any such sums or instruments, or both, to the Secured Parties, pro-rata in proportion to their respective then-currently outstanding principal amount of Debentures for application to the satisfaction of the Obligations (and if any Debenture is not outstanding, pro-rata in proportion to the initial purchases of the remaining Debentures).

(b) If any Debtor shall become entitled to receive or shall receive any securities or other property (including, without limitation, shares of Pledged Securities or instruments representing Pledged Securities acquired after the date hereof, or any options, warrants, rights or other similar property or certificates representing a dividend, or any distribution in connection with any recapitalization, reclassification or increase or reduction of capital, or issued in connection with any reorganization of such Debtor or any of its direct or indirect subsidiaries) in respect of the Pledged Securities (whether as an addition to, in substitution of, or in exchange for, such Pledged Securities or otherwise), such Debtor agrees to (i) accept the same as the agent of the Secured Parties; (ii) hold the same in trust on behalf of and for the benefit of the Secured Parties; and (iii) to deliver any and all certificates or instruments evidencing the same to Agent on or before the close of business on the fifth business day following the receipt thereof by such Debtor, in the exact form received together with the Necessary Endorsements, to be held by Agent subject to the terms of this Agreement as Collateral.

14

8. **Rights and Remedies Upon Default**.

(a) Upon the occurrence of any Event of Default and at any time thereafter, the Secured Parties, acting through the Agent, shall have the right to exercise all of the remedies conferred hereunder and under the Debentures, and the Secured Parties shall have all the rights and remedies of a secured party under the UCC. Without limitation, the Agent, for the benefit of the Secured Parties, shall have the following rights and powers:

(i) The Agent shall have the right to take possession of the Collateral and, for that purpose, enter, with the aid and assistance of any person, any premises where the Collateral, or any part thereof, is or may be placed and remove the same, and each Debtor shall assemble the Collateral and make it available to the Agent at places which the Agent shall reasonably select, whether at such Debtor's premises or elsewhere, and make available to the Agent, without rent, all of such Debtor's respective premises and facilities for the purpose of the Agent taking possession of, removing or putting the Collateral in saleable or disposable form.

(ii) Upon notice to the Debtors by Agent, all rights of each Debtor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and all rights of each Debtor to receive the dividends and interest which it would otherwise be authorized to receive and retain, shall cease. Upon such notice, Agent shall have the right to receive, for the benefit of the Secured Parties, any interest, cash dividends or other payments on the Collateral and, at the option of Agent, to exercise in such Agent's discretion all voting rights pertaining thereto. Without limiting the generality of the foregoing, Agent shall have the right (but not the obligation) to exercise all rights with respect to the Collateral as it were the sole and absolute owner thereof, including, without limitation, to vote and/or to exchange, at its sole discretion, any or all of the Collateral in connection with a merger, reorganization, consolidation, recapitalization or other readjustment concerning or involving the Collateral or any Debtor or any of its direct or indirect subsidiaries.

(iii) The Agent shall have the right to operate the business of each Debtor using the Collateral and shall have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as the Agent may deem commercially reasonable, all without (except as shall be required by applicable statute and cannot be waived) advertisement or demand upon or notice to any Debtor or right of redemption of a Debtor, which are hereby expressly waived. Upon each such sale, lease, assignment or other transfer of Collateral, the Agent, for the benefit of the Secured Parties, may, unless prohibited by applicable law which cannot be waived, purchase all or any part of the Collateral being sold, free from and discharged of all trusts, claims, right of redemption and equities of any Debtor, which are hereby waived and released.

15

(iv) The Agent shall have the right (but not the obligation) to notify any account debtors and any obligors under instruments or accounts to make payments directly to the Agent, on behalf of the Secured Parties, and to enforce the Debtors' rights against such account debtors and obligors.

(v) The Agent, for the benefit of the Secured Parties, may (but is not obligated to) direct any financial intermediary or any other person or entity holding any investment property to transfer the same to the Agent, on behalf of the Secured Parties, or its designee.

(vi) The Agent may (but is not obligated to) transfer any or all Intellectual Property registered in the name of any Debtor at the United States Patent and Trademark Office and/or Copyright Office into the name of the Secured Parties or any designee or any purchaser of any Collateral.

(b) The Agent shall comply with any applicable law in connection with a disposition of Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral. The Agent may sell the Collateral without giving any warranties and may specifically disclaim such warranties. If the Agent sells any of the Collateral on credit, the Debtors will only be credited with payments actually made by the purchaser. In addition, each Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Agent's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

(c) For the purpose of enabling the Agent to further exercise rights and remedies under this Section 8 or elsewhere provided by agreement or applicable law, each Debtor hereby grants to the Agent, for the benefit of the Agent and the Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Debtor) to use, license or sublicense following an Event of Default, any Intellectual Property now owned or hereafter acquired by such Debtor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

16

9. **Applications of Proceeds**. The proceeds of any such sale, lease or other disposition of the Collateral hereunder or from payments made on account of any insurance policy insuring any portion of the Collateral shall be applied first, to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, to the reasonable attorneys' fees and expenses incurred by the Agent in enforcing the Secured Parties' rights hereunder and in connection with collecting, storing and disposing of the Collateral, and then to satisfaction of the Obligations pro rata among the Secured Parties (based on then-outstanding principal amounts of Debentures at the time of any such determination), and to the payment of any other amounts required by applicable law, after which the Secured Parties shall pay to the applicable Debtor any surplus proceeds. If, upon the sale, license or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which the Secured Parties are legally entitled, the Debtors will be liable for the deficiency, together with interest thereon, at the rate of 18% per annum or the lesser amount permitted by applicable law (the "Default Rate"), and the reasonable fees of any attorneys employed by the Secured Parties to collect such deficiency. To the extent permitted by applicable law, each Debtor waives all claims, damages and demands against the Secured Parties arising out of the repossession, removal, retention or sale of the Collateral, unless due solely to the gross negligence or willful misconduct of the Secured Parties as determined by a final judgment (not subject to further appeal) of a court of competent jurisdiction.

10. **Securities Law Provision**. Each Debtor recognizes that Agent may be limited in its ability to effect a sale to the public of all or part of the Pledged Securities by reason of certain prohibitions in the Securities Act of 1933, as amended, or other federal or state securities laws (collectively, the "Securities Laws"), and may be compelled to resort to one or more sales to a restricted group of purchasers who may be required to agree to acquire the Pledged Securities for their own account, for investment and not with a view to the distribution or resale thereof. Each Debtor agrees that sales so made may be at prices and on terms less favorable than if the Pledged Securities were sold to the public, and that Agent has no obligation to delay the sale of any Pledged Securities for the period of time necessary to register the Pledged Securities for sale to the public under the Securities Laws. Each Debtor shall cooperate with Agent in its attempt to satisfy any requirements under the Securities Laws (including, without limitation, registration thereunder if requested by Agent) applicable to the sale of the Pledged Securities by Agent.

11. **Costs and Expenses**. Each Debtor agrees to pay all reasonable out-of-pocket fees, costs and expenses incurred in connection with any filing required hereunder, including without limitation, any financing statements pursuant to the UCC, continuation statements, partial releases and/or termination statements related thereto or any expenses of any searches reasonably required by the Agent. The Debtors shall also pay all other claims and charges which in the reasonable opinion of the Agent is reasonably likely to prejudice, imperil or otherwise affect the Collateral or the Security Interests therein. The Debtors will also, upon demand, pay to the Agent the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which the Agent, for the benefit of the Secured Parties, may incur in connection with (i) the enforcement of this Agreement, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, or (iii) the exercise or enforcement of any of the rights of the Secured Parties under the Debentures. Until so paid, any fees payable hereunder shall be added to the principal amount of the Debentures and shall bear interest at the Default Rate.

17

12. **Responsibility for Collateral**. The Debtors assume all liabilities and responsibility in connection with all Collateral, and the Obligations shall in no way be affected or diminished by reason of the loss, destruction, damage or theft of any of the Collateral or its unavailability for any reason. Without limiting the generality of the foregoing, (a) neither the Agent nor any Secured Party (i) has any duty (either before or after an Event of Default) to collect any amounts in respect of the Collateral or to preserve any rights relating to the Collateral, or (ii) has any obligation to clean-up or otherwise prepare the Collateral for sale, and (b) each Debtor shall remain obligated and liable under each contract or agreement included in the Collateral to be observed or performed by such Debtor thereunder. Neither the Agent nor any Secured Party shall have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Agent or any Secured Party of any payment relating to any of the Collateral, nor shall the Agent or any Secured Party be obligated in any manner to perform any of the obligations of any Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Agent or any Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Agent or to which the Agent or any Secured Party may be entitled at any time or times.

13. **Security Interests Absolute**. All rights of the Secured Parties and all obligations of the Debtors hereunder, shall be absolute and unconditional, irrespective of: (a) any lack of validity or enforceability of this Agreement, the Debentures or any agreement entered into in connection with the foregoing, or any portion hereof or thereof; (b) any change in the time, manner or place of payment or performance of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Debentures or any other agreement entered into in connection with the foregoing; (c) any exchange, release or nonperfection of any of the Collateral, or any release or amendment or waiver of or consent to departure from any other collateral for, or any guarantee, or any other security, for all or any of the Obligations; (d) any action by the Secured Parties to obtain, adjust, settle and cancel in its sole discretion any insurance claims or matters made or arising in connection with the Collateral; or (e) any other circumstance which might otherwise constitute any legal or equitable defense available to a Debtor, or a discharge of all or any part of the Security Interests granted hereby. Until the Obligations shall have been paid and performed in full, the rights of the Secured Parties shall continue even if the Obligations are barred for any reason, including, without limitation, the running of the statute of limitations or bankruptcy. Each Debtor expressly waives presentment, protest, notice of protest, demand, notice of nonpayment and demand for performance. In the event that at any time any transfer of any Collateral or any payment received by the Secured Parties hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall be deemed to be otherwise due to any party other than the Secured Parties, then, in any such event, each Debtor's obligations hereunder shall survive cancellation of this Agreement, and shall not be discharged or satisfied by any prior payment thereof and/or cancellation of this Agreement, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof. Each Debtor waives all right to require the Secured Parties to proceed against any other person or entity or to apply any Collateral which the Secured Parties may hold at any time, or to marshal assets, or to pursue any other remedy. Each Debtor waives any defense arising by reason of the application of the statute of limitations to any obligation secured hereby.

18

14.  **Term of Agreement**. This Agreement and the Security Interests shall terminate on the date on which all payments under the Debentures have been indefeasibly paid in full and all other Obligations have been paid or discharged; provided, however, that all indemnities of the Debtors contained in this Agreement (including, without limitation, Annex B hereto) shall survive and remain operative and in full force and effect regardless of the termination of this Agreement.

15.  **Power of Attorney; Further Assurances**.

(a)  Each Debtor authorizes the Agent, and does hereby make, constitute and appoint the Agent and its officers, agents, successors or assigns with full power of substitution, as such Debtor's true and lawful attorney-in-fact, with power, in the name of the Agent or such Debtor, to, after the occurrence and during the continuance of an Event of Default, (i) endorse any note, checks, drafts, money orders or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of the Agent; (ii) to sign and endorse any financing statement pursuant to the UCC or any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts, and other documents relating to the Collateral; (iii) to pay or discharge taxes, liens, security interests or other encumbrances at any time levied or placed on or threatened against the Collateral; (iv) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (v) to transfer any Intellectual Property or provide licenses respecting any Intellectual Property; and (vi) generally, at the option of the Agent, and at the expense of the Debtors, at any time, or from time to time, to execute and deliver any and all documents and instruments and to do all acts and things which the Agent deems necessary to protect, preserve and realize upon the Collateral and the Security Interests granted therein in order to effect the intent of this Agreement and the Debentures all as fully and effectually as the Debtors might or could do; and each Debtor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding. The designation set forth herein shall be deemed to amend and supersede any inconsistent provision in the Organizational Documents or other documents or agreements to which any Debtor is subject or to which any Debtor is a party. Without limiting the generality of the foregoing, after the occurrence and during the continuance of an Event of Default, each Secured Party is specifically authorized to execute and file any applications for or instruments of transfer and assignment of any patents, trademarks, copyrights or other Intellectual Property with the United States Patent and Trademark Office and the United States Copyright Office.

19

(b)  On a continuing basis, each Debtor will make, execute, acknowledge, deliver, file and record, as the case may be, with the proper filing and recording agencies in any jurisdiction, including, without limitation, the jurisdictions indicated on <u>Schedule C</u> attached hereto, all such instruments, and take all such action as may reasonably be deemed necessary or advisable, or as reasonably requested by the Agent, to perfect the Security Interests granted hereunder and otherwise to carry out the intent and purposes of this Agreement, or for assuring and confirming to the Agent the grant or perfection of a perfected security interest in all the Collateral under the UCC.

(c)  Each Debtor hereby irrevocably appoints the Agent as such Debtor's attorney-in-fact, with full authority in the place and instead of such Debtor and in the name of such Debtor, from time to time in the Agent's discretion, to take any action and to execute any instrument which the Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including the filing, in its sole discretion, of one or more financing or continuation statements and amendments thereto, relative to any of the Collateral without the signature of such Debtor where permitted by law, which financing statements may (but need not) describe the Collateral as "all assets" or "all personal property" or words of like import, and ratifies all such actions taken by the Agent. This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding.

16.  **Notices**. All notices, requests, demands and other communications hereunder shall be subject to the notice provision of the Purchase Agreement.

17.  **Other Security**. To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other person, firm, corporation or other entity, then the Agent shall have the right, in its sole discretion, to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of the Secured Parties' rights and remedies hereunder.

18.  **Appointment of Agent**. The Secured Parties hereby appoint Palisades Master Fund to act as their agent ("<u>Agent</u>") for purposes of exercising any and all rights and remedies of the Secured Parties hereunder. Such appointment shall continue until revoked in writing by a Majority in Interest, at which time a Majority in Interest shall appoint a new Agent. The Agent shall have the rights, responsibilities and immunities set forth in <u>Annex B</u> hereto.

19.  **Miscellaneous**.

(a)  No course of dealing between the Debtors and the Secured Parties, nor any failure to exercise, nor any delay in exercising, on the part of the Secured Parties, any right, power or privilege hereunder or under the Debentures shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(b)  All of the rights and remedies of the Secured Parties with respect to the Collateral, whether established hereby or by the Debentures or by any other agreements, instruments or documents or by law shall be cumulative and may be exercised singly or concurrently.

(c)  This Agreement, together with the exhibits and schedules hereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Agreement and the exhibits and schedules hereto. No provision of this Agreement may be waived, modified, supplemented or amended except in a written instrument signed, in the case of an amendment, by the Debtors and the Secured Parties or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought.

(d)  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(e)  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

(f)  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. The Debtor may not assign this Agreement or any rights or obligations hereunder without the prior written consent of each Secured Party (other than by merger). Any Secured Party may assign any or all of its rights under this Agreement to any Person to whom such Secured Party assigns or transfers any Securities, provided such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions of this Agreement that apply to the "Secured Parties."

(g)  Each party shall take such further action and execute and deliver such further documents as may be necessary or appropriate in order to carry out the provisions and purposes of this Agreement.

21

(h) All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each Debtor agrees that all proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and the Debentures (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York, Borough of Manhattan. Each Debtor hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such proceeding is improper. Each party hereto hereby irrevocably waives personal service of process and consents to process being served in any such proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. If any party shall commence a proceeding to enforce any provisions of this Agreement, then the prevailing party in such proceeding shall be reimbursed by the other party for its reasonable attorney's fees and other costs and expenses incurred with the investigation, preparation and prosecution of such proceeding.

(i)  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and, all of which taken together shall constitute one and the same Agreement. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were the original thereof.

(j) All Debtors shall jointly and severally be liable for the obligations of each Debtor to the Secured Parties hereunder.

(k) Each Debtor shall indemnify, reimburse and hold harmless the Agent and the Secured Parties and their respective partners, members, shareholders, officers, directors, employees and agents (and any other persons with other titles that have similar functions) (collectively, "Indemnitees") from and against any and all losses, claims, liabilities, damages, penalties, suits, costs and expenses, of any kind or nature, (including fees relating to the cost of investigating and defending any of the foregoing) imposed on, incurred by or asserted against such Indemnitee in any way related to or arising from or alleged to arise from this Agreement or the Collateral, except any such losses, claims, liabilities, damages, penalties, suits, costs and expenses which result from the gross negligence or willful misconduct of the Indemnitee as determined by a final, nonappealable decision of a court of competent jurisdiction. This indemnification provision is in addition to, and not in limitation of, any other indemnification provision in the Debentures, the Primary Agreements or any other agreement, instrument or other document executed or delivered in connection herewith or therewith.

22

Exhibit 4.6

(l) Nothing in this Agreement shall be construed to subject Agent or any Secured Party to liability as a partner in any Debtor or any if its direct or indirect subsidiaries that is a partnership or as a member in any Debtor or any of its direct or indirect subsidiaries that is a limited liability company, nor shall Agent or any Secured Party be deemed to have assumed any obligations under any partnership agreement or limited liability company agreement, as applicable, of any such Debtor or any if its direct or indirect subsidiaries or otherwise, unless and until any such Secured Party exercises its right to be substituted for such Debtor as a partner or member, as applicable, pursuant hereto.

(m)  To the extent that the grant of the security interest in the Collateral and the enforcement of the terms hereof require the consent, approval or action of any partner or member, as applicable, of any Debtor or any direct or indirect subsidiary of any Debtor or compliance with any provisions of any of the Organizational Documents, the Debtors hereby grant such consent and approval and waive any such noncompliance with the terms of said documents.

[SIGNATURE PAGES FOLLOW]

23

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed on the day and year first above written.

**FELLOWS ENERGY LTD.**

/s/ GEORGE S. YOUNG

George S. Young
Chief Executive Officer

[SIGNATURE PAGE OF HOLDERS FOLLOWS]

24

[SIGNATURE PAGE OF HOLDERS TO FLWE SA]

Name of Secured Party: PALISADES MASTER FUND, L.P.

/s/ Arlene DeCastro

Arlene DeCastro
Authorized Signatory

/s/ Peter Cooper

Peter Cooper
Authorized Signatory

**[SIGNATURE PAGE OF HOLDERS FOLLOWS]**

25

[SIGNATURE PAGE OF HOLDERS TO FLWE SA]

Name of Secured Party: CRESCENT INTERNATIONAL LTD.

*Signature of Authorized Signatory of Secured Party*: /s/ MAXI BREZZI

Name of Authorized Signatory: Maxi Brezzi

Title of Authorized Signatory: Authorized Signatory

EX-10.1 8 ex101.htm EXHIBIT 10.1
**Exhibit 10.1**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is dated February 15, 2007 and is made by and between Fellows Energy Ltd., a Nevada Corporation ("Fellows") and JGB Capital L.P., a Delaware corporation ("JGB").

**WHEREAS**, on or about June 17, 2005, Fellows and JGB entered into a Securities Purchase Agreement (the "SPA") pursuant to which Fellows issued a convertible debenture (the "Debenture") in the face amount of $1,000,000; and

**WHEREAS,** as of February 15, 2007, the outstanding face amount of the Debenture is $333,333.33 and

**WHEREAS,** simultaneously with the execution of this Agreement, the following transactions are also taking place: a) JGB is entering into a assignment agreement and addendum to assignment agreement with Crescent International Ltd. ("Crescent") for the assignment of the Debenture to Crescent; b) Fellows is entering into amendment and waiver agreements with Crescent and Palisades Master Fund Ltd. ("Palisades") for the amendment of the convertible debentures issued pursuant to the securities purchase agreements dated June 21, 2005 and September 17, 2005; and c) Fellows and Palisades are entering into a securities purchase agreement for the purchase of $714,500 in secured convertible debentures; and

**WHEREAS**, on account of dilutive issuances of equity by Fellows, the conversion price of the Debentures and the exercise prices of the common stock purchase warrants (collectively, the "Warrants") issued in connection with the Debentures have been reduced to equal $0.1357, subject to adjustment therein, with proportional increases in the number of shares of common stock issuable upon exercise of such Warrants, as set forth therein; and

**WHEREAS,** certain events of default have occurred pursuant to the Debentures and are continuing to occur related to the Debentures and as a result of such defaults ("Existing Defaults"), JGB is entitled, among other things, to enforce its rights and remedies against Fellows, including without limitation, acceleration and immediately demand payment in full of all obligations under the Debentures; and

**WHEREAS,** JGB has agreed to accept $250,000 from Crescent (the "Assignment Amount") for the assignment of the Debenture to Crescent and $83,333.33 from Fellows (the "Settlement Amount") for the final settlement of the Debentures; and

**WHEREAS**, subject to the terms hereunder, Fellows and JGB have reached a full and final settlement for the assignment of the Debentures;

**NOW, THEREFORE**, in consideration of the mutual conditions and covenants contained in this Agreement, and for other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, it is hereby stipulated, consented to and agreed by and between Fellows and JGB as follows:

1

1.  The preliminary statements set forth above by this reference hereto are hereby incorporated into this Agreement.

2.  On or before February 16, 2007, Fellows shall pay JGB the sum of Eighty-Three Thousand, Eight Hundred Thirty-Three Dollars and Thirty-Three Cents ($83,333.33).

3.  On or before February 16, 2007, JGB agrees to accept, in the aggregate, the sum of Two Hundred Fifty Thousand Dollars and no Cents ($250,000) (the "Settlement Payment") from Crescent.

4.  Simultaneously with the transfer of the Settlement Payment, JGB shall execute and deliver to Crescent the Addendum to Assignment, and all attachments to such Addendum, all of which are attached hereto as Exhibit A.

5.  The Warrants shall be amended to remove Sections 2(f) and 3(b) of the Warrants, which provided for a call provision on the warrants and an adjustment of the Warrant exercise price upon a dilutive issuance, respectively.

6.  The Transaction Documents (as defined in the SPAs) shall be amended to remove any requirement that Fellows register the shares of common stock issuable upon exercise of the Warrants or reserve a sufficient number of shares underlying the Warrants until such time as Fellows obtains Stockholder Approval (as defined below).

2

7.  JGB shall not exercise the Warrants until such time as Fellows has obtained Stockholder Approval and has filed a Certificate of Amendment to its Articles of Incorporation increasing its authorized shares of Common Stock to at least 250,000,000 shares, and hereby releases any shares previously reserved for the Warrants under the SPAs to be utilized for issuance to Palisades, which both JGB and Fellows agree is a third party beneficiary of the covenants set forth in this paragraph 9, entitled to enforce such covenants as if they were parties to this Agreement. For purposes of this Agreement, Stockholder Approval shall mean the effective date of a Certificate of Amendment to Fellows' Articles of Incorporation increasing the number of authorized shares of common stock to at least 250 million, which Certificate of Amendment shall be filed as soon as possible after Fellows' obtains approval from the holders of a majority of the then current shares of common stock and Fellows' complies with the filing and disclosure requirements of Section 14 under the 1934 Act in connection with the Stockholder Approval. Fellows shall use its best efforts to obtain, on or before May 15, 2007 the Stockholder Approval. Upon obtaining the Stockholder Approval, Fellows shall issue JGB 500,000 shares of restricted common stock.

8.  In the event that the Settlement Payment is not delivered to JGB on or before February 16, 2007 (a "Settlement Default"), the Debentures shall remain in full force and effect as they were as of February 15, 2007.

9.  Upon the receipt of the Settlement Payment and as it relates solely to the Debentures (and specifically not to any rights or obligations under the Warrants as set forth in Section 7 of this Agreement), JGB releases and discharges Fellows, Fellow's heirs, executors, administrators, parent company, holding company, subsidiaries, successors, predecessors, officers, directors, principals, control persons, past and present employees, insurers, agents, attorneys, and assigns (the "Fellows Releasees") from all actions, cause of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, against the Fellows Releasees, that JGB or its heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever, whether or not known or unknown, from the beginning of the world to the day of the date of this Release.

10.  Upon the payment of the Settlement Payment and as it relates solely to the Debentures (and specifically not to any rights or obligations under the Warrants as set forth in Section 7 of this Agreement), Fellows releases and discharges JGB, JGB's heirs, executors, administrators, parent company, holding company, subsidiaries, successors, predecessors, officers, directors, principals, control persons, past and present employees, insurers, agents and assigns from all actions, cause of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, against JGB, that Fellows or its heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever, whether or not known or unknown, from the beginning of the world to the day of the date of this Release.

11.  Fellows and JGB each warrant and represent that no other person or entity has any interest in the matters released herein, and that they have not assigned or transferred, or purported to assign or transfer, to any person or entity all or any portion of the matters released herein.

3

12.  Each party shall be responsible for their own attorneys' fees and costs.

13.  All parties acknowledge and represent that: (a) they have read the Agreement; (b) they clearly understand the Agreement and each of its terms; (c) they fully and unconditionally consent to the terms of this Agreement; (d) they have had the benefit and advice of counsel of their own selection; (e) they have executed this Agreement, freely, with knowledge, and without influence or duress; (f) they have not relied upon any other representations, either written or oral, express or implied, made to them by any person; and (g) the consideration received by them has been actual and adequate.

14.  This Agreement contains the entire agreement and understanding concerning the subject matter hereof between the parties and supersedes and replaces all prior negotiations, proposed agreement and agreements, written or oral. Each of the parties hereto acknowledges that neither any of the parties hereto, nor agents or counsel of any other party whomsoever, has made any promise, representation or warranty whatsoever, express or implied, not contained herein concerning the subject hereto, to induce it to execute this Agreement and acknowledges and warrants that it is not executing this Agreement in reliance on any promise, representation or warranty not contained herein.

15.  This Agreement may not be modified or amended in any manner except by an instrument in writing specifically stating that it is a supplement, modification or amendment to the Agreement and signed by each of the parties hereto.

16.  Should any provision of this Agreement be declared or be determined by any court or tribunal to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be severed and deemed not to be part of this Agreement.

17.  Any dispute arising out of this agreement shall be adjudicated under the laws and in the courts of the State of New York.

18.  This Agreement may be executed in facsimile counterparts, each of which, when all parties have executed at least one such counterpart, shall be deemed an original, with the same force and effect as if all signatures were appended to one instrument, but all of which together shall constitute one and the same Agreement.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the date first indicated above.

/s/ GEORGE S. YOUNG

George Young, CEO
Fellows Energy Ltd.

/s/ BRETT COHEN

Bret Cohen
JGB Capital L.P.

# EXHIBIT B



## U.S. Securities and Exchange Commission

### FELLOWS ENERGY LTD (0001144439)

SIC: 1382 - Oil & Gas Field Exploration Services
State location: CO | State of Inc.: NV | Fiscal Year End: 1231

formerly: FUEL CENTERS INC (filings through 2003-11-14)

**Business Address**
1942 BROADWAY ST
SUITE 320
BOULDER CO 80302

**Mailing Address**
1942 BROADWAY ST
SUITE 320
BOULDER CO 80302

3039264415

To limit filing results, enter
form type or date (as 2002/05/23).

Form Type [        ]

Prior to [        ]

Ownership? ⦿ Include ◯ Exclude ◯ Only

[40 Entries ▾]    Retrieve Selected Filings

Retrieve All Filings

Key to Descriptions

**[Paper]** Paper filings are available by film number from the SEC Public Reference Room.

**[Cover]** Filing contains an SEC-released cover letter or correspondence.

Items 1 - 40

| Form | Formats | Description | Filing Date | File/Film No |
|------|---------|-------------|-------------|--------------|
| DEF 14A | [html][text] 255 KB | Other definitive proxy statements<br>Acc-no: 0001144439-07-000014 (34 Act) | 2007-06-12 | 000-33321<br>07913340 |
| 10QSB | [html][text] 474 KB | Optional form for quarterly and transition reports of small business issuers<br>Acc-no: 0001144439-07-000012 (34 Act) | 2007-05-16 | 000-33321<br>07856138 |
| NT 10-Q | [html][text] 26 KB | Notification of inability to timely file Form 10-Q or 10-QSB<br>Acc-no: 0001144439-07-000010 (34 Act) | 2007-05-16 | 000-33321<br>07855483 |
| PRE 14A | [html][text] 350 KB | Other preliminary proxy statements<br>Acc-no: 0001140361-07-008135 (34 Act) | 2007-04-23 | 000-33321<br>07779974 |
| 10KSB | [html][text] 1 MB | Optional form for annual and transition reports of small business issuers [Section 13 or 15(d), not S-B Item 405]<br>Acc-no: 0001140361-07-008133 (34 Act) | 2007-04-23 | 000-33321<br>07779972 |
| NT 10-K | [html][text] 29 KB | Notification of inability to timely file Form 10-K 405, 10-K, 10-KSB 405, 10-KSB, 10-KT, or 10-KT405<br>Acc-no: 0001013762-07-000515 (34 Act) | 2007-04-02 | 000-33321<br>07738963 |
| 424B3 | [html][text] 1 MB | Prospectus [Rule 424(b)(3)]<br>Acc-no: 0001013762-07-000282 (33 Act) | 2007-02-21 | 333-129627<br>07639052 |
| 424B3 | [html][text] 1 MB | Prospectus [Rule 424(b)(3)]<br>Acc-no: 0001013762-07-000279 (33 Act) | 2007-02-21 | 333-127413<br>07639014 |
| 8-K | [html][text] 937 KB | Current report, Items 1.01, 2.03, 3.02, and 9.01<br>Acc-no: 0001013762-07-000276 (34 Act) | 2007-02-21 | 000-33321<br>07638383 |
| S-8 | [html][text] 75 KB | Securities to be offered to employees in employee benefit plans<br>Acc-no: 0001013762-07-000014 (33 Act) | 2007-01-04 | 333-139803<br>07509663 |
| 10QSB | [html][text] 507 KB | Optional form for quarterly and transition reports of small business issuers<br>Acc-no: 0001013762-06-002296 (34 Act) | 2006-11-20 | 000-33321<br>061230962 |
| NT 10-Q | [html][text] 34 KB | Notification of inability to timely file Form 10-Q or 10-QSB<br>Acc-no: 0001013762-06-002222 (34 Act) | 2006-11-14 | 000-33321<br>061214473 |
| 424B3 | [html][text] 54 KB | Prospectus [Rule 424(b)(3)]<br>Acc-no: 0001013762-06-002101 (33 Act) | 2006-10-30 | 333-129627<br>061173025 |
| 424B3 | [html][text] 143 KB | Prospectus [Rule 424(b)(3)]<br>Acc-no: 0001013762-06-002099 (33 Act) | 2006-10-30 | 333-127413 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | 061172962 |
| S-8 | [html][text] 70 KB | Securities to be offered to employees in employee benefit plans<br>Acc-no: 0001013762-06-002058 (33 Act) | 2006-10-19 | 333-138078 | |
| | | | | | 061153035 |
| 10KSB/A | [html][text] 1 MB | **[Amend]**Optional form for annual and transition reports of small<br>business issuers [Section 13 or 15(d), not S-B Item 405]<br>Acc-no: 0001013762-06-002056 (34 Act) | 2006-10-19 | 000-33321 | |
| | | | | | 061153023 |
| 10QSB | [html][text] 499 KB | Optional form for quarterly and transition reports of small business<br>issuers<br>Acc-no: 0001013762-06-001712 (34 Act) | 2006-08-21 | 000-33321 | |
| | | | | | 061046841 |
| NT 10-Q | [html][text] 31 KB | Notification of inability to timely file Form 10-Q or 10-QSB<br>Acc-no: 0001013762-06-001665 (34 Act) | 2006-08-15 | 000-33321 | |
| | | | | | 061034305 |
| 10QSB | [html][text] 456 KB | Optional form for quarterly and transition reports of small business<br>issuers<br>Acc-no: 0001013762-06-001105 (34 Act) | 2006-05-22 | 000-33321 | |
| | | | | | 06858890 |
| NT 10-Q | [html][text] 33 KB | Notification of inability to timely file Form 10-Q or 10-QSB<br>Acc-no: 0001013762-06-001027 (34 Act) | 2006-05-15 | 000-33321 | |
| | | | | | 06840958 |
| 10KSB | [html][text] 1 MB | Optional form for annual and transition reports of small business<br>issuers [Section 13 or 15(d), not S-B Item 405]<br>Acc-no: 0001013762-06-000840 (34 Act) | 2006-04-17 | 000-33321 | |
| | | | | | 06763211 |
| NT 10-K | [html][text] 33 KB | Notification of inability to timely file Form 10-K 405, 10-K, 10-KSB<br>405, 10-KSB, 10-KT, or 10-KT405<br>Acc-no: 0001013762-06-000650 (34 Act) | 2006-03-31 | 000-33321 | |
| | | | | | 06726654 |
| 8-K | [html][text] 36 KB | Current report, items 4.01 and 9.01<br>Acc-no: 0001013762-06-000547 (34 Act) | 2006-03-15 | 000-33321 | |
| | | | | | 06687760 |
| UPLOAD | [html][text] 6 KB | **[Cover]**SEC-generated letter<br>Acc-no: 0000000000-06-010496 | 2006-03-01 | | |
| UPLOAD | [html][text] 5 KB | **[Cover]**SEC-generated letter<br>Acc-no: 0000000000-06-010402 | 2006-03-01 | | |
| CORRESP | [html][text] 3 KB | **[Cover]**Correspondence<br>Acc-no: 0001013762-06-000368 | 2006-02-14 | | |
| CORRESP | [html][text] 3 KB | **[Cover]**Correspondence<br>Acc-no: 0001013762-06-000366 | 2006-02-14 | | |
| | | | | | 06616794 |
| SB-2/A | [html][text] 1 MB | **[Amend]**Optional form for registration of securities to be sold to the<br>public by small business issuers<br>Acc-no: 0001013762-06-000357 (33 Act) | 2006-02-14 | 333-129627 | |
| | | | | | 06616374 |
| 10QSB/A | [html][text] 613 KB | **[Amend]**Optional form for quarterly and transition reports of small<br>business issuers<br>Acc-no: 0001013762-06-000352 (34 Act) | 2006-02-14 | 000-33321 | |
| | | | | | 06616195 |
| 10QSB/A | [html][text] 535 KB | **[Amend]**Optional form for quarterly and transition reports of small<br>business issuers<br>Acc-no: 0001013762-06-000349 (34 Act) | 2006-02-14 | 000-33321 | |
| | | | | | 06616103 |
| 10QSB/A | [html][text] 474 KB | **[Amend]**Optional form for quarterly and transition reports of small<br>business issuers<br>Acc-no: 0001013762-06-000347 (34 Act) | 2006-02-14 | 000-33321 | |
| 10KSB/A | [html][text] 1 MB | **[Amend]**Optional form for annual and transition reports of small<br>business issuers [Section 13 or 15(d), not S-B Item 405]<br>Acc-no: 0001013762-06-000344 (34 Act) | 2006-02-14 | 000-33321 | |
| CORRESP | [html][text] 46 KB | **[Cover]**Correspondence<br>Acc-no: 0001013762-06-000334 | 2006-02-13 | | |
| | | | | | 06604466 |
| SB-2/A | [html][text] 1 MB | **[Amend]**Optional form for registration of securities to be sold to the<br>public by small business issuers<br>Acc-no: 0001013762-06-000332 (33 Act) | 2006-02-13 | 333-129627 | |
| | | | | | 06604336 |
| 10QSB/A | [html][text] 614 KB | **[Amend]**Optional form for quarterly and transition reports of small<br>business issuers<br>Acc-no: 0001013762-06-000330 (34 Act) | 2006-02-13 | 000-33321 | |
| | | | | | 06604200 |
| 10QSB/A | [html][text] 535 KB | **[Amend]**Optional form for quarterly and transition reports of small<br>business issuers<br>Acc-no: 0001013762-06-000328 (34 Act) | 2006-02-13 | 000-33321 | |
| | | | | | 06604149 |
| 10QSB/A | [html][text] 477 KB | **[Amend]**Optional form for quarterly and transition reports of small<br>business issuers<br>Acc-no: 0001013762-06-000326 (34 Act) | 2006-02-13 | 000-33321 | |
| 10KSB/A | [html][text] 976 KB | **[Amend]**Optional form for annual and transition reports of small<br>business issuers [Section 13 or 15(d), not S-B Item 405]<br>Acc-no: 0001013762-06-000324 (34 Act) | 2006-02-13 | 000-33321 | |
| | | | | | 06603955 |
| 10QSB/A | [html][text] 360 KB | **[Amend]**Optional form for quarterly and transition reports of small<br>business issuers<br>Acc-no: 0001013762-06-000320 (34 Act) | 2006-02-13 | 000-33321 | |
| | | | | | 06603892 |
| 10QSB/A | [html][text] 331 KB | **[Amend]**Optional form for quarterly and transition reports of small<br>business issuers<br>Acc-no: 0001013762-06-000318 (34 Act) | 2006-02-13 | 000-33321 | |

Next 40

*http://www.sec.gov/cgi-bin/browse-edgar*

# EXHIBIT C

DEF 14A 1 def14-a.htm PROXY STATEMENT

**SCHEDULE 14A**
**(RULE 14a-101)**

**INFORMATION REQUIRED IN PROXY STATEMENT**

**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the Securities**
**Exchange Act of 1934**

Filed by the Registrant [X]

Filed by a Party other than the Registrant [_]

Check the appropriate box:

[ ]  Preliminary Proxy Statement                                    [_]  Confidential, For Use of
the Commission Only
                    (As Permitted by Rule 14a-6(e)(2))

[X]  Definitive Proxy Statement

[_]  Definitive Additional Materials

[_]  Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12

**FELLOWS ENERGY LTD.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]  No fee required

[_]  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1) Title of each class of securities to which transaction applies:

    (2) Aggregate number of securities to which transaction applies:

    (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth
the amount on which the filing fee is calculated and state how it was determined):

    (4) Proposed maximum aggregate value of transaction:

    (5) Total fee paid:

[_] Fee paid previously with preliminary materials.

[_] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

   (1) Amount Previously Paid:

   (2) Form, Schedule or Registration Statement No.:

   (3) Filing Party:

   (4) Date Filed:

**FELLOWS ENERGY LTD.**
**1942 Broadway St. Suite 320**
**Boulder, Colorado 80302**
**(303) 926-4415**

**TO THE STOCKHOLDERS OF FELLOWS ENERGY LTD.**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (the "Meeting") of Fellows Energy Ltd., a Nevada corporation (the "Company" or "Fellows"), will be held at 10:00 AM (Colorado time), on June 27, 2007 at 370 Interlocken Boulevard, Suite 400, Broomfield, Colorado 80021, for the following purposes:

1. To elect two (2) directors of the Company to serve until the 2008 Annual Meeting of Stockholders or until their successors have been duly elected and qualified;

2. To Amend the Company's Articles of Incorporation, as amended, to increase the number of authorized shares of common stock, par value $.001 per share (the "Common Stock"), of the Company from 100,000,000 shares to 300,000,000 shares;

3. To adopt the Company's 2007 Stock Incentive Plan; and

4. To transact such other business as may properly come before the Meeting and any adjournment or postponement thereof.

Only stockholders who own shares of our common stock at the close of business on June 7, 2007 are entitled to notice of and to vote at the annual meeting. You may vote your shares by marking, signing and dating the enclosed proxy card as promptly as possible and returning it in the enclosed postage-paid envelope.

You may also vote in person at the annual meeting, even if you use the option set forth above.

We have enclosed with this Notice of Annual Meeting, a proxy statement, a form of proxy and a copy of our annual report to stockholders. Our annual report is not a part of this proxy statement.

By Order of the Board of Directors,


*/s/ GEORGE S. YOUNG*
*George S. Young*
*Chairman of the Board*


Boulder, Colorado
June 11, 2007

**FELLOWS ENERGY LTD.**
**1942 Broadway St. Suite 320**
**Boulder, Colorado 80302**
**(303) 926-4415**

### PROXY STATEMENT FOR 2007 ANNUAL MEETING OF STOCKHOLDERS

The board of directors is soliciting proxies to be used at our June 27, 2007 annual meeting of stockholders. Please read and carefully consider the information presented in this proxy statement and vote by completing, dating, signing and returning the enclosed proxy in the enclosed postage-paid envelope.

This proxy statement, the form of proxy and our annual report will be mailed to all stockholders on or about June 11, 2007. Our annual report is not a part of this proxy statement.

### INFORMATION ABOUT THE ANNUAL MEETING

**WHEN IS THE ANNUAL MEETING?**

June 27, 2007, 10:00 A.M. Colorado time.

**WHERE WILL THE ANNUAL MEETING BE HELD?**

The meeting will be held at 370 Interlocken Boulevard, Suite 400, Broomfield, Colorado 80021.

**WHAT ITEMS WILL BE VOTED UPON AT THE ANNUAL MEETING?**

You will be voting on the following matters:

1. ELECTION OF DIRECTORS. To elect two (2) directors to serve until the 2008 Annual Meeting of stockholders or until their successors are duly elected and qualified;

2. AMENDMENT OF THE ARTICLES OF INCORPORATION TO INCREASE THE NUMBER OF AUTHORIZED SHARES OF COMMON STOCK. To consider adopting an amendment to the Articles of Incorporation that would increase the number of authorized shares of common stock from 100,000,000 to 300,000,000;

3. ADOPTION OF 2007 STOCK INCENTIVE PLAN. To adopt the 2007 Stock Incentive Plan; and

4. OTHER BUSINESS. To transact such other business as may properly come before the annual meeting or any adjournment of the annual meeting.

**WHO CAN VOTE?**

Only holders of record of our common stock at the close of business on June 7, 2007 will be entitled to notice of and to vote at the annual meeting and any adjournments of the annual meeting. You are entitled to one vote for each share of common stock held on that date. On June 7, 2007, there were 100,000,000 shares of our common stock outstanding and entitled to vote at the Stockholders Meeting.

**YOUR BOARD OF DIRECTORS HAS APPROVED EACH OF THE PROPOSALS SET FORTH HEREIN.**

**ACCORDINGLY, THE BOARD RECOMMENDS A VOTE FOR THE ELECTION OF THE NOMINEE DIRECTORS, THE AMENDMENT OF THE ARTICLES OF INCORPORATION AND THE ADOPTION OF THE 2007 STOCK INCENTIVE PLAN.**

**HOW DO I VOTE BY PROXY?**

You may vote your shares by mail by marking, signing and dating the enclosed proxy card as promptly as possible

and returning it in the enclosed postage-paid envelope. A pre-addressed, postage-paid envelope is provided for this purpose.

If you return your signed proxy card before the annual meeting, we will vote your shares as you direct. For each item of business, you may vote "FOR" or "AGAINST" or you may "ABSTAIN" from voting.

If you return your signed proxy card but do not specify how you want to vote your shares, we will vote them:

- "FOR" the election of all of our nominees for directors;

- "FOR" the amendment of the Company's Articles of Incorporation to increase the number of authorized shares of common stock from 100,000,000 to 300,000,000; and

- "FOR" the adoption of our 2007 Stock Incentive Plan.

If any matters other than those set forth above are properly brought before the annual meeting, the individuals named in your proxy card may vote your shares in accordance with their best judgment.

**HOW DO I CHANGE OR REVOKE MY PROXY?**

You may revoke your Proxy at any time before it is voted either by filing with the Secretary of the Company, at our principal executive offices, a written notice of revocation or a duly executed proxy bearing a later date or by attending the Annual Meeting and expressing a desire to vote your shares in person. Our principal executive offices are located at 1942 Broadway St. Suite 320, Boulder, Colorado 80302.

**WHAT CONSTITUTES A "QUORUM" FOR THE ANNUAL MEETING?**

The representation, in person or by proxy, of a majority of the outstanding shares of our common stock entitled to vote is necessary to constitute a quorum at the Annual Meeting. All Proxies that are returned will be counted by the Inspector of Elections in determining the presence of a quorum and on each issue to be voted on, except as noted below. An abstention from voting or a broker non-vote will be used for the purpose of establishing a quorum, but will not be counted in the voting process. All Proxies that are properly completed, signed and returned to the Company before the Annual Meeting, and that have not been revoked, will be voted in favor of the proposals described in this Proxy Statement unless otherwise directed.

**HOW MANY VOTES ARE REQUIRED?**

- Directors nominees are elected by a plurality of the votes cast in person or by proxy, provided that a quorum is present at the Meeting.

- The proposal to amend the Articles of Incorporation to increase the number of authorized shares of common stock from 100,000,000 to 300,000,000 will require the affirmative vote of at least a majority of the Company's outstanding shares of Common Stock. Thus, any abstentions, "broker non-votes" (shares held by brokers or nominees as to which they have no discretionary authority to vote on a particular matter and have received no instructions from the beneficial owners or persons entitled to vote thereon), or other limited proxies will have the effect of a vote against amending the Company's Articles of Incorporation.

- The adoption of the 2007 Stock Incentive Plan will require an affirmative vote of the majority of the votes cast in person or by proxy, provided that a quorum is present at the annual meeting.

**WHO PAYS FOR THE SOLICITATION OF PROXIES?**

We will pay the cost of preparing, printing and mailing material in connection with this solicitation of proxies. We will, upon request, reimburse brokerage firms, banks and others for their reasonable out-of-pocket expenses in forwarding proxy material to beneficial owners of stock or otherwise in connection with this solicitation of proxies.

**WHEN ARE STOCKHOLDER PROPOSALS FOR THE 2008 ANNUAL MEETING DUE?**

Any stockholder proposals for the 2008 annual meeting must be received by us, directed to the attention of the Company's secretary, Mr. George S. Young, Fellows Energy Ltd., 1942 Broadway St. Suite 320, Boulder, Colorado 80302 no later than December 31, 2007. The use of certified mail, return receipt requested, is advised. To be eligible for inclusion, a proposal must comply with our bylaws, Rule 14a-8 and all other applicable provisions of Regulation 14A under the Securities Exchange Act of 1934.

## PROPOSAL 1: ELECTION OF DIRECTORS
### (ITEM 1 ON THE PROXY CARD)

At the Meeting, two (2) directors are to be elected. Pursuant to the Company's By-laws, all directors are elected to serve for the ensuing year and until their respective successors are elected and qualified. Unless otherwise directed, the persons named in the enclosed Proxy intend to cast all votes pursuant to proxies received for the election of Messrs. Young and Prince (collectively, the "Nominees"). If any of the Nominees becomes unavailable for any reason, which event is not anticipated, the shares represented by the enclosed proxy will be voted for such other person designated by the Board.

Vote required: Directors must be elected by a plurality of all votes cast at the meeting. Votes withheld for any director will not be counted.

Voting by the Proxies: The Proxies will vote your shares in accordance with your instructions. If you have not given specific instructions to the contrary, your shares will be voted to approve the election of the nominees named in the Proxy Statement. Although the Company knows of no reason why the nominees would not be able to serve, if a nominee were not available for election, the Proxies would vote your Common Stock to approve the election of any substitute nominee proposed by the Board of Directors. The Board may also choose to reduce the number of directors to be elected as permitted by our Bylaws.

General Information about the Nominees: The following information regarding the Nominees, their occupations, employment history and directorships in certain companies is as reported by the respective Nominees.

### *George S. Young*

On January 5, 2004, our board of directors appointed Mr. Young as our President, Chief Executive Officer and Chairman of the board of directors. Mr. Young is an experienced business executive in the mining and petroleum industries. He is an attorney and engineer by profession, and began his legal career in the law department of Exxon Company USA. Mr. Young also worked at Kennecott Copper Corporation as a metallurgical engineer involved in the construction and start-up of a new copper smelter. From 1998 to 2002, Mr. Young practiced natural resource law in Salt Lake City, Utah. Prior to that Mr. Young was the President of Oro Belle Resources Corporation in Golden, Colorado from 1996 to 1998. Previous positions also include General Counsel and Acting General Manager for the Intermountain Power Project, a $4.4 billion coal-fired power project; Domestic Minerals Division Counsel for Getty Oil Company; and General Counsel for Bond International Gold, Inc. Mr. Young currently serves as a director of Palladon Ventures Ltd., a British Columbia corporation which trades on the TSX Venture Exchange under the trading symbol PLL.V, and International Royalty Corporation, a company listed on the Toronto Stock Exchange and the American Stock Exchange. Mr. Young is the sole owner, officer and director of Diamond Oil & Gas Corporation, a privately held Nevada corporation. He holds a B.Sc. in Metallurgical Engineering, which he earned in 1975 from the University of Utah and a J.D. degree, which he earned in 1979 from the University of Utah. Mr. Young is a member of the Society of Mining Engineers, and the state bars of Utah, Colorado and Texas.

### *Steven L. Prince*

As of January 5, 2004, our board of directors appointed Mr. Prince as our Vice President and a member of our board of directors. Mr. Prince is a petroleum engineer with over 20 years of operating experience in conventional oil and gas drilling and in coal bed natural gas drilling and field development. Prior to joining Fellows Energy, Mr. Prince had been the Senior Petroleum Engineer for the Navajo Nation of Indians. From 2001 to 2003, Mr. Prince was the Operations Manager for Coal Bed Methane Production Consultants. From 1997 to 2002, he served as Executive Director of the Castle Valley Gas Producers Council, a gas industry trade association. Previous positions also include Drilling Engineer for Shell Western Exploration & Production; Operations Manager and Engineering Manager for River Gas Corporation, Facilities Engineer for Atlantic Richfield Co., and Production Engineer for Amoco Production Co.  Mr. Prince is a member of the Society of Petroleum Engineers.  Mr. Prince received his B.S. in Petroleum Engineering with honors from Montana College of Mineral Science and Technology in 1987.

Directors are elected annually and hold office until the next annual meeting of the stockholders of the Company and

until their successors are elected and qualified. Officers are elected annually and serve at the discretion of the Board of Directors.

**ROLE OF THE BOARD**

Pursuant to Nevada law, our business, property and affairs are managed under the direction of our board of directors. The board has responsibility for establishing broad corporate policies and for the overall performance and direction of Fellows, but is not involved in day-to-day operations. Members of the board keep informed of our business by participating in board and committee meetings, by reviewing analyses and reports sent to them regularly, and through discussions with our executive officers.

**2006 BOARD MEETINGS**

During the fiscal year ended December 31, 2006, the board had five meetings and took action four times by unanimous written consent.

def14-a.htm

**BOARD COMMITTEES**

The Board does not have any standing committees.  As our stock is currently quoted on the Over-the-Counter Bulletin Board, we are not required to have any standing committees.  In addition, we have a limited board that allows all board members to participate in the functions ascribed to the standing committees.  Our Board of Directors intend to continually evaluate the need for an Audit, Nominating and/or Compensation Committees.

ELECTION OF DIRECTORS REQUIRES THE AFFIRMATIVE VOTE OF THE HOLDERS OF A PLURALITY OF THE SHARES OF COMMON STOCK REPRESENTED AT THE ANNUAL MEETING. SHARES OF COMMON STOCK REPRESENTED BY PROXY CARDS RETURNED TO US WILL BE VOTED FOR THE NOMINEES LISTED ABOVE UNLESS YOU SPECIFY OTHERWISE. THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE ELECTION OF DIRECTORS.

**PROPOSAL 2: TO CONSIDER AND VOTE UPON A PROPOSAL TO
AMEND THE COMPANY'S ARTICLES OF INCORPORATION
TO INCREASE THE NUMBER OF AUTHORIZED SHARES OF
COMMON STOCK FROM 100,000,000 TO 300,000,000**
(ITEM 2 ON THE PROXY CARD)

On April 20, 2007, the Board of Directors authorized an amendment to the Company's Articles of Incorporation to increase the number of our authorized shares of common stock. Subject to shareholder approval, Article Fourth would be amended to read as follows and would be filed with the California Secretary of State:

> "FOURTH: The Corporation is authorized to issue two classes of stock. One class of stock shall be Common Stock, par value $0.001. The second class of stock shall be Preferred Stock, $0.001 par value. The Preferred Stock, or any series thereof, shall have such designations, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof as shall be expressed in the resolution or resolutions providing for the issue of such stock adopted by the board of directors and may be made dependent upon facts ascertainable outside such resolution or resolutions of the board of directors, provided that the matter in which such facts shall operate upon such designations, preferences, rights and qualifications; limitations or restrictions of such class or series of stock is clearly and expressly set forth in the resolution or resolutions providing for the issuance of such stock by the board of directors.
>
> The total number of shares of stock of each class which the Corporation shall have authority to issue and the par value of each share of each class of stock are as follows:

| Class | Par Value | Authorized Shares |
|-------|-----------|-------------------|
| Common | $0.001 | 300,000,000 |
| Preferred | $0.001 | 25,000,000 |
| Totals: | | 325,000,000" |

The terms of the additional shares of common stock will be identical to those of the currently outstanding shares of common stock. However, because holders of common stock have no preemptive rights to purchase or subscribe for any unissued stock of the Company, the issuance of additional shares of common stock will reduce the current stockholders' percentage ownership interest in the total outstanding shares of Common Stock. This amendment and the creation of additional shares of authorized common stock will not alter the current number of issued shares. The relative rights and limitations of the shares of common stock will remain unchanged under this amendment.

As of June 7, 2007, a total of 100,000,000 shares of the Company's currently authorized 100,000,000 shares of common stock are issued and outstanding. The increase in the number of authorized but unissued shares of common stock would enable the Company, without further stockholder approval, to issue shares from time to time as may be required for proper business purposes, such as raising additional capital for ongoing operations, business and asset acquisitions, stock splits and dividends, present and future employee benefit programs and other corporate purposes.

The proposed increase in the authorized number of shares of common stock could have a number of effects on the Company's stockholders depending upon the exact nature and circumstances of any actual issuances of authorized but unissued shares. The increase could have an anti-takeover effect, in that additional shares could be issued (within the limits imposed by applicable law) in one or more transactions that could make a change in control or takeover of the Company more difficult. For example, additional shares could be issued by the Company so as to dilute the stock ownership or voting rights of persons seeking to obtain control of the Company. Similarly, the issuance of additional shares to certain persons allied with the Company's management could have the effect of making it more difficult to remove the Company's current management by diluting the stock ownership or voting rights of persons seeking to cause such removal. Except as further discussed herein, the Board of Directors is not aware of any attempt, or contemplated attempt, to acquire control of the Company, and this proposal is not being presented with the intent that it be utilized as a type of anti-takeover device.

Stockholders do not have any preemptive or similar rights to subscribe for or purchase any additional shares of common stock that may be issued in the future, and therefore, future issuances of common stock may, depending on

the circumstances, have a dilutive effect on the earnings per share, voting power and other interests of the existing stockholders.

Except for the following, there are currently no plans, arrangements, commitments or understandings for the issuance of the additional shares of common stock which are to be authorized.

· **Secured Convertible Debentures**

On February 15, 2007, we entered into a series of transactions to restructure securities issued pursuant to securities purchase agreements dated June 17, 2005 and September 21, 2005.

*Background*

June 2005 Financing

On June 17, 2005, we closed a financing pursuant to a securities purchase agreement with three accredited investors, Palisades Master Fund, L.P. ("Palisades"), Crescent International Ltd. ("Crescent") and JGB Capital L. P. ("JGB") for the issuance of $5,501,199.95 in face amount of debentures maturing September 16, 2008 (the "June Debentures"). The June Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting October 1, 2005, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.60 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring June 17, 2008, to purchase 4,584,334 shares of restricted common stock, exercisable at a per share of $0.649 (the "June Warrants"). In addition, the exercise price of the June Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the June Warrants' exercise price, all of the June Warrants shall expire on the 30th trading day after we send a call notice to the June Warrant holders. If at any time after one year from the date of issuance of the June Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the June Warrants, then the holder may exercise the June Warrant at such time by means of a cashless exercise.

September 2005 Financing

On September 21, 2005, we closed a financing pursuant to a securities purchase agreement with two accredited investors, Palisades and Crescent for the issuance of $3,108,000 in face amount of debentures maturing December 20, 2008 (the "September Debentures" and together with the June Debentures, the "Old Debentures"). The September Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting January 1, 2006, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.75 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring September 21, 2008, to purchase 2,172,000 shares of restricted common stock, exercisable at a per share of $0.80 (the "September Warrants" and together with the June Warrants, the "Old Warrants"). In addition, the exercise price of the September Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the September Warrants' exercise price, all of the September Warrants shall expire on the 30th trading day after we send a call notice to the September Warrant holders. If at any time after one year from the date of issuance of the September Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the September Warrants, then the holder may exercise the September Warrant at such time by means of a cashless exercise.

*Restructuring*

On February 15, 2007, the following transactions took place with regards to the Old Debentures and Old Warrants:

1) JGB entered into an assignment agreement with Crescent, pursuant to which Crescent purchased from JGB the June Debentures issued to JGB. The face value of the June Debentures issued for JGB at the time of the transaction was $333,333.33 and Crescent paid $250,000 to JGB for the assignment;

2) We entered into a settlement agreement with JGB for the sum of $83,333.33. We amended the terms of the Old Warrants held by JGB to remove the ratchet and call provisions and JGB agreed to release any shares reserved for issuance of the Old Warrants and to not exercise such Old Warrants until we obtain an increase in the authorized shares of common stock. Upon obtaining the increase in authorized shares, we agreed to issue JGB 500,000 shares of restricted common stock;

3) We entered into a first amendment and waiver agreement with Palisades for the amendment of the Old Debentures issued to Palisades (the "Palisades Amendment Agreement"); and

4) We entered into a first amendment and waiver agreement with Crescent for the amendment of the Old Debentures issued to JGB (and purchased by Crescent) and Crescent (the "Crescent Amendment Agreement" and together with the Palisades Amendment Agreement, the "Restructuring Amendments").

Palisades and Crescent agreed to amend the Old Debentures to remove the mandatory monthly liquidation provision and to amend the fixed conversion price of the Old Debentures to $0.1375 (the "Fixed Conversion Price"). As a result, the principal amount remaining on the Old

Debentures is now due and payable at maturity, unless sooner converted into shares of common stock by the investors, at the Fixed Conversion Price. Palisades and Crescent further agreed to waive any and all existing defaults under the Old Debentures.

Pursuant to the Palisades Amendment Agreement, we agreed to issue 7,025,789 shares of common stock (the "Monthly Redemption Shares") to Palisades upon conversion of $608,433.15 in principal amount of the Old Debentures. Such Monthly Redemption Shares were issued as payment for monthly redemptions owed to Palisades on December 1, 2006 and January 1, 2007 and February 1, 2007 pursuant to the Old Debentures. These Monthly Redemption Shares were not issued while we negotiated the terms of a potential buy-out or restructuring of the Old Debentures. The Monthly Redemption Shares were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission and represent the remaining shares of common stock registered thereunder for Palisades pursuant to the Old Debentures. As a result of the Monthly Redemption Shares, the exercise price of the Old Warrants was reduced to $0.0866, which Palisades exercised on a cashless basis and received 2,970,758 shares of common stock which were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission.

We agreed to pay Palisades a forbearance fee of $150,000 a month, for six months, which fee was paid in shares of common stock at an issuance price of $0.1375, for a total issuance of 5,454,546 shares of restricted common stock. In addition, we agreed to issue Palisades 1,449,825 shares of common stock as a commitment fee for the restructuring of the Old Debentures.

In connection with the restructuring, we executed a security agreement (the "Security Agreement") in favor of Palisades and JGB granting them a first priority security interest in all of our goods, inventory, contractual rights and general intangibles, receivables, documents, instruments, chattel paper, and intellectual property, except for our Carbon County prospect, which Palisades and JGB took a second priority interest and for our Carter Creek and Weston County prospects, which the investors were not granted any security interest. The Security Agreements state that if an event of default occurs under the Old Debentures or Security Agreement, the Investors have the right to take possession of the collateral, to operate our business using the collateral, and have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the collateral, at public or private sale or otherwise to satisfy our obligations under these agreements.

*New Financing*

On February 15, 2006, we closed a financing pursuant to a securities purchase agreement with Palisades for the issuance of a $714,500 face amount debenture maturing September 15, 2007 (the "New Debenture"). The New Debenture does not accrue interest and the investors paid $500,000 for the New Debenture. We paid a commission of $100,000 to HPC Capital Management (a registered broker-dealer) in connection with the transaction, resulting in net proceeds to us of $400,000 before our legal fees. We used the net proceeds to pay our settlement agreement payment to JGB, repayment of a bridge loan to Petro Capital Securities, LLC and the remainder for general working capital purposes. We also issued HPC Capital Management 6,458,063 shares of restricted common stock and agreed to issue an additional 1,041,937 shares of restricted common stock upon obtaining an increase in our authorized shares of common stock, which shares are additional compensation for its services in connection with the transaction with the investors.

The convertible debentures are secured and are convertible into our common stock, at Palisades option, at a fixed conversion price of $0.1375. Based on this conversion price, the $714,500 secured convertible debenture is convertible into 5,196,364 shares of our common stock.

In the event of default, the investors may require payment, which shall be the greater of: (A) 130% of the principal amount of the face amount of the debenture to be prepaid, or (B) the principal amount of the debenture to be prepaid, divided by the conversion price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is less, multiplied by the closing price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is greater

The conversion price of the debenture may be adjusted in certain circumstances such as if we pay a stock

dividend, subdivide or combine outstanding shares of common stock into a greater or lesser number of shares, or take such other actions as would otherwise result in dilution of the investor's position.

We have agreed to file a registration statement with the Securities and Exchange Commission to cover the future sale by the investors of the shares issuable upon conversion of the Old and New Debentures. If the registration statement is not filed by the filing deadline or if the registration statement is not declared effective by the effective deadline, we are required to pay liquidated damages to the investors.

The following are the risks associated with our current financing arrangement:

**There Are a Large Number of Shares Underlying Our Convertible Debentures and Warrants That May be Available for Future Sale and the Sale of These Shares May Depress the Market Price of Our Common Stock.**

As of June 7, 2007, we had 100,000,000 shares of common stock issued and outstanding, convertible debentures issued in June 2005, September 2005 and February 2007 outstanding that may be converted into an estimated 24,024,197 shares of common stock and outstanding warrants issued in June and September 2005 to purchase 1,516,668 shares of common stock. To the extent registered pursuant to our registration statements, all of the shares issuable upon conversion of the June and September 2005 debentures and upon exercise of our June and September 2005 warrants, may be sold without restriction. The sale of these shares may adversely affect the market price of our common stock.

---

**The Issuance of Shares Upon Conversion of the Convertible Debentures and Exercise of Outstanding Warrants May Cause Immediate and Substantial Dilution to Our Existing Stockholders.**

The issuance of shares upon conversion of the convertible debentures and exercise of warrants may result in substantial dilution to the interests of other stockholders since the selling stockholders may ultimately convert and sell the full amount issuable on conversion. Although the selling stockholders may not convert their convertible debentures and/or exercise their warrants if such conversion or exercise would cause them to own more than 4.99% of our outstanding common stock, this restriction does not prevent the selling stockholders from converting and/or exercising some of their holdings and then converting the rest of their holdings. In this way, the selling stockholders could sell more than this limit while never holding more than this limit. There is no upper limit on the number of shares that may be issued which will have the effect of further diluting the proportionate equity interest and voting power of holders of our common stock, including investors in this offering.

**If We Are Required for any Reason to Repay Our Outstanding Secured Convertible Debentures, We Would Be Required to Deplete Our Working Capital, If Available, Or Raise Additional Funds.  Our Failure to Repay the Secured Convertible Debentures, If Required, Could Result in Legal Action Against Us, Which Could Require the Sale of Substantial Assets.**

Between 2005 and 2007, we entered into Securities Purchase Agreements for the sale of an aggregate of $9,323,700 principal face amount of secured convertible debentures, of which approximately $2,993,938 remains outstanding. The secured convertible debentures are due and payable, with interest, in September 2007 unless sooner converted into shares of our common stock. In addition, any event of default such as our failure to repay the principal when due, our failure to issue shares of common stock upon conversion by the holder, our failure to timely file a registration statement or have such registration statement declared effective, breach of any covenant, representation or warranty in the Securities Purchase Agreement or related convertible debentures, the assignment or appointment of a receiver to control a substantial part of our property or business, the filing of a money judgment, writ or similar process against our company in excess of $50,000, the commencement of a bankruptcy, insolvency, reorganization or liquidation proceeding against our company and the delisting of our common stock could require the early repayment of the convertible debentures, including default interest on the outstanding principal balance of the convertible debentures if the default is not cured with the specified grace period. We anticipate that the full amount of the convertible debentures will be converted into shares of our common stock, in accordance with the terms of the convertible debentures. If we are required to repay the convertible debentures, we would be required to use our limited working capital and raise additional funds. If we were unable to repay the convertible debentures when required, the debenture holders could commence legal action against us and foreclose on all of our assets to recover the amounts due. Any such action would require us to curtail or cease operations.

### RECOMMENDATION OF THE BOARD:

**THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" APPROVAL OF THE PROPOSAL TO AMEND THE ARTICLES OF INCORPORATION TO INCREASE THE NUMBER OF AUTHORIZED SHARES OF THE COMPANY'S COMMON STOCK FROM 100,000,000 TO 300,000,000.**

## PROPOSAL NO. 3
## APPROVAL OF THE 2007 STOCK INCENTIVE PLAN
### (ITEM 3 ON THE PROXY CARD)

At the Annual Meeting, the Company's stockholders are being asked to approve the 2007 Stock Incentive Plan (the "2007 Incentive Plan") and to authorize 2,000,000 shares of Common Stock for issuance thereunder. The following is a summary of principal features of the 2007 Incentive Plan. The summary, however, does not purport to be a complete description of all the provisions of the 2007 Incentive Plan. The 2007 Incentive Plan is attached hereto as exhibit "B."

### General

The 2007 Incentive Plan was adopted by the Board of Directors. The Board of Directors has initially reserved 10,000,000 shares of Common Stock for issuance under the 2007 Incentive Plan, subject to shareholder approval increasing the number of authorized shares of common stock. Under the Plan, options may be granted which are intended to qualify as Incentive Stock Options ("ISOs") under Section 422 of the Internal Revenue Code of 1986 (the "Code") or which are not ("Non-ISOs") intended to qualify as Incentive Stock Options thereunder.

The 2007 Incentive Plan and the right of participants to make purchases thereunder are intended to qualify as an "employee stock purchase plan" under Section 423 of the Internal Revenue Code of 1986, as amended (the "Code"). The 2007 Incentive Plan is not a qualified deferred compensation plan under Section 401(a) of the Internal Revenue Code and is not subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

### Purpose

The primary purpose of the 2007 Incentive Plan is to attract and retain the best available personnel for the Company in order to promote the success of the Company's business and to facilitate the ownership of the Company's stock by employees. In the event that the 2007 Incentive Plan is not adopted the Company may have considerable difficulty in attracting and retaining qualified personnel, officers, directors and consultants.

### Administration

The 2007 Incentive Plan, when approved, will be administered by the Company's Board of Directors, as the Board of Directors may be composed from time to time. All questions of interpretation of the 2007 Incentive Plan are determined by the Board, and its decisions are final and binding upon all participants. Any determination by a majority of the members of the Board of Directors at any meeting, or by written consent in lieu of a meeting, shall be deemed to have been made by the whole Board of Directors.

Notwithstanding the foregoing, the Board of Directors may at any time, or from time to time, appoint a committee (the "Committee") of at least two members of the Board of Directors, and delegate to the Committee the authority of the Board of Directors to administer the Plan. Upon such appointment and delegation, the Committee shall have all the powers, privileges and duties of the Board of Directors, and shall be substituted for the Board of Directors, in the administration of the Plan, subject to certain limitations.

Members of the Board of Directors who are eligible employees are permitted to participate in the 2007 Incentive Plan, provided that any such eligible member may not vote on any matter affecting the administration of the 2007 Incentive Plan or the grant of any option pursuant to it, or serve on a committee appointed to administer the 2007 Incentive Plan. In the event that any member of the Board of Directors is at any time not a "disinterested person", as defined in Rule 16b-3(c)(3)(i) promulgated pursuant to the Securities Exchange Act of 1934, the Plan shall not be administered by the Board of Directors, and may only by administered by a Committee, all the members of which are disinterested persons, as so defined.

### ELIGIBILITY

Under the 2007 Incentive Plan, options may be granted to key employees, officers, directors or consultants of

the Company, as provided in the 2007 Incentive Plan.

**Terms of Options**

The term of each Option granted under the Plan shall be contained in a stock option agreement between the Optionee and the Company and such terms shall be determined by the Board of Directors consistent with the provisions of the Plan, including the following:

(a) PURCHASE PRICE. The purchase price of the Common Shares subject to each ISO shall not be less than the fair market value (as set forth in the 2007 Incentive Plan), or in the case of the grant of an ISO to a Principal Stockholder, not less that 110% of fair market value of such Common Shares at the time such Option is granted. The purchase price of the Common Shares subject to each Non-ISO shall be determined at the time such Option is granted, but in no case less than 85% of the fair market value of such Common Shares at the time such Option is granted.

(b) VESTING. The dates on which each Option (or portion thereof) shall be exercisable and the conditions precedent to such exercise, if any, shall be fixed by the Board of Directors, in its discretion, at the time such Option is granted.

(c) EXPIRATION. The expiration of each Option shall be fixed by the Board of Directors, in its discretion, at the time such Option is granted; however, unless otherwise determined by the Board of Directors at the time such Option is granted, an Option shall be exercisable for five (5) years after the date on which it was granted (the "Grant Date"). Each Option shall be subject to earlier termination as expressly provided in the 2007 Incentive Plan or as determined by the Board of Directors, in its discretion, at the time such Option is granted.

(d) TRANSFERABILITY. No Option shall be transferable, except by will or the laws of descent and distribution, and any Option may be exercised during the lifetime of the Optionee only by him. No Option granted under the Plan shall be subject to execution, attachment or other process.

(e) OPTION ADJUSTMENTS. The aggregate number and class of shares as to which Options may be granted under the Plan, the number and class shares covered by each outstanding Option and the exercise price per share thereof (but not the total price), and all such Options, shall each be proportionately adjusted for any increase decrease in the number of issued Common Shares resulting from split-up spin-off or consolidation of shares or any like Capital adjustment or the payment of any stock dividend.

Except as otherwise provided in the 2007 Incentive Plan, any Option granted hereunder shall terminate in the event of a merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation of the Company. However, the Optionee shall have the right immediately prior to any such transaction to exercise his Option in whole or in part notwithstanding any otherwise applicable vesting requirements.

(f) TERMINATION, MODIFICATION AND AMENDMENT. The 2007 Incentive Plan (but not Options previously granted under the Plan) shall terminate ten (10) years from the earlier of the date of its adoption by the Board of Directors or the date on which the Plan is approved by the affirmative vote of the holders of a majority of the outstanding shares of capital stock of the Company entitled to vote thereon, and no Option shall be granted after termination of the Plan. Subject to certain restrictions, the Plan may at any time be terminated and from time to time be modified or amended by the affirmative vote of the holders of a majority of the outstanding shares of the capital stock of the Company present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the State of Nevada.

## FEDERAL INCOME TAX ASPECTS OF THE 2007 INCENTIVE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE EFFECT OF FEDERAL INCOME TAXATION UPON THE PARTICIPANTS AND THE COMPANY WITH RESPECT TO THE PURCHASE OF SHARES UNDER THE 2007 INCENTIVE PLAN. THIS SUMMARY DOES NOT PURPORT TO BE COMPLETE AND DOES NOT ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES TO TAXPAYERS WITH SPECIAL TAX STATUS. IN ADDITION, THIS SUMMARY DOES NOT DISCUSS THE PROVISIONS OF THE INCOME TAX LAWS OF ANY MUNICIPALITY, STATE OR FOREIGN COUNTRY IN WHICH THE PARTICIPANT MAY RESIDE, AND DOES NOT DISCUSS ESTATE, GIFT OR OTHER TAX CONSEQUENCES OTHER THAN INCOME TAX CONSEQUENCES. THE COMPANY ADVISES EACH PARTICIPANT TO CONSULT HIS OR HER OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF PARTICIPATION IN THE 2007 INCENTIVE PLAN AND FOR REFERENCE TO APPLICABLE PROVISIONS OF THE CODE.

The 2007 Incentive Plan and the right of participants to make purchases thereunder are intended to qualify under the provisions of Sections 421, 422 and 423 of the Code. Under these provisions, no income will be recognized by a participant prior to disposition of shares acquired under the 2007 Incentive Plan.

If the shares are sold or otherwise disposed of (including by way of gift) more than two years after the first day of the offering period during which shares were purchased (the "Offering Date"), a participant will recognize as ordinary income at the time of such disposition the lesser of (a) the excess of the fair market value of the shares at the time of such disposition over the purchase price of the shares or (b) 15% of the fair market value of the shares on the first day of the offering period. Any further gain or loss upon such disposition will be treated as long-term capital gain

or loss. If the shares are sold for a sale price less than the purchase price, there is no ordinary income and the participant has a capital loss for the difference.

If the shares are sold or otherwise disposed of (including by way of gift) before the expiration of the two-year holding period described above, the excess of the fair market value of the shares on the purchase date over the purchase price will be treated as ordinary income to the participant. This excess will constitute ordinary income in the year of sale or other disposition even if no gain is realized on the sale or a gift of the shares is made. The balance of any gain or loss will be treated as capital gain or loss and will be treated as long-term capital gain or loss if the shares have been held more than one year.

In the case of a participant who is subject to Section 16(b) of the Exchange Act, the purchase date for purposes of calculating such participant's compensation income and beginning of the capital gain holding period may be deferred for up to six months under certain circumstances. Such individuals should consult with their personal tax advisors prior to buying or selling shares under the 2007 Incentive Plan.

The ordinary income reported under the rules described above, added to the actual purchase price of the shares, determines the tax basis of the shares for the purpose of determining capital gain or loss on a sale or exchange of the shares.

---

The Company is entitled to a deduction for amounts taxed as ordinary income to a participant only to the extent that ordinary income must be reported upon disposition of shares by the participant before the expiration of the two-year holding period described above.

**Restrictions on Resale**

Certain officers and directors of the Company may be deemed to be "affiliates" of the Company as that term is defined under the Securities Act. The Common Stock acquired under the 2007 Incentive Plan by an affiliate may be reoffered or resold only pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or another exemption from the registration requirements of the Securities Act.

**Stock Option Plan**

On October 9, 2003, we adopted an incentive stock option plan, pursuant to which shares of our common stock are reserved for issuance to satisfy the exercise of options. The purpose of the incentive stock option plan is to retain qualified and competent officers, employees and directors. As noted in the table below, the incentive stock option plan for our executive officers authorizes up to 2,000,000 shares of our common stock, to be purchased pursuant to the exercise of options. The effective date of the stock option plan was October 9, 2003, and the stock option plan was approved by our shareholders on November 10, 2003. On September 15, 2004, we granted an option for 200,000 shares to our CEO, 150,000 shares to our Vice President and 125,000 shares to an employee. These options are exercisable at $0.80 per share, the price of our stock on the grant date. The options vested 50% on the grant date and vest 50% on September 15, 2005. On October 3, 2005, we granted an option for 100,000 shares to our CEO, 150,000 to our Vice President and 175,000 and 200,000 shares to two employees respectively. The options vest 6 months from the date of grant.
.
Our board of directors, or a committee thereof, administers the stock option plan and is authorized, in its discretion, to grant options thereunder to all of our eligible employees, including officers, and to our directors, whether or not those directors are also our employees. Options will be granted pursuant to the provisions of the incentive stock option plan on such terms, subject to such conditions and at such exercise prices as shall be determined by our board of directors. Options granted pursuant to the stock option plan will not be exercisable after the expiration of ten years from the date of grant.

**Outstanding Equity Awards at Fiscal Year-End Table.**

| Name | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| George Young | 300,000 | | | $0.80 | October 3, 2015 | | | | |
| Steven Prince | 300,000 | | | $0.80 | October 3, 2015 | | | | |

**Required Vote**

The approval of the 2007 Incentive Plan and the reservation of 10,000,000 shares for issuance requires the affirmative vote of the holders of a majority of the shares of the Company's Common Stock present at the Annual Meeting in person or by proxy and entitled to vote and constituting at least a majority of the required quorum.

The proxy holders intend to vote the shares represented by proxies to approve, the 7005 Stock Incentive Plan.

**RECOMMENDATION OF THE BOARD:**

**THE BOARD RECOMMENDS A VOTE FOR APPROVAL OF THE 2007 STOCK INCENTIVE PLAN.**

### BENEFICIAL OWNERSHIP OF FELLOWS COMMON STOCK OF PRINCIPAL STOCKHOLDERS, DIRECTORS AND MANAGEMENT

The following table sets forth certain information regarding beneficial ownership of our common stock as of June 7, 2007

• by each person who is known by us to beneficially own more than 5% of our common stock;
• by each of our officers and directors; and
• by all of our officers and directors as a group.

| NAME AND ADRESS OF OWNER | TITLE OF CLASS | NUMBER OF SHARES OWNED (1) | PERCENTAGE OF CLASS (2) |
|---|---|---|---|
| George S. Young<br>1942 Broadway St., Suite 320<br>Boulder, CO  80302 | Common Stock | 3,800,000 (3) | 3.8% |
| Steven L. Prince<br>1942 Broadway St., Suite 320<br>Boulder, CO  80302 | Common Stock | 300,000 (4) | * |
| All Officers and Directors As a Group (2 persons) | Common Stock | 4,100,000 (3) (4) | 4.1% |

(1) Beneficial Ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of common stock subject to options or warrants currently exercisable or convertible, or exercisable or convertible within 60 days of June 7, 2007 are deemed outstanding for computing the percentage of the person holding such option or warrant but are not deemed outstanding for computing the percentage of any other person.

(2) Percentage based on 100,000,000 shares of common stock outstanding as of June 7, 2007.

(3) Includes 300,000 shares issuable pursuant to options and 3,500,000 shares owned by Diamond Oil & Gas Corporation, of which Mr. Young is the sole owner and is therefore deemed to be the beneficial owner.

(4) Includes 300,000 shares issuable pursuant to options.

## SECTION 16(A) BENEFICIAL OWNERSHIP COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors and executive officers, and persons who own more then 10 percent of the Company's Common Stock, to file with the SEC the initial reports of ownership and reports of changes in ownership of common stock. Officers, directors and greater than 10 percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) forms they file.

Specific due dates for such reports have been established by the Commission and the Company is required to disclose in this Proxy Statement any failure to file reports by such dates during fiscal 2006. Based solely on its review of the copies of such reports received by it, or written representations from certain reporting persons that no Forms 5 were required for such persons, the Company believes that during the fiscal year ended December 31, 2006, there was no failure to comply with Section 16(a) filing requirements applicable to its officers, directors and ten percent stockholders.

## POLICY WITH RESPECT TO SECTION 162(m)

Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), provides that, unless an appropriate exemption applies, a tax deduction for the Company for compensation of certain executive officers named in the Summary Compensation Table will not be allowed to the extent such compensation in any taxable year exceeds

$1 million.  As no executive officer of the Company received compensation during 2004 approaching $1 million, and the Company does not believe that any executive officer's compensation is likely to exceed $1 million in 2005, the Company has not developed an executive compensation policy with respect to qualifying compensation paid to its executive officers for deductibility under Section 162(m) of the Code.

## EXECUTIVE COMPENSATION

The following table sets forth the annual and long-term compensation paid to our Chief Executive Officer and the other executive officers who earned more than $100,000 per year at the end of the last completed fiscal year.  We refer to all of these officers collectively as our "named executive officers."

### Summary Compensation Table

| Name & Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| George S. Young, CEO, Principal Executive Officer | 2006 | $120,000 | $2,000 | | | | | | $122,000 |
| Steven Prince, VP of Operations | 2006 | $108,000 | $2,000 | | | | | | $110,000 |

### Employment Agreements with Executive Officers

None.

### Director Compensation

Our Directors are elected by the vote of a majority in interest of the holders of our voting stock and hold office until the expiration of the term for which he or she was elected and until a successor has been elected and qualified.

A majority of the authorized number of directors constitutes a quorum of the Board for the transaction of business.  The directors must be present at the meeting to constitute a quorum.  However, any action required or permitted to be taken by the Board may be taken without a meeting if all members of the Board individually or collectively consent in writing to the action.

Directors did not receive any compensation for their services during fiscal year 2006.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Since the beginning of our prior fiscal year, there have been no transactions, or proposed transactions, which have materially affected or will materially affect us in which any director, executive officer or beneficial holder of more than 10% of the outstanding common stock, or any of their respective relatives, spouses, associates or affiliates, has had or will have any direct or material indirect interest. We have no policy regarding entering into transactions with affiliated parties.

## ADDITIONAL INFORMATION

Our Annual Report on Form 10-KSB for the fiscal year ended December 31, 2006 and Quarterly Report on Form 10-QSB for the quarter ended March 31, 2007, as filed with the SEC, excluding exhibits are being mailed to shareholders with this Proxy Statement.  We will furnish any exhibit to our Annual or Quarterly Report on Form 10-KSB or 10-QSB, respectively, free of charge to any shareholder upon written request to Fellows Energy Ltd., 1942 Broadway St. Suite 320, Boulder, Colorado 80302.  The Annual Report and Quarterly Report are incorporated in this Proxy Statement. You are encouraged to review the Annual Report with subsequent information filed by the Company with

the SEC and other publicly available information.

**OTHER BUSINESS**

The Board of Directors is not aware of any matter other than the matters described above to be presented for action at the Meeting. However, if any other proper items of business should come before the Meeting, it is the intention of the individuals named on your proxy card as the proxy holders to vote in accordance with their best judgment on such matters.

**By Order of the Board of Directors**

*/s/ GEORGE S. YOUNG*
*George S. Young*
*Chairman of the Board*

Dated: June 11, 2007
Boulder, Colorado

**EXHIBIT A**

### CERTIFICATE OF AMENDMENT TO THE

### ARTICLES OF INCORPORATION

### OF

### FELLOWS ENERGY LTD.

The undersigned, President of Fellows Energy Ltd. (the "Corporation"), does hereby certify as follows:

FIRST: The name of the corporation is:

### FELLOWS ENERGY LTD.

SECOND:  The articles of incorporation of the Corporation is hereby amended by replacing Article FOURTH, in its entirety, with the following:

"FOURTH: The Corporation is authorized to issue two classes of stock.  One class of stock shall be Common Stock, par value $0.001.  The second class of stock shall be Preferred Stock, par value $0.001.  The Preferred Stock, or any series thereof, shall have such designations, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof as shall be expressed in the resolution or resolutions providing for the issue of such stock adopted by the board of directors and may be made dependent upon facts ascertainable outside such resolution or resolutions of the board of directors, provided that the matter in which such facts shall operate upon such designations, preferences, rights and qualifications; limitations or restrictions of such class or series of stock is clearly and expressly set forth in the resolution or resolutions providing for the issuance of such stock by the board of directors.

The total number of shares of stock of each class which the Corporation shall have authority to issue and the par value of each share of each class of stock are as follows:

| Class | Par Value | Authorized Shares |
|-------|-----------|-------------------|
| Common | $0.001 | 300,000,000 |
| Preferred | $0.001 | 25,000,000 |
| Totals: | | 325,000,000 |

THIRD:          The amendment of the articles of incorporation herein certified has been duly adopted at a meeting of the Corporation's Board of Directors and stockholders holding a majority of the outstanding shares of common stock of the Corporation in accordance with the provisions of Section 78.320 of the General Corporation Law of the State of Nevada.

IN WITNESS WHEREOF, the Corporation has caused its corporate seal to be hereunto affixed and this Certificate of Amendment of the Corporation's Articles of Incorporation, as amended, to be signed by George S. Young, its President, this ___ day of _____, 2007.

**FELLOWS ENERGY LTD.**


George S. Young
                              President

**EXHIBIT B**

# FELLOWS ENERGY LTD.
## 2007 INCENTIVE STOCK PLAN

**This Fellows Energy Ltd. 2007 Incentive Stock Plan** (the "**Plan**") is designed to retain directors, executives and selected employees and consultants and reward them for making major contributions to the success of the Company.  These objectives are accomplished by making long-term incentive awards under the Plan thereby providing Participants with a proprietary interest in the growth and performance of the Company.

1. Definitions.

(a) "**Board**" - The Board of Directors of the Company.

(b) "**Code**" - The Internal Revenue Code of 1986, as amended from time to time.

(c) "**Committee**" - The Compensation Committee of the Company's Board, or such other committee of the Board that is designated by the Board to administer the Plan, composed of not less than two members of the Board whom are disinterested persons, as contemplated by Rule 16b-3 ("**Rule 16b-3**") promulgated under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").

(d) "**Company**" – FELLOWS ENERGY LTD. and its subsidiaries including subsidiaries of subsidiaries.

(e) "**Exchange Act**" - The Securities Exchange Act of 1934, as amended from time to time.

(f) "**Fair Market Value**" - The fair market value of the Company's issued and outstanding Stock as determined in good faith by the Board or Committee.

(g) "**Grant**" - The grant of any form of stock option, stock award, or stock purchase offer, whether granted singly, in combination or in tandem, to a Participant pursuant to such terms, conditions and limitations as the Committee may establish in order to fulfill the objectives of the Plan.

(h) "**Grant Agreement**" - An agreement between the Company and a Participant that sets forth the terms, conditions and limitations applicable to a Grant.

(i) "**Option**" - Either an Incentive Stock Option, in accordance with Section 422 of Code, or a Nonstatutory Option, to purchase the Company's Stock that may be awarded to a Participant under the Plan. A Participant who receives an award of an Option shall be referred to as an "**Optionee**."

(j) "**Participant**" - A director, officer, employee or consultant of the Company to whom an Award has been made under the Plan.

(k) "**Restricted Stock Purchase Offer**" - A Grant of the right to purchase a specified number of shares of Stock pursuant to a written agreement issued under the Plan.

(l) "**Securities Act**" - The Securities Act of 1933, as amended from time to time.

(m) "**Stock**" - Authorized and issued or unissued shares of common stock of the Company.

(n) "**Stock Award**" - A Grant made under the Plan in stock or denominated in units of stock for which the Participant is not obligated to pay additional consideration.

2. Administration. The Plan shall be administered by the Board, provided however, that the Board may delegate such administration to the Committee. Subject to the provisions of the Plan, the Board and/or the Committee shall have authority to (a) grant, in its discretion, Incentive Stock Options in accordance with Section 422 of the Code, or Nonstatutory Options, Stock Awards or Restricted Stock Purchase Offers; (b) determine in good faith the fair market value of the Stock covered by any Grant; (c) determine which eligible persons shall receive Grants and the number of shares, restrictions, terms and conditions to be included in such Grants; (d) construe and interpret the Plan; (e) promulgate, amend and rescind rules and regulations relating to its administration, and correct defects, omissions and inconsistencies in the Plan or any Grant; (f) consistent with the Plan and with the consent of the Participant, as appropriate, amend any outstanding Grant or amend the exercise date or dates thereof; (g) determine the duration and purpose of leaves of absence which may be granted to Participants without constituting termination of their employment for the purpose of the Plan or any Grant; and (h) make all other determinations necessary or advisable for the Plan's administration. The interpretation and construction by the Board of any provisions of the Plan or selection of Participants shall be conclusive and final. No member of the Board or the Committee shall be liable for any action or determination made in good faith with respect to the Plan or any Grant made thereunder.

3. Eligibility.

(a) <u>General:</u>  The persons who shall be eligible to receive Grants shall be directors, officers, employees or consultants to the Company. The term consultant shall mean any person, other than an employee, who is engaged by the Company to render services and is compensated for such services. An Optionee may hold more than one Option. Any issuance of a Grant to an officer or director of the Company subsequent to the first registration of any of the securities of the Company under the Exchange Act shall comply with the requirements of Rule 16b-3.

(b) <u>Incentive Stock Options:</u>  Incentive Stock Options may only be issued to employees of the Company. Incentive Stock Options may be granted to officers or directors, provided they are also employees of the Company. Payment of a director's fee shall not be sufficient to constitute employment by the Company.

The Company shall not grant an Incentive Stock Option under the Plan to any employee if such Grant would result in such employee holding the right to exercise for the first time in any one calendar year, under all Incentive Stock Options granted under the Plan or any other plan maintained by the Company, with respect to shares of Stock having an aggregate fair market value, determined as of the date of the Option is granted, in excess of $100,000. Should it be determined that an Incentive Stock Option granted under the Plan exceeds such maximum for any reason other than a failure in good faith to value the Stock subject to such option, the excess portion of such option shall be considered a Nonstatutory Option. To the extent the employee holds two (2) or more such Options which become exercisable for the first time in the same calendar year, the foregoing limitation on the exercisability of such Option as Incentive Stock Options under the Federal tax laws shall be applied on the basis of the order in which such Options are granted. If, for any reason, an entire Option does not qualify as an Incentive Stock Option by reason of exceeding such maximum, such Option shall be considered a Nonstatutory Option.

(c) <u>Nonstatutory Option:</u>  The provisions of the foregoing Section 3(b) shall not apply to any Option designated as a "**Nonstatutory Option**" or which sets forth the intention of the parties that the Option be a Nonstatutory Option.

(d) <u>Stock Awards and Restricted Stock Purchase Offers:</u>  The provisions of this Section 3 shall not apply to any Stock Award or Restricted Stock Purchase Offer under the Plan.

4. Stock.

(a) <u>Authorized Stock:</u> Stock subject to Grants may be either unissued or reacquired Stock.

(b) <u>Number of Shares:</u>  Subject to adjustment as provided in Section 5(i) of the Plan, the total number of shares of Stock which may be purchased or granted directly by Options, Stock Awards or Restricted Stock Purchase Offers, or purchased indirectly through exercise of Options granted under the Plan shall not exceed Ten Million (10,000,000).  If any Grant shall for any reason terminate or expire, any shares allocated thereto but remaining unpurchased upon such expiration or termination shall again be available for Grants with respect thereto under the Plan as though no Grant had previously occurred with respect to such shares. Any shares of Stock issued pursuant to a Grant and repurchased pursuant to the terms thereof shall be available for future Grants as though not previously covered by a Grant.

(c) Reservation of Shares: The Company shall reserve and keep available at all times during the term of the Plan such number of shares as shall be sufficient to satisfy the requirements of the Plan. If, after reasonable efforts, which efforts shall not include the registration of the Plan or Grants under the Securities Act, the Company is unable to obtain authority from any applicable regulatory body, which authorization is deemed necessary by legal counsel for the Company for the lawful issuance of shares hereunder, the Company shall be relieved of any liability with respect to its failure to issue and sell the shares for which such requisite authority was so deemed necessary unless and until such authority is obtained.

(d) Application of Funds:                    The proceeds received by the Company from the sale of Stock pursuant to the exercise of Options or rights under Stock Purchase Agreements will be used for general corporate purposes.

(e) No Obligation to Exercise: The issuance of a Grant shall impose no obligation upon the Participant to exercise any rights under such Grant.

5. Terms and Conditions of Options. Options granted hereunder shall be evidenced by agreements between the Company and the respective Optionees, in such form and substance as the Board or Committee shall from time to time approve. The form of Incentive Stock Option Agreement attached hereto as Exhibit A and the three forms of a Nonstatutory Stock Option Agreement for employees, for directors and for consultants, attached hereto as Exhibit B-1, Exhibit B-2 and Exhibit B-3, respectively, shall be deemed to be approved by the Board. Option agreements need not be identical, and in each case may include such provisions as the Board or Committee may determine, but all such agreements shall be subject to and limited by the following terms and conditions:

(a) Number of Shares: Each Option shall state the number of shares to which it pertains.

(b) Exercise Price: Each Option shall state the exercise price, which shall be determined as follows:

(i) Any Incentive Stock Option granted to a person who at the time the Option is granted owns (or is deemed to own pursuant to Section 424(d) of the Code) stock possessing more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company ("Ten Percent Holder") shall have an exercise price of no less than 110% of the Fair Market Value of the Stock as of the date of grant; and

(ii) Incentive Stock Options granted to a person who at the time the Option is granted is not a Ten Percent Holder shall have an exercise price of no less than 100% of the Fair Market Value of the Stock as of the date of grant.

For the purposes of this Section 5(b), the Fair Market Value shall be as determined by the Board in good faith, which determination shall be conclusive and binding; provided however, that if there is a public market for such Stock, the Fair Market Value per share shall be the average of the bid and asked prices (or the closing price if such stock is listed on the NASDAQ National Market System or Small Cap Issue Market) on the date of grant of the Option, or if listed on a stock exchange, the closing price on such exchange on such date of grant.

(c) Medium and Time of Payment: The exercise price shall become immediately due upon exercise of the Option and shall be paid in cash or check made payable to the Company. Should the Company's outstanding Stock be registered under Section 12(g) of the Exchange Act at the time the Option is exercised, then the exercise price may also be paid as follows:

(i) in shares of Stock held by the Optionee for the requisite period necessary to avoid a charge to the Company's earnings for financial reporting purposes and valued at Fair Market Value on the exercise date, or

(ii) through a special sale and remittance procedure pursuant to which the Optionee shall concurrently provide irrevocable written instructions (a) to a Company designated brokerage firm to effect the immediate sale of the purchased shares and remit to the Company, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate exercise price payable for the purchased shares plus all applicable Federal, state and local income and employment taxes required to be withheld by the Company by reason of such purchase and (b) to the Company to deliver the certificates for the purchased shares directly to such brokerage firm in order to complete the sale transaction.

At the discretion of the Board, exercisable either at the time of Option grant or of Option exercise, the exercise price may also be paid (i) by Optionee's delivery of a promissory note in form and substance satisfactory to the Company and permissible under applicable securities rules and bearing interest at a rate determined by the Board in its sole discretion, but in no event less than the minimum rate of interest required to avoid the imputation of compensation income to the Optionee under the Federal tax laws, or (ii) in such other form of consideration permitted by the Nevada corporations law as may be acceptable to the Board.

(d) <u>Term and Exercise of Options:</u>   Any Option granted to an employee of the Company shall become exercisable over a period of no longer than five (5) years. In no event shall any Option be exercisable after the expiration of ten (10) years from the date it is granted, and no Incentive Stock Option granted to a Ten Percent Holder shall, by its terms, be exercisable after the expiration of five (5) years from the date of the Option. Unless otherwise specified by the Board or the Committee in the resolution authorizing such Option, the date of grant of an Option shall be deemed to be the date upon which the Board or the Committee authorizes the granting of such Option.

Each Option shall be exercisable to the nearest whole share, in installments or otherwise, as the respective Option agreements may provide. During the lifetime of an Optionee, the Option shall be exercisable only by the Optionee and shall not be assignable or transferable by the Optionee, and no other person shall acquire any rights therein. To the extent not exercised, installments (if more than one) shall accumulate, but shall be exercisable, in whole or in part, only during the period for exercise as stated in the Option agreement, whether or not other installments are then exercisable.

(e) <u>Termination of Status as Employee, Consultant or Director:</u>   If Optionee's status as an employee shall terminate for any reason other than Optionee's disability or death, then Optionee (or if the Optionee shall die after such termination, but prior to exercise, Optionee's personal representative or the person entitled to succeed to the Option) shall have the right to exercise the portions of any of Optionee's Incentive Stock Options which were exercisable as of the date of such termination, in whole or in part, within 30 days after such termination (or, in the event of "*termination for good cause*" as that term is defined in Nevada case law related thereto, or by the terms of the Plan or the Option Agreement or an employment agreement, the Option shall automatically terminate as of the termination of employment as to all shares covered by the Option).

With respect to Nonstatutory Options granted to employees, directors or consultants, the Board may specify such period for exercise, not less than 30 days (except that in the case of "*termination for cause*" or removal of a director), the Option shall automatically terminate as of the termination of employment or services as to shares covered by the Option, following termination of employment or services as the Board deems reasonable and appropriate. The Option may be exercised only with respect to installments that the Optionee could have exercised at the date of termination of employment or services. Nothing contained herein or in any Option granted pursuant hereto shall be construed to affect or restrict in any way the right of the Company to terminate the employment or services of an Optionee with or without cause.

(f) <u>Disability of Optionee:</u>   If an Optionee is disabled (within the meaning of Section 22(e)(3) of the Code) at the time of termination, the three (3) month period set forth in Section 5(e) shall be a period, as determined by the Board and set forth in the Option, of not less than six months nor more than one year after such termination.

(g) <u>Death of Optionee:</u>  If an Optionee dies while employed by, engaged as a consultant to, or serving as a Director of the Company, the portion of such Optionee's Option which was exercisable at the date of death may be exercised, in whole or in part, by the estate of the decedent or by a person succeeding to the right to exercise such Option at any time within (i) a period, as determined by the Board and set forth in the Option, of not less than six (6) months nor more than one (1) year after Optionee's death, which period shall not be more, in the case of a Nonstatutory Option, than the period for exercise following termination of employment or services, or (ii) during the remaining term of the Option, whichever is the lesser. The Option may be so exercised only with respect to installments exercisable at the time of Optionee's death and not previously exercised by the Optionee.

(h) <u>Nontransferability of Option:</u>  No Option shall be transferable by the Optionee, except by will or by the laws of descent and distribution.

(i) <u>Recapitalization:</u>  Subject to any required action of shareholders, the number of shares of Stock covered by each outstanding Option, and the exercise price per share thereof set forth in each such Option, shall be proportionately adjusted for any increase or decrease in the number of issued shares of Stock of the Company resulting from a stock split, stock dividend, combination, subdivision or reclassification of shares, or the payment of a stock dividend, or any other increase or decrease in the number of such shares affected without receipt of consideration by the Company; provided, however, the conversion of any convertible securities of the Company shall not be deemed to have been "*effected without receipt of consideration*" by the Company.

In the event of a proposed dissolution or liquidation of the Company, a merger or consolidation in which the Company is not the surviving entity, or a sale of all or substantially all of the assets or capital stock of the Company (collectively, a "**Reorganization**"), unless otherwise provided by the Board, this Option shall terminate immediately prior to such date as is determined by the Board, which date shall be no later than the consummation of such Reorganization.  In such event, if the entity which shall be the surviving entity does not tender to Optionee an offer, for which it has no obligation to do so, to substitute for any unexercised Option a stock option or capital stock of such surviving of such surviving entity, as applicable, which on an equitable basis shall provide the Optionee with substantially the same economic benefit as such unexercised Option, then the Board may grant to such Optionee, in its sole and absolute discretion and without obligation, the right for a period commencing thirty (30) days prior to and ending immediately prior to the date determined by the Board pursuant hereto for termination of the Option or during the remaining term of the Option, whichever is the lesser, to exercise any unexpired Option or Options without regard to the installment provisions of Paragraph 6(d) of the Plan; provided, that any such right granted shall be granted to all Optionees not receiving an offer to receive substitute options on a consistent basis, and provided further, that any such exercise shall be subject to the consummation of such Reorganization.

Subject to any required action of shareholders, if the Company shall be the surviving entity in any merger or consolidation, each outstanding Option thereafter shall pertain to and apply to the securities to which a holder of shares of Stock equal to the shares subject to the Option would have been entitled by reason of such merger or consolidation.

In the event of a change in the Stock of the Company as presently constituted, which is limited to a change of all of its authorized shares without par value into the same number of shares with a par value, the shares resulting from any such change shall be deemed to be the Stock within the meaning of the Plan.

To the extent that the foregoing adjustments relate to stock or securities of the Company, such adjustments shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided in this Section 5(i), the Optionee shall have no rights by reason of any subdivision or consolidation of shares of stock of any class or the payment of any stock dividend or any other increase or decrease in the number of shares of stock of any class, and the number or price of shares of Stock subject to any Option shall not be affected by, and no adjustment shall be made by reason of, any dissolution, liquidation, merger, consolidation or sale of assets or capital stock, or any issue by the Company of shares of stock of any class or securities convertible into shares of stock of any class.

The Grant of an Option pursuant to the Plan shall not affect in any way the right or power of the Company to make any adjustments, reclassifications, reorganizations or changes in its capital or business structure or to merge, consolidate, dissolve, or liquidate or to sell or transfer all or any part of its business or assets.

(j) <u>Rights as a Shareholder:</u>  An Optionee shall have no rights as a shareholder with respect to any shares covered by an Option until the effective date of the issuance of the shares following exercise of such Option by Optionee. No adjustment shall be made for dividends (ordinary or extraordinary, whether in cash, securities or other property) or distributions or other rights for which the record date is prior to the date such stock certificate is issued, except as expressly provided in Section 5(i) hereof.

(k) <u>Modification, Acceleration, Extension, and Renewal of Options:</u>  Subject to the terms and conditions and within the limitations of the Plan, the Board may modify an Option, or, once an Option is exercisable, accelerate the rate at which it may be exercised, and may extend or renew outstanding Options granted under the Plan or accept the surrender of outstanding Options (to the extent not theretofore exercised) and authorize the granting of new Options in substitution for such Options, provided such action is permissible under Section 422 of the Code and applicable state securities laws. Notwithstanding the provisions of this Section 5(k), however, no modification of an Option shall, without the consent of the Optionee, alter to the Optionee's detriment or impair any rights or obligations under any Option theretofore granted under the Plan.

(l) <u>Exercise Before Exercise Date:</u>  At the discretion of the Board, the Option may, but need not, include a provision whereby the Optionee may elect to exercise all or any portion of the Option prior to the stated exercise date of the Option or any installment thereof. Any shares so purchased prior to the stated exercise date shall be subject to repurchase by the Company upon termination of Optionee's employment as contemplated by Section 5(n) hereof prior to the exercise date stated in the Option and such other restrictions and conditions as the Board or Committee may deem advisable.

(m) <u>Other Provisions:</u>  The Option agreements authorized under the Plan shall contain such other provisions, including, without limitation, restrictions upon the exercise of the Options, as the Board or the Committee shall deem advisable. Shares shall not be issued pursuant to the exercise of an Option, if the exercise of such Option or the issuance of shares thereunder would violate, in the opinion of legal counsel for the Company, the provisions of any applicable law or the rules or regulations of any applicable governmental or administrative agency or body, such as the Code, the Securities Act, the Exchange Act, applicable state securities laws, Nevada corporation law, and the rules promulgated under the foregoing or the rules and regulations of any exchange upon which the shares of the Company are listed. Without limiting the generality of the foregoing, the exercise of each Option shall be subject to the condition that if at any time the Company shall determine that (i) the satisfaction of withholding tax or other similar liabilities, or (ii) the listing, registration or qualification of any shares covered by such exercise upon any securities exchange or under any state or federal law, or (iii) the consent or approval of any regulatory body, or (iv) the perfection of any exemption from any such withholding, listing, registration, qualification, consent or approval is necessary or desirable in connection with such exercise or the issuance of shares thereunder, then in any such event, such exercise shall not be effective unless such withholding, listing registration, qualification, consent, approval or exemption shall have been effected, obtained or perfected free of any conditions not acceptable to the Company.

(n) <u>Repurchase Agreement:</u>  The Board may, in its discretion, require as a condition to the Grant of an Option hereunder, that an Optionee execute an agreement with the Company, in form and substance satisfactory to the Board in its discretion ("**Repurchase Agreement**"), (i) restricting the Optionee's right to transfer shares purchased under such Option without first offering such shares to the Company or another shareholder of the Company upon the same terms and conditions as provided therein; and (ii) providing that upon termination of Optionee's employment with the Company, for any reason, the Company (or another shareholder of the Company, as provided in the Repurchase Agreement) shall have the right at its discretion (or the discretion of such other shareholders) to purchase and/or redeem all such shares owned by the Optionee on the date of termination of his or her employment at a price equal to: (A) the fair value of such shares as of such date of termination; or (B) if such repurchase right lapses at 20% of the number of shares per year, the original purchase price of such shares, and upon terms of payment permissible under the applicable state securities laws; provided that in the case of Options or Stock Awards granted to officers, directors, consultants or affiliates of the Company, such repurchase provisions may be subject to additional or greater restrictions as determined by the Board or Committee.

6.  Stock Awards and Restricted Stock Purchase Offers.

   (a)  <u>Types of Grants.</u>

      (i)  <u>Stock Award.</u>  All or part of any Stock Award under the Plan may be subject to conditions established by the Board or the Committee, and set forth in the Stock Award Agreement, which may include, but are not limited to, continuous service with the Company, achievement of specific business objectives, increases in specified indices, attaining growth rates and other comparable measurements of Company performance. Such Awards may be based on Fair Market Value or other specified valuation. All Stock Awards will be made pursuant to the execution of a Stock Award Agreement substantially in the form attached hereto as <u>Exhibit C</u>.

      (ii)  <u>Restricted Stock Purchase Offer.</u>  A Grant of a Restricted Stock Purchase Offer under the Plan shall be subject to such (i) vesting contingencies related to the Participant's continued association with the Company for a specified time and (ii) other specified conditions as the Board or Committee shall determine, in their sole discretion, consistent with the provisions of the Plan. All Restricted Stock Purchase Offers shall be made pursuant to a Restricted Stock Purchase Offer substantially in the form attached hereto as <u>Exhibit D</u>.

   (b)  <u>Conditions and Restrictions.</u>  Shares of Stock which Participants may receive as a Stock Award under a Stock Award Agreement or Restricted Stock Purchase Offer under a Restricted Stock Purchase Offer may include such restrictions as the Board or Committee, as applicable, shall determine, including restrictions on transfer, repurchase rights, right of first refusal, and forfeiture provisions. When transfer of Stock is so restricted or subject to forfeiture provisions it is referred to as "**Restricted Stock**". Further, with Board or Committee approval, Stock Awards or Restricted Stock Purchase Offers may be deferred, either in the form of installments or a future lump sum distribution. The Board or Committee may permit selected Participants to elect to defer distributions of Stock Awards or Restricted Stock Purchase Offers in accordance with procedures established by the Board or Committee to assure that such deferrals comply with applicable requirements of the Code including, at the choice of Participants, the capability to make further deferrals for distribution after retirement. Any deferred distribution, whether elected by the Participant or specified by the Stock Award Agreement, Restricted Stock Purchase Offers or by the Board or Committee, may require the payment be forfeited in accordance with the provisions of Section 6(c). Dividends or dividend equivalent rights may be extended to and made part of any Stock Award or Restricted Stock Purchase Offers denominated in Stock or units of Stock, subject to such terms, conditions and restrictions as the Board or Committee may establish.

   (c)  <u>Cancellation and Rescission of Grants.</u>  Unless the Stock Award Agreement or Restricted Stock Purchase Offer specifies otherwise, the Board or Committee, as applicable, may cancel any unexpired, unpaid, or deferred Grants at any time if the Participant is not in compliance with all other applicable provisions of the Stock Award Agreement or Restricted Stock Purchase Offer, the Plan and with the following conditions:

      (i)  A Participant shall not render services for any organization or engage directly or indirectly in any business which, in the judgment of the chief executive officer of the Company or other senior officer designated by the Board or Committee, is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company. For Participants whose employment has terminated, the judgment of the chief executive officer shall be based on the Participant's position and responsibilities while employed by the Company, the Participant's post-employment responsibilities and position with the other organization or business, the extent of past, current and potential competition or conflict between the Company and the other organization or business, the effect on the Company's customers, suppliers and competitors and such other considerations as are deemed relevant given the applicable facts and circumstances.  A Participant who has retired shall be free, however, to purchase as an investment or otherwise, stock or other securities of such organization or business so long as they are listed upon a recognized securities exchange or traded over-the-counter, and such investment does not represent a substantial investment to the Participant or a greater than ten percent (10%) equity interest in the organization or business.

(ii) A Participant shall not, without prior written authorization from the Company, disclose to anyone outside the Company, or use in other than the Company's business, any confidential information or material, as defined in the Company's Proprietary Information and Invention Agreement or similar agreement regarding confidential information and intellectual property, relating to the business of the Company, acquired by the Participant either during or after employment with the Company.

(iii) A Participant, pursuant to the Company's Proprietary Information and Invention Agreement, shall disclose promptly and assign to the Company all right, title and interest in any invention or idea, patentable or not, made or conceived by the Participant during employment by the Company, relating in any manner to the actual or anticipated business, research or development work of the Company and shall do anything reasonably necessary to enable the Company to secure a patent where appropriate in the United States and in foreign countries.

(iv) Upon exercise, payment or delivery pursuant to a Grant, the Participant shall certify on a form acceptable to the Committee that he or she is in compliance with the terms and conditions of the Plan. Failure to comply with all of the provisions of this Section 6(c) prior to, or during the six months after, any exercise, payment or delivery pursuant to a Grant shall cause such exercise, payment or delivery to be rescinded. The Company shall notify the Participant in writing of any such rescission within two years after such exercise, payment or delivery. Within ten days after receiving such a notice from the Company, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of the rescinded exercise, payment or delivery pursuant to a Grant. Such payment shall be made either in cash or by returning to the Company the number of shares of Stock that the Participant received in connection with the rescinded exercise, payment or delivery.

(d) <u>Nonassignability.</u>

(i) Except pursuant to Section 6(e)(iii) and except as set forth in Section 6(d)(ii), no Grant or any other benefit under the Plan shall be assignable or transferable, or payable to or exercisable by, anyone other than the Participant to whom it was granted.

(ii) Where a Participant terminates employment and retains a Grant pursuant to Section 6(e)(ii) in order to assume a position with a governmental, charitable or educational institution, the Board or Committee, in its discretion and to the extent permitted by law, may authorize a third party (including but not limited to the trustee of a "blind" trust), acceptable to the applicable governmental or institutional authorities, the Participant and the Board or Committee, to act on behalf of the Participant with regard to such Awards.

(e) <u>Termination of Employment.</u>  If the employment or service to the Company of a Participant terminates, other than pursuant to any of the following provisions under this Section 6(e), all unexercised, deferred and unpaid Stock Awards or Restricted Stock Purchase Offers shall be cancelled immediately, unless the Stock Award Agreement or Restricted Stock Purchase Offer provides otherwise:

(i) <u>Retirement Under a Company Retirement Plan.</u>  When a Participant's employment terminates as a result of retirement in accordance with the terms of a Company retirement plan, the Board or Committee may permit Stock Awards or Restricted Stock Purchase Offers to continue in effect beyond the date of retirement in accordance with the applicable Grant Agreement and the exercisability and vesting of any such Grants may be accelerated.

(ii) <u>Rights in the Best Interests of the Company.</u>  When a Participant resigns from the Company and, in the judgment of the Board or Committee, the acceleration and/or continuation of outstanding Stock Awards or Restricted Stock Purchase Offers would be in the best interests of the Company, the Board or Committee may (i) authorize, where appropriate, the acceleration and/or continuation of all or any part of Grants issued prior to such termination and (ii) permit the exercise, vesting and payment of such Grants for such period as may be set forth in the applicable Grant Agreement, subject to earlier cancellation pursuant to Section 9 or at such time as the Board or Committee shall deem the continuation of all or any part of the Participant's Grants are not in the Company's best interest.

(iii) <u>Death or Disability of a Participant.</u>

(1) In the event of a Participant's death, the Participant's estate or beneficiaries shall have a period up to the expiration date specified in the Grant Agreement within which to receive or exercise any outstanding Grant held by the Participant under such terms as may be specified in the applicable Grant Agreement. Rights to any such outstanding Grants shall pass by will or the laws of descent and distribution in the following order: (a) to beneficiaries so designated by the Participant; if none, then (b) to a legal representative of the Participant; if none, then (c) to the persons entitled thereto as determined by a court of competent jurisdiction. Grants so passing shall be made at such times and in such manner as if the Participant were living.

(2) In the event a Participant is deemed by the Board or Committee to be unable to perform his or her usual duties by reason of mental disorder or medical condition which does not result from facts which would be grounds for termination for cause, Grants and rights to any such Grants may be paid to or exercised by the Participant, if legally competent, or a committee or other legally designated guardian or representative if the Participant is legally incompetent by virtue of such disability.

(3) After the death or disability of a Participant, the Board or Committee may in its sole discretion at any time (1) terminate restrictions in Grant Agreements; (2) accelerate any or all installments and rights; and (3) instruct the Company to pay the total of any accelerated payments in a lump sum to the Participant, the Participant's estate, beneficiaries or representative; notwithstanding that, in the absence of such termination of restrictions or acceleration of payments, any or all of the payments due under the Grant might ultimately have become payable to other beneficiaries.

(4) In the event of uncertainty as to interpretation of or controversies concerning this Section 6, the determinations of the Board or Committee, as applicable, shall be binding and conclusive.

7. Investment Intent. All Grants under the Plan are intended to be exempt from registration under the Securities Act provided by Rule 701 thereunder. Unless and until the granting of Options or sale and issuance of Stock subject to the Plan are registered under the Securities Act or shall be exempt pursuant to the rules promulgated thereunder, each Grant under the Plan shall provide that the purchases or other acquisitions of Stock thereunder shall be for investment purposes and not with a view to, or for resale in connection with, any distribution thereof. Further, unless the issuance and sale of the Stock have been registered under the Securities Act, each Grant shall provide that no shares shall be purchased upon the exercise of the rights under such Grant unless and until (i) all then applicable requirements of state and federal laws and regulatory agencies shall have been fully complied with to the satisfaction of the Company and its counsel, and (ii) if requested to do so by the Company, the person exercising the rights under the Grant shall (i) give written assurances as to knowledge and experience of such person (or a representative employed by such person) in financial and business matters and the ability of such person (or representative) to evaluate the merits and risks of exercising the Option, and (ii) execute and deliver to the Company a letter of investment intent and/or such other form related to applicable exemptions from registration, all in such form and substance as the Company may require. If shares are issued upon exercise of any rights under a Grant without registration under the Securities Act, subsequent registration of such shares shall relieve the purchaser thereof of any investment restrictions or representations made upon the exercise of such rights.

8. Amendment, Modification, Suspension or Discontinuance of the Plan. The Board may, insofar as permitted by law, from time to time, with respect to any shares at the time not subject to outstanding Grants, suspend or terminate the Plan or revise or amend it in any respect whatsoever, except that without the approval of the shareholders of the Company, no such revision or amendment shall (i) increase the number of shares subject to the Plan, (ii) decrease the price at which Grants may be granted, (iii) materially increase the benefits to Participants, or (iv) change the class of persons eligible to receive Grants under the Plan; provided, however, no such action shall alter or impair the rights and obligations under any Option, or Stock Award, or Restricted Stock Purchase Offer outstanding as of the date thereof without the written consent of the Participant thereunder. No Grant may be issued while the Plan is suspended or after it is terminated, but the rights and obligations under any Grant issued while the Plan is in effect shall not be impaired by suspension or termination of the Plan.

In the event of any change in the outstanding Stock by reason of a stock split, stock dividend, combination or reclassification of shares, recapitalization, merger, or similar event, the Board or the Committee may adjust proportionally (a) the number of shares of Stock (i) reserved under the Plan, (ii) available for Incentive Stock Options and Nonstatutory Options and (iii) covered by outstanding Stock Awards or Restricted Stock Purchase Offers; (b) the Stock prices related to outstanding Grants; and (c) the appropriate Fair Market Value and other price determinations for such Grants. In the event of any other change affecting the Stock or any distribution (other than normal cash dividends) to holders of Stock, such adjustments as may be deemed equitable by the Board or the Committee, including adjustments to avoid fractional shares, shall be made to give proper effect to such event. In the event of a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation, the Board or the Committee shall be authorized to issue or assume stock options, whether or not in a transaction to which Section 424(a) of the Code applies, and other Grants by means of substitution of new Grant Agreements for previously issued Grants or an assumption of previously issued Grants.

9. Tax Withholding. The Company shall have the right to deduct applicable taxes from any Grant payment and withhold, at the time of delivery or exercise of Options, Stock Awards or Restricted Stock Purchase Offers or vesting of shares under such Grants, an appropriate number of shares for payment of taxes required by law or to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for withholding of such taxes. If Stock is used to satisfy tax withholding, such stock shall be valued based on the Fair Market Value when the tax withholding is required to be made.

10. Availability of Information. During the term of the Plan and any additional period during which a Grant granted pursuant to the Plan shall be exercisable, the Company shall make available, not later than one hundred and twenty (120) days following the close of each of its fiscal years, such financial and other information regarding the Company as is required by the bylaws of the Company and applicable law to be furnished in an annual report to the shareholders of the Company.

11. Notice. Any written notice to the Company required by any of the provisions of the Plan shall be addressed to the chief personnel officer or to the chief executive officer of the Company, and shall become effective when it is received by the office of the chief personnel officer or the chief executive officer.

12. Indemnification of Board. In addition to such other rights or indemnifications as they may have as directors or otherwise, and to the extent allowed by applicable law, the members of the Board and the Committee shall be indemnified by the Company against the reasonable expenses, including attorneys' fees, actually and necessarily incurred in connection with the defense of any claim, action, suit or proceeding, or in connection with any appeal thereof, to which they or any of them may be a party by reason of any action taken, or failure to act, under or in connection with the Plan or any Grant granted thereunder, and against all amounts paid by them in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by them in satisfaction of a judgment in any such claim, action, suit or proceeding, except in any case in relation to matters as to which it shall be adjudged in such claim, action, suit or proceeding that such Board or Committee member is liable for negligence or misconduct in the performance of his or her duties; provided that within sixty (60) days after institution of any such action, suit or Board proceeding the member involved shall offer the Company, in writing, the opportunity, at its own expense, to handle and defend the same.

13. Governing Law. The Plan and all determinations made and actions taken pursuant hereto, to the extent not otherwise governed by the Code or the securities laws of the United States, shall be governed by the law of the State of Nevada and construed accordingly.

14. Effective and Termination Dates. The Plan shall become effective on the date it is approved by the holders of a majority of the shares of Stock then outstanding. The Plan shall terminate ten years later, subject to earlier termination by the Board pursuant to Section 8.

The foregoing 2007 Incentive Stock Plan (consisting of 14 pages, including this page) was duly adopted and approved by the Board of Directors on [   ], 2007.

FELLOWS ENERGY LTD.
a Nevada corporation

By:      /s/ GEORGE S. YOUNG
George S. Young
Its:      Chief Executive Officer

**PROXY**

**FELLOWS ENERGY LTD.**
**ANNUAL MEETING OF STOCKHOLDERS - TO BE HELD**
**JUNE 27, 2007**
**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**

The undersigned, revoking all prior proxies, hereby appoints GEORGE S. YOUNG and STEVEN PRINCE and each of them, with full power of substitution in each, as proxies for the undersigned, to represent the undersigned and to vote all the shares of Common Stock of the Company which the undersigned would be entitled to vote, as fully as the undersigned could vote and act if personally present, at the Annual Meeting of Stockholders (the "Meeting") to be held on June 27, 2007, at 10:00 AM, local time, at 370 Interlocken Boulevard, Suite 400, Broomfield, Colorado 80021, or at any adjournments or postponements thereof.

Should the undersigned be present and elect to vote at the Meeting or at any adjournments or postponements thereof, and after notification to the Secretary of the Company at the Meeting of the stockholder's decision to terminate this proxy, then the power of such attorneys or proxies shall be deemed terminated and of no further force and effect. This proxy may also be revoked by filing a written notice of revocation with the Secretary of the Company or by duly executing a proxy bearing a later date.

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ALL NOMINEES FOR DIRECTOR AND EACH OF THE LISTED PROPOSALS.**

Proposal (1) The election as directors of all nominees listed below to serve until the 2008 Annual Meeting of Stockholders or until their successors have been duly elected and qualified (except as marked to the contrary).

Nominees:
01)    George S. Young                02)    Steven L. Prince

FOR ALL [____]                WITHHOLD ALL [____]                FOR ALL EXCEPT [____]

To withhold authority to vote, mark "For All Except" and write the nominee's number on the line below.

Proposal (2) Amending the Articles of Incorporation to increase the number of authorized shares of common stock from 100,000,000 to 300,000,000.

**FOR|___|          AGAINST|___|          ABSTAIN|___|**

Proposal (3) Adopting the 2007 Stock Incentive Plan.

**FOR|___|          AGAINST|___|          ABSTAIN|___|**

The shares represented by this proxy will be voted as directed by the stockholder, but if no instructions are specified, this proxy will be voted for the election of the Board nominees and for proposals (2) and (3). If any other business is presented at the Meeting, this proxy will be voted by those named in this proxy in their best judgment. At the present time, the Board of Directors knows of no other business to be presented at the Meeting.

The undersigned acknowledges receipt from the Company, prior to the execution of this proxy, of the Notice of Annual Meeting and accompanying Proxy Statement relating to the Meeting, an Annual Report for fiscal year ended December 31, 2006 and a Quarterly Report for the quarter ended March 31, 2007.

NOTE: PLEASE MARK, DATE AND SIGN AS YOUR NAME(S) APPEAR(S) HEREON AND RETURN IN THE ENCLOSED ENVELOPE. IF ACTING AS AN EXECUTORS, ADMINISTRATORS, TRUSTEES, GUARDIANS, ETC., YOU SHOULD SO INDICATE WHEN SIGNING. IF THE SIGNER IS CORPORATION, PLEASE SIGN THE FULL CORPORATE NAME, BY DULY AUTHORIZED OFFICER. IF SHARES ARE HELD JOINTLY, EACH SHAREHOLDER SHOULD SIGN.

Signature (Please sign within the box)
[_____] DATE: _____, 2007

Signature (Joint owners)
[_____] DATE: _____, 2007

# EXHIBIT D

form10-qsb.htm

10QSB 1 form10-qsb.htm FELLOWS ENERGY LTD. 10-QSB Q1'07

# United States
# Securities And Exchange Commission

**Washington, D.C. 20549**

# Form 10-QSB

✖  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2007

Commission File Number: 000-33321

# Fellows Energy Ltd.

**(Exact Name of Small Business Issuer as Specified in its Charter)**

| | |
|---|---|
| **Nevada** | **33-0967648** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**1942 Broadway St., Suite #320
Boulder, CO 80302**

**(Address of Principal Executive Offices)**

**(303) 926-4415
(Registrant's Telephone Number, Including Area Code)**

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ✖ Yes ¨ No

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

¨ Yes ✖ No

State the number of shares outstanding of each of the issuer's classes of common equity, as of the latest practicable date: As of May 11, 2007 there were 100,000,000 shares of the issuer's $.001 par value common stock issued and outstanding.

Transitional Small Business Disclosure Format: ¨ Yes ✖ No

1

**FELLOWS ENERGY LTD.**

Quarterly Report on Form 10-QSB for the
Quarterly Period Ending March 31, 2007

Table of Contents

PART I. FINANCIAL INFORMATION

Item 1.  Financial Statements

   Balance Sheets:

   March 31, 2007 (Unaudited) and December 31, 2006 — 3

   Statements of Operations:

   Three Months Ended March 31, 2007 and 2006 (Unaudited) — 4

   Statements of Cash Flows:

   Three Months Ended March 31, 2007 and 2006 (Unaudited) — 5

   Notes to Unaudited Financial Statements:

   March 31, 2007 — 6-14

Item 2.  Management Discussion and Analysis — 15

Item 3.  Controls and Procedures — 20

PART II. OTHER INFORMATION

Item 1.  Legal Proceedings — 21

Item 2.  Unregistered Sales of Equity Securities and Use of Proceeds — 21

Item 3.  Defaults Upon Senior Securities — 21

Item 4.  Submission of Matters to a Vote of Security Holders — 21

Item 5.  Other Information — 21

Item 6.  Exhibits — 22

Signatures — 23

2

Table of Contents

**Part I: Financial Information**

**Item 1.  Financial Statements**

Fellows Energy Ltd.
Balance Sheets

| | | March 31, 2007 (Unaudited) | | December 31, 2006 (Unaudited) |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and Cash Equivalents | $ | 58,847 | $ | 179,926 |
| Interest Receivable | | 4,499 | | 2,568 |
| Accounts Receivable | | 66,247 | | 80,258 |
| Note Receivable | | 233,633 | | 233,634 |
| Prepaids | | 2,732 | | — |
| Total current assets | | 365,958 | | 496,386 |
| | | | | |
| Proved and unproved oil & gas property | | 7,481,406 | | 7,468,809 |
| | | | | |
| Equipment, net of $158,275 and $118,651 accumulated depreciation respectively | | 1,481,080 | | 1,509,932 |
| Restricted cash | | 160,000 | | 160,000 |
| Deferred financing costs | | 756,500 | | 228,758 |
| | | | | |
| Total assets | $ | 10,244,944 | $ | 9,863,885 |
| | | | | |
| **Liabilities And Stockholders' Equity** | | | | |
| Accounts payable | $ | 387,332 | $ | 359,662 |
| Joint venture partner interest payable | | 96,627 | | 99,167 |
| Taxes payable | | 9,333 | | 9,433 |
| Interest payable current portion | | 225,700 | | 205,700 |
| Notes payable current portion | | 1,583,268 | | 1,583,111 |
| Convertible debenture current portion | | 2,943,755 | | 1,608,433 |
| | | | | |
| Total current liabilities | | 5,246,015 | | 3,865,506 |
| | | | | |
| Interest payable – net of current portion | | 204,516 | | 154,819 |
| Notes payable – related party | | 1,963,000 | | 1,733,000 |
| Notes payable – net of current portion | | 377,786 | | 428,000 |
| Convertible debenture – net of current portion | | — | | 1,385,505 |
| | | | | |
| Stockholders' equity | | | | |
| Preferred stock, $.001 par value; 25,000,000 shares authorized; none outstanding | | — | | — |
| Common stock, $.001 par value; 100,000,000 shares authorized; 100,000,000 and 73,447,619 shares issued and outstanding | | 100,000 | | 73,447 |
| Additional paid-in capital | | 22,200,001 | | 19,963,497 |
| Stock issuance obligation | | 154,830 | | 61,055 |
| Stock pledged as collateral | | (1,665,000) | | (1,665,000) |
| Accumulated deficit | | (18,336,204) | | (16,135,944) |

| | | | | |
|---|---|---|---|---|
| Total stockholders' equity | | 2,453,627 | | 2,297,055 |
| Total liabilities and stockholders' equity | $ | 10,244,944 | $ | 9,863,885 |

See accompanying notes to unaudited financial statements

3

Table of Contents

Fellows Energy Ltd.
Statements of Operations
(Unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| Revenue | $ 111,410 | $ 60,915 |
| | | |
| Operating expense | | |
| Exploration and production | 94,547 | 216,072 |
| General and administrative | 1,557,573 | 692,135 |
| | | |
| Operating (loss) | (1,540,710) | (847,292) |
| | | |
| Other income (expense) | | |
| Interest expense | (662,995) | (16,999) |
| Project revenue applied as credit to purchase | — | 198,361 |
| Note receivable default penalty | — | 80,000 |
| Insurance rebates and project purchase credit | — | 19,993 |
| Miscellaneous income (expense) | 12,691 | — |
| Total other income (expense) | (650,304) | 281,355 |
| | | |
| Income (loss) before income tax | (2,191,014) | (565,937) |
| | | |
| Income tax expense | — | — |
| Deferred tax benefit | — | — |
| | | |
| Net income (loss) | $ (2,191,014) | $ (565,937) |
| | | |
| Other comprehensive income (loss) | | |
| Unrealized holding gains on marketable securities | — | 14,124 |
| Comprehensive Income (loss) | $ (2,191,014) | $ (551,813) |
| | | |
| Basic and diluted earnings (loss) per share | $ (0.02) | $ (0.01) |
| Basic and diluted weighted average shares outstanding | 88,250,100 | 54,471,773 |

See accompanying notes to unaudited financial statements

4

Table of Contents

Fellows Energy Ltd.
Statements of Cash Flows
(Unaudited)

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2007 | 2006 |
| Cash flow from operating activities: | | |
| Net income (loss) | $ (2,191,014) | $ (565,937) |
| Adjustments to reconcile net income to net cash used in operating activities: | | |
| Gain on sale of marketable securities | — | 20,496 |
| Debt issue costs and discount amortization | — | 435,116 |
| Depreciation | 39,624 | 7,277 |
| Expenses paid with stock issuance | 1,581,710 | — |
| Expenses paid with stock issuance obligation | 93,774 | — |
| Changes in operating assets and liabilities: | | |
| Receivables | (12,080) | (201,829) |
| Prepaid expense | (2,732) | (2,794) |
| Deferred financing costs | (527,742) | 76,252 |
| Accounts payable | 27,670 | 54,335 |
| Interest payable | 20,000 | 145,700 |
| Joint venture partner interest payable | (2,640) | 60,915 |
| Net cash provided by (used in) operating activities | (973,430) | 29,531 |
| | | |
| Cash flow from investing activities: | | |
| Proceeds from sale of marketable securities | — | 85,411 |
| Deposits | — | 554,000 |
| Unproved oil and gas property additions | (12,597) | (445,000) |
| Restricted Cash | — | (25,000) |
| Purchase of equipment | (10,772) | (1,148,607) |
| Net cash provided by (used in) investing activities | (23,369) | (979,196) |
| | | |
| Cash flow from financing activities: | | |
| Proceeds from issuance of convertible debenture | 714,500 | — |
| Payments on convertible debenture | (50,183) | (260,499) |
| Borrowings on note payable | 261,459 | 1,070,119 |
| Payments on notes payable | (50,057) | (134,000) |
| Net cash provided by (used in) financing activities: | 875,719 | 675,620 |
| | | |
| Net increase (decrease) in cash and equivalents | (121,080) | (274,045) |
| Cash and equivalents at beginning of period | 179,926 | 347,558 |
| | | |
| Cash and equivalents at end of period | $ 58,846 | $ 73,513 |
| | | |
| Supplemental Disclosure of Cash Flow and Non-cash Investing and Financing Activity: | | |
| Income tax paid | $ — | $ — |

| | | | | |
|---|---|---:|---|---:|
| Interest paid | $ | 72,533 | $ | — |
| Non cash: | | | | |
| Convertible debenture paid with stock issuance | $ | 31,250 | $ | 740,231 |
| Legal and advisory services in exchange for stock issuance obligation | $ | 61,055 | $ | — |
| Fees paid with stock | $ | 1,581,710 | $ | — |

See accompanying notes to unaudited financial statements

5

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

**Note 1—Basis of Presentation and Nature of Operations**

We have prepared the accompanying unaudited condensed financial statements in accordance with accounting principles generally accepted in the United States for interim financial information and with the instructions to Form 10-QSB and itme 310(b) of Regulation S-B. They do not include all information and notes required by generally accepted accounting principles for complete financial statements. You should read these financial statements with our Annual Report on Form 10-KSB for the year ended December 31, 2006, as well as the 10-QSB for the quarters ended June 30, 2006 and September 30, 2006. In our opinion, we have included all adjustments (consisting of normal recurring adjustments) considered necessary for a fair presentation. Operating results for the quarters presented are not necessarily indicative of the results that you may expect for the full year.

We are engaged in the exploration, extraction, processing and reclamation of coal bed methane, natural gas, and oil projects in the western United States. We were incorporated in the state of Nevada on April 9, 2001 as Fuel Centers, Inc. On November 12, 2003, we changed our name to Fellows Energy Ltd. Our principal offices are located in Broomfield, Colorado.

**Use of Estimates**

The preparation of the financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those statements.

**Accumulated Other Comprehensive Income (Loss)**

Accumulated other comprehensive income reflects changes in equity that result from transactions and economic events from non-operating sources. For the Company, such items consisted of unrealized holding gains and losses on market securities for the current period.

**Earnings (Loss) per share**

We compute basic and diluted earnings (loss) per share as net income or loss divided by the weighted average number of shares of common stock outstanding for the period. Diluted earnings per share is similar to basic earnings per share but also presents the dilutive effect on a per share basis of securities convertible into common shares (e.g. stock options, warrants and other convertible securities) as if they had been converted at the beginning of the periods presented. In periods in which we incur losses we exclude potential shares from convertible securities from the computation of diluted loss per share as their effect is antidilutive in those periods.

**Stock Options**

On October 9, 2003, we adopted an incentive stock option plan, pursuant to which shares of our common stock are reserved for issuance to satisfy the exercise of options. The plan authorizes up to 2,000,000 shares of authorized common stock to be purchased pursuant to the exercise of options. Our stockholders approved the plan on November 10, 2003. On September 15, 2004, we granted an option for 200,000 shares to our CEO, 150,000 shares to our vice president and 125,000 shares to an employee. These options are exercisable at $0.80 per share, the price of our

stock on the grant date. The options vested 50% on the grant date and vest 50% on September 15, 2005. On October 3, 2005, we granted an option for 100,000 shares to our CEO, 150,000 to our Vice President and 175,000 and 200,000 shares to two employees respectively. The options vest 6 months from the date of grant. On November 1, 2006, we granted an option for 300,000 shares to our Vice President of Business Development.  The options vest 6 months from the date of grant.

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123(R), "Share-Based Payment" ("SFAS 123(R)"), which is a revision of SFAS No. 123, Accounting for Stock-Based Compensation. SFAS 123(R) is effective for public companies for the first fiscal year beginning after June 15, 2005, supersedes Accounting Principles Board Opinion No. 25 ("APB 25"), Accounting for Stock Issued to Employees, and amends SFAS 95, Statement of Cash Flows. SFAS 123(R) eliminates the option to use APB 25's intrinsic value method of accounting and requires recording expense for stock compensation based on a fair value based method.

On July 1, 2005, the Company adopted the "modified prospective method" which requires the Company to recognize compensation costs, for all share-based payments granted, modified or settled, in financial statements issued subsequent to July 1, 2005, as well as for any awards that were granted prior to the adoption date for which the required service has not yet been performed. The adoption of SFAS 123(R) did not have a material effect on the Company's financial condition or results of operations because subsequent to July 1, 2005, the Company did not enter into any share-based transactions.

6

form10-qsb.htm

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

Prior to July 1, 2005, the Company accounted for its stock-based compensation using APB 25 and related interpretations. Under APB 25, compensation expense was recognized for stock options with an exercise price that was less than the market price on the grant date of the option. For stock options with exercise prices at or above the market value of the stock on the grant date, the Company adopted the disclosure-only provisions of Statement of Financial Accounting Standards No. 123 "Accounting for Stock-Based Compensation" ("SFAS 123") for the stock options granted to the employees and directors of the Company. Accordingly, no compensation cost was recognized for these options prior to June 30, 2005.

Compensation expense has been recognized in the accompanying financial statements for stock options that were issued to our outside consultants. Had compensation expense for the options granted to our employees and directors been determined based on the fair value at the grant date for options, consistent with the provisions of SFAS 123, the Company's net (loss) income and net (loss) income per share for the three months ended March 31, 2007 and 2006 would have been the pro forma amounts indicated below.

We estimate the fair value of the options we grant at the date of grant using a Black-Scholes option pricing model with the following weighted-average assumptions for the quarter ended March 31, 2007: a risk-free interest rate of 4.37%; no expected dividend; a volatility factor of 97.5%; and a maturity date of ten years.

For purposes of pro forma disclosures, we amortize to expense the estimated fair value of the options over the options' vesting period. Our pro forma information for the first quarter of 2007 is as follows (in thousands, except per share amounts).

| | Three Months Ended March 31, 2007 | | Three Months Ended March 31, 2006 | |
|---|---|---|---|---|
| Net loss as reported | $ | (2,191,014) | $ | (565,937) |
| Deduct: Total stock based employee compensation expense determined under fair value based method for all awards | | (10,077) | | (13,955) |
| Pro forma net loss | $ | (2,201,091) | $ | (579,892) |
| Basic and diluted loss per share—as reported | $ | (0.02) | $ | 0.00 |
| Pro forma basic and diluted loss per share | $ | (0.02) | $ | -nil- |

The Black-Scholes option-pricing model was developed for use in estimating the fair value of traded options that have no vesting restrictions, are fully transferable, and are not subject to trading restrictions or blackout periods. In addition, option valuation models require the input of highly subjective assumptions, including the expected stock price volatility. Because our employee stock options have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect the fair value estimate, it is our opinion that the existing models do not necessarily provide a reliable single measure of the fair value of our employee stock options.

**Reclassifications**

We have made certain reclassifications to the 2006 financial statements to conform with the 2007 financial statement presentation.

**Note 2 – Asset Retirement Obligation**

The Company follows Statement of Financial Accounting Standards ("SFAS") No. 143, *"Accounting for Asset Retirement Obligations"*, which requires that the fair value of a liability for an asset retirement obligation be recognized in the period in which it is incurred if a reasonable estimate of fair value can be made. The associated asset retirement costs are capitalized as part of the carrying amount of the long-lived asset. The increase in carrying value of a property associated with the capitalization of an asset retirement cost is included in proved oil and gas properties in the consolidated balance sheets.

7

form10-qsb.htm

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

The Company depletes the amount added to proved oil and gas property costs.  The future cash outflows for oil and gas properties associated with settling the asset retirement obligations that have been accrued in the accompanying balance sheets are excluded from the ceiling test calculations.  The Company's asset retirement obligation consists of costs related to the plugging of wells and removal of facilities and equipment on its oil and gas properties.  The asset retirement liability is allocated to operating expenses using a systematic and rational method. At March 31, 2007, the asset retirement obligation and accretion expense were not booked because these amounts were not considered to be material.

**Note 3—Going Concern**

As shown in the accompanying financial statements, we have incurred significant operating losses since inception and previously incurred a loss on our discontinued automotive fuel business. As of March 31, 2007, we have limited financial resources until such time that we are able to generate positive cash flow from operations. These factors raise substantial doubt about our ability to continue as a going concern. Our ability to achieve and maintain profitability and positive cash flow is dependent upon our ability to locate profitable mineral properties, generate revenue from our planned business operations, and control exploration cost. Management plans to fund its future operation by joint venturing, obtaining additional financing, and attaining additional commercial production. However, there is no assurance that we will be able to obtain additional financing from investors or private lenders, or that additional commercial production can be attained.  Although management believes that production from the Carbon County and Creston projects will generate revenues sufficient to sustain the Company, no assurance can be given that such revenues will be generated from the projects.

**Note 4—Deposits**

In March of 2006, we acquired the interests in one producing property and maintained our interest in three other exploration oil and gas properties. The project we acquired is known as the Carbon County project. As of March 31, 2007 we have no have funds held on deposit for properties.

**Note 5—Notes Receivable**

In August and September 2005 as part of our earn-in arrangement, we agreed to advance Mountain Oil and Gas a total of $66,000 for purposes of working capital in exchange for oilfield and rig services.  Originally this balance was classified as a deposit, and has since been reclassified as a note receivable.  As indicated in the agreement, in the event that sufficient services were not performed, the amount was to be treated as a loan, and would take on a 12% interest payable beginning February of 2006.  The amount is secured with field equipment including a pumping unit, engine, treater, and rods.  We are in the process of negotiating repayment, and consider the amount fully collectible.

In October 2005, we entered into an agreement to obtain up to a 75% working interest in certain well bores owned by Mountain Oil and Gas.  In connection with this, we agreed to advance Mountain Oil and Gas a total of $100,000 for the purpose of well bonding and working capital.  This was due and payable back to the Company on December 30, 2005 either in cash or labor towards the workover of the well bore. In the event that we were not paid by December 30, 2005, we are entitled to $160,000 of the net revenues from the 1-16A1E well beginning January 1, 2006.  Repayment is secured by a pumping unit located on the Dye-Hall well for the value of the working capital and well bonding.  As of March 31, 2007, we have collected $20,000 on the note, and are negotiating payment or collection of security for the remaining portion.  We consider the remaining portion as fully collectible.

**Note 6—Notes Payable**

At March 31, 2007, we owed $1,963,000 on an unsecured 8% demand note payable to an entity controlled by our CEO.

In 2006, we obtained $1.25 million in industry partner financing to carry the Creston project forward, in exchange for 1.6 million shares of restricted common stock and warrants to purchase 1.8 million shares at $0.70 per share. The repayment of the $1.25 million in financing is secured with 1.6 million shares of restricted stock held in escrow and is personally guaranteed by George S. Young, our CEO, and by his private company, Diamond Oil and Gas Corporation.

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

In March 2006, we borrowed $750,000 on a secured 12% note payable for a period of 36 months in exchange for a 5% overriding royalty interest in Carbon County, as well as the right to participate in any future exploration activities on the project on the basis of a 10% working interest. As of March 31, 2007, we have paid $167,000 towards the principal and interest.

In May 2006, we borrowed $500,000 at 12% interest in exchange for a 2% overriding royalty interest in Carbon County as well as 50,000 shares of common stock.  As of March 31, 2006, we have paid $170,000 towards the principal and interest.

**Note 7—Related Party Transactions**

At March 31, 2007 we owed $1,963,000 on an unsecured, 8% demand note payable to an entity controlled by our CEO.

In 2006, we obtained $1.25 million in industry partner financing to carry the Creston project forward, in exchange for 1.6 million shares of restricted common stock and warrants to purchase 1.8 million shares at $0.70 per share. The repayment of the $1.25 million in financing is secured with 1.6 million shares of restricted stock held in escrow and is personally guaranteed by George S. Young, our CEO, and by his private company, Diamond Oil and Gas Corporation.

**Note 8—Common Stock**

We issued 11,189,947 shares of common stock in the first quarter of 2007, for the debt service of our convertible debentures.  The first quarter redemption share payments amounted to 1,075,343 shares, 118,057 shares, and 9,996,547 shares at an average price of $0.06 per share.

In addition to the redemption issuances above, we issued 5,454,546 at $0.1375, 1,449,825 at $0.09, and 6,458,063 at $0.09 in connection with the convertible debenture restructuring.  We also committed to issue 1,041,937 shares upon obtaining an increase in our authorized shares of common stock.

In January 2007, we issued 2,000,000 shares at $0.06 to our legal counsel as payment for services relating to the debenture restructuring as well as outstanding legal fees.

**Note 9 —Convertible Debentures Restructuring**

On February 15, 2007, we entered into a series of transactions to restructure securities issued pursuant to securities purchase agreements dated June 17, 2005 and September 21, 2005.

*Background*

**June 2005 Financing**

On June 17, 2005, we closed a financing pursuant to a securities purchase agreement with three accredited investors, Palisades Master Fund, L.P. ("Palisades"), Crescent International Ltd. ("Crescent") and JGB Capital L. P. ("JGB") for the issuance of $5,501,200in face amount of debentures maturing September 16, 2008 (the "June Debentures"). The June Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting October 1, 2005, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.60 per share or 80%

of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring June 17, 2008, to purchase 4,584,334 shares of restricted common stock, exercisable at a per share of $0.649 (the "June Warrants"). In addition, the exercise price of the June Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

9

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

If in any period of 20 consecutive trading days our stock price exceeds 250% of the June Warrants' exercise price, all of the June Warrants shall expire on the 30th trading day after we send a call notice to the June Warrant holders. If at any time after one year from the date of issuance of the June Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the June Warrants, then the holder may exercise the June Warrant at such time by means of a cashless exercise.

**September 2005 Financing**

On September 21, 2005, we closed a financing pursuant to a securities purchase agreement with two accredited investors, Palisades and Crescent for the issuance of $3,108,000 in face amount of debentures maturing December 20, 2008 (the "September Debentures" and together with the June Debentures, the "Old Debentures"). The September

Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting January 1, 2006, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.75 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring September 21, 2008, to purchase 2,172,000 shares of restricted common stock, exercisable at a per share of $0.80 (the "September Warrants" and together with the June Warrants, the "Old Warrants"). In addition, the exercise price of the September Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the September Warrants' exercise price, all of the September Warrants shall expire on the 30th trading day after we send a call notice to the September Warrant holders. If at any time after one year from the date of issuance of the September Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the September Warrants, then the holder may exercise the September Warrant at such time by means of a cashless exercise.

*Restructuring*

On February 15, 2007, the following transactions took place with regards to the Old Debentures and Old Warrants:

1) JGB entered into an assignment agreement with Crescent, pursuant to which Crescent purchased from JGB the June Debentures issued to JGB.  The face value of the June Debentures issued to JGB at the time of the transaction was $333,333 and Crescent paid $250,000 to JGB for the assignment;

2) We entered into a settlement agreement with JGB for the sum of $83,333.  We amended the terms of the Old Warrants held by JGB to remove the ratchet and call provisions and JGB agreed to release any shares reserved for issuance of the Old Warrants and to not exercise such Old Warrants until we obtain an increase in the authorized shares of common stock.  Upon obtaining the increase in authorized shares, we agreed to issue JGB 500,000 shares of restricted common stock;

3) We entered into a first amendment and waiver agreement with Palisades for the amendment of the Old Debentures issued to Palisades (the "Palisades Amendment Agreement"); and

4)  We entered into a first amendment and waiver agreement with Crescent for the amendment of the Old Debentures issued to JGB (and purchased by Crescent) and Crescent (the "Crescent Amendment Agreement" and together with the Palisades Amendment Agreement, the "Restructuring Amendments").

Palisades and Crescent agreed to amend the Old Debentures to remove the mandatory monthly liquidation provision and to amend the fixed conversion price of the Old Debentures to $0.1375 (the "Fixed Conversion Price").  As a result, the principal amount remaining on the Old Debentures is now due and payable at maturity, unless sooner converted into shares of common stock by the investors, at the Fixed Conversion Price.  Palisades and Crescent further agreed to waive any and all existing defaults under the Old Debentures.

10

form10-qsb.htm

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

Pursuant to the Palisades Amendment Agreement, we agreed to issue 7,025,789 shares of common stock (the "Monthly Redemption Shares") to Palisades upon conversion of $608,433 in principal amount of the Old Debentures. Such Monthly Redemption Shares were issued as payment for monthly redemptions owed to Palisades on December 1, 2006 and January 1, 2007 and February 1, 2007 pursuant to the Old Debentures. These Monthly Redemption Shares were not issued while we negotiated the terms of a potential buy-out or restructuring of the Old Debentures. The Monthly Redemption Shares were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission and represent the remaining shares of common stock registered thereunder for Palisades pursuant to the Old Debentures. As a result of the Monthly Redemption Shares, the exercise price of the Old Warrants was reduced to $0.0866, which Palisades exercised on a cashless basis and received 2,970,758 shares of common stock which were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission.

We agreed to pay Palisades a forbearance fee of $150,000 a month, for six months, which fee was paid in shares of common stock at an issuance price of $0.1375, for a total issuance of 5,454,546 shares of restricted common stock. In addition, we agreed to issue Palisades 1,449,825 shares of common stock as a commitment fee for the restructuring of the Old Debentures.

In connection with the restructuring, we executed a security agreement (the "Security Agreement") in favor of Palisades and JGB granting them a first priority security interest in all of our goods, inventory, contractual rights and general intangibles, receivables, documents, instruments, chattel paper, and intellectual property, except for our Carbon County prospect, which Palisades and JGB took a second priority interest and for our Carter Creek and Weston County prospects, which the investors were not granted any security interest. The Security Agreements state that if an event of default occurs under the Old Debentures or Security Agreement, the Investors have the right to take possession of the collateral, to operate our business using the collateral, and have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the collateral, at public or private sale or otherwise to satisfy our obligations under these agreements.

On February 15, 2007, we closed a financing pursuant to a securities purchase agreement with Palisades for the issuance of a $714,500 face amount debenture maturing September 15, 2007 (the "New Debenture"). The New Debenture does not accrue interest and the investors paid $500,000 for the New Debenture. We paid a commission of $100,000 to HPC Capital Management (a registered broker-dealer) in connection with the transaction, resulting in net proceeds to us of $400,000 before our legal fees. We used the net proceeds to pay our settlement agreement payment to JGB, repayment of a bridge loan to Petro Capital Securities, LLC and the remainder for general working capital purposes. We also issued HPC Capital Management 6,458,063 shares of restricted common stock and agreed to issue an additional 1,041,937 shares of restricted common stock upon obtaining an increase in our authorized shares of common stock, which shares are additional compensation for its services in connection with the transaction with the investors.

The convertible debentures are secured and are convertible into our common stock, at Palisades option, at a fixed conversion price of $0.1375. Based on this conversion price, the $714,500 secured convertible debenture is convertible into 5,196,364 shares of our common stock.

In the event of default, the investors may require payment, which shall be the greater of: (A) 130% of the principal amount of the face amount of the debenture to be prepaid, or (B) the principal amount of the debenture to be prepaid, divided by the conversion price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is less, multiplied by the closing price on (x) the date the default amount

is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is greater

The conversion price of the debenture may be adjusted in certain circumstances such as if we pay a stock dividend, subdivide or combine outstanding shares of common stock into a greater or lesser number of shares, or take such other actions as would otherwise result in dilution of the investor's position.

The Company has agreed to file a registration statement with the Securities and Exchange Commission to cover the future sale by the investors of the shares issuable upon conversion of the Old and New Debentures. If the registration statement is not filed by the filing deadline or if the registration statement is not declared effective by the effective deadline, we are required to pay liquidated damages to the investors.

11

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

**Note 10—Proved and Unproved Oil and Gas Property**

*Carbon County Project, Utah*

On September 12, 2005, we entered into an option agreement to purchase a gas field in Carbon County, Utah which was producing approximately 30 million cubic feet of natural gas per month. The field comprises 5,953 gross acres (2,440 net acres) with three gas wells currently producing and has an additional five wells drilled that are presently shut-in. Production is derived from the Ferron Sandstone formation, and the gas is marketed into the adjacent gas pipeline operated by Questar Gas Resources. The acquisition included an associated gas gathering system and a 6 mile pipeline and compression facility servicing the project and adjacent production. The field has potential for 20 additional well sites on 160 acre spacing on the undeveloped acreage. The property is adjacent to our Gordon Creek project and to the very successful Drunkards Wash field originally developed by River Gas Corp.

The purchase option called for an acquisition price of $3 million, and we closed the purchase of the acquisition on March 13, 2006 with an industry partner, Thunderbird Energy Corporation ("TBD") formerly MBA Resource Corp. of Canada. TBD paid $1.5 million and arranged third party financing of $750,000 toward the $3 million purchase price in exchange for a 50% interest in the project. We previously paid a deposit toward the purchase price and received production credits since October 1, 2005. We thus acquired a 50% interest in the project with only an additional payment of $241,000. Together with TBD we formed Gordon Creek, LLC, a joint operating company incorporated in the state of Utah to carry out gas production and drilling operations as well as gas gathering activities for both project gas and adjacent third party production.

We will use the experience of our personnel who participated in the development of Drunkards Wash to increase current production and expand production in both the Ferron Sandstone and in the underlying coal bed methane seams that are not currently being exploited by the existing wells. We will immediately undertake to increase production in the existing wells, complete those wells in the coal for their coal bed methane potential, and thereafter drill additional wells on the acreage being acquired.

*Creston Project, Uintah Basin, Utah*

On October 25, 2005, we announced that we had entered into a participation agreement with Mountain Oil and Gas, Inc., Creston Resources Ltd. and Homeland Gas and Oil Ltd. (collectively "Creston"), and are completing arrangements with private investors, whereby we are to supply operating expertise and program supervision to earn working interests in up to 45 producing oil wells in the Uintah Basin of Utah. We have since commenced a rework program to re-complete previously-completed zones and extend behind pipe reserves in the wells, located primarily in the Altamont-Bluebell Field. Creston will retain the current or historical production while we and the private investors will earn a variable percentage of the production increase resulting from the reworking operations. Work has commenced on two of the first four, and we plan on maintaining continuous operations until all wells have been brought to full potential.

Under the participation agreement, we are to begin reworking wells as necessary to revitalize production across the 9,000 acres that pertain to the wells. Due to the over-pressured, fractured nature of reservoir in the field, as well as the large vertical extent of potential pay zones, many of the wells have formation damage resulting from high drilling mud weights and cementing operations. These conditions have left many zones unable to produce to their potential. We will employ a variety of conventional and innovative proprietary techniques to reduce the effects of formation damage and attempt to increase oil and gas recovery.

During the first quarter of 2006, we completed the workover on the first well which commenced production at a daily rate of 100 BOE. We are now evaluating the next wells to be re-completed. In addition, we received joint venture financing arrangements with private investors to provide for $1.25 million in funds to conduct the reworking program.  The Company is now evaluating the results of the program to date prior to performing any additional work on the Creston wells.  The Company is also considering working with other owners or operating companies in the area and may discontinue working with Creston in favor of working with other operators.

12

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

**Weston County, Wyoming**

In November 2004 we executed a joint venture agreement with JMG Exploration, to drill our Weston County and Gordon Creek projects. Under the agreement, JMG Exploration will receive a 50% interest in exchange for spending $2,000,000 in exploration and drilling activity on the two projects by November 7, 2005. In addition, JMG Exploration loaned $1,500,000 to us with a short-term note. In connection with repayment of the JMG Exploration loan, we have assigned the remaining 50% interest in the Weston County project to JMG Exploration, subject to our right to reacquire those interests for approximately $391,000 by June 30, 2005, which right has been exercised. As part of the full settlement of the $1,500,000 note, JMG Exploration's commitment to spend $2,000,000 in exploration and drilling activity by November 7, 2005 has been terminated. In connection with this transaction, we recorded a gain from extinguishment of debt of $383,531.

The Weston County project is a 19,290-acre project on the east flank of the Powder River Basin. The prospect is a potential extension of an existing producing field. We are continuing our work and evaluation with JMG Exploration on permitting and other pre-drilling activities. In addition, we are targeting nearby locations with potential in the Minnelusa sandstone and Dakota channel sandstone formations.

**Gordon Creek, Utah**

JMG Exploration will also drill on the 5,242-acre Gordon Creek project, which we acquired from The Houston Exploration Company for $288,000. The Gordon Creek project is in an area of known coal resources in Carbon County in eastern Utah near other operating coal bed methane projects, such as the Drunkard's Wash Project, which our project personnel successfully drilled previously for River Gas Corporation.

Based on exploration results, JMG Exploration has indicated its intent to sell a portion of its working interest to Enterra Energy Trust in an arrangement under which JED Oil, Inc. under a development agreement with Enterra, will complete any development programs on the projects.

**Carter Creek, Wyoming**

In 2004 we purchased the 10,678-acre Carter Creek Project in the southern Powder River Basin.  Although we previously contemplated drilling on the project, and we believe much of the project acreage is drill-ready, we have not yet commenced any drilling activities to date due to capital constraints.  We are now entertaining proposals from industry partners for joint venturing the drilling and production activities.  Based on our analysis of the geologic structure of this region, we anticipate productive sections in the Cretaceous, Niobrara, Turner (Frontier) and Mowry layers, in that several existing wells in the Carter Creek area currently produce oil.

Work continues to identify additional areas for leasing and drillsite delineation. We will continue our evaluation and preparation for drilling the fractured shales. It is likely that horizontal drilling methods will be identified as an effective technique to tap into the potential of this field.

13

Table of Contents

Fellows Energy Ltd.
Notes to Unaudited Financial Statements
March 31, 2007

### Overthrust, Utah and Wyoming

The Overthrust coal bed methane project was an unconventional play with 183,000 gross and 118,950 net acres targeting coal bed natural gas in southwestern Wyoming and northeastern Utah that we entered into with Quaneco, LLC in 2004. This project also had the potential for conventional oil and gas.

As of December 31, 2006, due to a technical reanalysis of the project, new data relating to seismic work done in the area, capital constraints, and the inability to renegotiate with Quaneco and the leaseholders a more workable framework to carry forward with this early-stage project, we determined to relinquish our rights to the project and pursue more advance-stage projects in producing areas in the Uintah Basin and elsewhere.  As such, we recorded a charge in the amount of $1,025,092 for the year ended December 31, 2006.

### Bacaroo, Colorado

In 2004 we optioned the Bacaroo project in Colorado through our affiliation with Thomasson Partner Associates. We believe the project is an opportunity to establish conventional oil and gas production with comparatively inexpensive drilling in areas of established production, while other projects being reviewed offer longer term, larger potential exploration opportunities. We are acquiring acreage in the prospect prior to commencing drilling operations.

Leasing and seismic evaluation activities continue. One entire target area is now under lease, and two additional areas are now undergoing leasing. We will perform additional geologic evaluation and permitting work in preparation for drilling in 2007.

### Johns Valley Project, Utah

In 2004, we acquired an agreement with Johns Valley Limited Partnership whereby we have the option to earn a 70% working interest in 25,201 acres of oil and gas leases from the Utah School and Institutional Trust Lands Administration. Due to permitting delays and other operating parameters in the field, we negotiated to restructure the potential option and the timing and amounts of our work commitments as provided under the option assignment agreement. During the fourth quarter of 2006, due to capital constraints, we determined not to pursue the option on this project and relinquished our rights related thereto.

### Recent Activity

We have mobilized a workover rig to commence reworking on one producing well and one shut-in well on the Carbon County Project. We similarly expect to engage in continuous operations at Carbon County until all wells are suitably reworked and all prospective new wellsites are drilled. We also hope to drill on our other projects during 2007. We are seeking additional capital which we need in order to perform these projects. We currently do not have any contracts, commitments or arrangements for additional financing and there is no guarantee that we will be able to obtain such additional financing on terms that are favorable to us, or at all.

The operations we plan for 2007 include continuing development drilling and reworking activities on the Carbon County, exploring leases on the other projects we have acquired as well as seeking to acquire and explore additional property, and implementing production on one or more of our projects. Our goal is to discover and continue to produce substantial additional commercial quantities of oil and gas, including coalbed methane, on the properties, although no assurances can be given that commercial quantities are available, if at all.

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Forward-Looking Statements**

This report includes certain forward-looking statements. Forward-looking statements are statements that predict the occurrence of future events and are not based on historical fact. Forward-looking statements may be identified by the use of forward-looking terminology, such as "may", "shall", "will", "could", "expect", "estimate", "anticipate", "predict", "probable", "possible", "should", "continue", or similar terms, variations of those terms or the negative of those terms. We have written the forward-looking statements specified in the following information on the basis of assumptions we consider to be reasonable. However, we cannot predict our future operating results. Any representation, guarantee, or warranty should not be inferred from those forward-looking statements.

The assumptions we used for purposes of the forward-looking statements specified in the following information represent estimates of future events and are subject to uncertainty in economic, legislative, industry, and other circumstances. As a result, judgment must be exercised in the identification and interpretation of data and other information and in their use in developing and selecting assumptions from and among reasonable alternatives. To the extent that the assumed events do not occur, the outcome may vary substantially from anticipated or projected results. Accordingly we express no opinion on the achievability of those forward-looking statements. We cannot guarantee that any of the assumptions relating to the forward-looking statements specified in the following information are accurate. We assume no obligation to update any such forward-looking statements.

**Overview**

On January 5, 2004, we began operations as an oil and gas exploration company. We acquired interests in certain assets owned by Diamond Oil & Gas Corporation, in exchange for 3,500,000 shares of common stock. The transaction was deemed to have a value of $6,405,000. The assets included certain oil and gas projects, as well as the right to enter into the Exploration Services Funding Agreement with Thomasson Partner Associates, Inc. of Denver, Colorado. Diamond is controlled by our CEO, George S. Young. Our goal is to discover substantial commercial quantities of oil and gas, including coalbed methane, on the properties as well as to acquire and explore additional property.

Projects acquired from Thomasson Partner Associates under the Exploration Services Funding Agreement (as Amended) include the Weston County project in Wyoming, the Gordon Creek project in Utah, the Carter Creek project in Wyoming, the Circus project in Montana, the Bacaroo project in Colorado, the Platte project in Nebraska, and the Badger project in South Dakota.   During the year ended December 31, 2006, we abandoned the Platte and Badger projects.  As of December 31, 2006, we terminated our formal agreement with Thomasson Partner Associates, and will continue accessing projects informally, without having any first right to any project.

**Plan of Operations**

During the next twelve months, we expect to pursue oil and gas operations on some or all of our property, including the acquisition of additional acreage through leasing, farm-out or option and participation in the drilling of oil and gas wells. We intend to continue to evaluate additional opportunities in areas where we feel there is potential for oil and gas reserves and production, and may participate in areas other than those already identified, although we cannot assure that additional opportunities will be available, or if we participate in additional opportunities, that those opportunities will be successful.

Our current cash position is not sufficient to fund our cash requirements during the next twelve months, including operations and capital expenditures. We intend to continue joint venture or equity and/or debt financing efforts to support our current and proposed oil and gas operations and capital expenditures. We may sell interests in our

properties. We cannot assure that continued funding will be available.

15

Table of Contents

We have not entered into commodity swap arrangements or hedging transactions. Although we have no current plans to do so, we may enter into commodity swap and/or hedging transactions in the future in conjunction with oil and gas production. We have no off-balance sheet arrangements.

Our future financial results continue to depend primarily on (1) our ability to discover or purchase commercial quantities of oil and gas; (2) the market price for oil and gas; (3) our ability to continue to source and screen potential projects; and (4) our ability to fully implement our exploration and development program with respect to these and other matters. We cannot assure that we will be successful in any of these activities or that the prices of oil and gas prevailing at the time of production will be at a level allowing for profitable production.

**Results of Operations**

*Revenue*. For the three months ended March 31, 2007, we earned approximately $111,000 from our Creston project and newly acquired Carbon County project, compared to $61,000 revenue for the three months ended March 31, 2006.

*Operating expense*. For the three months ended March 31, 2007, our operating expense was approximately $1,558,000, compared to $847,000 for the three months ended March 31, 2006. The expenses came from oil and gas exploration and production, salaries, business advisory services, legal and professional fees, travel, investor relations expense, and debt service. $1,183,000 of the total $1,558,000 expense consisted of fees related to the debenture restructuring.

*Interest expense*. We incurred interest expense of $663,000 for the three months ended March 31, 2007, compared to $17,000 for the three months ended March 31, 2007.

**Liquidity and Capital Resources**

For the quarter ended March 31, 2006, we had a net loss of $567,000. For the quarter ended March 31, 2007, we incurred a net loss of $2,191,000. At March 31, 2007, we had $59,000 of cash and cash equivalents, total current assets of $366,000, and current liabilities of $5,246,000 for working capital of $(4,880,000).

Based upon our significant operating losses from inception, there is substantial doubt as to our ability to continue as a going concern. Our audited and unaudited financial statements have been prepared on a basis that contemplates our continuation as a going concern and the realization of assets and liquidation of liabilities in the ordinary course of business. Our audited and unaudited consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might be necessary should we be unable to continue as a going concern.

The Carbon County and Creston projects were acquired in late 2005, and were not brought into production until the first quarter of 2006. They have not yet been in production for a sufficient time, and have not yet been sufficiently reworked by additional field operations to determine their productive capacities. At this point, we have not generated sufficient oil and gas sales to sustain our operations. To fully carry out our business plans we need to increase production revenues, raise a substantial amount of additional capital, sell project assets, or obtain industry joint venture financing, which we are currently seeking. We can give no assurance that we will be able to increase production or raise such capital. We have limited financial resources until such time that we are able to generate such additional financing or additional cash flow from operations. Our ability to obtain profitability and positive cash flow is dependent upon our ability to exploit our mineral holdings, generate revenue from our planned business operations and control our exploration cost. To fully carry out our business plans we need to raise a substantial amount of additional capital, which we are currently seeking. We can give no assurance that we will be able to raise such capital. We have limited financial resources until such time that we are able to generate positive cash

flow from operations. Our ability to maintain profitability and positive cash flow is dependent upon our ability to locate profitable natural gas or oil properties, generate revenue from our planned business operations, and control exploration cost. Should we be unable to raise adequate capital or to meet the other above objectives, it is likely that we would have to substantially curtail our business activity, and that our investors would incur substantial losses of their investment.

16

Table of Contents

On February 15, 2007, we entered into a series of transactions to restructure securities issued pursuant to securities purchase agreements dated June 17, 2005 and September 21, 2005.

***Background***

## June 2005 Financing

On June 17, 2005, we closed a financing pursuant to a securities purchase agreement with three accredited investors, Palisades Master Fund, L.P. ("Palisades"), Crescent International Ltd. ("Crescent") and JGB Capital L. P. ("JGB") for the issuance of $5,501,199.95 in face amount of debentures maturing September 16, 2008 (the "June Debentures"). The June Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting October 1, 2005, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.60 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring June 17, 2008, to purchase 4,584,334 shares of restricted common stock, exercisable at a per share of $0.649 (the "June Warrants"). In addition, the exercise price of the June Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the June Warrants' exercise price, all of the June Warrants shall expire on the 30th trading day after we send a call notice to the June Warrant holders. If at any time after one year from the date of issuance of the June Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the June Warrants, then the holder may exercise the June Warrant at such time by means of a cashless exercise.

## September 2005 Financing

On September 21, 2005, we closed a financing pursuant to a securities purchase agreement with two accredited investors, Palisades and Crescent for the issuance of $3,108,000 in face amount of debentures maturing December 20, 2008 (the "September Debentures" and together with the June Debentures, the "Old Debentures"). The September Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting January 1, 2006, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.75 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring September 21, 2008, to purchase 2,172,000 shares of restricted common stock, exercisable at a per share of $0.80 (the "September Warrants" and together with the June Warrants, the "Old Warrants"). In addition, the exercise price of the September Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the September Warrants' exercise price,

all of the September Warrants shall expire on the 30th trading day after we send a call notice to the September Warrant holders. If at any time after one year from the date of issuance of the September Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the September Warrants, then the holder may exercise the September Warrant at such time by means of a cashless exercise.

17

Table of Contents

*Restructuring*

On February 15, 2007, the following transactions took place with regards to the Old Debentures and Old Warrants:

1) JGB entered into an assignment agreement with Crescent, pursuant to which Crescent purchased from JGB the June Debentures issued to JGB. The face value of the June Debentures issued to JGB at the time of the transaction was $333,333.33 and Crescent paid $250,000 to JGB for the assignment;

2) We entered into a settlement agreement with JGB for the sum of $83,333.33. We amended the terms of the Old Warrants held by JGB to remove the ratchet and call provisions and JGB agreed to release any shares reserved for issuance of the Old Warrants and to not exercise such Old Warrants until we obtain an increase in the authorized shares of common stock. Upon obtaining the increase in authorized shares, we agreed to issue JGB 500,000 shares of restricted common stock;

3) We entered into a first amendment and waiver agreement with Palisades for the amendment of the Old Debentures issued to Palisades (the "Palisades Amendment Agreement"); and

4) We entered into a first amendment and waiver agreement with Crescent for the amendment of the Old Debentures issued to JGB (and purchased by Crescent) and Crescent (the "Crescent Amendment Agreement" and together with the Palisades Amendment Agreement, the "Restructuring Amendments").

Palisades and Crescent agreed to amend the Old Debentures to remove the mandatory monthly liquidation provision and to amend the fixed conversion price of the Old Debentures to $0.1375 (the "Fixed Conversion Price"). As a result, the principal amount remaining on the Old Debentures is now due and payable at maturity, unless sooner converted into shares of common stock by the investors, at the Fixed Conversion Price. Palisades and Crescent further agreed to waive any and all existing defaults under the Old Debentures.

Pursuant to the Palisades Amendment Agreement, we agreed to issue 7,025,789 shares of common stock (the "Monthly Redemption Shares") to Palisades upon conversion of $608,433 in principal amount of the Old Debentures. Such Monthly Redemption Shares were issued as payment for monthly redemptions owed to Palisades on December 1, 2006 and January 1, 2007 and February 1, 2007 pursuant to the Old Debentures. These Monthly Redemption Shares were not issued while we negotiated the terms of a potential buy-out or restructuring of the Old Debentures. The Monthly Redemption Shares were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission and represent the remaining shares of common stock registered thereunder for Palisades pursuant to the Old Debentures. As a result of the Monthly Redemption Shares, the exercise price of the Old Warrants was reduced to $0.0866, which Palisades exercised on a cashless basis and received 2,970,758 shares of common stock which were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission.

We agreed to pay Palisades a forbearance fee of $150,000 a month, for six months, which fee was paid in shares of common stock at an issuance price of $0.1375, for a total issuance of 5,454,546 shares of restricted common stock. In addition, we agreed to issue Palisades 1,449,825 shares of common stock as a commitment fee for the restructuring of the Old Debentures.

In connection with the restructuring, we executed a security agreement (the "Security Agreement") in favor of Palisades and JGB granting them a first priority security interest in all of our goods, inventory, contractual rights and general intangibles, receivables, documents, instruments, chattel paper, and intellectual property, except for our Carbon County prospect, which Palisades and JGB took a second priority interest and for our Carter Creek and Weston County prospects, which the investors were not granted any security interest. The Security Agreements state that if an event of default occurs under the Old Debentures or Security Agreement, the Investors have the right to take possession of the collateral, to operate our business using the collateral, and have the right to assign, sell, lease

or otherwise dispose of and deliver all or any part of the collateral, at public or private sale or otherwise to satisfy
our obligations under these agreements.

18

Table of Contents

### *New Financing*

On February 15, 2007, we closed a financing pursuant to a securities purchase agreement with Palisades for the issuance of a $714,500 face amount debenture maturing September 15, 2007 (the "New Debenture"). The New Debenture does not accrue interest and the investors paid $500,000 for the New Debenture. We paid a commission of $100,000 to HPC Capital Management (a registered broker-dealer) in connection with the transaction, resulting in net proceeds to us of $400,000 before our legal fees. We used the net proceeds to pay our settlement agreement payment to JGB, repayment of a bridge loan to Petro Capital Securities, LLC and the remainder for general working capital purposes.  We also issued HPC Capital Management 6,458,063 shares of restricted common stock and agreed to issue an additional 1,041,937 shares of restricted common stock upon obtaining an increase in our authorized shares of common stock, which shares are additional compensation for its services in connection with the transaction with the investors.

The convertible debentures are secured and are convertible into our common stock, at Palisades option, at a fixed conversion price of $0.1375. Based on this conversion price, the $714,500 secured convertible debenture is convertible into 5,196,364 shares of our common stock.

In the event of default, the investors may require payment, which shall be the greater of: (A) 130% of the principal amount of the face amount of the debenture to be prepaid, or (B) the principal amount of the debenture to be prepaid, divided by the conversion price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is less, multiplied by the closing price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is greater

The conversion price of the debenture may be adjusted in certain circumstances such as if we pay a stock dividend, subdivide or combine outstanding shares of common stock into a greater or lesser number of shares, or take such other actions as would otherwise result in dilution of the investor's position.

We have agreed to file a registration statement with the Securities and Exchange Commission to cover the future sale by the investors of the shares issuable upon conversion of the Old and New Debentures. If the registration statement is not filed by the filing deadline or if the registration statement is not declared effective by the effective deadline, we are required to pay liquidated damages to the investors.

**Cash flow**. For the three months ended March 31, 2007, we used $973,000 in our operating activities. We used $23,000 in investing activity for property and option acquisitions, and obtained $876,000 in financing activity from capital obtained through financings. We decreased our December 31, 2006 cash balance of $180,000 to $59,000 at March 31, 2007.

### Critical Accounting Policies and Estimates

Our Management's Discussion and Analysis of Financial Condition and Results of Operations section discusses our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenue and expense during the reporting period. On an on-going basis, we evaluate our estimates and judgments, including those related to revenue recognition, accrued expense, financing operations, contingencies and litigation. We base our estimates and judgments on historical experience and on various other factors that we believe to be reasonable under the circumstances. Our estimates and judgments form the basis for determining the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions. These carrying values are some of

the most significant accounting estimates inherent in the preparation of our financial statements. These accounting policies are described in relevant sections in this discussion and in the notes to the financial statements included in our December 31, 2006 Form 10-KSB Annual Report.

19

Table of Contents

**Item 3. Controls and Procedures**

*(a) Evaluation of disclosure controls and procedures.*

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934 as of March 31, 2007. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on our evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are designed at a reasonable assurance level but were not fully effective during the quarter in providing reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

*(b) Changes in internal control over financial reporting.*

We regularly review our system of internal control over financial reporting and make changes to our processes and systems to improve controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, consolidating activities, and migrating processes.

There were no changes in our internal control over financial reporting that occurred during the period covered by this Quarterly Report on Form 10-QSB that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

**Part II: Other Information**

**Item 1. Legal Proceedings**

From time to time, we may become involved in various lawsuits and legal proceedings which arise in the ordinary course of business. However, litigation is subject to inherent uncertainties, and an adverse result in these or other matters may arise from time to time that may harm our business. Except as described in our annual report on Form 10-KSB, filed with the Commission on April 20, 2007, we are currently not aware of any such legal proceedings or claims that we believe will have, individually or in the aggregate, a material adverse affect on our business, financial condition or operating results.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

Pursuant to the Palisades Amendment Agreement, we agreed to issue 7,025,789 shares of common stock (the "Monthly Redemption Shares") to Palisades upon conversion of $608,433.15 in principal amount of the Old Debentures.  Such Monthly Redemption Shares were issued as payment for monthly redemptions owed to Palisades on December 1, 2006 and January 1, 2007 and February 1, 2007 pursuant to the Old Debentures.  These Monthly Redemption Shares were not issued while we negotiated the terms of a potential buy-out or restructuring of the Old Debentures.  The Monthly Redemption Shares were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission and represent the remaining shares of common stock registered thereunder for Palisades pursuant to the Old Debentures.  As a result of the Monthly Redemption Shares, the exercise price of the Old Warrants was reduced to $0.0866, which Palisades exercised on a cashless basis and received 2,970,758 shares of common stock which were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission.

We agreed to pay Palisades a forbearance fee of $150,000 a month, for six months, which fee was paid in shares of common stock at an issuance price of $0.1375, for a total issuance of 5,454,546 shares of restricted common stock.  In addition, we agreed to issue Palisades 1,449,825 shares of common stock as a commitment fee for the restructuring of the Old Debentures.

On February 15, 2006, we closed a financing pursuant to a securities purchase agreement with Palisades for the issuance of a $714,500 face amount debenture maturing September 15, 2007 (the "New Debenture"). The New Debenture does not accrue interest and the investors paid $500,000 for the New Debenture. We paid a commission of $100,000 to HPC Capital Management (a registered broker-dealer) in connection with the transaction, resulting in net proceeds to us of $400,000 before our legal fees. We used the net proceeds to pay our settlement agreement payment to JGB, repayment of a bridge loan to Petro Capital Securities, LLC and the remainder for general working capital purposes.  We also issued HPC Capital Management 6,458,063 shares of restricted common stock and agreed to issue an additional 1,041,937 shares of restricted common stock upon obtaining an increase in our authorized shares of common stock, which shares are additional compensation for its services in connection with the transaction with the investors.

The convertible debentures are secured and are convertible into our common stock, at Palisades option, at a fixed conversion price of $0.1375. Based on this conversion price, the $714,500 secured convertible debenture is convertible into 5,196,364 shares of our common stock.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Submission of Matters to a Vote of Securities Holders**

None.

**Item 5. Other Information**

None.

form10-qsb.htm

Table of Contents

**Item 6. Exhibits**

31.1     Certification of Chief Executive Officer pursuant to Rule 13a-14 and Rule 15d-14(a), promulgated under the Securities and Exchange Act of 1934, as amended

31.2     Certification of Chief Financial Officer pursuant to Rule 13a-14 and Rule 15d 14(a), promulgated under the Securities and Exchange Act of 1934, as amended

32.1     Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chief Executive Officer)

32.2     Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chief Financial Officer)

Table of Contents

**Signatures**

In accordance with the requirements of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**FELLOWS ENERGY LTD.**

Date:  May 16, 2007

By: */s/ GEORGE S. YOUNG*
George S. Young
*Chief Executive Officer ( Principal Executive Officer Principal Accounting Officer and Principal Financial Officer)*

23

EX-31.1 2 ex31_1.htm EXHIBIT 31.1

EXHIBIT 31.1
FELLOWS ENERGY LTD.
OFFICER'S CERTIFICATE PURSUANT TO SECTION 302

I, George S. Young, certify that:

1. I have reviewed this quarterly report on Form 10-QSB of Fellows Energy Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Omitted pursuant to SEC Release No. 33-8238];

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: May 16, 2007

/s/ GEORGE S. YOUNG
George S. Young
Chief Executive Officer

EX-31.2 3 ex31_2.htm EXHIBIT 31.2

EXHIBIT 31.2

FELLOWS ENERGY LTD.

OFFICER'S CERTIFICATE PURSUANT TO SECTION 302

I, George S. Young, certify that:

1. I have reviewed this quarterly report on Form 10-QSB of Fellows Energy Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) [Omitted pursuant to SEC Release No. 33-8238];

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: May 16, 2007

/s/ GEORGE S. YOUNG
George S. Young
Principal Financial Officer

EX-32.1 4 ex32_1.htm EXHIBIT 32.1

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly report of Fellows Energy Ltd. (the "Company") on Form 10-QSB for the period ending March 31, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, George S. Young, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to Fellows Energy Ltd. and will be retained by Fellows Energy Ltd. and furnished to the Securities and Exchange Commission or its staff upon request.

Date:  May 16, 2007                    By: */s/ GEORGE S. YOUNG*
                                       George S. Young
                                       Chief Executive Officer

ex32_2.htm

EX-32.2 5 ex32_2.htm EXHIBIT 32.2

Exhibit 32.2

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly report of Fellows Energy Ltd. (the "Company") on Form 10-QSB for the period ending March 31, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, George S. Young, Principal Financial Officer of the Company, certify, pursuant to 18 U.S.C. section 906 of the Sarbanes-Oxley Act of 2002, that:

    (1)  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

    (2)  The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to Fellows Energy Ltd. and will be retained by Fellows Energy Ltd. and furnished to the Securities and Exchange Commission or its staff upon request.

Date:  May 16, 2007             By: */s/ GEORGE S. YOUNG*
                                                George S. Young
                                                Principal Financial Officer

# EXHIBIT E

10KSB 1 form10ksb.htm FORM 10KSB

# UNITED STATES

## SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549

## FORM 10-KSB

[x]    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2006**

[  ] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period From _____ to _____**

Commission File Number 000-33321

# FELLOWS ENERGY LTD.

(Exact name of small business issuer as specified in its charter)

| **Nevada** | | **33-0967648** |
| --- | --- | --- |
| (State or other jurisdiction of incorporation or organization) | | (IRS Employer Identification No.) |
| **1942 Broadway St. Suite 320** | | |
| **Boulder, Colorado** | **80302** | **(303) 926-4415** |

(Address of principal executive office)          (Postal Code)          (Issuer's telephone number)

370 Interlocken Boulevard, Suite 400, Broomfield, Colorado 80021
(former name, former address and former fiscal year, if changed since last report)

Securities registered under Section 12(b) of the Exchange Act:

Securities registered under Section 12(g) of the Exchange Act:  Common Stock, $0.001 par value

Indicate by check mark whether the issuer (1) has filed all reports required to be filed by Section 13 or 15(d) of
the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant
was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes  [ x ]  No  [  ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes [  ]  No  [ x ]
Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-B is not contained
herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-KSB or any amendment to Form 10-KSB.

Yes [  ]  No  [ x ]  Delinquent filers are disclosed herein.


Fellows had $424,000 in revenue in 2006.


The aggregate market value of the Common Stock held by non-affiliates (as affiliates are defined in Rule 12b-2 of
the Exchange Act) of the registrant, computed by reference to the average of the high and low sale price on April 14,
2006, was $17,262,556.

As of April 11, 2007 there were 100,000,000 shares of issuer's common stock outstanding.

1

Table of Contents

**FELLOWS ENERGY LTD.**

**FORM 10-KSB**

**For the Fiscal Year Ended December 31, 2006**

Part I                                                                                    Page

Item 1      Description of Business                                                          3
Item 2      Description of Property                                                         11
Item 3      Legal Proceedings                                                              15
Item 4      Submission of Matters to a Vote of Security Holders                            16


Part II                                                                                   Page

Item 5      Market for Common Equity and Related Stockholder Matters                       16
Item 6      Management's Discussion and Analysis or Plan of Operation                      17
Item 7      Financial Statements                                                           22
Item 8      Changes In and Disagreements With Accountants on Accounting and Financial Disclosure   39
Item 8A     Controls and Procedures                                                        40
Item 8B     Other Information                                                              41


Part III                                                                                  Page

Item 9      Directors, Executive Officers, Promoters and Control Persons; Compliance with Section 16(a) of the Exchange Act   41
Item 10     Executive Compensation                                                         42
Item 11     Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters   44
Item 12     Certain Relationships and Related Transactions                                 45
Item 13     Exhibits                                                                       45
Item 14     Principal Accountant Fees and Services                                         48
Item 15     Signatures                                                                     49

2

form10ksb.htm

Table of Contents

**PART I**

**FORWARD-LOOKING INFORMATION**

This Annual Report of Fellows Energy Ltd. on Form 10-KSB contains forward-looking statements, particularly those identified with the words, "anticipates," "believes," "expects," "plans," "intends," "objectives" and similar expressions. These statements reflect management's best judgment based on factors known at the time of such statements. The reader may find discussions containing such forward-looking statements in the material set forth under "Legal Proceedings" and "Management's Discussion and Analysis and Plan of Operations," generally, and specifically therein under the captions "Liquidity and Capital Resources" as well as elsewhere in this Annual Report on Form 10-KSB. Actual events or results may differ materially from those discussed herein.

**ITEM 1.  DESCRIPTION OF BUSINESS.**

**Company History**

Fellows Energy Ltd. was incorporated in Nevada on April 9, 2001 as Fuel Centers, Inc.  In November 2001, the Commission declared effective our registration statement to register 31,185,150, as adjusted, shares of common stock held by our stockholders. We were originally formed to offer business consulting services in the retail automobile fueling industry. During the fourth quarter of 2003, we decided to change management, enter the oil and gas business and cease all activity in the automobile refueling industry. On November 12, 2003, we changed our name to Fellows Energy Ltd. and shifted our focus to exploration for oil and gas in the Rocky Mountain Region. On January 5, 2004, we acquired certain interests in certain oil and gas leases and other interests owned by Diamond Oil & Gas Corporation, a Nevada corporation. Diamond is wholly owned by George S. Young, our CEO, President and a Director. Our common stock is publicly traded over-the-counter and quoted on the OTC Bulletin Board under the symbol "FLWE.OB."

We are an early stage oil and gas company led by an experienced management team and focused on exploration and production of natural gas, especially from "unconventional plays" such as tight sands and coal beds, and oil in the Rocky Mountain Region. In many unconventional plays accumulations of hydrocarbons are found over a large area expanse and/or a thick vertical section, which when compared to conventional plays, typically have a higher geological and/or commercial development risk and lower average decline rate. Whereas a "conventional play" is an accumulation of hydrocarbons in a structural or stratigraphic setting within high-quality reservoirs. Our strategy is to pursue selected opportunities that are characterized by reasonable entry costs, favorable economic terms, high reserve potential relative to capital expenditures and the availability of existing technical data that may be further developed using current technology.   In 2006, we also turned our emphasis away from early stage exploration projects to focus on advanced-stage and producing properties.

**Business Strategy**

We seek to: (1) achieve attractive returns on capital for the benefit of our stockholders through investment in exploration and development of unconventional plays; (2) maintain a strong balance sheet to preserve maximum financial and operational flexibility; and (3) create strong employee incentives through equity ownership.

*Disciplined Acquisition Strategy*

We intend to acquire producing oil and gas properties where we believe significant additional value can be created. Management is primarily interested in unconventional play properties with a combination of these

factors: (1) opportunities for long life production with stable production levels; (2) geological formations with multiple producing horizons; (3) substantial exploitation potential; and (4) relatively low capital investment production costs.

### Exploitation of Properties

We intend to maximize the value of our properties through a combination of successful exploration, drilling, increasing production, increasing recoverable reserves and reducing operating costs. Where we deem appropriate, we will employ technology to improve recoveries such as directional and horizontal drilling. Directional and horizontal drilling and completion methods have historically produced oil and gas at faster rates and with lower operating costs basis than traditional vertical drilling.

### Experienced and Dedicated Personnel

We intend to maintain a highly competitive team of experienced and technically proficient employees and consultantsand motivate them through a positive work environment and stock ownership. We believe that employee ownership, which is encouraged through our stock option plan, is essential for attracting, retaining and motivating qualified personnel.

3

Table of Contents

**Company and Industry Highlights**

*Solid Rocky Mountain Fundamentals*

According to the report *Balancing Natural Gas Policy - Fueling Demands of a Growing Economy* (September 25, 2003), released in the fall of 2003 by the National Petroleum Council:

Current higher gas prices are the result of a fundamental shift in the supply and demand balance. North America is moving to a period in its history in which it will no longer be self-reliant in meeting its growing natural gas needs as production from traditional U.S. and Canadian basins has plateaued. Government policy encourages the use of natural gas but does not address the corresponding need for additional natural gas supplies.

Furthermore, within the State of Wyoming, as indicated by data compiled by the Wyoming Oil & Gas Conservation Commission and available on its website at wogcc.state.wy.us, gas production has increased 80% since the mid-1990s and is expected to surpass 6 Bcf per day this year, largely from coal bed methane production in the Powder River Basin and tight sands gas production from the Green River Basin. In the Powder River Basin, 16,000 wells have been drilled to date (mostly in the last five years) and approximately 50,000 additional drill locations have been identified. Although this area has been historically challenged by pipeline capacity restraints and tough environmental regulations, substantial progress has been made with the doubling of capacity of the Kern River Pipeline and the completion of the Grasslands and Cheyenne Plains Pipelines, which Management believes bodes well for future development, growth and economics in the Rocky Mountain Region.

*Focus on Unconventional Plays*

In building our inventory of oil and gas projects, we have concentrated on unconventional plays as well as conventional oil and gas projects.

Compared to conventional plays, unconventional plays present different advantages and risks. Typically, unconventional plays involve less geologic risk than conventional plays with respect to locating gas because hydrocarbons are known to exist and because unconventional plays are typically larger in size. Similarly, due to the greater size of typical unconventional plays, they inherently have greater reserve potential than conventional plays. In general, unconventional plays have not been developed to the extent of conventional plays and therefore greater opportunities exist for acquiring additional unconventional plays and increasing reserves.

However, development of typical unconventional plays may involve greater extraction and retrieval costs than are involved in development of typical conventional plays. In the typical unconventional play, the existence of gas is known but the quantity of such gas, and commercial viability, is unknown. The process of developing an unconventional play requires significant costs before the commercial viability can be ascertained. Therefore, there is a greater risk of cost overrun and the risk of inadequate gas recoveries is not avoided.

It is important to recognize that unconventional plays offer attractive potential for large reserve additions. This is because the large conventional traps have largely been found and developed, and because unconventional plays inherently have much greater size and therefore greater reserve potential. All of the top five onshore "gas giant" fields discovered and developed in the 1990s (including Powder River Basin coal bed methane, Jonah, Pinedale, Madden Deep and Ferron coal bed methane) were in the Rocky Mountain Region.

*Strong Acquisition Market*

The recent sales of major Rocky Mountain independent oil and gas companies such as Westport Resources
Corporation, Tom Brown, Inc., Evergreen Resources, Inc., Patina Oil & Gas Corporation and Prima Energy
Corporation for an estimated total consideration of over ten billion dollars, in the opinion of our management,
bear testimony to the strength of the acquisition market for companies that have established proven reserve growth
from unconventional plays. While only Evergreen was a pure unconventional-play oriented company, each of the
others has had a major component of such plays as part of their portfolio which helped to increase their exit valuations
due to the large amount of proven undeveloped category reserves associated with them.

4

Table of Contents

### Large Strategic Land Position

Through our direct ownership of mineral rights in the Powder River Basin and Uinta Basin, we have a strategic land position in the oil and gas producing basins of the Rocky Mountains. Known hydrocarbon resources in reservoirs in unconventional plays such as coal seams, thick oil-bearing shales, and extensive bodies of tight gas-bearing sands throughout the properties create the potential for a large inventory of drilling locations should initial exploration efforts prove successful. Although there are no assurances, this inventory could support future net reserve additions and production growth over the next several years.

### Strong Underlying Industry Fundamentals

According to the National Petroleum Council Gas Report, the domestic natural gas fundamentals will continue to be attractive, for the foreseeable future. The U.S. faces a significant natural gas supply problem due to the maturing of its traditional producing basins, the increase in exploration and development costs, and demand increases coupled with production decline rates. The U.S. has several ways to combat this supply problem through measures including increased development and importation of Canadian and Alaskan gas and delivery of liquefied natural gas. However, the impact of these efforts is expected to only mitigate the supply decline or at best increase supply marginally.

### Proven Management Expertise

Our CEO and President George S. Young and our Vice President Steve Prince have experience in operating and growing an oil and gas public company. Mr. Young brings strong leadership and business qualifications, an understanding from having been trained as both an attorney and engineer and 25 years of natural resource industry experience. Mr. Prince brings 13 years of oil and gas industry experience as a geologist and as a significant contributor to the development of major producing fields in areas of interest to us.

### Financing Strategy

We intend to access debt and equity markets for private and public financings from time to time based on our needs on terms in the market then available to us. Initially, we expect that the bulk of capital formation will be in the form of convertible debt to equity capital to support the initial phases of exploration and exploitation work required on our projects. To the extent the plays mature into "Proven" status as determined by independent third-party engineers, we plan to utilize debt sources for a large percentage of our capital requirements so as to maximize the return on equity that these projects generate. This debt may be in the form of senior bank debt, junior or subordinated bank debt, and/ or mezzanine debt. We cannot provide any assurance that we will be able to raise additional debt or equity to fund future operational and exploration needs or terms acceptable to us.

Additionally, we may generate funds through (1) a joint venture, sale or farm out on an interest in one or more of its properties and/or (2) divesting one or more of our properties that are determined not to fit with its strategic core holdings.

### Property Summary

In our short operating history in the oil and gas industry, we have positioned our company to control and exploit potential reserves from a number of large unconventional oil and gas resource type projects covering approximately 57,000 acres. These projects focus on coal bed methane, tight sands gas and oil from fractured shales. Such projects

are characterized by their widespread occurrence, large reserve potential, low finding and development costs, high drilling success rates, and low geologic and operating risks. Such projects are also subject to certain risks and development of such projects requires substantial capital.  Our Carbon County project is in exploration, development and production stages. This project has proven producing reserves in excess of 1.36 Bcf, proven developed non-producing in excess of 2.23 Bcf, proven undeveloped reserves in excess of 6.93 Bcf, and probable and possible reserves of in excess of 3.78 Bcf and 12.6 Bcf, for a total of 26.9 Bcf. Please see Item 2 Description of Property under Note 10 to the financials for more discussion related to the property and reserves.

**Competition**

Oil and gas exploration and acquisition of undeveloped properties is a highly competitive and speculative business. We compete with a number of other companies, including major oil companies and other independent operators which are more experienced and which have greater financial resources. Such companies may be able to pay more for prospective oil and gas properties. Additionally, such companies may be able to evaluate, bid for and purchase a greater number of properties and prospects than our financial and human resources permit. We do not hold a significant competitive position in the oil and gas industry.

5

form10ksb.htm

Table of Contents

**Regulation**

Our operations are or will be subject to various types of regulation at the federal, state and local levels. Such regulation includes requiring permits for the drilling of wells; maintaining bonding requirements in order to drill or operate wells; implementing spill prevention plans; submitting notification and receiving permits relating to the presence, use and release of certain materials incidental to oil and gas operations; and regulating the location of wells, the method of drilling and casing wells, the use, transportation, storage and disposal of fluids and materials used in connection with drilling and production activities, surface usage and the restoration of properties upon which wells have been drilled, the plugging and abandoning of wells and the transporting of production. Our operations are or will be also subject to various conservation matters, including the regulation of the size of drilling and spacing units or proration units, the number of wells which may be drilled in a unit, and the unitization or pooling of oil and gas properties. In this regard, some states allow the forced pooling or integration of tracts to facilitate exploration while other states rely on voluntary pooling of lands and leases, which may make it more difficult to develop oil and gas properties. In addition, state conservation laws establish maximum rates of production from oil and gas wells, generally limit the venting or flaring of gas, and impose certain requirements regarding the ratable purchase of production. The effect of these regulations is to limit the amounts of oil and gas we may be able to produce from our wells and to limit the number of wells or the locations at which we may be able to drill.

Our business is affected by numerous laws and regulations, including energy, environmental, conservation, tax and other laws and regulations relating to the oil and gas industry. We plan to develop internal procedures and policies to ensure that our operations are conducted in full and substantial environmental regulatory compliance.

Failure to comply with any laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of injunctive relief or both. Moreover, changes in any of these laws and regulations could have a material adverse effect on business. In view of the many uncertainties with respect to current and future laws and regulations, including their applicability to us, we cannot predict the overall effect of such laws and regulations on our future operations.

We believe that our operations comply in all material respects with applicable laws and regulations and that the existence and enforcement of such laws and regulations have no more restrictive an effect on our operations than on other similar companies in the energy industry. We do not anticipate any material capital expenditures to comply with federal and state environmental requirements.

**Environmental Matters**

Operations on properties in which we have an interest are subject to extensive federal, state and local environmental laws that regulate the discharge or disposal of materials or substances into the environment and otherwise are intended to protect the environment. Numerous governmental agencies issue rules and regulations to implement and enforce such laws, which are often difficult and costly to comply with and which carry substantial administrative, civil and criminal penalties and in some cases injunctive relief for failure to comply.

Some laws, rules and regulations relating to the protection of the environment may, in certain circumstances, impose "strict liability" for environmental contamination. These laws render a person or company liable for environmental and natural resource damages, cleanup costs and, in the case of oil spills in certain states, consequential damages without regard to negligence or fault. Other laws, rules and regulations may require the rate of oil and gas production to be below the economically optimal rate or may even prohibit exploration or production activities in

form10ksb.htm

environmentally sensitive areas. In addition, state laws often require some form of remedial action, such as closure of inactive pits and plugging of abandoned wells, to prevent pollution from former or suspended operations.

Legislation has been proposed in the past and continues to be evaluated in Congress from time to time that would reclassify certain oil and gas exploration and production wastes as "hazardous wastes." This reclassification would make these wastes subject to much more stringent storage, treatment, disposal and clean-up requirements, which could have a significant adverse impact on operating costs. Initiatives to further regulate the disposal of oil and gas wastes are also proposed in certain states from time to time and may include initiatives at the county, municipal and local government levels. These various initiatives could have a similar adverse impact on operating costs.

The regulatory burden of environmental laws and regulations increases our cost and risk of doing business and consequently affects our profitability. The federal Comprehensive Environmental Response, Compensation and Liability Act, or CERCLA, also known as the "Superfund" law, imposes liability, without regard to fault, on certain classes of persons with respect to the release of a "hazardous substance" into the environment. These persons include the current or prior owner or operator of the disposal site or sites where the release occurred and companies that transported, disposed or arranged for the transport or disposal of the hazardous substances found at the site. Persons who are or were responsible for releases of hazardous substances under CERCLA may be subject to joint and several liability for the costs of cleaning up the hazardous substances that have been released into the environment and for damages to natural resources, and it is not uncommon for the federal or state government to pursue such claims.

6

Table of Contents

It is also not uncommon for neighboring landowners and other third parties to file claims for personal injury or property or natural resource damages allegedly caused by the hazardous substances released into the environment. Under CERCLA, certain oil and gas materials and products are, by definition, excluded from the term "hazardous substances." At least two federal courts have held that certain wastes associated with the production of crude oil may be classified as hazardous substances under CERCLA. Similarly, under the federal Resource, Conservation and Recovery Act, or RCRA, which governs the generation, treatment, storage and disposal of "solid wastes" and "hazardous wastes," certain oil and gas materials and wastes are exempt from the definition of "hazardous wastes." This exemption continues to be subject to judicial interpretation and increasingly stringent state interpretation. During the normal course of operations on properties in which we have an interest, exempt and non-exempt wastes, including hazardous wastes, that are subject to RCRA and comparable state statutes and implementing regulations are generated or have been generated in the past. The federal Environmental Protection Agency and various state agencies continue to promulgate regulations that limit the disposal and permitting options for certain hazardous and non-hazardous wastes.

We believe that the operator of the properties in which we have an interest is in substantial compliance with applicable laws, rules and regulations relating to the control of air emissions at all facilities on those properties. Although we maintain insurance against some, but not all, of the risks described above, including insuring the costs of clean-up operations, public liability and physical damage, there is no assurance that our insurance will be adequate to cover all such costs, that the insurance will continue to be available in the future or that the insurance will be available at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could have a material adverse effect on our financial condition and operations. Compliance with environmental requirements, including financial assurance requirements and the costs associated with the cleanup of any spill, could have a material adverse effect on our capital expenditures, earnings or competitive position. We do believe, however, that our operators are in substantial compliance with current applicable environmental laws and regulations. Nevertheless, changes in environmental laws have the potential to adversely affect operations. At this time, we have no plans to make any material capital expenditures for environmental control facilities.

**EMPLOYEES**

As of April 11, 2007, we have eight full-time employees. The majority of development services have been provided to us by the officers and outside, third-party vendors. Currently, there exist no organized labor agreements or union agreements between us and our employees. We do not have employment agreements with any of our employees. We believe that our relations with our employees are good.

**RISKS RELATED TO BUSINESS**

You should carefully consider the following risk factors and all other information contained herein as well as the information included in this Annual Report in evaluating our business and prospects. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties, other than those we describe below, that are not presently known to us or that we currently believe are immaterial may also impair our business operations. If any of the following risks occur, our business and financial results could be harmed. You should refer to the other information contained in this Annual Report, including our consolidated financial statements and the related notes.

**We Have a History Of Losses Which May Continue, and May Negatively Impact Our Ability to Achieve Our Business Objectives.**

We incurred net losses of $8,590,847 and $2,498,816 for the years ended December 31, 2006 and 2005, respectively.

We cannot assure you that we can achieve or sustain profitability on a quarterly or annual basis in the future. Our operations are subject to the risks and competition inherent in the establishment of a business enterprise. There can be no assurance that future operations will be profitable. Revenues and profits, if any, will depend upon various factors, including whether we will be able to continue expansion of our revenue. We may not achieve our business objectives and the failure to achieve such goals would have an adverse impact on us.

**If We Are Unable to Obtain Additional Funding, Our Business Operations Will be Harmed and If We Do Obtain Additional Financing, Our Then Existing Shareholders May Suffer Substantial Dilution.**

We will require additional funds to sustain and expand our acquisition, exploration and production of natural gas from coal bed methane. We anticipate that we will require up to approximately $500,000 to fund our continued operations for the next twelve months from the date of this prospectus, depending on revenues from operations. Additional capital will be required to effectively support the operations and to otherwise implement our overall business strategy. There can be no assurance that financing will be available in amounts or on terms acceptable to us, if at all. The inability to obtain additional capital will restrict our ability to grow and may reduce our ability to continue to conduct business operations. If we are unable to obtain additional

7

form10ksb.htm

Table of Contents

financing, we will likely be required to curtail our marketing and development plans and possibly cease our operations. Any additional equity financing may involve substantial dilution to our then existing shareholders.

**Our Independent Registered Public Accounting Firm Has Stated There is Substantial Doubt About Our Ability to Continue As a Going Concern, Which May Hinder Our Ability to Obtain Future Financing.**

In their report dated April 17, 2007 on our financial statements as of and for the year ended December 31, 2006, our independent registered public accounting firm stated that our significant losses from operations and our limited financial resources raised substantial doubt about our ability to continue as a going concern. Since December 31, 2006, we have continued to experience losses from operations. Our ability to continue as a going concern is subject to our ability to generate a profit and/or obtain necessary debt or equity funding from outside sources, including  the sale of our securities, and/or loans and grants from various financial institutions where possible.

**We Have a Limited Operating History and if We are not Successful in Continuing to Grow Our Business, Then We may have to Scale Back or Even Cease Our Ongoing Business Operations.**

We have a limited history of revenues from operations and have no individually significant tangible assets.  We have yet to generate positive earnings and there can be no assurance that we will ever operate profitably.  Our success is significantly dependent on a successful acquisition, drilling, completion and production program. Our operations will be subject to all the risks inherent in the establishment of a developing enterprise and the uncertainties arising from the absence of a significant operating history. Except for our Carbon County prospect, we are in the development stage and potential investors should be aware of the difficulties normally encountered by enterprises in the development stage. We may be unable to locate recoverable reserves or operate on a profitable basis. If our business plan is not successful, and we are not able to operate profitably, investors may lose some or all of their investment in our company.

**If We Are Unable to Retain the Services of Mr. Young or If We Are Unable to Successfully Recruit Qualified Managerial and Field Personnel Having Experience in Oil and Gas Exploration, We May Not Be Able to Continue Our Operations.**

Our success depends to a significant extent upon the continued service of Mr. George S. Young, our President, Chief Executive Officer and a director. Loss of the services of Mr. Young could have a material adverse effect on our growth, revenues, and prospective business. We do not maintain key-man insurance on the life of Mr. Young. In addition, in order to successfully implement and manage our business plan, we will be dependent upon, among other things, successfully recruiting qualified managerial and field personnel having experience in the oil and gas exploration business. Competition for qualified individuals is intense. There can be no assurance that we will be able to find, attract and retain existing employees or that we will be able to find, attract and retain qualified personnel on acceptable terms.

**As Most of Our Properties are in the Exploration and Development Stage, There Can be no Assurance That We Will Establish Commercial Discoveries on Our Properties.**

Exploration for economic reserves of oil and gas is subject to a number of risk factors. Few properties that are explored are ultimately developed into producing oil and/or gas wells. Most of our properties are in the exploration and development stage only and are without proven reserves of oil and gas. We may not establish commercial discoveries on any of our properties beyond that already discovered and developed at our Carbon County project.

**The Potential Profitability of Oil and Gas Ventures Depends Upon Factors Beyond the Control of Our Company.**

The potential profitability of oil and gas properties is dependent upon many factors beyond our control. For instance, world prices and markets for oil and gas are unpredictable, highly volatile, potentially subject to governmental fixing, pegging, controls, or any combination of these and other factors, and respond to changes in domestic, international, political, social, and economic environments. Additionally, due to worldwide economic uncertainty, the availability and cost of funds for production and other expenses have become increasingly difficult, if not impossible, to project. In addition, adverse weather conditions can also hinder drilling operations. These changes and events may materially affect our financial performance. These factors cannot be accurately predicted and the combination of these factors may result in our company not receiving an adequate return on invested capital.

**Even if We are Able to Discover and Generate a Gas Well, There Can be no Assurance the Well Will Become Profitable**

We have not yet made a discovery of coalbed methane gas or drilled a gas well to capture any gas other than at our Carbon County project. Even if we are able to, a productive well may become uneconomic in the event water or other deleterious substances are encountered which impair or prevent the production of oil and/or gas from the well. In addition, production from any well may be unmarketable if it is impregnated with water or other deleterious substances. In addition, the marketability of oil and gas which may be acquired or discovered will be affected by numerous factors, including the proximity and capacity of oil and

8

Table of Contents

gas pipelines and processing equipment, market fluctuations of prices, taxes, royalties, land tenure, allowable production and environmental protection, all of which could result in greater expenses than revenue generated by the well.

**Competition In The Oil And Gas Industry Is Highly Competitive And There Is No Assurance That We Will Be Successful In Acquiring The Leases.**

The oil and gas industry is intensely competitive. We compete with numerous individuals and companies, including many major oil and gas companies, which have substantially greater technical, financial and operational resources and staffs. Accordingly, there is a high degree of competition for desirable oil and gas leases, suitable properties for drilling operations and necessary drilling equipment, as well as for access to funds. We cannot predict if the necessary funds can be raised or that any projected work will be completed. Our budget anticipates our acquisition of additional acreage in the Rocky Mountain Region. This acreage may not become available or if it is available for leasing, that we may not be successful in acquiring the leases.

**The Marketability of Natural Resources Will be Affected by Numerous Factors Beyond Our Control Which May Result in Us not Receiving an Adequate Return on Invested Capital to be Profitable or Viable.**

The marketability of natural resources which may be acquired or discovered by us will be affected by numerous factors beyond our control. These factors include market fluctuations in oil and gas pricing and demand, the proximity and capacity of natural resource markets and processing equipment, governmental regulations, land tenure, land use, regulation concerning the importing and exporting of oil and gas and environmental protection regulations. The exact effect of these factors cannot be accurately predicted, but the combination of these factors may result in us not receiving an adequate return on invested capital to be profitable or viable.

**Oil and Gas Operations are Subject to Comprehensive Regulation Which May Cause Substantial Delays or Require Capital Outlays in Excess of Those Anticipated Causing an Adverse Effect on Our Company.**

Oil and gas operations are subject to federal, state, and local laws relating to the protection of the environment, including laws regulating removal of natural resources from the ground and the discharge of materials into the environment. Oil and gas operations are also subject to federal, state, and local laws and regulations which seek to maintain health and safety standards by regulating the design and use of drilling methods and equipment. Various permits from government bodies are required for drilling operations to be conducted; no assurance can be given that such permits will be received. Environmental standards imposed by federal, provincial, or local authorities may be changed and any such changes may have material adverse effects on our activities. Moreover, compliance with such laws may cause substantial delays or require capital outlays in excess of those anticipated, thus causing an adverse effect on us. Additionally, we may be subject to liability for pollution or other environmental damages. To date we have not been required to spend any material amount on compliance with environmental regulations. However, we may be required to do so in future and this may affect our ability to expand or maintain our operations.

**Exploration and Production Activities are Subject to Certain Environmental Regulations Which May Prevent or Delay the Commencement or Continuance of Our Operations.**

In general, our exploration and production activities are subject to certain federal, state and local laws and regulations relating to environmental quality and pollution control. Such laws and regulations increase the costs of these activities and may prevent or delay the commencement or continuance of a given operation. Compliance with these laws and regulations has not had a material effect on our operations or financial condition to date. Specifically, we are subject to legislation regarding emissions into the environment, water discharges and storage and disposition of hazardous wastes. In addition, legislation has been enacted which requires well and facility sites to be abandoned

and reclaimed to the satisfaction of state authorities. However, such laws and regulations are frequently changed and we are unable to predict the ultimate cost of compliance. Generally, environmental requirements do not appear to affect us any differently or to any greater or lesser extent than other companies in the industry.

We believe that our operations comply, in all material respects, with all applicable environmental regulations.

Our operating partners maintain insurance coverage customary to the industry; however, we are not fully insured against all possible environmental risks.

**Exploratory Drilling Involves Many Risks and We May Become Liable for Pollution or Other Liabilities Which May Have an Adverse Effect on Our Financial Position.**

Drilling operations generally involve a high degree of risk. Hazards such as unusual or unexpected geological formations, power outages, labor disruptions, blow-outs, sour gas leakage, fire, inability to obtain suitable or adequate machinery, equipment or labor, and other risks are involved. We may become subject to liability for pollution or hazards against which it cannot adequately insure or which it may elect not to insure. Incurring any such liability may have a material adverse effect on our financial position and operations.

9

Table of Contents

**Risks Relating to Our Current Financing Arrangements:**

**There Are a Large Number of Shares Underlying Our Convertible Debentures and Warrants That May be Available for Future Sale and the Sale of These Shares May Depress the Market Price of Our Common Stock.**

As of April 13, 2007, we had 100,000,000 shares of common stock issued and outstanding, convertible debentures issued in June 2005, September 2005 and February 2007 outstanding that may be converted into an estimated 24,024,197 shares of common stock and outstanding warrants issued in June and September 2005 to purchase 1,516,668 shares of common stock. To the extent registered pursuant to our registration statements, all of the shares issuable upon conversion of the June and September 2005 debentures and upon exercise of our June and September 2005 warrants, may be sold without restriction. The sale of these shares may adversely affect the market price of our common stock.

**The Issuance of Shares Upon Conversion of the Convertible Debentures and Exercise of Outstanding Warrants May Cause Immediate and Substantial Dilution to Our Existing Stockholders.**

The issuance of shares upon conversion of the convertible debentures and exercise of warrants may result in substantial dilution to the interests of other stockholders since the selling stockholders may ultimately convert and sell the full amount issuable on conversion. Although the selling stockholders may not convert their convertible debentures and/or exercise their warrants if such conversion or exercise would cause them to own more than 4.99% of our outstanding common stock, this restriction does not prevent the selling stockholders from converting and/or exercising some of their holdings and then converting the rest of their holdings. In this way, the selling stockholders could sell more than this limit while never holding more than this limit. There is no upper limit on the number of shares that may be issued which will have the effect of further diluting the proportionate equity interest and voting power of holders of our common stock, including investors in this offering.

**If We Are Required for any Reason to Repay Our Outstanding Secured Convertible Debentures, We Would Be Required to Deplete Our Working Capital, If Available, Or Raise Additional Funds.  Our Failure to Repay the Secured Convertible Debentures, If Required, Could Result in Legal Action Against Us, Which Could Require the Sale of Substantial Assets.**

Between 2005 and 2007, we entered into Securities Purchase Agreements for the sale of an aggregate of $9,323,700 principal face amount of secured convertible debentures, of which approximately $2,993,938 remains outstanding. The secured convertible debentures are due and payable, with interest, in September 2007 unless sooner converted into shares of our common stock. In addition, any event of default such as our failure to repay the principal when due, our failure to issue shares of common stock upon conversion by the holder, our failure to timely file a registration statement or have such registration statement declared effective, breach of any covenant, representation or warranty in the Securities Purchase Agreement or related convertible debentures, the assignment or appointment of a receiver to control a substantial part of our property or business, the filing of a money judgment, writ or similar process against our company in excess of $50,000, the commencement of a bankruptcy, insolvency, reorganization or liquidation proceeding against our company and the delisting of our common stock could require the early repayment of the convertible debentures, including default interest on the outstanding principal balance of the convertible debentures if the default is not cured with the specified grace period. We anticipate that the full amount of the convertible debentures will be converted into shares of our common stock, in accordance with the terms of the convertible debentures. If we are required to repay the convertible debentures, we would be required to use our limited working capital and raise additional funds. If we were unable to repay the convertible debentures when required, the debenture holders could commence legal action against us and foreclose on all of our assets to recover the amounts due. Any such action would require us to curtail or cease operations.

**Risks Relating to Our Common Stock:**

**If We Fail to Remain Current on Our Reporting Requirements, We Could be Removed From the OTC Bulletin Board Which Would Limit the Ability of Broker-Dealers to Sell Our Securities and the Ability of Stockholders to Sell Their Securities in the Secondary Market.**

Companies trading on the OTC Bulletin Board, such as us, must be reporting issuers under Section 12 of the Securities Exchange Act of 1934, as amended, and must be current in their reports under Section 13, in order to maintain price quotation privileges on the OTC Bulletin Board. If we fail to remain current on our reporting requirements, we could be removed from the OTC Bulletin Board. As a result, the market liquidity for our securities could be severely adversely affected by limiting the ability of broker-dealers to sell our securities and the ability of stockholders to sell their securities in the secondary market.

10

Table of Contents

**Our Common Stock is Subject to the "Penny Stock" Rules of the SEC and the Trading Market in Our Securities is Limited, Which Makes Transactions in Our Stock Cumbersome and May Reduce the Value of an Investment in Our Stock.**

The Securities and Exchange Commission has adopted Rule 15g-9 which establishes the definition of a "penny stock," for the purposes relevant to us, as any equity security that has a market price of less than $5.00 per share or with an exercise price of less than $5.00 per share, subject to certain exceptions. For any transaction involving a penny stock, unless exempt, the rules require:

- that a broker or dealer approve a person's account for transactions in penny stocks; and
- that broker or dealer receive from the investor a written agreement to the transaction, setting forth the identity and quantity of the penny stock to be purchased.

In order to approve a person's account for transactions in penny stocks, the broker or dealer must:

- obtain financial information and investment experience objectives of the person; and
- make a reasonable determination that the transactions in penny stocks are suitable for that person and the person has sufficient knowledge and experience in financial matters to be capable of evaluating the risks of transactions in penny stocks.

The broker or dealer must also deliver, prior to any transaction in a penny stock, a disclosure schedule prescribed by the Commission relating to the penny stock market, which, in highlight form:

- sets forth the basis on which the broker or dealer made the suitability determination; and
- that the broker or dealer received a signed, written agreement from the investor prior to the transaction.

Generally, brokers may be less willing to execute transactions in securities subject to the "penny stock" rules. This may make it more difficult for investors to dispose of our common stock and cause a decline in the market value of our stock.

Disclosure also has to be made about the risks of investing in penny stocks in both public offerings and in secondary trading and about the commissions payable to both the broker-dealer and the registered representative, current quotations for the securities and the rights and remedies available to an investor in cases of fraud in penny stock transactions. Finally, monthly statements have to be sent disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks.

11

Table of Contents

## ITEM 2.  DESCRIPTION OF PROPERTY.

Our principal executive offices are located at 1942 Broadway Street, Suite 320, Boulder, Colorado 80302, and our telephone number is (303) 926-4415. In exchange for administrative services, we pay no rent for the 300 square foot suite we now occupy. We believe that our current office space and facilities are sufficient to meet our present needs and do not anticipate any difficulty securing alternative or additional space, as needed, on terms acceptable to us. In addition, we have the following oil and gas properties in connection with our principal business activities:

### Carbon County Project, Utah

  On September 12, 2005, we entered into an option agreement to purchase a gas field in Carbon County, Utah currently producing approximately 30 million cubic feet of natural gas per month.  The field comprises 5,953 gross acres (2,440 net acres) with three gas wells currently producing and has an additional five wells drilled that are presently shut-in. Production is derived from the Ferron Sandstone formation, and the gas is marketed into the adjacent gas pipeline operated by Questar Gas Resources.  The acquisition included an associated gas gathering system and a 6 mile pipeline and compression facility servicing the project and adjacent production. The field has potential for 20 additional well sites on 160 acre spacing on the undeveloped acreage.  The property is adjacent to our Gordon Creek project and to the very successful Drunkards Wash field originally developed by River Gas Corp.

    The purchase option called for an acquisition price of $3 million, and we closed the purchase of the acquisition on March 13, 2006 with an industry partner, Thunderbird Energy Corporation ("TBD") formerly MBA Resource Corp. of Canada.  TBD paid $1.5 million and arranged third party financing of $750,000 for part of our share of the $3 million purchase price in exchange for a 50% interest in the project.  We previously paid a deposit toward the purchase price and received production credits since October 1, 2005.  We thus acquired a 50% interest in the project with only an additional payment of $241,000.  Together with TBD we formed Gordon Creek, LLC a joint operating company incorporated in the state of Utah to carry out gas production and drilling operations as well as gas gathering activities for both project gas and adjacent third party production.

We will use the experience of its personnel who participated in the development of Drunkards Wash to increase current production and expand production in both the Ferron Sandstone and in the underlying coal bed methane seams that are not currently being exploited by the existing wells. We will immediately undertake to increase production in the existing wells, complete those wells in the coal for their coal bed methane potential, and thereafter drill additional wells on the acreage being acquired.

### Weston County Project, Wyoming

The Weston County play will focus initially on the development of a conventional oil field followed by exploration for conventional oil reservoirs in the Dakota and Minnelusa on 19,290 gross and net acres. The South Coyote Creek Field thus far has no identifiable reserves but we hope that it will provide short-term cash flow to cover our overhead.

We acquired an option to purchase a 100% working interest for 19,290 acres of oil and gas rights in Weston County, Wyoming for a total purchase price of $750,000. We closed the purchase on June 15, 2004 and concluded a reevaluation of drilling production data and seismic surveys. This resulted in the delineation of 18 conventional oil and gas well locations on the property which are ready to drill that are potential extensions of an existing producing field called South Coyote Creek Field. South Coyote Creek Field was discovered and developed back in the 1960s and has produced approximately 3 million barrels of oil to date. We signed a joint venture agreement with JMG Exploration to drill our Weston County and Gordon Creek projects. Under the agreement, JMG Exploration will receive a 50% interest in exchange for incurring $2,000,000 in exploration and drilling expenditures on the two projects by November

7, 2005. In addition, JMG Exploration loaned $1,500,000 to us with a short-term note. In connection with repayment of the JMG Exploration loan, we assigned the remaining 50% interest in the Weston County project to JMG Exploration, subject to our right to reacquire those interests for approximately $391,000 by June 30, 2005, which right has been exercised. As part of the full settlement of the $1,500,000 note, JMG Exploration's commitment to spend $2,000,000 in exploration and drilling activity by November 7, 2005 was terminated. In connection with this transaction, we recorded a gain from extinguishment of debt of $383,531.

The Weston County play has two deeper horizons at drilling depths of 5,000 to 7,500 feet that add enormous oil and gas reserve potential to the acreage position we own. The Cretaceous Dakota and Permo-Penn Minnelusa are both highly productive sandstone reservoirs when found in trapping positions and have accounted for hundreds of millions of barrels of production in the Powder River Basin. Some of the largest Dakota and Minnelusa fields are located within 10 miles of the Fellows' acreage including the 75 million barrel Raven Creek and 25 million barrel Donkey Creek.

The Dakota and Minnelusa are also both amenable to seismic exploration and can be resolved clearly with 3-D seismic. We have access to 200 miles of a regional 2-D seismic data base that covers the Weston County play area. On the basis of this seismic, a series of prospects in the Dakota and Minnelusa have been identified with the potential for up to 50 million barrels of oil reserves. One of these prospects is a Minnelusa field with only one producer drilled to date that appears to be on the edge of a much larger accumulation.

**Carter Creek Project, Wyoming**

The Carter Creek Project targets an unconventional play for oil on 14,196 gross and 9,959 net acres from fractured shales in the Niobrara and Mowry.

In January 2004, we acquired a 100% working interest of 10,678 acres known as the Carter Creek Project in the southern Powder River Basin of Wyoming for $223,000. This project was generated by Thomasson Partner Associates.

12

Table of Contents

The Carter Creek Project offers large-scale reserve potential from a section of over-pressured Lower Cretaceous zones including the Niobrara, Turner (Frontier), Mowry, Muddy, and the normally pressured Dakota formations. All these zones are currently productive in the region of the Carter Creek Project. Drilling depths to the Dakota range from 10,000 feet to 11,500 feet. The primary objectives in the Carter Creek Project are the Niobrara and Mowry formations which are both thick hydrocarbon-rich shale units. These shale units are referred to as "source beds" because under sufficient heat and pressure they are the source of petroleum that feeds the conventional oil and gas traps in a given basin. In this case, the source beds also act as oil reservoirs due to fracturing that has been induced along shear zones created by regional tectonic forces. Within these shear zones are fractures which provide both storage of oil and gas, as well as the permeability necessary for them to flow to a well bore. The shear zones also provide a pathway for thermal energy from deeper in the basin to flow into a local area and promote oil generation and maturation, thus improving the hydrocarbon recovery potential within the shear zone. Over pressuring is caused by hydrocarbon generation within the source beds which also contributes to the fracture system.

The current plan for this project is to acquire additional seismic and leasehold, then drill one horizontal well into the Niobrara section at a location where the available seismic data suggests good fractured reservoir conditions exist. To minimize formation damage, the well will be drilled under-balanced. Cost of the well is projected at $1,250,000. The risk of finding producible reserves in this project is considered low due to the widespread occurrence of hydrocarbons within the objective formations, the remaining question is whether the production levels achieved will provide economic returns on a consistent basis.

**Gordon Creek Project, Utah**

The Gordon Creek Project targets an unconventional play on 5,242 gross and 3,184 net acres for gas from tight sands in the Ferron formation, plus coal bed natural gas from coals in the Emery formation.

In January 2004, we acquired an option to purchase 5,242 acres known as the Gordon Creek Project. We closed the purchase for $288,000 in July 2004. The Gordon Creek Project is located in Carbon County, eastern Utah.

The Gordon Creek Project targets natural gas reserves in two large unconventional plays: (1) the Cretaceous Ferron sandstone play and (2) the Cretaceous Emery coal bed natural gas play. The Cretaceous Ferron sandstone play is established by the Clear Creek Field which has had cumulative production of 137 Bcf from 16 wells or an average of 8.6 Bcf per well to date. The Clear Creek Field is located 7 miles to the west of the Fellows acreage.

During 2001, 2002 and 2003, Klabzuba Oil & Gas drilled a series of six wells previously drilled into the 100 foot thick Ferron sandstone at Gordon Creek Field and completed them for production. Gordon Creek Field is located 3 miles south of Fellows' acreage. The six wells have produced 1.5 Bcf in their first year of production according to state records.

As previously mentioned, we have signed a joint venture agreement with JMG Exploration to drill our Weston County and Gordon Creek projects. This agreement was amended in June 2005 and we assigned the remaining 50% interest in the Gordon Creek project to JMG Exploration, subject to our rights to reacquire such interest for $390,000 which has been exercised. As of December 2006 Thunderbird, our partner in the Carbon County project, has negotiated the purchase of JMG's half of the Weston and Gordon Creek projects.

In addition to the Ferron sandstone, the Gordon Creek project has potential in the Emery coal. While the Emery coal play

is in an early stage it may have similar potential to the Drunkard's Wash field which produces from the Ferron coal. The Drunkard's Wash Field is located 6 miles to the southeast of out Gordon Creek land holdings. Our project personnel were previously involved in drilling for River Gas Corporation in the Drunkard's Wash field.

**Bacaroo Project, Baca County, Colorado**

The Bacaroo Project targets conventional oil and gas reserves from prolific reservoirs in the Pennsylvanian Topeka, Lansing-Kansas City and Morrow formations as well as the Mississippian Keyes formations. The Bacaroo Project has been developed by Thomasson Partner Associates and is located in Baca County, Colorado on the northwest flank of the greater Anadarko Basin. Nearby analog fields include the Morrow Stateline and Interstate fields with production of 25 to 50 MMBO; and the Keyes Dome, which has produced 1 TCF of gas from the Mississippian Keyes section. Currently, we have six prospects undergoing lease acquisition. Three of these prospects have multiple objectives with seismically and subsurface defined structural or stratigraphic traps, and are adjacent to or on-trend with proven production. All of the selected drill sites are near to or offsetting excellent shows of oil and gas with drilling depths of objectives ranging from 1,200 to 5,000 feet. The estimated initial cost to acquire 34,720 acres and drill eight evaluation wells is $2.3 million.

13

Table of Contents

**Uintah Basin Workover Project, Uintah Basin, Utah (formerly known as the Creston Project)**

 On October 25, 2005, we entered into a participation agreement with Mountain Oil and Gas, Inc., Creston Resources Ltd, and Homeland Gas and Oil Ltd. (collectively "Creston"), and began negotiations with private investors, to supply operating expertise and program supervision to earn working interests in up to 45 producing oil wells in the Uintah Basin of Utah.  Thereafter, we immediately commenced a rework operation on the first well chosen for the program to re-complete previously-completed zones and extend behind pipe reserves.  This well is located in the prolific Altamont-Bluebell Field, which has produced over 350 million barrels of oil equivalent. Creston will retain the current or historical production in this well, while we and the private investors will earn a variable percentage of the production increase resulting from the reworking operations. We completed work on the first well and commenced production in the first quarter of 2006.   Although we plan to continue our interest in this well and generate revenue from it, we are seeking new opportunities from parties other than Creston in order to pursue our reworking efforts, since, due to Creston's own financial difficulties, we have not been able to maintain our interests in the other wells and properties as previously contemplated with Creston.  As a result, our efforts will now focus on wells of other parties.

In many areas of the Altamont-Bluebell field and other areas of the Uintah Basin, due to the over-pressured, fractured nature of the reservoirs and the heavy nature of the oil, as well as the large vertical extent of potential pay zones, many of the wells have formation damage resulting from high drilling mud weights and cementing operations.  These conditions have left many zones unable to produce to their potential.  We will employ a variety of conventional and innovative proprietary techniques to reduce the effects of formation damage and increase oil and gas recovery.

**Johns Valley Project, Utah**

In 2004, we acquired an agreement with Johns Valley Limited Partnership whereby we have the option to earn a 70% working interest in 25,201 acres of oil and gas leases from the Utah School and Institutional Trust Lands Administration. Due to permitting delays and other operating parameters in the field, we negotiated to restructure the potential option and the timing and amounts of our work commitments as provided under the option assignment agreement. During the fourth quarter of 2006, due to capital constraints, we determined not to pursue the option on this project and relinquish our rights related thereto.  Accordingly, we recorded a charge in the amount of $1,873,295 for the year ended December 31, 2006.

**Overthrust Coal Bed Methane Project, Utah and Wyoming**

The Overthrust Coal Bed Methane Project was an unconventional play with 183,000 gross and 118,950 net acres targeting coal bed natural gas in southwestern Wyoming and northeastern Utah that we entered into with Quaneco, LLC in 2004. This project also had the potential for conventional oil and gas.

As of December 31, 2006, due to a technical reanalysis of the project, new data relating to seismic work done in the area, capital constraints, and the inability to renegotiate with Quaneco and the leaseholders a more workable framework to carry forward with this early-stage project, we determined to relinquish our rights to the project and pursue more advance-stage projects in producing areas in the Uintah Basin and elsewhere.  As such, we recorded a charge in the amount of $1,025,092 for the year ended December 31, 2006.

**Deposits on Other Projects**

During the year ended December 31, 2006, the Company also recorded charges of approximately $391,000 related to the relinquishment of options for cash deposits previously made on certain other properties.

14

Table of Contents

**Summary of Our Projects, Acreage Holdings, and Wells**

| Project | Objective | Play Type | Gross Acres | Net Acres |
|---|---|---|---|---|
| **Bacaroo Project, Baca County, Colorado** | | | | |
| | Conventional Oil | | 3,400 | 3,400 |
| **Uintah Basin Workover Project, Utah** | | | | |
| | Conventional Oil | | 9,000 | 160 |
| **Carbon County Project, Utah** | | | | |
| | Tight Sands Gas and Coal | | 5,953 | 2,440 |
| **Weston County Project, Wyoming** | | | | |
| | Turner | Conventional Oil | 19,290 | 9,645 |
| | Dakota | Conventional Oil | | |
| | Minnelusa | Conventional Oil | | |
| **Carter Creek, Converse County, Wyoming** | | | | |
| | Niobrara | Oil from Fractured Shale | 14,196 | 9,959 |
| | Mowry | Oil from Fractured Shale | | |
| | Turner, Muddy, Dakota | Conventional Oil | | |
| **Gordon Creek, Carbon County, Utah** | | | | |
| | Ferron Sandstone | Tight Sands Gas | 5,242 | 1,592 |
| | Emery Coal | Coal Bed Natural Gas | | |
| | | **Totals** | **57,081** | **27,196** |

## ITEM 3.  LEGAL PROCEEDINGS.

From time to time, we may become involved in various lawsuits and legal proceedings, which arise in the ordinary course of business. However, litigation is subject to inherent uncertainties, and an adverse result in these or other matters may arise from time to time that may harm our business. Except as disclosed below, we are currently not aware of any such legal proceedings or claims that we believe will have, individually or in the aggregate, a material adverse affect on our business, financial condition or operating results.

We were sued in the Sixth Judicial District Court, Garfield County, Utah on November 10, 2004, by Midway Perforating and Drilling, Inc. in a complaint alleging nonpayment of charges connected with drilling the Johns Valley 10-33C2 well in Garfield County, UT. The complaint seeks damages of $100,000 and costs of $10,000. We filed our Answer and Counterclaim on January 19, 2005. We plan to vigorously defend this case because we believe that the plaintiff failed to follow our instructions to use appropriate equipment for controlling deviation of the wellbore, and that such failure caused the well to be unusable. The suit is currently in its discovery stages. Although we believe we have a strong defense and counterclaim, we cannot predict the final outcome of the suit.

Table of Contents

**ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.**

None.

**PART II**

**ITEM 5.  MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS.**

**MARKET INFORMATION**

Our common stock is quoted on the OTC Bulletin Board under the symbol "FLWE". For the periods indicated, the following table sets forth the high and low bid prices per share of common stock. These prices represent inter-dealer quotations without retail markup, markdown, or commission and may not necessarily represent actual transactions.

| | High ($) | Low ($) |
|---|---|---|
| **Fiscal Year 2005** | | |
| First Quarter | 1.25 | 0.71 |
| Second Quarter | 1.00 | 0.42 |
| Third Quarter | 1.40 | 0.48 |
| Fourth Quarter | 0.82 | 0.31 |
| | | |
| **Fiscal Year 2006** | | |
| First Quarter | 0.60 | 0.30 |
| Second Quarter | 0.44 | 0.15 |
| Third Quarter | 0.43 | 0.14 |
| Fourth Quarter | 0.19 | 0.07 |
| | | |
| **Fiscal Year 2007** | | |
| First Quarter | 0.10 | 0.03 |
| Second Quarter (1) | 0.04 | 0.04 |

(1) As of April 14, 2007

**HOLDERS**

As of April 11, 2007, we had approximately 86 holders of our common stock. The number of record holders was determined from the records of our transfer agent and does not include beneficial owners of common stock whose shares are held in the names of various security brokers, dealers, and registered clearing agencies. The transfer agent of our common stock is Pacific Stock Transfer Company, 500 E. Warm Springs Road, Suite 240, Las Vegas, Nevada 89119.

**DIVIDENDS**

We have never declared or paid any cash dividends on our common stock. We do not anticipate paying any cash dividends to stockholders in the foreseeable future. In addition, any future determination to pay cash dividends will be

at the discretion of the Board of Directors and will be dependent upon our financial condition, results of operations, capital requirements, and such other factors as the Board of Directors deem relevant.

16

Table of Contents

**RECENT SALE OF UNREGISTERED SECURITIES**

Unless otherwise noted, the issuances noted below are all considered exempt from registration by reason of Section 4(2) of the Securities Act of 1933, as amended.

In October 2006, we issued 800,000 shares of common stock at $0.14 pursuant to a legal consulting agreement. The shares were issued pursuant to an exemption under Section 4(2) of the Securities Act of 1933.

In November 2006, we issued 1,083,607 shares of common stock at $0.14 in accordance with ratchet down rights under the May 18, 2005 private placement. The shares were issued pursuant to an exemption under Section 4(2) of the Securities Act of 1933.

During the three months ended December 31, 2006, we issued 5,031,413 shares of common stock upon conversion of $522,898 of previously issued convertible debentures. The shares were issued pursuant to an exemption under Section 4(2) of the Securities Act of 1933.

**ITEM 6.  MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION.**

The following information should be read in conjunction with the consolidated financial statements and the notes thereto contained elsewhere in this report. The Private Securities Litigation Reform Act of 1995 provides a "safe harbor" for forward-looking statements. Information in this Item 6, "Management's Discussion and Analysis or Plan of Operation," and elsewhere in this 10-KSB that does not consist of historical facts, are "forward-looking statements." Statements accompanied or qualified by, or containing words such as "may," "will," "should," "believes," "expects," "intends," "plans," "projects," "estimates," "predicts," "potential," "outlook," "forecast," "anticipates," "presume," and "assume" constitute forward-looking statements, and as such, are not a guarantee of future performance. The statements involve factors, risks and uncertainties including those discussed in the "Risk Factors" section contained elsewhere in this report, the impact or occurrence of which can cause actual results to differ materially from the expected results described in such statements. Risks and uncertainties can include, among others, fluctuations in general business cycles and changing economic conditions; changing product demand and industry capacity; increased competition and pricing pressures; advances in technology that can reduce the demand for the Company's products, as well as other factors, many or all of which may be beyond the Company's control. Consequently, investors should not place undue reliance on forward-looking statements as predictive of future results. The Company disclaims any obligation to update the forward-looking statements in this report.

**Overview**

On January 5, 2004, we began operations as an oil and gas exploration company. We acquired interests in certain assets owned by Diamond Oil & Gas Corporation, in exchange for 3,500,000 shares of common stock. The transaction was deemed to have a value of $6,405,000. The assets included certain oil and gas projects, as well as the right to enter into the Exploration Services Funding Agreement with Thomasson Partner Associates, Inc. of Denver, Colorado. Diamond is controlled by our CEO, George S. Young. Our goal is to discover substantial commercial quantities of oil and gas, including coalbed methane, on the properties as well as to acquire and explore additional property.

Projects acquired from Thomasson Partner Associates under the Exploration Services Funding Agreement (as Amended) include the Weston County project in Wyoming, the Gordon Creek project in Utah, the Carter Creek project in Wyoming, the Circus project in Montana, the Bacaroo project in Colorado, the Platte project in Nebraska, and the Badger project in South Dakota.  During the year ended December 31, 2006, we abandoned the Platte and

Badger projects.  In 2005, we paid Thomasson a total of $1,350,000, including the $800,000 acquisition consulting fee. As of December 31, 2006, we terminated our formal agreement with Thomasson Partner Associates, and will continue accessing projects informally, without having any first right to any project.

**Operations Plan**

During the next twelve months, we expect to pursue oil and gas operations on some or all of our property, including the acquisition of additional acreage through leasing, farmout or option and participation in the drilling of oil and gas wells. We intend to continue to evaluate additional opportunities in areas where we feel there is potential for oil and gas reserves and

Table of Contents

production and may participate in areas other than those already identified, although we cannot assure that additional opportunities will be available, or if we participate in additional opportunities, that those opportunities will be successful.

Our current cash position is not sufficient to fund our cash requirements during the next twelve months, including operations and capital expenditures. We intend to continue joint venture or obtain equity and/or debt financing efforts to support our current and proposed oil and gas operations and capital expenditures. We may sell interests in our properties. We cannot assure that continued funding will be available.

We have not entered into commodity swap arrangements or hedging transactions. Although we have no current plans to do so, we may enter into commodity swap and/or hedging transactions in the future in conjunction with oil and gas production. We have no off-balance sheet arrangements.

Our future financial results continue to depend primarily on (1) our ability to discover or purchase commercial quantities of oil and gas; (2) the market price for oil and gas; (3) our ability to continue to source and screen potential projects; and (4) our ability to fully implement our exploration and development program with respect to these and other matters. We cannot assure that we will be successful in any of these activities or that the prices of oil and gas prevailing at the time of production will be at a level allowing for profitable production.

**Recent Activity**

On March 13, 2006 we purchased a gas field in Carbon County, Utah. The field comprises 5,953 gross acres (2,440 net acres) with four gas wells currently producing and an additional six wells drilled that are presently shut-in. Production is derived from the Ferron Sandstone formation, and the gas is marketed into the adjacent gas pipeline operated by Questar Gas Resources. The field has potential for 20 additional well sites on 160 acre spacing on the undeveloped acreage. The property is adjacent to our Gordon Creek project and to the successful Drunkards Wash field originally developed by River Gas Corp.  A favorable engineering study has been completed by MHA Petroleum Consultants verifying in excess of 10.5 BCF of gas in the proven reserve category for the project.

We will use the experience of our personnel who participated in the development of Drunkards Wash to increase current production and expand production in both the Ferron Sandstone and in the associated coal bed methane seams that are not currently being exploited by the existing wells. Over the past year, we have reworked two wells, both of which showed potential for sustained production at levels well above what they had produced in the past.  We plan to rework additional wells that show similar potential in 2007.  Six drilling permits are currently being processed by the State of Utah which will allow us to drill additional wells in strategic locations.  We expect the new wells to perform at least as well as our best wells which directly offset the new wells.

The operations we plan for the balance of 2007 include continuing development drilling and reworking activities on the Carbon County, exploring leases on the other projects we have acquired as well as seeking to acquire and explore additional property, and implementing production on one or more of our projects. Our goal is to discover and continue to produce substantial additional commercial quantities of oil and gas, including coalbed methane, on the properties, although no assurances can be given that commercial quantities are available, if at all.

**Liquidity and Capital Resources**

In 2006, we incurred a loss of approximately $8,591,000. At December 31, 2006, we had approximately $180,000 of cash and cash equivalents, and a $234,000 note receivable.  Our total current assets were $496,000, and current

liabilities were $3,866,000, including accounts payable and the current portions of interest payable, notes payable, and convertible debentures payable.

Based upon our significant operating losses from inception, there is substantial doubt as to our ability to continue as a going concern. Our audited financial statements have been prepared on a basis that contemplates our continuation as a going concern and the realization of assets and liquidation of liabilities in the ordinary course of business. Our audited consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might be necessary should we be unable to continue as a going concern.

The Carbon County and Creston projects were acquired in late 2005, and were not brought into production until the first quarter of 2006. They have not yet been in production for a sufficient time, and have not yet been sufficiently reworked by additional field operations to determine their ultimate productive capacities. At this point, we have not generated sufficient oil and gas sales to sustain our operations. To fully carry out our business plans we need to increase production revenues, raise a substantial amount of additional capital, sell project assets, or obtain industry joint venture financing, which we are currently seeking. We can give no assurance that we will be able to increase production or raise such capital. We have limited financial

18

Table of Contents

resources until such time that we are able to generate such additional financing or additional cash flow from operations. Our ability to maintain profitability and positive cash flow is dependent upon our ability to exploit our mineral holdings, generate revenue from our planned business operations and control our exploration cost. To fully carry out our business plans we need to raise a substantial amount of additional capital, which we are currently seeking. We can give no assurance that we will be able to raise such capital. We have limited financial resources until such time that we are able to generate positive cash flow from operations. Our ability to maintain profitability and positive cash flow is dependent upon our ability to locate profitable natural gas or oil properties, generate revenue from our planned business operations, and control exploration cost. Should we be unable to raise adequate capital or to meet the other above objectives, it is likely that we would have to substantially curtail our business activity, and that our investors would incur substantial losses of their investment.

**Financing and Restructuring**

On February 15, 2007, we entered into a series of transactions to restructure securities issued pursuant to securities purchase agreements dated June 17, 2005 and September 21, 2005.

*Background*

June 2005 Financing

On June 17, 2005, we closed a financing pursuant to a securities purchase agreement with three accredited investors, Palisades Master Fund, L.P. ("Palisades"), Crescent International Ltd. ("Crescent") and JGB Capital L. P. ("JGB") for the issuance of $5,501,199.95 in face amount of debentures maturing September 16, 2008 (the "June Debentures"). The June Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting October 1, 2005, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.60 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring June 17, 2008, to purchase 4,584,334 shares of restricted common stock, exercisable at a per share of $0.649 (the "June Warrants"). In addition, the exercise price of the June Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the June Warrants' exercise price, all of the June Warrants shall expire on the 30th trading day after we send a call notice to the June Warrant holders. If at any time after one year from the date of issuance of the June Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the June Warrants, then the holder may exercise the June Warrant at such time by means of a cashless exercise.

September 2005 Financing

On September 21, 2005, we closed a financing pursuant to a securities purchase agreement with two accredited investors, Palisades and Crescent for the issuance of $3,108,000 in face amount of debentures maturing December 20, 2008 (the "September Debentures" and together with the June Debentures, the "Old Debentures"). The September Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the

first of every month, starting January 1, 2006, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.75 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring September 21, 2008, to purchase 2,172,000 shares of restricted common stock, exercisable at a per share of $0.80 (the "September Warrants" and together with the June Warrants, the "Old Warrants"). In addition, the exercise price of the September Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the September Warrants' exercise price, all of the September Warrants shall expire on the 30th trading day after we send a call notice to the September Warrant holders. If at any time after one year from the date of issuance of the September Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the September Warrants, then the holder may exercise the September Warrant at such time by means of a cashless exercise.

19

Table of Contents

*Restructuring*

On February 15, 2007, the following transactions took place with regards to the Old Debentures and Old Warrants:

1)      JGB entered into an assignment agreement with Crescent, pursuant to which Crescent purchased from JGB the June Debentures issued to JGB.  The face value of the June Debentures issued to JGB at the time of the transaction was $333,333.33 and Crescent paid $250,000 to JGB for the assignment;

2)      We entered into a settlement agreement with JGB for the sum of $83,333.33.  We amended the terms of the Old Warrants held by JGB to remove the ratchet and call provisions and JGB agreed to release any shares reserved for issuance of the Old Warrants and to not exercise such Old Warrants until we obtain an increase in the authorized shares of common stock.  Upon obtaining the increase in authorized shares, we agreed to issue JGB 500,000 shares of restricted common stock;

3)      We entered into a first amendment and waiver agreement with Palisades for the amendment of the Old Debentures issued to Palisades (the "Palisades Amendment Agreement"); and

4)      We entered into a first amendment and waiver agreement with Crescent for the amendment of the Old Debentures issued to JGB (and purchased by Crescent) and Crescent (the "Crescent Amendment Agreement" and together with the Palisades Amendment Agreement, the "Restructuring Amendments").

Palisades and Crescent agreed to amend the Old Debentures to remove the mandatory monthly liquidation provision and to amend the fixed conversion price of the Old Debentures to $0.1375 (the "Fixed Conversion Price").  As a result, the principal amount remaining on the Old Debentures is now due and payable at maturity, unless sooner converted into shares of common stock by the investors, at the Fixed Conversion Price.  Palisades and Crescent further agreed to waive any and all existing defaults under the Old Debentures.

Pursuant to the Palisades Amendment Agreement, we agreed to issue 7,025,789 shares of common stock (the "Monthly Redemption Shares") to Palisades upon conversion of $608,433.15 in principal amount of the Old Debentures.  Such Monthly Redemption Shares were issued as payment for monthly redemptions owed to Palisades on December 1, 2006 and January 1, 2007 and February 1, 2007 pursuant to the Old Debentures.  These Monthly Redemption Shares were not issued while we negotiated the terms of a potential buy-out or restructuring of the Old Debentures.  The Monthly Redemption Shares were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission and represent the remaining shares of common stock registered thereunder for Palisades pursuant to the Old Debentures.  As a result of the Monthly Redemption Shares, the exercise price of the Old Warrants was reduced to $0.0866, which Palisades exercised on a cashless basis and received 2,970,758 shares of common stock which were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission.

We agreed to pay Palisades a forbearance fee of $150,000 a month, for six months, which fee was paid in shares of common stock at an issuance price of $0.1375, for a total issuance of 5,454,546 shares of restricted common stock.  In addition, we agreed to issue Palisades 1,449,825 shares of common stock as a commitment fee for the restructuring of the Old Debentures.

In connection with the restructuring, we executed a security agreement (the "Security Agreement") in favor of Palisades and JGB granting them a first priority security interest in all of our goods, inventory, contractual rights and general intangibles, receivables, documents, instruments, chattel paper, and intellectual property, except for our Carbon County prospect, which Palisades and JGB took a second priority interest and for our Carter Creek and Weston County prospects, which the investors were not granted any security interest.  The Security Agreements state that if an event of default occurs under the Old Debentures or Security Agreement, the Investors have the right to take possession of the collateral, to operate our business using the collateral, and have the right to assign, sell, lease

or otherwise dispose of and deliver all or any part of the collateral, at public or private sale or otherwise to satisfy
our obligations under these agreements.

*New Financing*

On February 15, 2007, we closed a financing pursuant to a securities purchase agreement with Palisades for the issuance
of a $714,500 face amount debenture maturing September 15, 2007 (the "New Debenture"). The New Debenture does
not accrue interest and the investors paid $500,000 for the New Debenture. We paid a commission of $100,000 to
HPC Capital Management (a registered broker-dealer) in connection with the transaction, resulting in net proceeds to us
of $400,000 before our legal fees. We used the net proceeds to pay our settlement agreement payment to JGB,
repayment of a bridge loan to Petro Capital Securities, LLC and the remainder for general working capital
purposes.  We also issued HPC Capital Management 6,458,063 shares of restricted common stock and agreed to issue
an additional 1,041,937 shares of restricted common stock upon obtaining an increase in our authorized shares of
common stock, which shares are additional compensation for its services in connection with the transaction with
the investors.

The convertible debentures are secured and are convertible into our common stock, at Palisades option, at a
fixed conversion price of $0.1375. Based on this conversion price, the $714,500 secured convertible debenture
is convertible into 5,196,364 shares of our common stock.

Table of Contents

In the event of default, the investors may require payment, which shall be the greater of: (A) 130% of the principal amount of the face amount of the debenture to be prepaid, or (B) the principal amount of the debenture to be prepaid, divided by the conversion price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is less, multiplied by the closing price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is greater

The conversion price of the debenture may be adjusted in certain circumstances such as if we pay a stock dividend, subdivide or combine outstanding shares of common stock into a greater or lesser number of shares, or take such other actions as would otherwise result in dilution of the investor's position.

We have agreed to file a registration statement with the Securities and Exchange Commission to cover the future sale by the investors of the shares issuable upon conversion of the Old and New Debentures. If the registration statement is not filed by the filing deadline or if the registration statement is not declared effective by the effective deadline, we are required to pay liquidated damages to the investors.

*Cash flow.* In 2006, we used approximately $2,700,000 in our operating activities. We used $600,000 in investing activity primarily for equipment, property and option acquisitions, and obtained $3,134,000 in financing activity from capital obtained through financings and loans. We decreased our 2005 cash balance of approximately $348,000 to $180,000 at December 31, 2006.

## Results of Operations

*Revenues.* For the year ended December 31, 2006, we had revenues of $424,000 compared to no revenue in 2005, other than revenue in the fourth quarter 2005 from the Carbon County project applied as a credit towards the purchase price of the project, which closed in March of 2006.

*Operating Expenses.* Operating expenses for 2006 were approximately $5,834,000 as compared to $4,558,000 for 2005, or an increase of approximately 28%. This increase is primarily related to the following increases:

In 2006, our exploration and production expenses were $1,027,000, which included $463,000 of lease operating expenses and $564,000 of exploration related expenses.

Our 2006 general and administrative expense was approximately $2,365,000, which included $371,000 in legal fees, $713,000 in stock issuance expense including ratchet down rights, $453,000 of business advisory, consulting, financial and investor services including accounting fees, $547,000 of employee compensation, and $280,000 in insurance expense, travel expense, depreciation expense, and other office related expenses.

Also during the year ended December 31, 2006, we recorded charges of approximately $3,289,000 related to the relinquishment of the Kirby and Castle Rock, Platte, Badger, Overthrust, and the Johns Valley project options, as well as other options for cash deposits previously made on certain other properties.

*Interest Expense.* Our 2006 interest expense was approximately $2,722,000, up by $1,739,000 from 2005 of $982,000 due to additional convertible debenture related interest, issuance cost, and discount expense.

## Critical Accounting Policies

*Investment in Oil and Gas Properties*

We follow the successful-efforts method of accounting for oil and gas property as defined under Statement of Financial Accounting Standards No. 19, Financial Accounting and Reporting by Oil and Gas Producing Companies ("FAS 19"). Under this method of accounting, we capitalize all property acquisition cost and cost of exploratory and development wells when incurred, pending determination of whether the well has found proved reserves. If an exploratory well does not find proved reserves, we charge to expense the cost of drilling the well. We include exploratory dry hole cost in cash flow from investing activities within the cash flow statement. We capitalize the cost of development wells whether productive or nonproductive. We had no exploratory well cost that had been suspended for one year or more as of December 31, 2006.

We expense as incurred geological and geophysical cost and the cost of carrying and retaining unproved property. We will provide depletion, depreciation and amortization (DD&A) of capitalized cost of proved oil and gas property on a field-by-field basis using the units-of-production method based upon proved reserves. In computing DD&A we will take into consideration restoration, dismantlement and abandonment cost and the anticipated proceeds from equipment salvage. When applicable, we will apply the provisions of Statement of Financial Accounting Standards No. 143, Accounting for Asset Retirement Obligations, which provides guidance on accounting for dismantlement and abandonment cost.

We review our long-lived assets for impairment when events or changes in circumstances indicate that an impairment may have occurred. In the impairment test we compare the expected undiscounted future net revenue on a field-by-field basis with the related net capitalized cost at the end of each period. We will calculate expected future cash flow on all proved reserves using a 10% discount rate and escalated prices. Should the net capitalized cost exceed the undiscounted future net revenue of a property, we will write down the cost of the property to fair value, which we will determine using discounted future net revenue. We will provide an impairment allowance on a property-by-property basis when we determine that the unproved property will not be developed.

*Revenue Recognition*

We record revenues from the sales of natural gas and oil when delivery to the customer has occurred and title has transferred.  This occurs when oil or gas has been delivered to a pipeline or a tank lifting has occurred. We may have a gas marketer on certain properties, in which case we use the sales method to account for gas imbalances.  Under this method, revenue is recorded on the basis of natural gas actually sold by the Company.

21

Table of Contents

**ITEM 7.  FINANCIAL STATEMENTS.**

FELLOWS ENERGY LTD.

INDEX TO FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 23 |
| Balance Sheets | 24 |
| Statements of Operations | 25 |
| Statements of Changes in Stockholders' Equity | 26 |
| Statements of Cash Flows | 27 |
| Notes to Financial Statements | 28 |

22

Table of Contents

<u>Report of Independent Registered Public Accounting Firm</u>

To the Board of Directors and Stockholders of
Fellows Energy Ltd.

We have audited the accompanying balance sheets of Fellows Energy Ltd., as of December 31, 2006 and 2005, and the related statements of operations, changes in stockholders` equity, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fellows Energy Ltd. as of December 31, 2006 and 2005, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the financial statements, the Company has significant losses from operations which raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are described in Note 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Mendoza Berger & Company
Mendoza Berger & Company
Irvine, California
April 17, 2007

Table of Contents

**Fellows Energy Ltd.**
**Balance Sheets**

|  | Year Ended Dec. 31, 2006 | Year Ended Dec. 31, 2005 |
|---|---|---|
| **Assets** | | |
| Cash and Cash Equivalents | $ 179,926 | $ 347,558 |
| Marketable securities, available-for-sale | — | 405,556 |
| Interest Receivable | 2,568 | 179 |
| Accounts Receivable | 80,258 | |
| Note Receivable | 233,634 | 99,879 |
| Total current assets | 496,386 | 853,172 |
| | | |
| Proved and unproved oil & gas property | 7,468,809 | 9,575,813 |
| | | |
| Equipment, net of $118,651 and $18,418 accumulated depreciation respectively | 1,509,932 | 287,836 |
| Deposits | — | 716,000 |
| Restricted cash | 160,000 | 235,000 |
| Deferred debt issue costs | 228,758 | 533,769 |
| | | |
| Total assets | $ 9,863,885 | $ 12,201,590 |
| | | |
| **Liabilities And Stockholders' Equity** | | |
| Accounts payable | $ 359,662 | $ 188,003 |
| Joint venture partner interest payable | 99,167 | — |
| Taxes payable | 9,433 | — |
| Interest payable current portion | 205,700 | 125,700 |
| Notes payable current portion | 1,583,111 | — |
| Convertible debenture current portion | 1,608,433 | 3,879,441 |
| | | |
| Total current liabilities | 3,865,506 | 4,193,144 |
| | | |
| Interest payable – net of current portion | 154,819 | — |
| Notes payable – related party | 1,733,000 | 12,000 |
| Notes payable – net of current portion | 428,000 | — |
| Convertible debenture – net of current portion | 1,385,505 | 1,184,407 |
| | | |
| Stockholders' equity | | |
| Preferred stock, $.001 par value; 25,000,000 shares authorized; none outstanding | — | — |
| Common stock, $.001 par value; 100,000,000 shares authorized; 73,447,619 and 52,545,329 shares issued and outstanding | 73,447 | 52,545 |
| Additional paid-in capital | 19,963,497 | 15,973,152 |
| Stock issuance obligation | 61,055 | — |

| | | |
|---|---:|---:|
| Stock pledged as collateral | (1,665,000) | (1,665,000) |
| Accumulated deficit | (16,135,944) | (7,548,658) |
| | | |
| Total stockholders' equity | 2,297,055 | 6,812,039 |
| | | |
| Total liabilities and stockholders' equity | $ 9,863,885 | $ 12,201,590 |

See accompanying notes.

24

Table of Contents

**Fellows Energy Ltd.**
**Statements of Operations**

| | Years Ended December 31, | |
|---|---|---|
| | 2006 | 2005 |
| Revenue | $ 423,761 | $ — |
| | | |
| Operating expenses | | |
| Exploration and Production | 1,027,459 | 1,141,202 |
| Relinquishment of property options | 3,289,387 | 1,143,882 |
| General and administrative | 2,365,137 | 2,273,022 |
| | | |
| Operating loss | (6,258,221) | (4,558,106) |
| | | |
| Other income (expense) | | |
| Interest expense, net | (2,721,506) | (982,031) |
| Gain on sale of unproved property | — | 1,550,797 |
| Gain on extinguishment of debt | — | 383,531 |
| Project revenue applied as credit to purchase | 246,939 | — |
| Note receivable default penalty | 80,000 | — |
| Re-sale of pipe | 34,644 | — |
| Insurance rebates and project purchase credit | 19,993 | — |
| Miscellaneous | 7,304 | 14,132 |
| Total other income (expense) | (2,332,626) | 966,429 |
| | | |
| Loss before income tax | (8,590,847) | (3,591,677) |
| | | |
| Income tax expense | — | — |
| Deferred tax benefit | — | — |
| | | |
| Net loss | $ (8,590,847) | $ (3,591,677) |
| | | |
| Other comprehensive income (loss) | | |
| Unrealized holding gains on marketable securities | 3,561 | 516 |
| | | |
| Comprehensive loss | $ (8,587,286) | $ (3,591,161) |
| | | |
| Basic and diluted loss per share | $ (0.14) | $ (0.08) |
| Basic and diluted weighted average shares outstanding | 61,726,047 | 47,599,638 |

See accompanying notes.

25

Table of Contents

**Fellows Energy Ltd.**
**Statements of Changes in Stockholders' Equity**
**December 31, 2006**

| | Common Stock | | Additional Paid-In Capital | Stock Obligation/ Pledged | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance, December 31, 2004 | 41,743,150 | $ 41,743 | $ 9,556,702 | $ 362,500 | $ (3,957,497) | $ 6,003,448 |
| Issue 200,000 shares for drilling purchase agreement | 200,000 | 200 | 193,800 | (194,000) | — | — |
| Issue 550,000 shares to business advisors | 550,000 | 550 | 432,450 | (168,500) | — | 264,500 |
| Issue 1,000,000 shares for oil and gas interests | 1,000,000 | 1,000 | 599,000 | — | — | 600,000 |
| Issue 2,449,265 shares for conversion of note | 2,449,265 | 2,449 | 392,262 | — | — | 394,711 |
| Issue 1,936,391 shares under private placement | 1,936,391 | 1,936 | 1,061,714 | — | — | 1,063,650 |
| Warrant valuation under convertible debentures | | | 1,099,673 | — | — | 1,099,673 |
| Issue 200,000 shares to financial advisors | 200,000 | 200 | 117,800 | — | — | 118,000 |
| Issue 1,000,000 shares converted under convertible debentures | 1,000,000 | 1,000 | 599,000 | — | — | 600,000 |
| Issue 50,000 shares as fee under convertible debenture | 50,000 | 50 | 29,950 | — | — | 30,000 |
| Issue 2,652,632 shares held as collateral in escrow | 2,652,632 | 2,653 | 1,662,348 | (1,665,000) | — | — |
| Issue 763,891 shares as redemption under convertible debenture | 763,891 | 764 | 228,453 | — | — | 229,218 |
| Comprehensive loss | — | — | — | — | (3,591,161) | (3,591,161) |
| Balance, December 31, 2005 | 52,545,329 | 52,545 | 15,973,152 | (1,665,000) | (7,548,658) | 6,812,039 |
| Issue 617,433 shares for debenture redemption | 617,433 | 617 | 228,599 | — | — | 229,216 |
| Issue 1,341,500 shares for debenture redemption | 1,341,500 | 1,342 | 357,375 | — | — | 358,717 |
| Issue 554,697 shares for debenture redemption | 554,697 | 555 | 151,743 | — | — | 152,298 |
| Issue 751,818 shares for debenture redemption | 751,818 | 752 | 205,667 | — | — | 206,419 |
| Issue 1,425,192 shares for debenture redemption | 1,425,192 | 1,425 | 357,292 | — | — | 358,717 |
| Issue 700,000 shares under drilling agreement | 700,000 | 700 | 195,300 | — | — | 196,000 |
| Issue 861,921 shares pursuant to ratchet down rights | 861,921 | 862 | 216,084 | — | — | 216,946 |
| Issue 790,000 pursuant to financing agreement | 790,000 | 790 | 252,010 | — | — | 252,800 |
| Issue 1,737,976 shares for debenture redemption | 1,737,976 | 1,738 | 356,979 | — | — | 358,717 |
| Issue 48,980 shares pursuant to financing agreement | 48,980 | 49 | 11,973 | — | — | 12,022 |
| Issue 118,057 shares for debenture redemption | 118,057 | 118 | 32,223 | — | — | 32,341 |
| Obligation to issue 50,000 shares pursuant to financing agreement | — | — | — | 22,500 | — | 22,500 |
| Obligation to issue 250,000 shares to business advisors | — | — | — | 61,055 | | 61,055 |

| | | | | | |
|---|---|---|---|---|---|
| Issue 137,257 for debenture redemption | 137,257 | 137 | 39,063 | — | — | 39,200 |
| Issue 50,000 shares pursuant to financing agreement | 50,000 | 50 | 22,450 | (22,500) | — | — |
| Issue 1,898,013 shares for debenture redemption | 1,898,013 | 1,898 | 356,819 | — | — | 358,717 |
| Issue 250,000 shares pursuant to financing agreement | 250,000 | 250 | 62,250 | — | — | 62,500 |
| Issue 2,586,369 shares for debenture redemption | 2,586,369 | 2,586 | 356,130 | — | — | 358,716 |
| Issue 118,057 shares for debenture redemption | 118,057 | 118 | 14,108 | — | — | 14,226 |
| Issue 487,070 shares for debenture redemption | 487,070 | 487 | 58,204 | — | — | 58,691 |
| Issue 800,000 shares to business advisors | 800,000 | 800 | 107,200 | — | — | 108,000 |
| Issue 3,130,267 shares for debenture redemption | 3,130,267 | 3,130 | 355,587 | — | — | 358,717 |
| Issue 1,083,607 shares pursuant to ratchet down rights | 1,083,607 | 1,084 | 149,213 | — | — | 150,297 |
| Issue 1,414,076 shares for debenture redemption | 1,414,076 | 1,414 | 104,076 | — | — | 105,490 |
| Comprehensive loss | — | — | — | — | (8,587,286) | (8,587,286) |
| | | | | | | |
| Balance, December 31, 2006 | 73,447,619 | 73,447 | 19,963,497 | (1,603,945 ) | (16,135,944) | 2,297,055 |

See accompanying notes.

26

Table of Contents

**Fellows Energy Ltd.**
**Statements of Cash Flows**

| | | Years Ended December 31, | | |
|---|---:|---:|---:|---:|
| | | **2006** | | **2005** |
| Cash flow from operating activities: | | | | |
| Net loss | $ | (8,590,847) | $ | (3,591,677) |
| | | | | |
| Adjustments to reconcile net income to net cash used in operating activities: | | | | |
| Gain on sale of marketable securities | | 50,530 | | 7,989 |
| Gain on sale of unproved property | | — | | (1,550,797) |
| Gain from extinguishment of debt | | — | | (383,531) |
| Relinquishment of property option | | 3,289,387 | | 1,143,882 |
| Debt issue costs and discount amortization | | 1,740,462 | | 819,622 |
| Depreciation | | 100,233 | | 13,391 |
| Expenses paid with stock issuance | | 653,821 | | 294,500 |
| Expenses paid with stock issuance obligation | | 61,055 | | — |
| Interest paid with stock issuance | | — | | 44,711 |
| Changes in operating assets and liabilities: | | | | |
| Receivables | | (216,402) | | (100,058) |
| Prepaid expense | | — | | (15,000) |
| Deferred debt issue costs | | (305,011) | | (533,769) |
| Joint venture partner interest payable | | 99,167 | | — |
| Interest payable | | 234,819 | | — |
| Accounts payable | | 181,092 | | (120,708) |
| Net cash provided by (used in) operating activities | $ | (2,701,694) | $ | (3,971,445) |
| | | | | |
| Cash flow from investing activities: | | | | |
| Purchase and sale of marketable securities | | 355,026 | | (413,545) |
| Deposits on unproved oil and gas property | | 716,000 | | (716,000) |
| Proceeds on sale of oil and gas property | | — | | 2,038,206 |
| Unproved oil and gas property additions | | (405,364) | | (2,163,456) |
| Restricted Cash | | 75,000 | | (100,000) |
| Purchase of equipment | | (1,340,747) | | (284,664) |
| Net cash provided by (used in) investing activities | $ | (600,085) | $ | (1,639,459) |
| | | | | |
| Cash flow from financing activities: | | | | |
| Proceeds from issuance of convertible debenture | | — | | 6,024,633 |
| Payments on convertible debenture | | (857,400) | | — |
| Proceeds from issuance of common stock | | — | | 945,650 |
| Proceeds from notes payable | | 4,449,962 | | 171,000 |

| | | | | |
|---|---|---:|---|---:|
| Payments on notes payable | | (458,416) | | (1,331,848) |
| Net cash provided by financing activities: | | 3,134,146 | | 5,809,435 |
| | | | | |
| Net increase in cash and equivalents | | (167,632) | | 198,531 |
| Cash and equivalents at beginning of period | | 347,558 | | 149,027 |
| | | | | |
| Cash and equivalents at end of period | $ | 179,926 | $ | 347,558 |
| | | | | |
| Supplemental Disclosure of Cash Flow and Non-cash Investing and Financing Activity: | | | | |
| Income tax paid | $ | — | $ | — |
| Interest paid | $ | — | $ | 81,750 |
| Non cash: | | | | |
| Conversion of $350,000 convertible note into common stock | $ | — | $ | 394,711 |
| Acquisition of oil & gas interest in exchange for common stock (as restated) | $ | — | $ | 600,000 |
| Contribution of oil & gas interest in exchange for stock issuance | $ | 196,000 | $ | — |
| Convertible debenture paid with stock | $ | 2,950,982 | $ | 829,218 |
| Legal and advisory services in exchange for stock issuance obligation | $ | 61,055 | $ | — |
| Fees paid with stock | $ | 85,000 | $ | 309,211 |

See accompanying notes.

27

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

**Note 1 - Nature of Operations and Significant Accounting Policies**

Nature of Operations - Fellows Energy Ltd. is engaged in the exploration, extraction, processing and reclamation of coalbed methane, natural gas, and oil projects within the Western United States. We incorporated in the state of Nevada on April 9, 2001 as Fuel Centers, Inc. On November 12, 2003, we changed our name to Fellows Energy Ltd. Our principal offices are in Boulder, Colorado.

Cash Equivalents - We consider all highly liquid debt instruments purchased with maturity of three months or less to be cash equivalents. At December 31, 2006 and 2005, we had approximately $180,000 and $348,000 in cash equivalents respectively.

Fair Value of Financial Instruments - The carrying amount of our financial instruments, which includes cash and accounts payable, approximate their fair value due to the short period to maturity of these instruments.

Restricted Cash - Restricted cash is cash balances held in the form of bank certificates of deposit, and with the state of Utah as a reclamation bond. At December 31, 2006 and 2005, $160,000 and $235,000 respectively, of restricted cash was on deposit with custodians to secure reclamation of oil and gas property.

Revenue Recognition - we record revenue when title passes, delivery occurs to our customers and the customer assumes the risks and rewards of ownership, when the price is fixed and determinable, and when collectibility is reasonably assured.

Income Tax - We recognize deferred tax assets and liabilities based on differences between the financial reporting and tax bases of assets and liabilities using the enacted tax rates and laws that are expected to be in effect when the differences are expected to be recovered. We provide a valuation allowance for deferred tax assets when we consider realization of such assets to be less likely than not.

Net Loss per Common Share - We have adopted Statement of Financial Accounting Standards No. 128, Earnings Per Share. Statement 128 requires the reporting of basic and diluted earnings/loss per share. We calculate basic loss per share by dividing net loss by the weighted average number of outstanding common shares during the period.  We calculate diluted loss per share by dividing net loss by the weighted average number of outstanding common shares including all potentially dilutive securities during the period.

Comprehensive Loss - We apply Statement of Financial Accounting Standards No. 130, Reporting Comprehensive Income. Statement 130 establishes standards for the reporting and display of comprehensive income or loss, requiring its components to be reported in a financial statement. For the years ended December 31, 2006 and 2005, our comprehensive loss was comprised of our net loss and any unrealized holding gain on our marketable securities as reported in our statements of operations.

Use of Estimates - Accounting principles generally accepted in the United States require us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expense during the reporting period. Actual results could differ from those estimates.

Concentration of Credit Risk - Financial instruments that potentially subject us to concentration of credit risk consist

of cash. At December 31, 2006, we had $79,926 in cash in excess of federally insured limits.

Oil and Gas Activity - We follow the successful-efforts method of accounting for oil and gas property as defined under Statement of Financial Accounting Standards No. 19, Financial Accounting and Reporting by Oil and Gas Producing Companies ("FAS 19"). Under this method of accounting, we capitalize all property acquisition cost and cost of exploratory and development wells when incurred, pending determination of whether the well has found proved reserves. If an exploratory well does not find proved reserves, we charge to expense the cost of drilling the well. We include exploratory dry hole cost in cash flow from investing activities within the cash flow statement. We capitalize the cost of development wells whether productive or nonproductive. We had no exploratory well cost that had been suspended for one year or more as of December 31, 2006.

28

form10ksb.htm

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

We expense as incurred geological and geophysical cost and the cost of carrying and retaining unproved property. We will provide depletion, depreciation and amortization (DD&A) of capitalized cost of proved oil and gas property on a field-by-field basis using the units-of-production method based upon proved reserves. In computing DD&A we will take into consideration restoration, dismantlement and abandonment cost and the anticipated proceeds from equipment salvage. When applicable, we will apply the provisions of Statement of Financial Accounting Standards No. 143, Accounting for Asset Retirement Obligations, which provides guidance on accounting for dismantlement and abandonment cost.

We review our long-lived assets for impairment when events or changes in circumstances indicate that an impairment may have occurred. In the impairment test we compare the expected undiscounted future net revenue on a field-by-field basis with the related net capitalized cost at the end of each period. We will calculate expected future cash flow on all proved reserves using a 10% discount rate and escalated prices. Should the net capitalized cost exceed the undiscounted future net revenue of a property, we will write down the cost of the property to fair value, which we will determine using discounted future net revenue. We will provide an impairment allowance on a property-by-property basis when we determine that the unproved property will not be developed.

Impairment of Unproved (Non-Producing) Properties

Unproved properties are assessed periodically, and at least annually, to determine whether or not they have been impaired. We provide an impairment allowance on unproved property at any time we determine that a property will not be developed. At December 31, 2006, we still consider our acquired properties to be economically and operationally viable, in accordance with FAS 19.   In determining that there was no impairment of the unproved properties, we considered such factors our commitment of project personnel and cost being incurred to develop as well as the existence of our active agreements with our venture partners and others. In addition, the Company had no unproved properties that were surrendered or abandoned during the year ended December 31, 2006 as a result of impairment.

Sales of Producing and Nonproducing Property - We account for the sale of a partial interest in a proved property as normal retirement. We recognize no gain or loss as long as this treatment does not significantly affect the unit-of-production depletion rate. We recognize a gain or loss for all other sales of producing properties and include the gain or loss in the results of operations.

We account for the sale of a partial interest in an unproved property as a recovery of cost when substantial uncertainty exists as to recovery of the cost applicable to the interest retained. We recognize a gain on the sale to the extent that the sales price exceeds the carrying amount of the unproved property. We recognize a gain or loss for all other sales of non-producing properties and include the gain or loss in the results of operations.

Stock Options - On October 9, 2003, we adopted an incentive stock option plan, pursuant to which shares of our common stock are reserved for issuance to satisfy the exercise of options. The purpose of the incentive stock option plan is to attract and retain qualified and competent officers, employees and directors. The plan authorizes up to 2,000,000 shares of authorized common stock to be purchased pursuant to the exercise of options. Our stockholders approved the plan on November 10, 2003. On September 15, 2004, we granted an option for 200,000 shares to our CEO, 150,000 shares to our vice president and 125,000 shares to an employee. These options are exercisable at $0.80 per share, the price of our stock on the grant date. The options vested 50% on the grant date and vest 50%

on September 15, 2005. On October 3, 2005, we granted an option for 100,000 shares to our CEO, 150,000 to our Vice President and 175,000 and 200,000 shares to two employees respectively. The options vest 6 months from the date of grant.  On November 1, 2006, we granted an option for 300,000 shares to our Vice President of Business Development.  The options vest 6 months from the date of grant.

We account for stock options to employees in accordance with Accounting Principles Board Opinion No. 25 (APB 25), Accounting for Stock Issued to Employees, and related interpretations. Pursuant to APB No. 25, we record no compensation expense to employees on the date of grant because in issuing the grants we set the exercise price of the underlying stock at or above the market value of the stock on the date of the grant. Stock options granted to consultants are accounted for under the fair value method, in accordance with Statement of Financial Accounting Standards No. 123, Accounting for Stock-Based Compensation.

Statement 123 and Statement 148, Accounting for Stock-Based Compensation Transition and Disclosure, require disclosure of pro forma information regarding net income and earnings per share. The Statements require that the information be determined as if we had accounted for employee stock options under the fair value method of the statements. We estimate the fair value of the options we grant at the date of grant using a Black-Scholes option pricing model with the following weighted-average assumptions for the year ended December 31, 2006: a risk-free interest rate of 4.37%; no expected dividend; a volatility factor of 97.5%; and a maturity date of ten years.

29

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

For purposes of pro forma disclosures, we amortize to expense the estimated fair value of the options over the options' vesting period. Our pro forma information for 2006 is as follows:

|  | | Year Ended December 31, 2006 |
| --- | --- | --- |
| Net loss | $ | (8,590,847) |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards | | (191,497) |
| Pro forma net loss | $ | (8,782,344) |
| Loss per share—as reported | $ | (0.11) |
| Loss per share—pro forma | $ | (0.11) |

The Black-Scholes option-pricing model was developed for use in estimating the fair value of traded options that have no vesting restrictions, are fully transferable, and are not subject to trading restrictions or blackout periods. In addition, option valuation models require the input of highly subjective assumptions, including the expected stock price volatility. Because our employee stock options have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect the fair value estimate, it is our opinion that the existing models do not necessarily provide a reliable single measure of the fair value of our employee stock options.

We have not adopted any of the early transition methods provided for in Statement No. 148. In December 2004 the Financial Accounting Standards Board issued Statement No. 123 (Revised 2004), Share-Based Payment. This statement requires companies to recognize the fair value of stock options and other stock-based compensation as expense for reporting periods beginning in July 2005. For awards issued prior to the effective date, the standard requires companies to utilize prior valuation models of fair value and recognize as expense the remaining unvested portion of the awards over the remaining vesting periods. The adoption of this statement is not expected to have a material impact on the Company's operating results, financial position or cash flow.

**Note 2 – Asset Retirement Obligation - Significant Accounting Policies, continued**

The Company follows Statement of Financial Accounting Standards ("SFAS") No. 143, *"Accounting for Asset Retirement Obligations"*, which requires that the fair value of a liability for an asset retirement obligation be recognized in the period in which it is incurred if a reasonable estimate of fair value can be made. The associated asset retirement costs are capitalized as part of the carrying amount of the long-lived asset. The increase in carrying value of a property associated with the capitalization of an asset retirement cost is included in proved oil and gas properties in the consolidated balance sheets. The Company depletes the amount added to proved oil and gas property costs. The future cash outflows for oil and gas properties associated with settling the asset retirement obligations that have been accrued in the accompanying balance sheets are excluded from the ceiling test calculations. The Company's asset retirement obligation consists of costs related to the plugging of wells and removal of facilities and equipment on

its oil and gas properties. The asset retirement liability is allocated to operating expenses using a systematic and rational method. At December 31, 2006, the asset retirement obligation and accretion expense were not booked because these amounts were not considered to be material.

**Note 3 - Going Concern**

As shown in the accompanying financial statements, we have incurred significant operating losses since inception and previously incurred a loss on our discontinued automotive fuel business. As of December 31, 2006, we have limited financial resources until such time that we are able to generate positive cash flow from operations. These factors raise substantial doubt about our ability to continue as a going concern. Our ability to achieve and maintain profitability and positive cash flow is dependent upon our ability to locate profitable mineral properties, generate revenue from our planned business operations, and control exploration cost. Management plans to fund its future operation by joint venturing, obtaining additional financing, and attaining additional commercial production. However, there is no assurance that we will be able to obtain additional financing from investors or private lenders, or that additional commercial production can be attained. Although management believes that production from the Carbon County and Creston projects will generate revenues sufficient to sustain the Company, no assurance can be given that such revenues will be generated from the projects.

30

form10ksb.htm

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

**Note 4 – Note Receivable**

In August and September 2005 as part of our earn-in arrangement, we agreed to advance Mountain Oil and Gas a total of $66,000 for purposes of working capital in exchange for oilfield and rig services.  Originally this balance was classified as a deposit, and has since been reclassified as a note receivable.  As indicated in the agreement, in the event that sufficient services were not performed, the amount was to be treated as a loan, and would take on a 12% interest payable beginning February of 2006.  The amount is secured with field equipment including a pumping unit, engine, treater, and rods.  We are in the process of negotiating repayment, and consider the amount fully collectible.

In October 2005, we entered into an agreement to obtain up to a 75% working interest in certain well bores owned by Mountain Oil and Gas.  In connection with this, we agreed to advance Mountain Oil and Gas a total of $100,000 for the purpose of well bonding and working capital.  This was due and payable back to the Company on December 30, 2005 either in cash or labor towards the workover of the well bore. In the event that we were not paid by December 30, 2005, we are entitled to $160,000 of the net revenues from the 1-16A1E well beginning January 1, 2006.  Repayment is secured by a pumping unit located on the Dye-Hall well for the value of the working capital and well bonding.  As of December 31, 2006, we have collected $20,000 on the note, and are negotiating payment or collection of security for the remaining portion.  We consider the remaining portion as fully collectible.

**Note 5 – Sale of Unproved Property**

In February 2005 we sold the Circus project for $2.04 million to an unrelated third party. We acquired the leases in October, 2004, with a total cost of $487,000 and thus realized a gain of $1.5 million on the sale. Additionally, we incurred $53,000 of closing cost on the sale.

**Note 6 - Convertible Note Payable**

On September 9, 2003, we received $350,000 for issuance of a convertible note payable to a third party investor. The principal is due and payable on March 9, 2005 together with interest at the rate of 8% per year. The note also contains a conversion feature that gives the holder the right to convert all or any portion of the principal indebtedness into shares of common stock on or before its due date. On March 3, 2005, the note holder notified us that they were exercising their right to convert the entire $350,000 note at a conversion rate of $0.1429 per share, or 2,449,265 shares.

**Note 7 - Convertible Debentures**

In June 2004 we issued a convertible debenture with a conversion price of $1.25 per share of common stock, subject to anti-dilution adjustments, in a private placement to two purchasers. The convertible debenture is secured by our assets. In connection with the issuance, we also issued warrants to purchase up to 400,000 shares of common stock at $1.50 per share. The warrants are exercisable for two years following conversion of the convertible debenture at an exercise price of $1.50. The offering resulted in gross proceeds to us, prior to the deduction of fees and cost, of approximately $1,000,000. We used the proceeds from the offering for working capital and general corporate purposes.

The conversion price of the convertible debenture and the exercise price of the warrants are subject to customary

anti-dilution rights. In addition, if we issue common stock at a price less than the conversion price of the convertible debenture, then the conversion price will be reduced to the lower price. Under such circumstances, the exercise price of the warrants will be adjusted to the same price as the conversion price. As part of the placement, we agreed to provide piggyback registration rights to register for resale all of the shares of common stock issuable upon conversion of the debenture and upon exercise of the warrants.  We are currently in negotiations to repay the convertible debenture.

We issued the above securities utilizing an exemption from registration requirements of the Securities Act of 1933 pursuant to Section 4(2) of the Securities Act and Regulation D promulgated under the Securities Act based on the representations of the Purchaser that it was an "accredited investor" (as defined under Rule 501 of Regulation D) and that it was purchasing the securities without a present view toward a distribution of the securities. In addition, we conducted no general solicitation in connection with the sale of the securities.

31

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

On June 17, 2005, we closed a financing pursuant to a securities purchase agreement with three accredited investors for the issuance of $5,501,200 in face amount of debentures maturing at the end of the 27th month from the date of issuance, and three year warrants to purchase common stock of the company. The debentures bear no interest and the investors paid $3,849,685, after discounts of $1,651,515, for the debentures. A commission of 9% on the $3.85 million was paid in connection with the transaction, and we paid $100,000 in legal fees, resulting in net proceeds to the company of $3,403,267. The debentures are unsecured and we are obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting October 1, 2005, which payment can be made in cash or in common stock. We may pay this amortization payment in cash or in stock at the lower of $0.60 per share (the Set Price) or 80% of the volume weighted average price of the stock for the five trading days prior to the repayment date. In the event that we make the payment in cash, we shall pay 110% of the monthly redemption amount. At any time after 90 days from the date that a registration statement registering the shares of common stock underlying the debentures and warrants is declared effective (the Effective Date), and if certain conditions are met, we have the right to redeem some or all of the debentures in a cash amount equal to 110% of the face amount of the debentures being redeemed. At any time, the debentures are convertible into common stock at the Set Price.

We issued warrants to the investors, expiring June 17, 2008, to purchase 4,584,334 shares of restricted common stock, exercisable at a per share of $0.649. In addition, the exercise price of the warrants will be adjusted in the event we issue common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions. Upon an issuance of shares of common stock below the exercise price, the exercise price of the warrants will be reduced to equal the share price at which the additional securities were issued and the number of warrant shares issuable will be increased such that the aggregate exercise price payable for the warrants, after taking into account the decrease in the exercise price, shall be equal to the aggregate exercise price prior to such adjustment.

Warrants to purchase 250,000 shares, at the same price and for the same term as the warrants issued to the investors, have been issued to HPC Capital Management as additional compensation for its services in connection with the transaction with the investors.

In addition to the $1,651,515 cash discount, we also recorded a discount of $626,042 based on a Black-Scholes model valuation of the 4,584,334 warrants issued to the debenture holders and the 250,000 warrants issued to HPC Capital Management.

On September 21, 2005, we closed a financing pursuant to a securities purchase agreement with two accredited investors for the issuance of $3,108,000 in face amount of debentures maturing December 21, 2008, and three year warrants to purchase common stock of the company. The debentures do not accrue interest and the investors paid $2,174,947.52 for the debentures. A commission of 8% on $2,000,000 raised was paid to in connection with the transaction, and we placed $50,000 in escrow for the payment of future legal fees, resulting in net proceeds to the company of $1,964,947.52 before $39,000 in associated current legal fees. Net proceeds will be used for general working capital. The debentures are unsecured and we are obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting January 1, 2006, which payment can be made in cash or in restricted common stock. We may pay this amortization payment in cash or in stock at the lower of $0.75 per share (the Set Price) or 80% of the volume weighted average price of the stock for the five trading days prior to the repayment date, provided that there is an effective registration statement and the monthly conversion price is greater of than $0.60.

In the event that we make the payment in cash, we shall pay 110% of the monthly redemption amount. At any time after 90 days from the date that a registration statement registering the shares of common stock underlying the debentures and warrants is declared effective (the Effective Date), and if certain conditions are met, we have the right to redeem some or all of the debentures in a cash amount equal to 110% of the face amount of the debentures being redeemed. At any time, the debentures are convertible to restricted common stock at the Set Price.

We issued warrants to the investors, expiring September 21, 2008, to purchase 2,072,000 shares of restricted common stock, at a price per share of $0.80. The number of shares underlying the warrants equals 50% of the shares issuable on full conversion of the debentures at the set price (as if the debentures were so converted on September 21, 2005). In addition, the exercise price of the warrants will be adjusted in the event we issue common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions. Upon an issuance of shares of common stock below the exercise price, the exercise price of the warrants will be reduced to equal the share price at which the additional securities were issued and the number of warrant shares issuable will be increased such that the aggregate exercise price payable for the warrants, after taking into account the decrease in the exercise price, shall be equal to the aggregate exercise price prior to such adjustment.

Warrants to purchase 100,000 shares, at the same price and for the same term as the warrants issued to the investors, have been issued to HPC Capital Management as additional compensation for its services in connection with the transaction with the investors.

32

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

In addition to the $933,052 cash discount, we also recorded a discount of $614,905 based on a Black-Scholes model valuation of the 2,072,000 warrants issued to the debenture holders and the 100,000 warrants issued to HPC Capital Management.

**Note 8 - Notes Payable**

Over the period October 2005 through December 2006 we borrowed a total of $1,747,000 on an unsecured 8% demand note payable to an entity controlled by our CEO. During the 2006, we paid back a total of $301,000 in principal on the note.

Also in 2005, we entered into a 45-well workover program, the Creston Project, in which we completed and placed the first well into production in the first quarter of 2006. We obtained $1.25 million in industry partner financing to carry the project forward. In connection with the transaction, we acquired the rights to up to a 75% working interest, reduced to 45% interest in 18 months, in the wells to be completed in the program as well as $1.25 million in project financing from an industry partner in exchange for 1,642,632 shares of restricted common stock and warrants to purchase 1.8 million shares at $0.70 per share. The repayment of the $1.25 million in financing is secured with 1.8 million shares of restricted stock held in escrow and is personally guaranteed by George S. Young, our CEO, and by his private company, Diamond Oil and Gas Corporation. At December 31, 2006 there was $900,000 outstanding on this financing.

In March 2006, we borrowed $750,000 on a secured 12% note payable for a period of 36 months in exchange for a 5% overriding royalty interest in Carbon County, as well as the right to participate in any future exploration activities on the project on the basis of a 10% working interest. At December 31, 2006 all of the principal was outstanding on this financing.

In May 2006, we borrowed $500,000 at 12% interest in exchange for a 2% overriding royalty interest in Carbon County as well as 50,000 shares of common stock. As of December 31, 2006, we have paid $139,000 towards the principal and interest.

In November 2004 we entered into a joint venture agreement with an unrelated company in which the company received a 50% interest in certain of our properties in exchange for a $2,000,000 commitment for exploration and drilling on the properties. In addition, the company loaned us $1,500,000, 50% of which was due on January 31, 2005 and we have repaid with interest and 50% of which was payable on April 30, 2005, with interest at 18%. This note was secured by all of our assets. In February 2005 we paid $750,000 principal of the 18% $1,500,000 note payable to JMG, plus accrued interest of $82,000. In May 2005, we assigned our remaining 50% interest in the Gordon Creek and Weston County properties to JMG as full payment of the unpaid principal and accrued interest on the note. As part of the settlement agreement, JMG's commitment to spend $2,000,000 in exploration and drilling activity on the two projects by November 7, 2005 was terminated and JMG granted us the option to re-acquire our 50% ownership by June 30, 2005 for the amount of $391,000. We exercised this option in June 2005. Under this transaction, the Company removed itself from the liability of the note payable, and re-acquired the 50% ownership in the Gordon Creek and Weston County properties for $391,000. In connection with this transaction, we recorded a gain from extinguishment of debt of $383,531.

**Note 9 - Common Stock**

For debt service of our convertible debentures, we issued 2,513,630 shares , 4,033,043 shares, 4,739,696 shares, and 5,031,413 shares of common stock in the first, second, third and fourth quarters of 2006, respectively. First quarter redemption share payments amounted to 617,433 shares, 1,341,500 shares, and 554,697 shares at an average price of $0.37, $0.27, and $0.27 per share respectively. Second quarter redemption share payments amounted to 751,818 shares, 1,425,192 shares, 1,737,976 shares, and 118,057 shares at an average price of $0.27, $0.25, $0.21, and $0.27 per share respectively. Third quarter redemption payments amounted to 137,257 shares, 1,898,013 shares, 2,586,369 shares, and 118,057 shares at an average price of $0.29, $0.19, $0.14, and $0.12 per share respectively. Fourth quarter redemption payments amounted to 487,070 shares, 3,130,267 shares, and 1,414,076 shares, at an average price of $0.12, $0.12, and $0.08 per share respectively.

In May 2006 we issued 700,000 shares in connection with the joint venture of one of our projects with a price of $0.28, we also issued 861,921 shares at $0.25 in accordance with ratchet down rights under the May 18, 2005 private placement. In addition, we issued 790,000 shares at $0.32 in connection with the joint venture secured project funding.

In June 2006, we issued 48,980 shares at $0.25 in accordance with the May 2006 note payable.

In July 2006, we issued 50,000 shares at $0.45 in accordance with the May 2006 note payable. We also issued 250,000 shares at $0.25 in accordance with the April 2006 financing.

In October 2006, we issued 800,000 shares of common stock at $0.14 pursuant to a legal consulting agreement.

33

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

In November 2006, we issued 1,083,607 shares of common stock at $0.14 in accordance with ratchet down rights under the May 18, 2005 private placement

As of December 31, 2006, we intend to issue common stock for obligations amounting to $76,000.

**Note 9 - Related Party Transactions**

Over the period October 2005 through December 2006 we borrowed a total of $2,034,000 on an unsecured 8% demand note payable to an entity controlled by our CEO. During the 2006, we paid back a total of $301,000 in principal on the note.

**Note 10 – Property Reserves (Unaudited)**

The following reserve quantity and future net cash flow information represents proved reserves located in the State of Utah in the United States. The reserves as of December 31, 2006 have been estimated by MHA Petroleum Consultants, independent petroleum engineers. We did not have any proved reserves in the State of Utah at December 31, 2005. The determination of oil and gas reserves is based on estimates, which are highly complex and interpretive. The estimates are subject to continuing change as additional information becomes available.

The standardized measure of discounted future net cash flows is prepared under the guidelines set forth by the Securities and Exchange Commission (SEC) that require the calculation to be performed using year-end oil and gas prices. The oil and gas prices used as of December 31, 2006 were based on the Nymax forecasted prices and costs. Future production costs are based on year-end costs and include severance taxes. The present value of future cash inflows is based on a 10% discount rate.

<u>**Reserve Quantities**</u>

**Table 1**

|  | Gas MMcf |
|---|---|
| Proven developed producing reserves | 1,362 |
| Proven developed non-producing reserves | 2,231 |
| Proven undeveloped reserves | 6,931 |
| Total proved reserves as of December 31, 2006 | 10,524 |
| Probable reserves | 3,780 |
| Possible reserves | 12,600 |
| Total proved , possible, and probable reserves as of December 31, 2006 | 26,904 |

**Standardized Measure of Discounted Future Net Cash Flows**

**Table 2 ( In thousands)**

| | December 31, 2006 |
|---|---|
| Future cash flows | $ 76,363 |
| Future production and development costs | (1,680) |
| Future income taxes | (30,624) |
| Future net cash flows before discount | $ 44,059 |
| 10% discount to present value | (4,005) |
| Standardized measure of discounted future net cash flows | $ 40,054 |

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

**Volumes, Prices and Operating Expenses**

The following table presents information regarding the production volumes, average sales prices received and average production costs associated with our sales of natural gas and oil for the periods indicated.

**Table 3**
**Production and Sales Data**

| | | December 31, 2006 |
|---|---|---|
| Natural gas production (Mcf) | | 235,378 |
| Average sales price per Mcf | $ | 5.5 |
| | | |
| Expenses per Mcf | | |
| Lease operating | $ | 1.91 |
| Gathering | $ | 0.94 |
| General and administrative | $ | 9.73 |
| Depletion and accretion | $ | .31 |

**Development, Exploration and Acquisition Capital Expenditures**

During the year ended December 31, 2006, we spent $1,027,000 in development and exploration activities. During the year ended December 31, 2005, we spent $1,141,000 on development and exploration activities, and $738,000 on the acquisition of acreage and option maintenance for John's Valley, Overthrust, and the Bacaroo project. As of December 31, 2006, we held a working interest of approximately 46% in 5,953 gross acres (2,440 net acres) located in Carbon County, Utah. As of December 31, 2006, we held an interest in four gross (1.84 net) producing and four gross shut-in (1.84 net) gas wells located on these properties.

Table 4 presents information regarding our net costs incurred in the purchase of proved and unproved properties and in exploration and development activities:

**Table 4**

| | | December 31, | | |
|---|---|---|---|---|
| | | 2006 | | 2005 |
| Property acquisition costs: | | | | |
| Unproved | $ | - | $ | 738,241 |
| Proved | | 1,200,000 | | 300,000 |
| Exploration | | 564,196 | | 1,141,202 |
| Development | | 463,263 | | - |
| | | | | |
| | $ | 2,227,459 | $ | 2,179,443 |

**Productive Wells and Acreage**

Table 5 summarizes our productive and shut-in gas wells as of December 31, 2006.  Productive wells are producing wells and wells capable of production.  Shut-in wells are wells that are capable of production but are not producing.  Gross wells are the total number of wells in which we have an interest.  Net wells are the sum of our fractional interests owned in the gross wells.

**Table 5**

|  | Productive gas wells | |
|  | Gross | Net |
| --- | --- | --- |
| Producing gas wells | 4 | 1.8 |
| Shut-in gas wells | 4 | 1.8 |

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

**Undeveloped Acreage**

Table 6 summarizes the undeveloped and developed leasehold acreage, by area, that we hold as of December 31, 2006. Undeveloped acres are acres on which wells have not been drilled or completed to a point that would permit the production of commercial quantities of oil and gas, regardless of whether or not the acreage contains proved reserves. Developed acres are acres that are spaced or assignable to productive wells. Gross acres are the total number of acres in which we have a working interest. Net acres are the sum of our fractional interests owned in the gross acres. The table does not include acreage that we have a contractual right to acquire or to earn through drilling projects, or any other acreage for which we have not yet received leasehold assignments. In certain leases, our ownership is not the same for all depths. The net acres in these leases are calculated using the greatest ownership interest at any depth. Generally, this greater interest represents our ownership in the primary objective formation.

**Table 6**
**Summary of Acreage**

| | Undeveloped acres | | Developed acres | |
|---|---|---|---|---|
| | Gross | Net | Gross | Net |
| Utah | 14,242 | 1,752 | 5,953 | 2,440 |
| Wyoming | 33,486 | 19,604 | – | – |
| Colorado | 3,440 | 3,440 | – | – |
| Total acres | 51,168 | 24,796 | 5,953 | 2,440 |

**Note 11 - Income Tax**

At December 31, 2006, we have available for federal income tax purposes a net operating loss carryforward of approximately $10,600,000, expiring at various times through 2024 that may be used to offset future taxable income. Therefore, we have provided no provision for income tax.

In addition, we have deferred tax assets of approximately $3,600,000 at December 31, 2006. We have not recorded a benefit from our net operating loss carryforward because realization of the benefit is uncertain and, therefore, a valuation allowance of $(3,600,000) has been provided for the deferred tax assets. The following table reports our carryforwards and the related deferred tax assets by year through December 31, 2006:

| Year | NOL carryforward | Deferred tax asset |
|---|---|---|
| 2001 | $         10,241 | $         3,481 |
| 2002 | 21,560 | 7,330 |
| 2003 | 122,915 | 41,791 |
| 2004 | 3,138,118 | 1,066,960 |
| 2005 | 1,957,800 | 665,700 |
| 2006 | 5,301,500 | 1,802,500 |

| Less: valuation allowance | | — | | (3,587,762) |
|---|---|---|---|---|
| Totals: | $ | 10,582,157 | $ | — |

**Note 12 - Commitments and contingencies**

 We were sued in the Sixth Judicial District Court, Garfield County, Utah on November 10, 2004, by Midway Perforating and Drilling in a complaint alleging nonpayment of charges connected with drilling the Johns Valley 10-33C2 well in Garfield County, UT. The complaint seeks damages of $100,000 and costs of $10,000. We filed our Answer and Counterclaim on January 19, 2005. We believe we have a strong defense and counterclaim in that the plaintiff failed to follow our instructions to use appropriate equipment for controlling deviation of the wellbore, and that such failure caused significant deviation of the wellbore, causing the well to be unusable and a breach of contract. The well bore failed to penetrate the target zone within the permitted drilling spacing unit due to horizontal deviation improperly allowed to occur by the plaintiff contractor. The suit is in its early stages. Although we believe we have a strong defense and counterclaim, we cannot predict the final outcome of the suit.

36

form10ksb.htm

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

**Note 13 - Subsequent Events**

On February 15, 2007, we entered into a series of transactions to restructure securities issued pursuant to securities purchase agreements dated June 17, 2005 and September 21, 2005.

*Background*

**June 2005 Financing**

On June 17, 2005, we closed a financing pursuant to a securities purchase agreement with three accredited investors, Palisades Master Fund, L.P. ("Palisades"), Crescent International Ltd. ("Crescent") and JGB Capital L. P. ("JGB") for the issuance of $5,501,199.95 in face amount of debentures maturing September 16, 2008 (the "June Debentures"). The June Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting October 1, 2005, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.60 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring June 17, 2008, to purchase 4,584,334 shares of restricted common stock, exercisable at a per share of $0.649 (the "June Warrants"). In addition, the exercise price of the June Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the June Warrants' exercise price, all of the June Warrants shall expire on the 30th trading day after we send a call notice to the June Warrant holders. If at any time after one year from the date of issuance of the June Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the June Warrants, then the holder may exercise the June Warrant at such time by means of a cashless exercise.

**September 2005 Financing**

On September 21, 2005, we closed a financing pursuant to a securities purchase agreement with two accredited investors, Palisades and Crescent for the issuance of $3,108,000 in face amount of debentures maturing December 20, 2008 (the "September Debentures" and together with the June Debentures, the "Old Debentures"). The September

Debentures were unsecured and we were obligated to pay 1/24th of the face amount of the debenture on the first of every month, starting January 1, 2006, which payment could be made in cash or in shares of our common stock. We could pay this amortization payment in cash or in stock at the lower of $0.75 per share or 80% of the volume weighted average price of our stock for the five trading days prior to the repayment date. In the event that we made the payment in cash, we paid 110% of the monthly redemption amount.

In addition, we issued warrants to the investors, expiring September 21, 2008, to purchase 2,172,000 shares of restricted common stock, exercisable at a per share of $0.80 (the "September Warrants" and together with the

June Warrants, the "Old Warrants"). In addition, the exercise price of the September Warrants would be adjusted in the event we issued common stock at a price below the exercise price, with the exception of any securities issued pursuant to a stock or option plan adopted by our board of directors, issued in connection with the debentures issued pursuant to the securities purchase agreement, or securities issued in connection with acquisitions or strategic transactions.

If in any period of 20 consecutive trading days our stock price exceeds 250% of the September Warrants' exercise price, all of the September Warrants shall expire on the 30th trading day after we send a call notice to the September Warrant holders. If at any time after one year from the date of issuance of the September Warrants there is not an effective registration statement registering, or no current prospectus available for, the resale of the shares underlying the September Warrants, then the holder may exercise the September Warrant at such time by means of a cashless exercise.

37

Table of Contents

**Fellows Energy Ltd.**
**Notes to Financial Statements**
**December 31, 2006 and 2005**

*Restructuring*

On February 15, 2007, the following transactions took place with regards to the Old Debentures and Old Warrants:

1)      JGB entered into an assignment agreement with Crescent, pursuant to which Crescent purchased from JGB the June Debentures issued to JGB.  The face value of the June Debentures issued to JGB at the time of the transaction was $333,333.33 and Crescent paid $250,000 to JGB for the assignment;

2)      We entered into a settlement agreement with JGB for the sum of $83,333.33.  We amended the terms of the Old Warrants held by JGB to remove the ratchet and call provisions and JGB agreed to release any shares reserved for issuance of the Old Warrants and to not exercise such Old Warrants until we obtain an increase in the authorized shares of common stock.  Upon obtaining the increase in authorized shares, we agreed to issue JGB 500,000 shares of restricted common stock;

3)      We entered into a first amendment and waiver agreement with Palisades for the amendment of the Old Debentures issued to Palisades (the "Palisades Amendment Agreement"); and

4)      We entered into a first amendment and waiver agreement with Crescent for the amendment of the Old Debentures issued to JGB (and purchased by Crescent) and Crescent (the "Crescent Amendment Agreement" and together with the Palisades Amendment Agreement, the "Restructuring Amendments").

Palisades and Crescent agreed to amend the Old Debentures to remove the mandatory monthly liquidation provision and to amend the fixed conversion price of the Old Debentures to $0.1375 (the "Fixed Conversion Price").  As a result, the principal amount remaining on the Old Debentures is now due and payable at maturity, unless sooner converted into shares of common stock by the investors, at the Fixed Conversion Price.  Palisades and Crescent further agreed to waive any and all existing defaults under the Old Debentures.

Pursuant to the Palisades Amendment Agreement, we agreed to issue 7,025,789 shares of common stock (the "Monthly Redemption Shares") to Palisades upon conversion of $608,433.15 in principal amount of the Old Debentures.  Such Monthly Redemption Shares were issued as payment for monthly redemptions owed to Palisades on December 1, 2006 and January 1, 2007 and February 1, 2007 pursuant to the Old Debentures.  These Monthly Redemption Shares were not issued while we negotiated the terms of a potential buy-out or restructuring of the Old Debentures.  The Monthly Redemption Shares were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission and represent the remaining shares of common stock registered thereunder for Palisades pursuant to the Old Debentures.  As a result of the Monthly Redemption Shares, the exercise price of the Old Warrants was reduced to $0.0866, which Palisades exercised on a cashless basis and received 2,970,758 shares of common stock which were previously registered for resale pursuant to resale registration statements filed with the Securities and Exchange Commission.

We agreed to pay Palisades a forbearance fee of $150,000 a month, for six months, which fee was paid in shares of common stock at an issuance price of $0.1375, for a total issuance of 5,454,546 shares of restricted common stock.  In addition, we agreed to issue Palisades 1,449,825 shares of common stock as a commitment fee for the restructuring of the Old Debentures.

In connection with the restructuring, we executed a security agreement (the "Security Agreement") in favor of Palisades and JGB granting them a first priority security interest in all of our goods, inventory, contractual rights and general intangibles, receivables, documents, instruments, chattel paper, and intellectual property, except for our

Carbon County prospect, which Palisades and JGB took a second priority interest and for our Carter Creek and Weston County prospects, which the investors were not granted any security interest. The Security Agreements state that if an event of default occurs under the Old Debentures or Security Agreement, the Investors have the right to take possession of the collateral, to operate our business using the collateral, and have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the collateral, at public or private sale or otherwise to satisfy our obligations under these agreements.

 On February 15, 2007, we closed a financing pursuant to a securities purchase agreement with Palisades for the issuance of a $714,500 face amount debenture maturing September 15, 2007 (the "New Debenture"). The New Debenture does not accrue interest and the investors paid $500,000 for the New Debenture. We paid a commission of $100,000 to HPC Capital Management (a registered broker-dealer) in connection with the transaction, resulting in net proceeds to us of $400,000 before our legal fees. We used the net proceeds to pay our settlement agreement payment to JGB, repayment of a bridge loan to Petro Capital Securities, LLC and the remainder for general working capital purposes. We also issued HPC Capital Management 6,458,063 shares of restricted common stock and agreed to issue an additional 1,041,937 shares of restricted common stock upon obtaining an increase in our authorized shares of common stock, which shares are additional compensation for its services in connection with the transaction with the investors

The convertible debentures are secured and are convertible into our common stock, at Palisades option, at a fixed conversion price of $0.1375. Based on this conversion price, the $714,500 secured convertible debenture is convertible into 5,196,364 shares of our common stock.

In the event of default, the investors may require payment, which shall be the greater of: (A) 130% of the principal amount of the face amount of the debenture to be prepaid, or (B) the principal amount of the debenture to be prepaid, divided by the conversion price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is less, multiplied by the closing price on (x) the date the default amount is demanded or otherwise due or (y) the date the default amount is paid in full, whichever is greater

The conversion price of the debenture may be adjusted in certain circumstances such as if we pay a stock dividend, subdivide or combine outstanding shares of common stock into a greater or lesser number of shares, or take such other actions as would otherwise result in dilution of the investor's position.

The Company has agreed to file a registration statement with the Securities and Exchange Commission to cover the future sale by the investors of the shares issuable upon conversion of the Old and New Debentures. If the registration statement is not filed by the filing deadline or if the registration statement is not declared effective by the effective deadline, we are required to pay liquidated damages to the investors.

.

38

Table of Contents

**ITEM 8.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

On March 10, 2006, Fellows Energy, Ltd. (the "Company") engaged the firm of Mendoza Berger & Company, LLP ("Mendoza Berger") to serve as its independent registered public accountants for the fiscal year ending December 31, 2005.  On March 9, 2006, the Company notified Hall and Company, CPAs ("Hall and Company") that it was terminating Hall and Company's services.  The decision to change accountants was recommended and approved by the Company's Audit Committee and Board of Directors.  The Company decided to switch its independent registered public accounting firm because the audit engagement partner it had worked with at Hall and Company left to join Mendoza Berger.  The Company believes this partner's intimate knowledge of its operations from inception merits a transition to Mendoza Berger.

During the two fiscal years ended December 31, 2003 and 2004, and through March 9, 2006, (i) there were no disagreements between the Company and Hall and Company on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure which, if not resolved to the satisfaction of Hall and Company would have caused Hall and Company to make reference to the matter in its reports on the Company's financial statements, and (ii) except for Hall and Company's report on the Company's December 31, 2004 financial statements dated March 29, 2005, except for Note 12, as to which the date is February 13, 2006, which included an explanatory paragraph wherein they expressed substantial doubt about the Company's ability to continue as a going concern, Hall and Company's reports on the Company's financial statements did not contain an adverse opinion or disclaimer of opinion, or was modified as to audit scope or accounting principles. During the two fiscal years ended December 31, 2004 and 2003 and through March 9, 2006, there were no reportable events as the term described in Item 304(a)(1)(iv) of Regulation S-B.

During the two fiscal years ended December 31, 2004 and 2003 and through March 9, 2006, the Company has not consulted with Mendoza Berger regarding either:

1.     The application of accounting principles to any specific transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, and neither a written report was provided to Mendoza Berger nor oral advice was provided that Mendoza Berger concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing or financial reporting issue; or
2.     Any matter that was either subject of disagreement or event, as defined in Item 304(a)(1)(iv) of Regulation S-B and the related instruction to Item 304 of Regulation S-B, or a reportable event, as that term is explained in Item 304 (a)(1)(iv) of Regulation S-B.

39

Table of Contents

## ITEM 8A – CONTROLS AND PROCEDURES

*(a) Evaluation of disclosure controls and procedures.*
Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934 as of December 31, 2006. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on our evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

*(b) Changes in internal control over financial reporting.*

We regularly review our system of internal control over financial reporting and make changes to our processes and systems to improve controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, consolidating activities, and migrating processes.

There were no changes in our internal control over financial reporting that occurred during the period covered by this Annual Report on Form 10-KSB that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

40

Table of Contents

## ITEM 8B – OTHER INFORMATION

None.

## ITEM 9. DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS.

### DIRECTORS AND EXECUTIVE OFFICERS

| Name | Age | Position |
|------|-----|----------|
| George S. Young | 55 | Chairman, Chief Executive Officer and President |
| Steven L. Prince | 48 | Vice President and Director |

Directors are elected to serve until the next annual meeting of stockholders and until their successors are elected and qualified. Currently there are three seats on our board of directors.

Directors serve without cash compensation and without other fixed remuneration. Officers are elected by the Board of Directors and serve until their successors are appointed by the Board of Directors. Biographical resumes of each officer and director are set forth below.

*George S. Young*

On January 5, 2004, our board of directors appointed Mr. Young as our President, Chief Executive Officer and Chairman of the board of directors. Mr. Young is an experienced business executive in the mining and petroleum industries. He is an attorney and engineer by profession, and began his legal career in the law department of Exxon Company USA. Mr. Young also worked at Kennecott Copper Corporation as a metallurgical engineer involved in the construction and start-up of a new copper smelter. From 1998 to 2002, Mr. Young practiced natural resource law in Salt Lake City, Utah. Prior to that Mr. Young was the President of Oro Belle Resources Corporation in Golden, Colorado from 1996 to 1998. Previous positions also include General Counsel and Acting General Manager for the Intermountain Power Project, a $4.4 billion coal-fired power project; Domestic Minerals Division Counsel for Getty Oil Company; and General Counsel for Bond International Gold, Inc. Mr. Young currently serves as a director of Palladon Ventures Ltd., a British Columbia corporation which trades on the TSX Venture Exchange under the trading symbol PLL.V, and International Royalty Corporation, a company listed on the Toronto Stock Exchange and the American Stock Exchange. Mr. Young is the sole owner, officer and director of Diamond Oil & Gas Corporation, a privately held Nevada corporation. He holds a B.Sc. in Metallurgical Engineering, which he earned in 1975 from the University of Utah and a J.D. degree, which he earned in 1979 from the University of Utah. Mr. Young is a member of the Society of Mining Engineers, and the state bars of Utah, Colorado and Texas.

*Steven L. Prince*

As of January 5, 2004, our board of directors appointed Mr. Prince as our Vice President and a member of our board of directors. Mr. Prince is a petroleum engineer with over 20 years of operating experience in conventional oil and gas drilling and in coal bed natural gas drilling and field development. Prior to joining Fellows Energy, Mr. Prince had been the Senior Petroleum Engineer for the Navajo Nation of Indians. From 2001 to 2003, Mr. Prince was the Operations Manager for Coal Bed Methane Production Consultants. From 1997 to 2002, he served as Executive Director of the Castle Valley Gas Producers Council, a gas industry trade association. Previous positions also include Drilling Engineer for Shell Western Exploration & Production; Operations Manager and Engineering

Manager for River Gas Corporation, Facilities Engineer for Atlantic Richfield Co., and Production Engineer for Amoco Production Co.  Mr. Prince is a member of the Society of Petroleum Engineers.  Mr. Prince received his B.S. in Petroleum Engineering with honors from Montana College of Mineral Science and Technology in 1987.

41

Table of Contents

## COMPLIANCE WITH SECTION 16(A) OF THE SECURITIES EXCHANGE ACT OF 1934

Section 16(a) of the Securities Exchange Act of 1934 (the "Exchange Act") requires the Company's directors and executive officers, and persons who own more than ten percent of a registered class of the Company's equity securities, to file with the Commission initial reports of ownership and reports of changes in ownership of the Company's Common Stock and other equity securities of the Company. Officers, directors and greater than ten percent shareholders are required by the Commission's regulations to furnish the Company with copies of all Section 16(a) forms they filed.

We have been provided with copies of all forms (3, 4 and 5) filed by officers, directors, or ten percent shareholders within three days of such filings. Based on our review of such forms that we received, or written representations from reporting persons that no Forms 5s were required for such persons, we believe that, during fiscal 2006, all Section 16(a) filing requirements have been satisfied on a timely basis for members of the Board of Directors and Executive Officers.

### Code of Ethics

We have adopted a code of ethics that applies to our principal executive officers, principal financial officer, principal accounting officer or controller, or persons performing similar functions. We filed our code of ethics as an exhibit to a previous SEC filing. We incorporate it by reference as an exhibit to this Form 10-KSB.

### Audit Committee Financial Expert

We do not yet have an audit committee financial expert serving on our audit committee because we have been focusing our efforts on our new operational direction in the oil and gas business.

### ITEM 10.  EXECUTIVE COMPENSATION.

The following table sets forth the annual and long-term compensation paid to our Chief Executive Officer and the other executive officers who earned more than $100,000 per year at the end of the last completed fiscal year.  We refer to all of these officers collectively as our "named executive officers."

### Summary Compensation Table

| Name & Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| George S. Young, CEO, Principal Executive Officer | 2006 | $120,000 | $2,000 | | | | | | $122,000 |
| Steven Prince, VP of Operations | 2006 | $108,000 | $2,000 | | | | | | $110,000 |

42

Table of Contents

**Outstanding Equity Awards at Fiscal Year-End Table.**

| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
|---|---|---|---|---|---|---|---|---|---|
| George Young | 300,000 | | | $ 0.80 | October 3, 2015 | | | | |
| Steven Prince | 300,000 | | | $ 0.80 | October 3, 2015 | | | | |

**Employment Agreements with Executive Officers**

None.

**Director Compensation**

Our Directors are elected by the vote of a majority in interest of the holders of our voting stock and hold office until the expiration of the term for which he or she was elected and until a successor has been elected and qualified.

A majority of the authorized number of directors constitutes a quorum of the Board for the transaction of business. The directors must be present at the meeting to constitute a quorum. However, any action required or permitted to be taken by the Board may be taken without a meeting if all members of the Board individually or collectively consent in writing to the action.

Directors did not receive any compensation for their services during fiscal year 2006.

The following tables set forth certain information regarding our CEO and each of our most highly-compensated executive officers whose total annual salary and bonus for the fiscal years ending December 31, 2005, 2004 and 2003 exceeded $100,000:

**Stock Option Plan**

On October 9, 2003, we adopted an incentive stock option plan, pursuant to which shares of our common stock are reserved for issuance to satisfy the exercise of options. The purpose of the incentive stock option plan is to retain qualified and competent officers, employees and directors. As noted in the table below, the incentive stock option plan for our executive officers authorizes up to 2,000,000 shares of our common stock, to be purchased pursuant to the exercise of options. The effective date of the stock option plan was October 9, 2003, and the stock option plan was approved by our shareholders on November 10, 2003. On September 15, 2004, we granted an option for

200,000 shares to our CEO, 150,000 shares to our Vice President and 125,000 shares to an employee. These options are exercisable at $0.80 per share, the price of our stock on the grant date. The options vested 50% on the grant date and vest 50% on September 15, 2005. On October 3, 2005, we granted an option for 100,000 shares to our CEO, 150,000 to our Vice President and 175,000 and 200,000 shares to two employees respectively.  The options vest 6 months from the date of grant.

Our board of directors, or a committee thereof, administers the stock option plan and is authorized, in its discretion, to grant options thereunder to all of our eligible employees, including officers, and to our directors, whether or not those directors are also our employees. Options will be granted pursuant to the provisions of the incentive stock option plan on such terms, subject to such conditions and at such exercise prices as shall be determined by our board of directors. Options granted pursuant to the stock option plan will not be exercisable after the expiration of ten years from the date of grant.

Table of Contents

**ITEM 11.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT
AND RELATED STOCKHOLDER MATTERS.**

The following table sets forth certain information regarding beneficial ownership of our common stock as of April 11, 2007

• by each person who is known by us to beneficially own more than 5% of our common stock;
• by each of our officers and directors; and
• by all of our officers and directors as a group.

| NAME AND ADRESS OF OWNER | TITLE OF CLASS | NUMBER OF SHARES OWNED (1) | PERCENTAGE OF CLASS (2) |
|---|---|---|---|
| George S. Young | Common Stock | 3,800,000(3) | 3.8% |
| 1942 Broadway St., Suite 320 | | | |
| Boulder, CO  80302 | | | |
| Steven L. Prince | Common Stock | 300,000(4) | * |
| 1942 Broadway St., Suite 320 | | | |
| Boulder, CO  80302 | | | |
| All Officers and Directors | Common Stock | 4,100,000(3) | 4.4% |
| As a Group (2 persons) | | | |

(1) Beneficial Ownership is determined in accordance with the rules of the Securities and Exchange Commission
and generally includes voting or investment power with respect to securities. Shares of common stock subject to options
or warrants currently exercisable or convertible, or exercisable or convertible within 60 days of April 11, 2007 are
deemed outstanding for computing the percentage of the person holding such option or warrant but are not
deemed outstanding for computing the percentage of any other person.

(2) Percentage based on 100,000,000 shares of common stock outstanding as of April 11, 2007.

(3) Includes 300,000 shares issuable pursuant to options and 3,500,000 shares owned by Diamond Oil & Gas
Corporation, of which Mr. Young is the sole owner and is therefore deemed to be the beneficial owner.

(4) Includes 300,000 shares issuable pursuant to options.

Table of Contents

**ITEM 12.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.**

   Since the beginning of our prior fiscal year, there have been no transactions, or proposed transactions, which have materially affected or will materially affect us in which any director, executive officer or beneficial holder of more than 10% of the outstanding common stock, or any of their respective relatives, spouses, associates or affiliates, has had or will have any direct or material indirect interest. We have no policy regarding entering into transactions with affiliated parties.

**ITEM 13.  EXHIBITS.**

| Exhibit No. | Description |
|---|---|
| 3.1 | Articles of Incorporation, filed as an exhibit to the registration statement on Form SB-2 filed with the Securities and Exchange Commission (the "Commission") on August 10, 2001, and incorporated herein by reference. |
| 3.2 | Certificate of Amendment to Articles of Incorporation, filed as an exhibit to the amended annual report on Form 10-KSB/A filed with the Commission on May 2, 2005, and incorporated herein by reference. |
| 3.3 | Bylaws, filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on August 10, 2001, and incorporated herein by reference. |
| 4.1 | Form of Convertible Debenture issued by Fellows Energy, Ltd., dated June 4, 2004, filed as an exhibit to the current report on Form 8-K filed with the Commission on June 17, 2004, and incorporated herein by reference. |
| 4.2 | Form of Warrant to Purchase Common Stock of Fellows Energy, Ltd., dated June 4, 2004, filed as an exhibit to the current report on Form 8-K filed with the Commission on June 17, 2004, and incorporated herein by reference. |
| 4.3 | Form of Security Agreement of Fellows Energy, Ltd., dated June 4, 2004, filed as an exhibit to the current report on Form 8-K filed with the Commission on June 17, 2004, and incorporated herein by reference. |
| 4.4 | Form of Warrant to Purchase Common Stock of Fellows Energy Ltd. dated May 18, 2005, filed as an exhibit to the quarterly report on Form 10-QSB filed with the Commission on May 23, 2005, and incorporated herein by reference. |
| 4.5 | Form of Registration Rights Agreement dated May 18, 2005, filed as an exhibit to the quarterly report on Form 10-QSB filed with the Commission on May 23, 2005, and incorporated herein by reference. |
| 4.6 | Form of Subscription Agreement dated May 18, 2005, filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on August 10, 2005, and incorporated herein by reference. |
| 4.7 | Form of Securities Purchase Agreement of Fellows Energy Ltd. dated June 17, 2005, filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on August 10, 2005, and incorporated herein by reference. |
| 4.8 | Form of Debenture issued by the Company, dated June 17, 2005, filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on August 10, 2005, and incorporated herein by reference. |

4.9     Form of Warrant to purchase Common Stock of the Company, dated June 17, 2005, filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on August 10, 2005, and incorporated herein by reference.

4.10    Form of Registration Rights Agreement of Fellows Energy Ltd. dated June 17, 2005, filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on August 10, 2005, and incorporated herein by reference.

45

Table of Contents

| | |
|---|---|
| 4.11 | Form of Securities Purchase Agreement of Fellows Energy Ltd. dated September 21, 2005, filed as an exhibit to the current report on Form 8-K filed with the Commission on September 22, 2005, and incorporated herein by reference |
| 4.12 | Form of Debenture issued by the Company, dated September 21, 2005, filed as an exhibit to the current report on Form 8-K filed with the Commission on September 22, 2005, and incorporated herein by reference |
| 4.13 | Form of Warrant to purchase Common Stock of the Company, dated September 21, 2005, filed as an exhibit to the current report on Form 8-K filed with the Commission on September 22, 2005, and incorporated herein by reference |
| 4.14 | Form of Registration Rights Agreement of Fellows Energy Ltd. dated September 21, 2005, filed as an exhibit to the current report on Form 8-K filed with the Commission on September 22, 2005, and incorporated herein by reference |
| 4.15 | First Amendment and Waiver Agreement, dated as of February 15, 2007, by and between Fellows Energy Ltd. and Palisades Master Fund, L.P., filed as an exhibit to the current report on Form 8-K filed with the Commission on February 21, 2007, and incorporated herein by reference |
| 4.16 | First Amendment and Waiver Agreement, dated as of February 15, 2007, by and between Fellows Energy Ltd. and Crescent International Ltd., filed as an exhibit to the current report on Form 8-K filed with the Commission on February 21, 2007, and incorporated herein by reference |
| 4.17 | Securities Purchase Agreement by and between Fellows Energy Ltd. and Palisades Master Fund, L.P., filed as an exhibit to the current report on Form 8-K filed with the Commission on February 21, 2007, and incorporated herein by reference |
| 4.18 | Debenture issued to Palisades Master Fund, L.P., filed as an exhibit to the current report on Form 8-K filed with the Commission on February 21, 2007, and incorporated herein by reference |
| 4.19 | Registration Rights Agreement by and between Fellows Energy Ltd. and Palisades Master Fund, L.P., filed as an exhibit to the current report on Form 8-K filed with the Commission on February 21, 2007, and incorporated herein by reference |
| 4.20 | Security Agreement by and among Fellows Energy Ltd., Palisades Master Fund, L.P. and Crescent International Ltd., filed as an exhibit to the current report on Form 8-K filed with the Commission on February 21, 2007, and incorporated herein by reference |
| 10.1 | Purchase Agreement of October 22, 2003 with Diamond Oil and Gas Corporation, filed as an exhibit to the proxy statement on Schedule 14A filed with the Commission on October 22, 2003, and incorporated herein by reference. |
| 10.2 | Stock Option Plan, filed as an exhibit to the quarterly report on Form 10-QSB filed with the Commission on May 23, 2005, and incorporated herein by reference. |
| 10.3 | Exploration Services Funding Agreement, dated January 26, 2004, between Fellows Energy Ltd. and Thomasson Partner Associates, Inc., filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on October 6, 2005, and incorporated herein by reference. |

10.4      Agreement to Extend and Amend Exploration Funding Service Agreement, dated February 24, 2005, between
          Fellows Energy Ltd. and Thomasson Partner Associates, Inc. filed as an exhibit to the amended annual report on Form
          10-KSB/A filed with the Commission on May 2, 2005, and incorporated herein by reference.

10.5      Purchase and Option Agreement, dated March 16, 2004, between Fellows Energy Ltd. and Quaneco, L.L.C., filed as
          an exhibit to the registration statement on Form SB-2 filed with the Commission on October 14, 2005, and
          incorporated herein by reference.

10.6      Amendment to Purchase and Option Agreement, dated September 14, 2004, between Fellows Energy Ltd. and Quaneco,
          L.L.C., filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on October 6, 2005,
          and incorporated herein by reference.

46

Table of Contents

| | |
|---|---|
| 10.7 | Agreement for Purchase of Interests in the Castle Rock and Kirby CBNG Projects of March 4, 2005 with Quaneco, L.L.C., filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on October 6, 2005, and incorporated herein by reference. |
| 10.8 | Promissory Note of November 8, 2004 with JMG Exploration, Inc., filed as an exhibit to the quarterly report on Form 10-QSB filed with the Commission on November 15, 2004, and incorporated herein by reference. |
| 10.9 | General Security Agreement of November 8, 2004 with JMG Exploration, Inc., filed as an exhibit to the quarterly report on Form 10-QSB filed with the Commission on November 15, 2004, and incorporated herein by reference. |
| 10.10 | Exploration and Development and Conveyance Agreement of November 8, 2004 with JMG Exploration, Inc., filed as an exhibit to the quarterly report on Form 10-QSB filed with the Commission on November 15, 2004, and incorporated herein by reference. |
| 10.11 | Consultant Agreement, dated February 1, 2005, between Fellows Energy, Ltd. and CEOCast, Inc., filed as an exhibit to the amended annual report on Form 10-KSB/A filed with the Commission on May 2, 2005, and incorporated herein by reference. |
| 10.12 | Consultant Agreement, dated August 1, 2004, between Fellows Energy, Ltd. and CEOCast, Inc., filed as an exhibit to the amended annual report on Form 10-KSB/A filed with the Commission on May 2, 2005, and incorporated herein by reference. |
| 10.13 | Letter Agreement, dated December 1, 2004, between Fellows Energy, Ltd. and Axiom Capital Management, Inc., filed as an exhibit to the amended annual report on Form 10-KSB/A filed with the Commission on May 2, 2005, and incorporated herein by reference. |
| 10.14 | Carter Creek Project Purchase Agreement, dated January 9, 2004, between Thomasson Partner Associates, Inc. and Fellows Energy Ltd., filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on October 6, 2005, and incorporated herein by reference. |
| 10.15 | Letter Agreement regarding Bacaroo Project, dated April 14, 2004, between Thomasson Partner Associates, Inc. and Fellows Energy Ltd., filed as an exhibit to the registration statement on Form SB-2 filed with the Commission on October 6, 2005, and incorporated herein by reference. |
| 10.16 | Note between Deseado, LLC and Fellows Energy Ltd., dated September 24, 2004, filed as an exhibit to the amended annual report on Form 10-KSB/A filed with the Commission on May 2, 2005, and incorporated herein by reference. |
| 10.17 | Settlement Agreement, dated as of February 15, 2007, by and between Fellows Energy Ltd. and JGB Capital, L.P., filed as an exhibit to the current report on Form 8-K filed with the Commission on February 21, 2007, and incorporated herein by reference |
| 31.1 | Certification of Chief Executive Officer pursuant to Rule 13a-14 and Rule 15d-14(a), promulgated under the Securities and Exchange Act of 1934, as amended |

31.2    Certification of Chief Financial Officer pursuant to Rule 13a-14 and Rule 15d 14(a), promulgated under the Securities and Exchange Act of 1934, as amended

32.1    Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chief Executive Officer)

32.2    Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chief Financial Officer)

47

Table of Contents

**ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES.**

**Audit Fees**

The aggregate fees billed by our auditors, for professional services rendered for the audit of the Company's annual financial statements for the years ended December 31, 2006 and 2005, and for the reviews of the financial statements included in the Company's Quarterly Reports on Form 10-QSB during the fiscal years were $89,778 and $105,823, respectively.

**Audit-Related Fees**

There have not been any fees billed in each of the last two years for assurance and related services by the principal independent accountant that are reasonably related to the performance of the audit or review of our financial statements.

**Tax Fees**

The aggregate fees billed for each of the last two fiscal years total $5,263 for professional services rendered by the principal independent accountant for tax compliance, tax advice, and tax planning.

**All Other Fees**

No other fees have been billed in the last two years for products and services provided by the principal accountant other than the services reported pursuant to the above portions of this Item 14.

Our board of directors acts as the audit committee and had no "pre-approval policies and procedures" in effect for the auditors' engagement for the audit years 2005 and 2006.

48

Table of Contents

**SIGNATURES**

In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**FELLOWS ENERGY LTD.**

Date:  April 20, 2007                    By: /s/ GEORGE S. YOUNG
                                         George S. Young
                                         Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer and
                                         Principal Accounting Officer), President and Chairman of the Board

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Position | Date |
|---|---|---|
| /s/ GEORGE S. YOUNG<br>George S. Young | Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer), President and Chairman of the Board | April 20, 2007 |
| /s/ STEVEN L. PRINCE<br>Steven L. Prince | Director | April 20, 2007 |

49

Table of Contents

EX-31.1 2 ex31_1.htm EXHIBIT 31.1
Exhibit 31.1

FELLOWS ENERGY LTD.
OFFICER'S CERTIFICATE PURSUANT TO SECTION 302

I, George S. Young, certify that:

1. I have reviewed this annual report on Form 10-KSB of Fellows Energy Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) [Omitted pursuant to SEC Release No. 33-8238];

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5.  The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: April 20, 2007

/s/ GEORGE S. YOUNG
George S. Young
Chief Executive Officer

EX-31.2 3 ex31_2.htm EXHIBIT 31.2
Exhibit 31.2

## FELLOWS ENERGY LTD.
### OFFICER'S CERTIFICATE PURSUANT TO SECTION 302

I, George S. Young, certify that:

1. I have reviewed this annual report on Form 10-KSB of Fellows Energy Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) [Omitted pursuant to SEC Release No. 33-8238];

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: April 20, 2007

/s/ GEORGE S. YOUNG
George S. Young
Principal Financial  Officer

EX-32.1 4 ex32_1.htm EXHIBIT 32.1

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual report of Fellows Energy Ltd. (the "Company") on Form 10-KSB for the period ending December 31, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, George S. Young, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to Fellows Energy Ltd. and will be retained by Fellows Energy Ltd. and furnished to the Securities and Exchange Commission or its staff upon request.

Date:  April 20, 2007                    By: */s/ GEORGE S. YOUNG*
                                         George S. Young
                                         Chief Executive Officer

EX-32.2 5 ex32_2.htm EXHIBIT 32.2

Exhibit 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual report of Fellows Energy Ltd. (the "Company") on Form 10-KSB for the period ending December 31, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, George S. Young, Principal Financial Officer of the Company, certify, pursuant to 18 U.S.C. section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to Fellows Energy Ltd. and will be retained by Fellows Energy Ltd. and furnished to the Securities and Exchange Commission or its staff upon request.

Date:  April 20, 2007                    By: */s/ GEORGE S. YOUNG*
                                         George S. Young
                                         Principal Financial Officer

# EXHIBIT F

| Date | Open | High | Low | Close | Volume | Adj Close |
|------|------|------|-----|-------|--------|-----------|
| 6/18/2007 | 0.05 | 0.06 | 0.04 | 0.04 | 222000 | 0.04 |
| 6/11/2007 | 0.05 | 0.06 | 0.04 | 0.06 | 314000 | 0.06 |
| 6/4/2007 | 0.03 | 0.09 | 0.03 | 0.04 | 1264000 | 0.04 |
| 5/29/2007 | 0.02 | 0.03 | 0.02 | 0.02 | 241100 | 0.02 |
| 5/21/2007 | 0.03 | 0.03 | 0.02 | 0.03 | 327200 | 0.03 |
| 5/14/2007 | 0.03 | 0.03 | 0.02 | 0.02 | 380100 | 0.02 |
| 5/7/2007 | 0.03 | 0.04 | 0.03 | 0.03 | 344800 | 0.03 |
| 4/30/2007 | 0.03 | 0.04 | 0.03 | 0.03 | 622800 | 0.03 |
| 4/23/2007 | 0.03 | 0.04 | 0.02 | 0.03 | 542200 | 0.03 |
| 4/16/2007 | 0.04 | 0.04 | 0.03 | 0.04 | 454900 | 0.04 |
| 4/9/2007 | 0.04 | 0.04 | 0.04 | 0.04 | 326500 | 0.04 |
| 4/2/2007 | 0.04 | 0.04 | 0.04 | 0.04 | 311700 | 0.04 |
| 3/26/2007 | 0.04 | 0.05 | 0.03 | 0.04 | 1930000 | 0.04 |
| 3/19/2007 | 0.04 | 0.05 | 0.03 | 0.04 | 1468400 | 0.04 |
| 3/12/2007 | 0.07 | 0.07 | 0.03 | 0.05 | 1118900 | 0.05 |
| 3/5/2007 | 0.08 | 0.08 | 0.07 | 0.07 | 241600 | 0.07 |
| 2/26/2007 | 0.09 | 0.09 | 0.06 | 0.08 | 327400 | 0.08 |
| 2/20/2007 | 0.09 | 0.1 | 0.09 | 0.09 | 359200 | 0.09 |
| 2/12/2007 | 0.09 | 0.09 | 0.08 | 0.09 | 154300 | 0.09 |
| 2/5/2007 | 0.09 | 0.09 | 0.09 | 0.09 | 177200 | 0.09 |
| 1/29/2007 | 0.08 | 0.1 | 0.08 | 0.09 | 228700 | 0.09 |
| 1/22/2007 | 0.07 | 0.08 | 0.06 | 0.08 | 168900 | 0.08 |
| 1/16/2007 | 0.07 | 0.07 | 0.06 | 0.07 | 258900 | 0.07 |
| 1/8/2007 | 0.07 | 0.08 | 0.06 | 0.07 | 612700 | 0.07 |
| 1/3/2007 | 0.07 | 0.08 | 0.07 | 0.07 | 250100 | 0.07 |
| 12/26/2006 | 0.07 | 0.09 | 0.07 | 0.07 | 1090800 | 0.07 |
| 12/18/2006 | 0.08 | 0.08 | 0.07 | 0.07 | 927000 | 0.07 |
| 12/11/2006 | 0.1 | 0.11 | 0.08 | 0.08 | 290900 | 0.08 |
| 12/4/2006 | 0.1 | 0.12 | 0.09 | 0.1 | 322900 | 0.1 |
| 11/27/2006 | 0.08 | 0.13 | 0.07 | 0.1 | 805600 | 0.1 |
| 11/20/2006 | 0.09 | 0.1 | 0.07 | 0.08 | 810500 | 0.08 |
| 11/13/2006 | 0.11 | 0.12 | 0.08 | 0.09 | 702400 | 0.09 |
| 11/6/2006 | 0.12 | 0.12 | 0.1 | 0.11 | 579000 | 0.11 |
| 10/30/2006 | 0.14 | 0.15 | 0.11 | 0.12 | 591500 | 0.12 |
| 10/23/2006 | 0.17 | 0.19 | 0.14 | 0.15 | 366200 | 0.15 |
| 10/16/2006 | 0.14 | 0.17 | 0.13 | 0.17 | 261600 | 0.17 |
| 10/9/2006 | 0.14 | 0.16 | 0.14 | 0.14 | 185200 | 0.14 |
| 10/2/2006 | 0.16 | 0.16 | 0.13 | 0.14 | 243100 | 0.14 |
| 9/25/2006 | 0.16 | 0.16 | 0.14 | 0.16 | 185600 | 0.16 |
| 9/18/2006 | 0.17 | 0.17 | 0.16 | 0.17 | 108600 | 0.17 |
| 9/11/2006 | 0.17 | 0.19 | 0.16 | 0.17 | 275600 | 0.17 |
| 9/5/2006 | 0.15 | 0.2 | 0.15 | 0.18 | 653900 | 0.18 |
| 8/28/2006 | 0.19 | 0.19 | 0.15 | 0.15 | 701000 | 0.15 |
| 8/21/2006 | 0.21 | 0.22 | 0.18 | 0.18 | 317200 | 0.18 |
| 8/14/2006 | 0.19 | 0.22 | 0.18 | 0.22 | 406200 | 0.22 |
| 8/7/2006 | 0.22 | 0.22 | 0.18 | 0.19 | 462300 | 0.19 |
| 7/31/2006 | 0.25 | 0.25 | 0.19 | 0.21 | 572400 | 0.21 |
| 7/24/2006 | 0.31 | 0.32 | 0.2 | 0.25 | 618400 | 0.25 |
| 7/17/2006 | 0.38 | 0.38 | 0.29 | 0.32 | 322700 | 0.32 |
| 7/10/2006 | 0.29 | 0.4 | 0.29 | 0.36 | 372100 | 0.36 |
| 7/3/2006 | 0.38 | 0.43 | 0.29 | 0.3 | 392600 | 0.3 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/26/2006 | 0.27 | 0.44 | 0.26 | 0.39 | 1498800 | 0.39 |
| 6/19/2006 | 0.17 | 0.28 | 0.15 | 0.25 | 541500 | 0.25 |
| 6/12/2006 | 0.19 | 0.2 | 0.15 | 0.17 | 605100 | 0.17 |
| 6/5/2006 | 0.25 | 0.25 | 0.18 | 0.2 | 578500 | 0.2 |
| 5/30/2006 | 0.24 | 0.26 | 0.23 | 0.24 | 197300 | 0.24 |
| 5/22/2006 | 0.26 | 0.28 | 0.22 | 0.25 | 357800 | 0.25 |